# UNITED STATES DISTRICT COURT

### FOR THE

### DISTRICT OF MINNESOTA

**MICHAEL R. CAMPOLI**, an individual,
and
**LAUREN J. C. CAMPOLI**, an individual,

Case No. _____

Plaintiffs,

v.

(1) **ANYWHERE REAL ESTATE INC.**,
a New Jersey company,
(2) **ANYWHERE INTEGRATED
SERVICES LLC**, a New Jersey
Corporation,
(3) **BURNET REALTY LLC d/b/a
COLDWELL BANKER REALTY**, a
New Jersey corporation,
(4) **BURNET TITLE**, a Minnesota
corporation,
(5) **SANDY GLIEDEN**, an individual,
(6) **TITLENEXUS LLC**, a Minnesota
company,
(7) **BRIAN HOELSCHER**, an individual,
(8) **DEENA COLE**, an individual,
(9) **TRUSTFUNDS LLC**, a Minnesota
company,
(10) **LYNN LEEGARD**, an individual,
(11) **UBS FINANCIAL SERVICES INC.**,
a foreign bank,
(12) **UBS BANK USA**, a Utah corporation,
(13) **WHITNEY J. WARD**, an individual,

COMPLAINT FOR FRAUD,
RACKETEERING, FALSE
ADVERTISING, CIVIL
CONSPIRACY, TORTIOUS
INTERFERENCE, BREACH OF
CONTRACT,
UNJUST ENRICHMENT,
BREACH OF FIDUCIARY
DUTIES, SLANDER OF TITLE,
NEGLIGENCE, NEGLIGENCE
IN SUPERVISION,
NEGLIGENCE IN RETENTION,
ABUSE OF PROCESS

DEMAND FOR JURY TRIAL

(14) **UMB BANK N.A.,** a Missouri corporation,

(15) **TIMOTHY "TJ" MUNDY**, an individual,

(16) **MATTHEW S. BAKER**, an individual,

(17) **ANTHONY J. MAURER**, an individual,

(18) **THOMAS REHMAN**, an individual,

(19) **MARK D. GRIEGER**, an individual,

(20) **CHELSEY R. HAGEN–BYRD**, an individual,

(21) **ISAIAH M. BYRD**, an individual,

(22) **WEXFORD REAL ESTATE LLC**, a Minnesota company,

(23) **JOEL A. BURGER**, an individual,

(24) **FAIRWAYS AND GREENS, LLC**, a Minnesota company,

(25) **JESSE J. BULL**, an individual,

(26) **LEE A. BULL**, an individual,

(27) **RYAN J. TRUCKE,** an individual,

(28) **BRUTLAG, TRUCKE & DOHERTY, P.A.**, a Minnesota corporation,

(29) **MATTHEW SLONEKER,** an individual,

(30) **LIND, JENSEN, SULLIVAN, & PETERSON, P.A.**, a Minnesota corporation,

(31) **LEWIS J. ROTMAN**, aka LJ ROTMAN, an individual,

(32) **SACHIN J. DARJI**, an individual,

(33) **REGIONAL MULTIPLE LISTING SERVICE OF MINNESOTA, INC. d/b/a NORTHSTARMLS**, a Minnesota corporation, and

(34) **JOHN/JANE DOE(S)**,

Defendants.

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**..................................................................................................................... 1

**NATURE OF THE CASE**....................................................................................................... 2

**PARTIES**................................................................................................................................. 14

**JURISDICTION AND VENUE**............................................................................................ 21

**APPLICABLE LAW**.............................................................................................................. 23

**FACTUAL ALLEGATIONS**................................................................................................ 23

    CHAPTER 1: THE DEAL............................................................................................. 23

        I. Plaintiffs: Homeowner Sellers............................................................................. 23

        II. Coldwell Banker Realty Brokerage Agreement................................................... 24

        III. Fiduciary Duties................................................................................................. 25

        IV. The Park Place Listing....................................................................................... 26

        V. Listing Response.................................................................................................. 27

        VI. The Plaintiff's Accident..................................................................................... 28

        VII. Joel Burger....................................................................................................... 28

        VIII. Park Place......................................................................................................... 31

        IX. Coldwell Banker: Let's Hold the Deal.............................................................. 38

        X. Plaintiffs to Coldwell: Please Collect Earnest Money........................................ 43

        XI. TrustFunds: Exclusive NorthstarMLS Escrow Delivery Provider.................... 48

        XII. May 9, 2022: Continued Events....................................................................... 70

        XIII. May 9, 2022: 12:31 p.m. Burger's Wire Fraud.............................................. 72

        XIV. May 9, 2022: 12:51 p.m. Wire Fraud............................................................ 83

        XV. Byrd: "I Clean It Up".......................................................................................89

        XVI. Byrd's Wire Fraud: Notice Sent to Plaintiffs................................................. 90

        XVII. May 10, 2022: Bulls' Day Late and $100,000 Short Wire Fraud.......................... 91

        XVIII. May 11, 2022: The Inspection....................................................................... 96

        XIX. Well-Inspection Contingency.......................................................................... 99

        XX. May 13, 2022: Earnest Money Still Unpaid.................................................... 102

        XXI. Same-Day Radon Test Request....................................................................... 104

XXII. Plaintiffs Ask Grieger to Act in Their Best Interest...............................105
XXIII. May 13, 2022 - Deephaven Farmhouse Sale for $4.1 Million............................105
XXIV. May 13, 2022 - Only the $5 Convenience Fee Settles.........................................107
XXV. May 13, 2022: Planned Contingency Default..................................................108
XXVI. May 14, 2022: Plaintiffs' Cancellation Amidst Deception.................................109
XXVII. Bulls' Reply: Decline to Sign..........................................................110
XXVIII. Coldwell to Plaintiffs: We Refuse to Terminate the Listing Agreement..........111
XXIX. May 16, 2022: Burger's Fabricated "Earnest Money Payment History" Report.113
XXX. Plaintiffs to Coldwell: We Have Retained Counsel..............................................117
XXXI. May 16, 2022: Well-Water Contingency Default....................................................117

CHAPTER 2: THE FRAUD SCHEME.....................................................................120
XXXII. May 17, 2022: Burger to Coldwell: "I Need Clarity".....................................120
XXXIII. May 18, 2022: Coldwell and Wexford's Clandestine Meeting........................120
XXXIV. Coldwell:  Unable to Enforce the Well Contingency.......................................121
XXXV. Accord and Satisfaction.........................................................................123
XXXVI. Coldwell: No TrustFunds Notifications.................................................125
XXXVII. Wolf to Burger: "All I have is emails and texts from Mr. Grieger saying it
hadn't hit the account yet."...........................................................................125
XXXVIII. Coldwell to Wolf: Two $50K Earnest Money Deposits, and its Delayed......129
XXXIX. Burger's 31-Minute Wire Fraud...........................................................130
XL. Late Afternoon May 18, 2022: No Upload to Transaction Manager.....................134
XLI. May 20, 2022: Coldwell: Let's Upload a New Deal..............................................135
XLII. May 20, 2022: No Earnest Money.........................................................138
XLIII. Fairways and Greens LLC's $100,000 Payment to Bulls.....................................138
XLIV. May 20, 2022: Plaintiffs Forfeit Earnest Money................................................141
XLV. TitleNexus, LLC....................................................................................142
XLVI. June 2, 2022: The Wire Fraud Conspiracy......................................................153
XLVII. June 3, 2022: The Sham Closing...........................................................156
XLVIII. The Extortionate Conduct: June 2022 to Present.............................................164
XLIX. December 15, 2022 - February 2023: Bulls' Build Plans....................................176

CHAPTER 3: THE COVER-UP.............................................................................177
L. Plaintiffs' December Investigation: The Search for a Signed Cancellation................177
LI. Defendants Obtain Other Real Property Through Earnest Money Fraud Scheme.... 187
LII. February 22, 2023: Letter Notice of Failed Well-Contingency to Bulls...................192

LIII. Declaratory Cancellation........................................................................193
LIV. Coldwell Banker Served by Plaintiffs with Plaintiffs' § 559.217 Notice...............197
LV. Bulls' Sham Litigation............................................................................199
LVI. Plaintiffs' Declaratory Action...............................................................204

CHAPTER 4: DISCOVERY.............................................................................211
LVII. Plaintiffs' Discovery Efforts and Findings..........................................211

CHAPTER 5: PREDICATE ACTS OF RACKETEERING....................................237
LVIII. Hobbs Act, Interference with commerce by threats or violence (18 U.S.C. § 1951(b)(2)).........................................................................................237
LIX. Wire Fraud (18 U.S.C. § 1343)............................................................242
LXI.  Money Laundering  (18 U.S.C. § 1956 & 18 U.S.C. § 1957)...............................263

CHAPTER 6: DAMAGES................................................................................266
I. Compensatory Damages............................................................................266
II. Punitive Damages.....................................................................................268
III. Emotional Distress and Loss of Enjoyment of Life................................269

CAUSES OF ACTION.....................................................................................269
Introduction to Federal Racketeer Influenced and Corrupt Organizations (RICO)...............269
Racketeering and Conspiracy Allegations....................................................269
COUNT 1.......................................................................................................271
RICO Conspiracy - 18 U.S.C. § 1962(d).....................................................271
COUNT 2.......................................................................................................295
RICO - Violation of 18 U.S.C. § 1962(c)....................................................295
(Conduct of an Enterprise Through a Pattern of Racketeering Activity)......................295
COUNT 3.......................................................................................................301
Violation of 18 U.S.C. § 1962(a)................................................................301
(Investment of Racketeering Proceeds in the Enterprise)........................301
COUNT 4.......................................................................................................304
Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)..........................304
COUNT 5.......................................................................................................306
Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)..........................306
COUNT 6.......................................................................................................308
Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)..........................308
COUNT 7.......................................................................................................311

Civil Conspiracy.................................................................................................... 311
COUNT 8.............................................................................................................312
Fraud (Primary Individual Actors): Fake Earnest Money Payment............................ 312
COUNT 9.............................................................................................................315
Fraud (Well-Contingency Conspirators): Concealment of Well-Contingency Default... 315
COUNT 10............................................................................................................316
Fraud (Coldwell Defendants): Regarding the Earnest Money........................................316
COUNT 11............................................................................................................320
Fraud (Coldwell Defendants): Regarding the "Ghost Agreement"................................320
COUNTS 12 - 20...................................................................................................323
Fraud (Financial Defendants): Banking and Wire Fraud..............................................323
COUNT 21............................................................................................................326
Fraud (Wire Fraud Defendants): Regarding the Sham Closing.....................................326
COUNT 22............................................................................................................329
Fraud: Extortionate Demands................................................................................ 329
COUNTS 23 - 30.................................................................................................. 331
Fraud: Pre-Litigation and Litigation Fraud................................................................331
COUNT 31............................................................................................................336
Fraud: Litigation Fraud by Third-Party Coldwell.......................................................336
COUNT 32............................................................................................................339
Fraud: Material Misrepresentation by Burnet Title.....................................................339
COUNT 33............................................................................................................340
Fraud: Fraud by TrustFunds LLC............................................................................340
COUNT 34............................................................................................................343
Fraud: Material Misrepresentation by Anywhere RE and Anywhere Integrated............ 343
COUNT 35............................................................................................................344
Tortious Interference with Contract..........................................................................344
COUNT 36............................................................................................................346
Breach of Contract................................................................................................ 346
COUNT 37............................................................................................................347
Fraudulent Misrepresentation................................................................................. 347
COUNT 38............................................................................................................349
Unjust Enrichment (Unpaid Earnest Money)..............................................................349
COUNT 39............................................................................................................351
Unjust Enrichment (Coldwell's Accord and Satisfaction)............................................351
COUNT 40............................................................................................................352

Unjust Enrichment (Equitable Title)........................................................................352

COUNT 41............................................................................................................353

Slander of Title....................................................................................................353

COUNT 42............................................................................................................355

Breach of Fiduciary Duty of Accounting: Failure to Retain Earnest Money.................355

COUNT 43............................................................................................................359

Breach of Fiduciary Duty of Loyalty: Failure to Enforce Well-Contingency Default....359

COUNT 44............................................................................................................363

Breach of Fiduciary Duty: Failure to Disclose........................................................363

COUNT 45............................................................................................................368

Breach of Fiduciary Duty: Failure to Supervise and Correct Subsidiary Misconduct....368

COUNT 46............................................................................................................372

Breach of Fiduciary Duty: Failure to Act Honestly..................................................372

Joel Burger (23)...................................................................................................372

COUNT 47............................................................................................................375

Breach of Fiduciary Duty of Loyalty: Failure to Communicate.................................375

COUNT 48............................................................................................................379

Breach of Fiduciary Duties by Burnet Title and TitleNexus......................................379

COUNT 49............................................................................................................384

Negligence..........................................................................................................384

COUNT 50............................................................................................................385

Negligence..........................................................................................................385

COUNTS 51 - 55...................................................................................................388

Negligent Retention.............................................................................................388

COUNT 56............................................................................................................399

Negligent Supervision..........................................................................................399

COUNT 57............................................................................................................400

Abuse of Process.................................................................................................400

**PRAYER FOR RELIEF**..............................................................................................**404**

**CERTIFICATION**.......................................................................................................**408**

# INTRODUCTION

For years, the United States residential real estate industry has operated with minimal oversight.  Due to real estate brokers' exclusive Multiple Listing Service (MLS) market access coupled with broker-only right to commission, consumers have little choice but to engage brokers to buy or sell their property. In return for high and largely fixed commissions, brokers make the often hollow promise that they will act as their client's fiduciary.

In an action addressing modern-day racketeering in the real estate industry, homeowner Plaintiffs seek treble damages, and equitable and injunctive relief arising from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68, along with related claims arising from Defendant broker Coldwell Banker Realty's breach of its fundamental fiduciary duties: the collection and retention of earnest money.

Coldwell's most consequential failure opened the doors of criminal opportunity to Defendant buyers and their broker, associated third-party providers, complicit financiers, and individual Defendants to orchestrate a long-term earnest money scheme to defraud wherein Defendants Bull wielded equitable title to Plaintiffs' residence with no money down in a concerted effort to extort the Plaintiffs for profit for over two years.

This lawsuit represents more than a solitary battle against an errant broker and its isolated act of malfeasance. Rather, it is a necessary reckoning for the systemic ills and secretive routine practices that currently permit buyers in at least sixteen midwest states to convert equitable title to sellers' real property with no money down. Here, profit-driven brokers and individuals engaged in related and continuous crimes that, without legal oversight, flourish unchecked. Plaintiffs now pray for a new era of accountability, and justice for their damages.

Plaintiffs Michael and Lauren Campoli bring this Complaint against Defendants for violations of federal and state law, including civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968) (Federal RICO) and the Lanham Act (15 U.S.C. §§ 1051 et seq.). Plaintiffs also assert claims under Minnesota state law, including fraud, civil conspiracy to commit fraud, breach of contract, tortious interference with a contract, and breach of fiduciary duties, as well as related claims against Defendants: Anywhere Real Estate Inc. (Anywhere RE), Anywhere Integrated Services (Anywhere Integrated), Burnet Realty LLC d/b/a Coldwell Banker Realty (Coldwell), Burnet Title (Burnet Title), Sandy Glieden (Glieden), TitleNexus LLC (TitleNexus), Brian Hoelscher (Hoelscher), Deena Cole (Cole), TrustFunds LLC (TrustFunds), Lynn Leegard (Leegard), UBS Financial Services Inc.(UBS Financial), UBS Bank USA (UBS Bank), Whitney J. Ward (Ward), UMB Bank N.A. (UMB), T.J. Mundy (Mundy), Matthew S. Baker (Baker), Anthony J. Maurer (Maurer), Thomas Rehman (Rehman), Mark Grieger (Grieger), Chelsey R. Hagen-Byrd (Byrd), Isaiah M. Byrd (I. Byrd), Wexford Real Estate LLC (Wexford), Joel A. Burger (Burger), Fairways and Greens LLC (F & G, LLC), Jesse J. Bull (J. Bull), Lee A. Bull (L. Bull), Ryan J. Truck (Trucke), Brutlag, Trucke & Doherty, P.A., (Brutlag PA), Matthew Sloneker (Sloneker), Lind, Jensen, Sullivan & Peterson, P.A. (Lind Jensen PA), Lewis J. Rotman (Rotman), Sachin J. Darji (Darji), Regional Multiple Listing Service of Minnesota, Inc. (NorthstarMLS), and John/Jane Does, and alleges as follows:

## NATURE OF THE CASE

1.      This is an action exposing a wide-scale, and long-term pattern of orchestrated real estate fraud constituting racketeering and related wrongdoing. Defendants Jesse and Lee Bull, purported buyers of Plaintiffs' residence and their broker, Joel Burger, devised and implemented



an earnest money scheme to defraud Plaintiff homeowners for profit, and collaterally, the Internal Revenue Service (IRS).

2.      On March 3, 2022, Plaintiffs contracted with Coldwell Banker Realty via their neighbor and licensed real estate agent, Mark Grieger, to provide residential brokerage services to Plaintiffs for the sale of Plaintiffs' residence located in Deephaven, Minnesota.

3.      Grieger was unable or unwilling to fulfill the job responsibilities that Plaintiffs entrusted to Grieger. Grieger passed off the transactional work to his associates, Chelsey Byrd and Isaiah Byrd, licensed real estate agents working at the direction of, and compensated by, Grieger's company.

4.      Grieger over-priced the Plaintiffs' home at nearly $4,000,000 resulting in little interest and only one offer. The one offer came from Defendants J. Bull and L. Bull, who were represented by Joel Burger, broker at Wexford Real Estate LLC.

5.      Burger failed to disclose to Plaintiffs  his 30-year personal, and later, business relationship with the Bulls. Burger was then the co-manager of Bulls' shell company, Fairways and Greens, LLC, (F & G, LLC),  the entity that was slated to take title to the Plaintiffs' residence.

6.      To induce the sale, Defendants Bull wrote an all cash offer for three-million and three-hundred thousand dollars ($3,300,000) with no real intention to pay cash or to purchase the residence. The purchase agreement, contingent upon a 10-day property Inspection and separate Well-Water Inspection, also required that Defendants Bull make an earnest money payment of $100,000 to Coldwell Banker Realty within two business days of the final acceptance date of May 6, 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

3

7.     Unbeknownst to Plaintiffs, and undisclosed by Grieger and Byrd – and later actively concealed by Anywhere Real Estate, Anywhere Integrated, Coldwell, Maurer, Wexford Realty, F & G, LLC, TrustFunds, TitleNexus, UBS Financial, UBS Bank, UMB, and Burger – Defendants Bull failed and refused to deposit Bulls' $100,000 earnest money payment with Coldwell Banker Realty, the designated earnest money holder, as required by the May 6, 2022 Park Place purchase agreement.

8.     Moreover, Grieger and Byrd failed to upload the fully executed Park Place purchase agreement within 48 hours of its full execution to Coldwell's Transaction Manager, so that even if Bulls had made the earnest money payment online using NorthstarMLS escrow delivery service TrustFunds, Coldwell could not retain it.

9.     With no earnest money down, and Coldwell Banker Realty holding the deal to prevent any deposit to Coldwell's trust account, the contingencies of the purchase agreement were of little import to Defendants Bull and their broker Joel Burger.

10.     Defendants Bull did not perform a well-water test within ten calendar days from the final acceptance date of May 6, 2022. The well-water contingency expressly permitted the Plaintiffs to declare the purchase agreement canceled if the party responsible for the test - in this case Defendants Bull - failed to obtain the test and provide the results to Plaintiffs or provide a signed written waiver of the well-water contingency within the ten-day contingency period. Defendants Bull did neither.

11.     On May 14, 2022, Plaintiffs assessed that L. Campoli's medical condition was too uncertain to proceed with the sale of the residence without risk to her health or the life of her unborn child. Still with no contractual assurance from Grieger, Byrd or I. Byrd that Bulls'



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

4

$100,000 earnest money deposit settled at Coldwell Banker Realty on May 14, 2022, Plaintiffs sought to cancel.

12.    Grieger and Byrd failed and refused to disclose to Plaintiffs that Defendants Bull had not deposited $100,000 with Coldwell Banker Realty within two business days of May 6, 2022 because Bulls failed and refused to make the deposit and Grieger and Byrd held the deal to prevent any earnest money settlement in Coldwell's trust account.

13.    Grieger, motivated by self-interest and intent on securing his $75,900 commission at the expense of his own neighbors, failed to obtain a signed cancellation of purchase agreement as required by Defendants Bull's failure to submit, and Grieger's and Coldwell's failure to retain, the $100,000 earnest money payment.

14.    Instead, Grieger and Byrd concealed their unlawful hold of the fully executed May 6, 2022 Park Place purchase agreement. Grieger and Byrd did not disclose to Plaintiffs that their purposeful failure to act prevented the settlement of earnest money in Coldwell's trust and as a result Bulls had no earnest money on deposit with Coldwell.

15.    The Park Place well-contingency expired at midnight on May 16, 2022, and Bulls failed to perform the well-test or waive the contingency, in writing, and signed by Bulls. But, despite Bulls' second contractual default, Coldwell still failed and refused to obtain a signed cancellation of the Park Place purchase agreement from Bulls.  Since Coldwell failed to retain Bulls' $100,000 earnest money deposit, Coldwell had no means to enforce the well-contingency default against them.

16.    Defendants Bull, now incentivized by the prospect of a financial windfall arising from Coldwell's non-disclosure of Bulls' contractual defaults - including Bulls' failure to remit the $100,000 earnest money and failure to waive the well-contingency in writing - refused to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

sign Plaintiffs' cancellation for over two years. Instead, Bulls unlawfully leveraged the equitable title to Plaintiffs' residence - inducing Plaintiffs by means of fear of serious economic and legal consequences -  to offer $25,000, in an effort to clear title.

17.     The Defendants Bull, now driven by greed of the criminal type, exploited the unlawfully obtained equitable title as leverage to demand a ransom fee, admitting at deposition: "Q: Oh, you felt that you wanted more than $25,000 to put your signature on an agreement that you breached? J. Bull: I did."

18.     To that end, Bulls' attorney, and fellow Golden Valley Country Club member, L.J. Rotman orchestrated a scheme that included actively concealing Bulls' contractual earnest money and well-contingency defaults. Leveraging Rotman's clout, Rotman demanded $330,000 from Plaintiffs in exchange for a signed cancellation; setting in motion Bulls' self-described "long-game," the operation of the Bull Enterprise through a pattern of racketeering activity, including extortion.

19.      Shortly thereafter, Bulls enlisted another willing operator and manager, Ryan J. Trucke of Brutlag P.A. to further the scheme to defraud. Trucke materially misrepresented that Bulls fulfilled all the contingencies of the agreement. Trucke escalated the scheme by threatening a forced judicial sale of Plaintiffs' home unless Plaintiffs complied with Bulls' monetary demands, then at $275,000. At the time, Defendants Bull were aware that Plaintiff L. Campoli was suffering from the long-term effects of a car accident while eight and a half months pregnant and, with other small children in her care, was particularly vulnerable to the fraudulent scheme.

20.     On  April 1, 2023, nearly one year later, in what Plaintiffs believed would end Defendants Bulls' onslaught of litigation threats and extortionist demands, then at $225,000, Plaintiffs served Bulls with a Notice of Declaratory Cancellation pursuant to Minn. Stat. §



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

6

559.217, subd. 4, without right to cure, upon Defendants Bull and Coldwell citing the previously undisclosed failed well-contingency, which by its terms, canceled the agreement. But, to no avail.

21.    Still without knowledge of Bulls' earnest money scheme to defraud, Plaintiffs state court Declaratory action was based solely on the well-inspection contingency default by Defendants Bull which, by the contingency's terms, canceled the agreement. (*See*, 27-CV-23-6625). Yet, Plaintiffs' state court action was limited in scope by the default provisions of the purchase agreement and Minn. Stat. § 559.217 to liquidated damages of $100,000; the amount of the earnest money that was to be deposited with Coldwell by Defendants Bull within two business days of May 6, 2022.

22.    As Plaintiffs underwent discovery in the Declaratory action, Plaintiffs began to uncover Bulls' earnest money scheme to defraud that began on or around May 6, 2022 when Burger and Bulls agreed and conspired to fake Bulls' $100,000 earnest money payment "using" TrustFunds. Burger forged TrustFunds email notifications and J. Bull earmarked funds in Bulls' UBS Financial Resource Management Account to create the appearance that J. Bull made the $100,000 deposit to Coldwell, when he did not.

23.    Grieger and Byrd knowingly participated in the fraudulent scheme when Grieger and/or Byrd received the forged TrustFunds email notification from Burger on May 9, 2022 and then "clean[ed] it [the email] up," by deleting the email header information from Burger that would have revealed to Plaintiffs that the email notice was not from TrustFunds and was forged.

24.    Coldwell, Maurer, Rehman, Baker, Grieger, and Byrd, concealed Defendants Bulls', Burger's, Grieger's, and Byrd's earnest money fraud as well as Bulls' well-contingency default from Plaintiffs because disclosing buyer defaults was not in Coldwell's best financial



interest and Coldwell was unable to enforce the well-contingency against Bulls without Bulls'
$100,000 earnest money on deposit anyway.

25.     To conceal Grieger and Byrd's complicity in Burger and Bulls' TrustFunds fraud,
and their secretive routine practice of holding deals to prevent earnest money settlement on
behalf of sellers, Coldwell agreed and conspired with Bulls and/or Burger to remit $100,000 of
Coldwell's funds "for Jesse Bull" as a substitute for the $100,000 Coldwell failed to retain from
Jesse Bull.

26.     Coldwell then forged a Park Place purchase agreement for a non-existent property
address at "20 507 Park Place" by misappropriating Plaintiffs signature pages from the canceled
20570 Park Place Agreement and representing it as authentic and enforceable.  But even
Coldwell's $100,000 on deposit "for Jesse Bull" was insufficient to induce Bulls to sign
Plaintiffs' May 14, 2022 cancellation.  Instead, Burger and Bulls, conspired to pursue Bulls'
"long game" that included leveraging the fraudulently obtained equitable title to Plaintiffs'
residence while acquiring $100,000 from Coldwell to insure Bulls' silence.

27.     To "set up the sellers," Defendants Bull and Burger, acting at the direction and
control of Rotman, orchestrated a sham closing via wire-fraud involving J.Bull's employer, UBS
Financial, and mortgage broker, UBS Bank.

28.     J. Bull agreed and conspired with Defendants Burger, Wexford Realty, UBS
Financial Services, and TitleNexus, to send UBS line of credit funds in the amount of
$3,300,000, inclusive of Bulls' $100,000 unpaid earnest money, to J. Bull at a Crown Bank
account maintained by TitleNexus and then back to UBS. This circular transfer created the
appearance that Defendants Bull could perform on their $3,300,000 all-cash offer, even though
Defendants Bull were unwilling or unable to do so.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

8

29.     The wire fraud conspiracy, defined with particularity in an email dated June 2, 2022, from Joel Burger to Whitney Ward at UBS Financial, Jesse Bull, and Deena Cole at TitleNexus, states that the "closing will not occur."  UBS will wire $3,300,000 to TitleNexus on June 3, 2022 and, "Once we have evidence that wire is at TitleNexus, we are going to send that [$3,300,000] right back to UBS."  On June 3, 2022, TitleNexus did just that; and wired the $3,300,000 back to UBS Bank hours later on the same day.

30.      Upon Defendants Bulls' demand, Deena Cole, operating within the scope of her employment at TitleNexus created the "evidence" Burger and Bulls sought: a fictitious single-balance ledger for Defendant Bulls' use to set up the sellers/Plaintiffs, reflecting that Jesse Bull "deposited" $3,300,000 with TitleNexus and these funds, including the $100,000 earnest money, remained at TitleNexus LLC, when the closing did not occur.

31.     Coldwell, TitleNexus, Burnet Title, UBS Bank, and UBS Financial along with their respective agents and leadership, were all aware that Defendants Bull failed to successfully deposit the $100,000 earnest money with Coldwell as required by the Park Place purchase agreement; setting the stage for the sham closing at TitleNexus wherein Bull directed UBS Financial to wire $3,300,000 - inclusive of the unpaid $100,000 earnest money - to himself as the beneficiary at a Crown Bank account maintained by TitleNexus.

32.     With the exception of NorthstarMLS, all Defendants knew that Bulls had no earnest money down. The Coldwell and TrustFunds-affiliated Defendants knew that Bulls and Burger had faked the TrustFunds payment. Despite this knowledge, each culpable actor remained silent and complicit, actively managing the Bull Enterprise with the common goal of profiting while concealing their unlawful acts and legal liabilities.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

9

33.     Defendants knew that disclosing Bulls' failure to deposit the $100,000 earnest money with Coldwell would reveal their identity and role in the Bull Enterprise's earnest money scheme to defraud. Moreover, it would also expose Defendants' significant liability for facilitating the fraudulent conversion of equitable title to Plaintiffs' property, even while Coldwell was obligated to act as Plaintiffs' fiduciary.

34.     Defendants Bull knew that if they disclosed their failure to deposit earnest money with Coldwell on or before May 10, 2022, Defendants Bull could not explain the $100,000 payment Coldwell remitted to Bulls. Defendants Bull could not lay claim to the $100,000 earnest money that remained in Bulls' possession. Defendants Bull could not lay claim to Coldwell's $100,000 on deposit with Hennepin County District Court, and Defendants Bull could not maintain their unspecified damages claim against Plaintiffs in state court.

35.     Nonetheless, as arranged and agreed upon by Defendants Bull and Burger, and at the advice and assistance of Defendant Brutlag P.A., Defendants Bull served upon the Plaintiffs, a sham Notice of Declaratory Cancellation, pursuant to Minn. Stat. § 559.217, on April 17, 2023. Defendant Burtlag P.A. drafted the Notice and identified TitleNexus as the earnest money holder.

36.     To perpetuate the scheme and the appearance of having made an earnest money payment to Coldwell, Brutlag P.A. also commenced a frivolous suit against Coldwell on or around April 26, 2023, in which it asserted, in keeping with the fictitious single balance ledger produced by TitleNexus, that, "the title company [TitleNexus], retained and continues to retain [Bulls'] earnest money."  Without financial motivation to disclose the cancellation likely signed by Bulls, and emboldened by the fraudulent actions of Grieger, Byrd, Coldwell and TrustFunds, Defendants Bull engaged Ryan J. Trucke of Brutlag P.A. to file a lawsuit against Plaintiffs for unspecified damages.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

37.     Coldwell answered Bulls' frivolous unfiled suit on or around May 12, 2023. In Coldwell's Answer, Coldwell did not admit that Bulls' made a deposit to Coldwell because Defendants Bull did not make a deposit to Coldwell pursuant to the purchase agreement requiring deposit to Coldwell's trust account within two business days of May 6, 2022.

38.     In the meantime, Bulls filed sham counterclaims against Plaintiffs in the Declaratory action pursuant to Minn. Stat. § 559.217.  Third-party culpable managers and operators of the Bull Enterprise, now Defendants in this action, conspired to obstruct Plaintiffs' discovery of the fraudulent earnest money scheme. To impede Plaintiffs' efforts, these Defendants refused to disclose critical evidence, litigated against Plaintiffs' subpoenas, and imposed exorbitant discovery fees upon Plaintiffs, to discourage discovery and conceal their unlawful and fraudulent acts.

39.     To perpetuate the fraud, Defendants Bull failed to comply with Rule 26 of the Minnesota Rules of Civil Procedure. Defendants Bull failed to produce any authentic evidence in the form of receipts, bank records, transaction history, or TrustFunds email notifications for their alleged $100,000 earnest money payment to Coldwell on May 9, 2022. Bulls failed to provide transaction records from their UMB checking account ending in -4774, from which Defendants Bull alleged under oath that an earnest money payment was made to Coldwell on May 9, 2022, via TrustFunds.

40.     Instead, Defendant Burger proffered additional forged TrustFund notices from several of Burger's dozen email addresses to Plaintiffs, to convince Plaintiffs, and their counsel, of the Bulls' non-existent earnest money payment. Defendants Bull then signed identical Interrogatory replies drafted by Trucke swearing and affirming that Coldwell possessed the earnest money, "upon information and belief" and, because Coldwell said so.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

11

41. Defendants Bull further failed and refused to produce any communications, documents, pleading, and/or discovery related to their unfiled suit against Coldwell wherein Coldwell affirmatively alleged "accord and satisfaction" with Defendants Bull. Defendant Trucke then materially misrepresented that Brutlag P.A. did not commence a suit against Coldwell on Bulls' behalf, and therefore had no information to disclose to Plaintiffs about it. Later confronted with a copy of the suit, Trucke claimed he "forgot" it.

42. TrustFunds' role in the earnest money scheme extended into the state court Declaratory action as well. In an effort to obscure TrustFunds' early involvement with Burger's fraud, and lack of any authentic TrustFunds records for Park Place, TrustFunds produced several falsified and forged email notifications in response to Plaintiffs' September 2023 subpoena duces tecum. Specifically, TrustFunds fabricated a series of email notifications and an Earnest Money Payment History purporting to document Bulls' non-existent $100,000 TrustFunds transaction on May 9, 2022. TrustFunds' forgeries were deliberately crafted to conceal both the conspiracy and TrustFunds' overt acts in furtherance of it.

43. To perpetuate the earnest money scheme to defraud without exposing it, Coldwell moved to quash its corporate deposition on the eve of the proceeding. Instead, Coldwell's Vice President of Sales, Tom Rehman, submitted an affidavit to the Court regarding Coldwell's fraudulent "20 507 Park Place" look-alike purchase agreement, designed to obscure the fact that Coldwell failed to collect Bulls' earnest money for the genuine 20570 Park Place Purchase Agreement. Through its attorney, Matthew Sloneker, Coldwell falsely and fraudulently represented via Zoom that Jesse Bull had remitted earnest money to Coldwell using TrustFunds at an undisclosed time. On September 13, 2024, Coldwell deposited $100,000 of its own funds into Hennepin County Court escrow, creating the false appearance that Coldwell was merely a



disinterested third party who retained Bulls' earnest money for the 20570 Park Place deal since May 9, 2022. To further the deception, Coldwell attributed its deposit of "earnest money" to Coldwell's fabricated "20 507 Park Place" purchase agreement, the only exhibit Coldwell attached to Rehman's affidavit.

44.    As a result of Defendants' unlawful conduct, Plaintiffs have spent hundreds of hours and over $100,000 on outside legal counsel, litigation fees, and other costs, defending against Bulls' long-term fraud and frivolous damages claim in state court in an effort to clear title to their property. Defendants Bull continue to wield equitable title to Plaintiffs' real property while perpetuating their sham lawsuit against Plaintiffs for damages and for "return" of the earnest money. Defendants Bull have conducted no timely discovery, withheld their bank records, and furthered the fraudulent scheme to cloud title to Plaintiffs' residence, all with the objective of additional financial gain.

45.    By means of this lawsuit, Plaintiffs seek to hold all Defendants jointly and severally liable for: (i) treble damages incurred by Plaintiffs as a result of Defendants' pattern of racketeering activity in violation of Federal RICO statutes, including attorneys' fees and costs exceeding $100,000 in an effort to clear title; (ii) attorneys' fees and costs incurred in bringing this lawsuit; and (iii) punitive damages in the amount of seventy-five million dollars ($75,000,000), or an amount to be determined by a jury, to address Defendants' illegal and prolonged fraud, punish their deliberate and egregious misconduct, and deter similar wrongdoing in the future.

46.    Some discovery has already occurred in the Declaratory state court action, which was premised on Plaintiffs' enforcement of Bulls' undisclosed well-contingency default. However, discovery related to the Bull Enterprise's earnest money fraud scheme—comprising a



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

13

pattern of related and continuous predicate acts of extortion, wire fraud, and money laundering

under RICO—remains incomplete. A *Motion for Sanctions* regarding Defendants' repeated

failure to disclose their UMB bank -4774 account records and other critical evidence is currently

under advisement. When discovery proceeds in this case—or if this Court allows the use of

discovery obtained in the underlying matter—additional co-conspirators may be named as

defendants, including attorneys, corporate executives, or others who purposefully concealed

relevant documents or otherwise participated in the Bull Enterprise's scheme to defraud

Plaintiffs.

## **PARTIES**

47.     Plaintiffs **Michael R. Campoli** and **Lauren J. C. Campoli** (Plaintiffs) are

married individuals residing at 20570 Park Place, Deephaven, Minnesota 55331, in Hennepin

County, Minnesota. At all times relevant to this action, Plaintiffs jointly owned the real property

located at 20570 Park Place (Park Place).

48.     Defendant **Anywhere Real Estate Inc**. (Anywhere RE) (1) is a corporation

organized under the laws of the State of New Jersey, with its principal place of business located

at 175 Park Avenue, Madison, New Jersey 07940. Defendant Anywhere RE is the parent

company of Burnet Realty d/b/a Coldwell Banker Realty.

49.     Defendant **Anywhere Integrated Services** (Anywhere Integrated) (2) is a

corporation organized under the laws of the State of New Jersey, with its principal place of

business located at 1000 Bishops Gate, Suite 100, Mount Laurel Township, New Jersey 08054.

Defendant Anywhere Integrated is a subsidiary of Anywhere RE. Anywhere Integrated owns and

operates Burnet Title.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

50.     Defendant **Burnet Realty LLC d/b/a Coldwell Banker Realty** (Coldwell) (3) is a real estate company organized under the laws of the State of New Jersey, with its principal place of business located at 175 Park Avenue, Madison, New Jersey 07940. Coldwell Banker Realty operates as a subsidiary of Anywhere RE.

51.     Defendant **Burnet Title** (4) is a real estate corporation organized under the laws of the State of Minnesota, with its principal place of business located at 5151 Edina Industrial Boulevard, Suite 500, Edina, Minnesota 55439-3022. Burnet Title is a subsidiary of Anywhere Integrated.

52.     Defendant **Sandy Glieden (Glieden)** (5) is a Closing Account Executive with Burnet Title, working primarily at the office located at 7550 France Avenue South, Suite 300, Edina, Minnesota 55435.

53.     Defendant **TitleNexus LLC (TitleNexus)** (6) is a limited liability company organized under the laws of the State of Minnesota, with its principal place of business at 13100 Wayzata Blvd #100, Minnetonka, MN 55305. TitleNexus has offices located in Minneapolis, Minnetonka, Coon Rapids and Maple Grove.

54.     Defendant **Brian Hoelscher (Hoelscher)** (7) is an attorney-owner and manager of TitleNexus LLC, with a principal executive office address of 13100 Wayzata Blvd. Suite 100, Minnetonka, MN 55305.

55.     Defendant **Deena Cole (Cole)** (8) is a part-owner of TitleNexus, LLC, and the manager of the TitleNexus office located at 500 Washington Avenue South, Suite 1035, Minneapolis, Minnesota 55415. Upon information and belief, Cole resides at 17519 Freeport Way, Farmington, Minnesota 55024 or at another address in Minnesota.



56.     Defendant **TrustFunds LLC (TrustFunds)** (9) is a limited liability company organized and existing under the laws of the State of Minnesota, with its principal place of business located at 614 88th Avenue Northeast, Blaine, Minnesota 55434. TrustFunds LLC is the only online escrow delivery service endorsed by, and integrated into, the NorthstarMLS.

57.     Defendant **Lynn Leegard (Leegard)** (10) is the President, manager and registered agent of TrustFunds, LLC. Upon information and belief, Leegard resides at 614 88th Avenue Northeast, Blaine, Minnesota 55434, TrustFunds' principal place of business.

58.     Defendant **UBS Financial Services Inc. (UBS Financial)** (11) is a foreign business corporation organized under the laws of Delaware, with its principal place of business located at 1200 Harbor Boulevard, Weehawken, NJ 07086. UBS Financial is registered to do business in the State of Minnesota as a foreign corporation under Minn. Stat. § 303, with its registered office located at 2780 Snelling Avenue N., Suite 101, Roseville, MN 55113. UBS Financial employs Defendant J. Bull as a financial advisor and manager of The Bull-Wiebler Group at UBS Financial.

59.     Defendant **UBS Bank USA (UBS Bank)** (12) is a business corporation organized under the laws of the State of Utah, with its principal place of business at 95 State Street, Suite 2200, Salt Lake City, Utah 84111. UBS Bank underwrote Defendant J. Bull's mortgage for Park Place and issued a Final Loan Commitment Letter despite deficiencies in Bull's mortgage application. UBS Bank subsequently underwrote a mortgage for another property located at Crosby Cove Road while Defendant Bull remained under contract to purchase Park Place as a cash transaction.

60.     Defendant **Whitney J. Ward (Ward)** (13) was a senior wealth strategy associate with The Bull-Wiebler Financial Group in and around the time Ward participated in the incidents



that gave rise to this complaint. The Bull-Weibler Financial Group is a private wealth management team within UBS Financial Services' exclusive private wealth management division. As of March 14, 2024 Ward held the position of client relationship manager with The Bull-Wiebler Financial Group and worked from UBS Financial's office located at 681 East Lake Street, Wayzata, Minnesota 55391.

61.     Defendant **UMB Bank N.A. (UMB)** (14) is a national banking association chartered under the laws of the United States, with its principal place of business located at 1010 Grand Boulevard, Kansas City, Missouri 64106.

62.     Defendant **Timothy "T.J." Mundy (Mundy)** (15) is a loan originator employed by UBS Bank USA. Upon information and belief, Mundy resides in the state of Florida and works at UBS Bank USA's office located at 5555 Gate Parkway, Suite 240, Jacksonville, Florida 32256.

63.     Defendant **Matthew S. Baker (Baker)** (16) is an independent sales associate whose real estate license is currently held by Coldwell Banker Realty. Upon information and belief, Baker resides in the State of Minnesota or Wisconsin and works at Coldwell's office located at 3033 Excelsior Boulevard, Suite 100, Minneapolis, Minnesota 55416. In 2022 and into 2023, Baker was the President of Coldwell Banker Realty, MN-Western Wisconsin.

64.     Defendant **Anthony J. Maurer (Maurer)** (17) is the Branch Vice President and Global Luxury Ambassador for Coldwell Banker Realty at the Wayzata branch, located at 235 Lake Street, Unit 100, Wayzata, Minnesota 55391. Maurer resides in Apple Valley, Minnesota. In 2022, Maurer served as the broker supervising Grieger and Byrd when Park Place was listed with Coldwell Banker Realty.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

65.     Defendant **Thomas Rehman (Rehman)** (18) is Vice President of Sales Administration for Coldwell Banker Realty. Rehman resides at 130 Birch Bluff Road, Excelsior, Minnesota 55331, and oversees Coldwell's trust accounts. Rehman works from Coldwell's office located at 7550 France Avenue, Edina, Minnesota 55435.

66.     Defendant **Mark Grieger (Grieger)** (19) is an independent sales associate whose real estate license is currently held by Coldwell Banker Realty. Mark Grieger resides at 20345 Park Place, Deephaven, Minnesota 55331. In March 2022, Grieger contracted on behalf of Coldwell Banker Realty with Plaintiff homeowners for an exclusive right to sell Plaintiffs' residence at Park Place.

67.     Defendant **Chelsey R. Hagen-Byrd (Byrd)** (20) is an independent sales associate whose real estate license is held by Coldwell Banker Realty. Byrd resides at 11570 Laketowne View, Albertville, Minnesota 55301. C. Byrd is employed by Defendant Grieger's company and serves as Grieger's real estate transaction coordinator on his team.

68.     Defendant **Isaiah M. Byrd (I. Byrd)** (21) is an independent sales associate whose real estate license is held by Coldwell Banker Realty. I. Byrd resides at 11570 Laketowne View, Albertville, Minnesota 55301. I. Byrd joined Grieger's team on or around April 25, 2022 and held open houses for Plaintiffs' property.

69.     Defendant **Wexford Real Estate LLC (Wexford)** (22) is a limited liability company organized and existing under the laws of the State of Minnesota, with its principal place of business at 6600 France Avenue South, Suite 490, Edina, Minnesota 55435. Wexford Realty is a real-estate brokerage owned and operated by Defendant Joel Burger.

70.     Defendant **Joel A. Burger, also known as "J.B. 2" (Burger)** (23) is an individual that resides at 13872 Granada Way, Apple Valley, Minnesota 55124. Burger has a thirty year



friendship with Defendants Bulls and, at all relevant times, acted as their real estate broker and co-manager of Fairways and Greens, LLC.

71.     Defendant **Fairways and Greens LLC (F & G, LLC)** (24) a limited liability company organized under the laws of the State of Minnesota, with its principal place of business at 6600 France Avenue South, Suite 490, Edina, Minnesota 55435. F & G, LLC is a shell company co-owned by J. Bull and L. Bull; In 2022, Joel Burger served as F&G, LLC's co-manager alongside  J. Bull.

72.     Defendant **Jesse J. Bull, also known as "J.B. 1", (J. Bull)** (25) resides at 16175 Crosby Cove Road, Wayzata, Minnesota 55391. J. Bull is a manager of The Bull-Wiebler Financial Group, a financial services team operating within UBS Financial.  J. Bull provides financial services to, among others, mutual clients of Defendant Joel Burger.

73.     Defendant **Lee A. Bull (L. Bull)** (26) resides at 16175 Crosby Cove Road, Wayzata, Minnesota 55391. L. Bull is married to Defendant Jesse J. Bull (J. Bull) and knowingly participated in the fraudulent schemes alleged herein. Upon information and belief, L. Bull co-owned and actively managed F & G, LLC's property acquisitions alongside J. Bull, facilitating the unlawful actions that gave rise to this complaint.

74.     Defendant **Ryan J. Trucke (Trucke)** (27) resides at 241 Verbena Drive, Watertown, Minnesota 55388. Trucke is, and at all relevant times was, the lead attorney for Defendants J. Bull and L. Bull. Since at least September 2022, Trucke has acted on Bulls' behalf and, in so doing, has exceeded the scope of providing routine legal services by employing the judicial process to further the fraudulent schemes alleged herein.

75.     Defendant **Brutlag, Trucke & Doherty, P.A. (Brutlag PA)** (28) is a professional association organized under the laws of the State of Minnesota, with its principal place of


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

business located at 3555 Plymouth Boulevard, Plymouth, Minnesota 55447. Ryan J. Trucke, Esq., serves as its Chief Executive Officer.

76.     Defendant **Matthew Sloneker (Sloneker)** (29), along with Anywhere RE's in-house counsel, James French, serves as the lead attorney for Coldwell Banker Realty. Sloneker conducts business from the offices of Lind Jensen, P.A., located at 1900 AT&T Tower, 901 Marquette Avenue South, Minneapolis, Minnesota 55402. Since at least February 2023, Sloneker has acted on Coldwell's behalf, and in so doing, has exceeded the scope of providing routine legal services by employing the judicial process to further the fraudulent schemes alleged herein.

77.     Defendant **Lind Jensen Sullivan & Peterson, P.A. (Lind Jensen PA)** (30) is a professional association organized under the laws of the State of Minnesota, with its principal place of business located at 1900 AT&T Tower, 901 Marquette Avenue South, Minneapolis, Minnesota 55402. Matthew Sloneker, Esq., is a shareholder at Lind Jensen PA. The firm provided legal representation to Defendants Mark Grieger (Grieger) and Chelsey R. Hagen-Byrd (Byrd) in connection with the state court case, despite the fact that Coldwell was not a party to the case and neither Grieger nor Byrd were employees of Coldwell.

78.     Defendant **Lewis J. Rotman, aka L.J. Rotman, (Rotman)** (31) resides at 219 Ardmore Drive, Golden Valley, Minnesota 55422. Rotman served as the lead attorney for J. Bull and L. Bull during and around May 2022, until Defendant Ryan J. Trucke assumed that role.

79.     Defendant **Sachin J. Darji (Darji)** (32) resides at 9119 Gateway Lane, Eden Prairie, Minnesota 55347-5534. Darji is an organizer and, upon information and belief, an active participant in the operations of Fairways and Greens LLC.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

80.    Defendant **Regional Multiple Listing Service of Minnesota, Inc. d/b/a NorthstarMLS**, **(NorthstarMLS)** (33) is a corporation formed under the laws of Minnesota with its principal place of business at 11100 Bren Road West, Suite 2, Minnetonka, Minnesota 55343. NorthstarMLS permitted the integration of TrustFunds on its property listings, allowing the merchant-based service to operate without adequate oversight or safeguards, thereby facilitating the fraudulent schemes alleged herein.

81.    Defendants **John and Jane Does** (34-44) are individuals or entities whose identities are currently unknown but who, upon information and belief, participated in or facilitated the unlawful acts and schemes alleged in this Complaint.  Plaintiffs will amend this Complaint to include the true names and capacities of these defendants when they are ascertained.

## JURISDICTION AND VENUE

82.    This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., and other federal laws.

83.    This Court has original subject-matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 because this action arises under the Federal Lanham Act, 15 U.S.C. §§ 1051 et seq.

84.    Plaintiffs federal and Minnesota state law claims are so interrelated that they share a common nucleus of operative fact. Under Article III of the United States Constitution, the Court has jurisdiction over Plaintiffs federal and state claims that arise out of the same nucleus of facts, pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

85.    Pursuant to Minn. Stat. § 543.19, this Court has personal jurisdiction over each



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

21

Defendant because each Defendant operates, conducts, engages in, or carries on a business within the State of Minnesota, maintains an office in the State of Minnesota, or has committed tortious acts within the State of Minnesota.

86.     This Court further has personal jurisdiction over Defendants Anywhere RE, Anywhere Integrated, Coldwell, Burnet Title, UBS Financial, UBS Bank, and UMB because they all have sufficient contacts with Minnesota, have conducted business in Minnesota and committed a tort in Minnesota.  These Defendants have at all times, purposefully directed activities at residents of Minnesota and have availed themselves of the benefits and protections of the State of Minnesota such that exercising jurisdiction would be reasonable and just.

87.     In the alternative, pursuant to 18 U.S.C. § 1965(a), this Court has personal jurisdiction over each Defendant because each Defendant resides, is found, has an agent, or transacts his/her affairs in this district.

88.     To the extent any defendant is found not to be subject to this Court's personal jurisdiction pursuant to Minn. Stat. § 543.19 and/or 18 U.S.C. § 1965(a), this Court may exercise personal jurisdiction over such defendant(s) pursuant to 18 U.S.C. § 1965 (b) because the ends of justice require that the Court exercise personal jurisdiction over any defendant who claims not to have sufficient minimum contacts with the forum.  Defendants have engaged in a multi-district conspiracy to defraud the Plaintiffs over two-years and there is no other district that may exercise personal jurisdiction over all Defendants.

89.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(2) where  a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district and where the real property that is the subject of the action is located in Hennepin County, Minnesota.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

22

## APPLICABLE LAW

**The Doctrine of Equitable Conversion:** Once parties have executed a binding contract for the sale of real estate, equitable title vests in the buyer and the seller holds only legal title as security for payment of the balance of the purchase price. *Stiernagle v. Cnty. of Waseca*, 511 N.W.2d 4, 5 (Minn. 1994); *In re Petition of S.R.A., Inc.*, 18 N.W.2d 442, 444 (Minn. 1945); aff'd sub nom. *S.R.A., Inc. v. State*, 327 U.S. 558 (1946).

## FACTUAL ALLEGATIONS

## CHAPTER 1: THE DEAL

### I.    Plaintiffs: Homeowner Sellers

90.    Plaintiffs, M. Campoli and L. Campoli, are a married couple raising their children in Hennepin County, Minnesota.

91.    M. Campoli is a physician; and for thirteen years has worked in service to the community in Wyoming, Minnesota.

92.    L. Campoli is a lawyer; and for seventeen years has worked in service to the community, first as a public defender in Colorado and Pennsylvania, and later as a private practitioner in Minnesota.

93.    In March 2022, Plaintiffs, then expecting a baby, sought to sell their residence located at 20570 Park Place, Deephaven, Minnesota 55331.

94.    For assistance with the sale, Plaintiffs entrusted the listing to their neighbor and licensed real estate agent Mark Grieger.



## II.     Coldwell Banker Realty Brokerage Agreement

95.     Anywhere RE, is a leading residential real estate service company in the United States and, with total assets of approximately $5.8 billion dollars, owns and operates Coldwell.

96.     On March 3, 2022, Plaintiffs herein contracted for residential real estate brokerage services with Coldwell via Coldwell's affiliated agent Grieger. (**Exhibit 1**, Coldwell's Exclusive Right to Sell Agreement).

97.     Grieger is an independent contractor; a real estate agent (agent) licensed by the Minnesota Department of Commerce and affiliated with Coldwell Banker Realty, the brokerage that holds Grieger's license.

98.     After signing the Coldwell Banker Realty brokerage agreement with Grieger, Grieger advised that he worked with C. Byrd, a licensed agent affiliated with Coldwell, and at times, her husband, I. Byrd, also a licensed agent affiliated with Coldwell.

99.     Neither Grieger nor Byrd are employees of Coldwell.

100.     Grieger, through his company, independently compensates Byrd on a monthly basis to act as his transaction coordinator on Grieger's residential real estate transactions. Byrd receives a bonus at a rate of $1,000 per million dollars of closed sales.

101.     Byrd held herself out to Plaintiffs as a licensed agent affiliated with Coldwell and working on the Plaintiffs' transaction at Grieger's direction.

102.     I. Byrd held himself out to Plaintiffs as a licensed agent affiliated with Coldwell and working on the Plaintiffs' transaction and open houses at Grieger's and/or Byrd's direction.

103.     Grieger, at the request of Plaintiffs, and due to the private nature of Plaintiffs' work, signed a Non-Disclosure Agreement on March 13, 2022. (**Exhibit 2**, NDA signed by Grieger).



104.    On March 12, 2022, Grieger requested that Plaintiffs also send a Non-Disclosure Agreement to Grieger's associates. Shortly thereafter, Byrd signed the agreement. (**Exhibit 3**, NDA signed by Byrd).

### III.    Fiduciary Duties

105.    Coldwell Banker Realty owed Plaintiffs fiduciary duties in the Park Place transaction pursuant to Coldwell's brokerage agreement with Plaintiffs.

106.    Fiduciary duty in real estate requires brokers, and their affiliated agents, to act in the best interests of their clients at all times, rather than in the brokers' financial interest.

107.    Coldwell's fiduciary duties to Plaintiffs included specific duties of: loyalty, obedience, diligence, confidentiality, accounting, and reasonable care.

108.    With respect to accounting, Minn. Stat. § 82.67, Subd. 3(2) states, "Accounting-broker/salesperson will account to client(s) for all client(s)' money and property received as agent."

109.    Coldwell owed Plaintiffs an accounting for all money and property received by Coldwell on behalf of Plaintiffs.

110.    In exchange for Coldwell's brokerage services and Coldwell's contractual promise to fulfill its fiduciary duties to Plaintiffs, Plaintiffs agreed to compensate Coldwell and the buyers' broker at commission rates of 2.3%, and 2.7%, respectively, of the final purchase price.



111.    Presuming a final sale price of $3,300,000; the commission payout was to be $75,900 plus a $499 brokerage commission to Coldwell and $89,100 to Wexford Realty, owned by Defendant Bulls' long-time friend and business-associate Joel Burger.[1]

## IV.    The Park Place Listing

112.    In March 2022, Byrd took the lead on preparing the Park Place listing for the NorthstarMLS.

113.    On or around March 6, 2022, Byrd arranged for professional photographs of the Plaintiffs' home to be uploaded to the MLS.

114.    The exterior of the home was photographed on or around March 7, 2022, in the snow.

115.    After the interior photos were completed later in March, Byrd uploaded the Park Place listing photos on or around March 22, 2022, to Grieger's MLS listing of Plaintiffs home.

116.    At all relevant times, Byrd accessed Grieger's Park Place MLS listing utilizing the impersonate feature of MLS, "to work as Mark Grieger" and appear as Grieger on the MLS. (Byrd Dep., at 87:92-96).

117.    The impersonate feature permits one MLS user to access another user's MLS listings, among other things.

118.    The 2022 MLS listing photo of the Plaintiffs' residence depicted the front of the residence at twilight, and a shoveled walkway leading to Plaintiffs' front door. (**Exhibit 4**, Appraisal tear sheet showing 2022 listing photo of Park Place as of May 10, 2022).

---

[1] Commission figures based on final acceptance purchase agreement price of $3,300,000; 5% total commission payout with 2.3% to Coldwell Banker Realty, and 2.7% to Wexford Realty per the Plaintiffs' listing agreement with Coldwell.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS



Figure A: Exhibit 4, Appraisal tear sheet showing 2022 MLS Listing photo of Park Place as of May 10, 2022

## V.    Listing Response

119.    Plaintiffs took measures to insure the listing's success: including painting, woodwork updates, cleaning, professional staging and drafting the MLS listing copy.

120.    Grieger failed to obtain a broker price opinion.

121.    Coldwell, through its agent Grieger, listed the property at $3,995,000.

122.    To support Coldwell/Grieger's listing price, Byrd contacted Zillow, a popular home buying and selling website, to alter Zillow's "Zestimate" (Zillow's proprietary estimated market value), from approximately $3,300,000 to a higher figure.

123.    The listing received few showings.

124.    Over the course of the listing, the Plaintiffs made repeated requests to Grieger to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

27

lower the price.

125.    The listing price was lowered once; to $3,750,000.

## VI.    The Plaintiff's Accident

126.    On April 25, 2022, Plaintiff L. Campoli was in a motor-vehicle accident wherein she was rear-ended by two cars on Highway 7 and suffered bodily injury while eight and a half months pregnant.

127.    Plaintiff conveyed her then known medical condition to Grieger and that, as long as Plaintiff's condition permitted, Plaintiffs' intention was to try to proceed with the listing, and the hopeful sale.

128.    At the time, Plaintiffs were under contract on another property and had invested over a year of time and $100,000 earnest money for that property.

## VII.    Joel Burger

### A.  Burger's Personal Relationship with Bulls

129.    J. Burger met J. Bull in 1989 or 1990 in Faribault, Minnesota.

130.    Then teens, nicknamed "J.B. 1" and "J.B. 2," frequented Shattuck-St. Mary's Ice Arena and Faribault Golf and Country Club where they were members and/or junior members.

131.    The J.B.s later got jobs at the Country Club and played countless rounds of golf together in the following years.

132.    Burger considers J. Bull one of his best friends.

133.    Burger also befriended L. Bull during childhood, and on occasion, spent time with her individually:  "We will be at the game if you wanna go see her [L. Bull]. I'm not gonna get there but you [Burger] don't need to see me [J. Bull]."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

28

134.    After years of friendship and business-dealings, Burger describes J. Bull as a frugal person who values money.

### B.  Burger's Multiple Businesses and Email Addresses

135.    Burger is the owner of Wexford Real Estate LLC d/b/a Wexford Realty; Wexford Golf, Inc; and Fairway Appraisal, LLC.

136.    Burger provides management services to MSP Golf, LLC and describes his job is to "manage the management team."

137.    Burger is also a licensed real estate appraiser and broker.

138.    Despite his licenses, Burger does not currently conduct appraisals nor seek non-referral brokerage clients.

139.    Burger's specific job responsibilities with respect to his multiple companies and clients are unknown. Burger refused to describe his typical work day or elaborate on the specifics of his job; stating that he is on call 24/7 to deal with business-related issues.

140.    Burger has approximately a dozen email addresses, many affiliated with separate domains.

141.    Some of Burger's active email addresses include: jburger@wexfordrealty.com, info@wexfordrealty.com, joel@wexfordcompanies.com, joel@burgercompanies.com, jburger@fairwayappraisal.com, jburger@pga.com, jburger@wexfordgolf.com, among others.

### C.  Burger / Bull's Mutual Clients and TitleNexus

142.    Burger and Bulls' early personal relationship expanded into a long-term mutually advantageous business relationship.

143.    In 2022, and likely earlier, Burger started using his real estate contacts and associates to facilitate financial transactions on behalf of Bulls' UBS Financial clients to title



companies, including TitleNexus, to accommodate the various needs of Bulls' high net worth clients.[2]

144.    For a fee, and at least in 2022 and later, Burger oversaw wire transfers from Bulls' UBS client accounts at UBS Financial to title company escrow accounts, such as TitleNexus, Defendant herein. (**Exhibit 5**, Email exchanges including J. Bull, Burger, UBS Financial, and TitleNexus regarding TitleNexus' receipt of UBS Financial client wires of $750,000 and $150,000 facilitated by Burger and Cole).

145.    Burger related that the purpose of the wire transfers from Bull's UBS Financial client accounts to TitleNexus'maintained Crown Bank escrow account(s) were for various expenses described broadly as investments, brokerage, management, leasing, development, consulting, and payments to third-party vendors.

146.    Burger provides and/or creates receipts for these various non-descript expenses to J. Bull's UBS clients.

147.    TitleNexus also profits from the arrangement; TitleNexus, at least in 2022 and later, collected fees for accepting Bulls' UBS client funds into Crown Bank escrow account(s) managed by TitleNexus and later cutting checks to third-parties as directed by Burger.

148.    Burger did not confirm or deny whether and when J. Bull had J.Bull's funds at an account maintained by TitleNexus at Crown Bank.

149.    Burger confirmed that TitleNexus is one of a number of other title company escrow accounts used as a receptacle for wire transfers of U.S. currency from Bull's client accounts at UBS Financial.

---

[2] According to J. Bull, J. Bull's average UBS Financial client portfolio exceeds ten-million dollars ($10,000,000); and J. Bull has approximately 300 clients.



150.    Burger alleged he had no knowledge as to whether he provided a real estate nexus for the "more than 1, less than 100" of J. Bull's UBS clients to re-characterize capital gains or claim real estate related "expenses" to lessen their taxes or avoid them altogether.

151.    In the lead up to the Park Place transaction, Burger brokered other real estate deals on behalf of Defendants Bull and other Wexford Real Estate clients utilizing TitleNexus' and TrustFunds' services for the transactions.

### D.  Burger as Co-Manager of Fairways and Greens LLC

152.    The business relationship between Bull and Burger culminated when Burger was tapped as co-manager of Bulls' shell company F & G, LLC wherein "the business and affairs of the Company shall be managed by the co-Managers under the direction of the Board of Governors" consisting of J. Bull and L. Bull.  (**Exhibit 6**, Written Action of Fairways and Greens LLC and Articles of Organization effective March 6, 2018).

153.    At least in 2022 and later, J. Bull and J. Burger were the co-managers of F & G, LLC.

154.    F & G, LLC has no active business operations nor does the company produce any goods or provide any services to the community.

155.    F & G, LLC currently holds title to Bulls' personal residence on Lake Minnetonka at 16175 Crosby Cove Rd., brokered by Coldwell and for which Burger signed the loan and closing documents on April 3, 2023.

### VIII.    Park Place

### A.  House Showing

156.    On or around April 27, 2022, Defendants Burger and Bull set up a showing at Park Place.



157.    Burger, as Bulls' broker, attended the showing with the Bulls.

158.    Plaintiffs offered to invite Bulls' family members for a second showing; Burger rejected the idea, telling Grieger, "no, they're not like that."

159.    Nonetheless, after one showing, Burger advised Grieger that "we may have traction" and requested the architectural plans from Plaintiffs.

160.    Plaintiffs did not possess the architectural plans; but Plaintiffs made arrangements to release them from the first owner's builder to provide to Defendants Bull.

**B.  Initial Offer and "Verification" of funds**

161.    On or around May 3, 2022, Defendants Bull made an initial offer of $3,100,000 in cash, with the option to obtain a mortgage.

162.    Burger sent the initial offer to Grieger with the message: "I'm going to be grinding to even get them up a dollar [...]" (**Exhibit 7**, Burger's May 5, 2022 email to Grieger regarding initial offer).

163.    Along with the offer, a verification of funds was prepared by Ms. Whitney Ward of UBS Financial and submitted to Grieger on J. Bull's behalf by Burger. (**Exhibit 8**, UBS Financial Verification of Funds letter prepared by Whitney Ward).

164.    Ms. Ward was a former summer intern working with  J.Bull at Merrill Lynch in 2014.

165.    Bull kept in touch with Ms. Ward for several years after the internship ended, sending her emails, articles and life updates.

166.    Ms. Ward received either emails and/or phone calls from J. Bull approximately "two or three times a year" from 2014 to 2019.



167.    In 2019, during one such phone call, J. Bull encouraged Ms. Ward to apply for a position at UBS Financial working for The Bull-Wiebler Group. Ms. Ward applied. Shortly thereafter, Ms. Ward was offered, and then accepted, the job.

168.    For one year, Ms. Ward followed her husband to Colorado for work, but kept working for UBS and, ultimately, returned to The Bull-Wiebler Group in 2023.

169.    At the time the Bulls' verification of funds was submitted to Plaintiffs in 2022 by Ms. Ward, Ms. Ward was working under J. Bull's direction and control at the UBS Bull-Wiebler Financial Group.

170.    Defendant Burger, who has had countless interactions with Ward, did not disclose to Grieger that the verification of funds was prepared by Bulls' former intern and underling UBS Financial employee, Whitney Ward.

171.    Defendant Burger also failed to disclose on the Park Place purchase agreement that Defendant Burger was the co-manager of Bulls' company, F & G, LLC, the entity that was slated to take title to Plaintiffs' residence and for which Burger was to sign the closing documents.

172.    Neither Grieger nor Byrd followed-up on Bulls' verification of funds with UBS Financial nor obtained verification of funds commensurate with the later agreed upon sale price of $3,300,000.

173.    Grieger did however convey to Plaintiffs that J. Bull was "cheap;" and encouraged Plaintiffs to maintain the overpriced listing of the home so that Bull would think he was getting a good deal.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

### C. Bulls: Do we really want to do this?

174.    After additional negotiations, Plaintiffs signed a counter-offer for $3,300,000 on May 6, 2022.

175.    In a late night text to Grieger while Burger was trying to obtain Bulls' signatures on the Plaintiffs' counter-offer: Grieger: "Ohhh, I see, you talked and they're deciding if they really want to move there." Burger: "100 percent discussed.  Recommend we sign. He's still got his first communion money, Mark."

176.     On the eve of the signing of the purchase agreement, Burger's texts revealed a conflicted household wherein J. Bull was uncomfortable with the price of Park Place but L.Bull wanted to sign:  "wife will win this one", Burger texted Grieger on May 6, 2022.

177.    Yet,  late into the night, the unsigned counter-offer and uncertainty remained: "It's more of a do we really want to do this…"





Figure B: May 5, 2022 Texts between Burger (left) and Grieger (right)

178.    To ease the decision, Burger reaffirmed the fact that Bulls' could negotiate price concessions based on inspection deficiencies or cancel the agreement at any time during the 10-day home inspection contingency period.

179.    Based on the past experience of buying and selling other real properties, J. Bull knew that he could negotiate price concessions based on inspection deficiencies or cancel the agreement at any time during the 10-day home inspection contingency period.

180.    On the eve of May 6, 2022, Plaintiffs waited late into the night to receive the signed counter-offer Grieger promised. But none was forthcoming.

 COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

181.    On the morning of May 7, 2022, still in the absence of a fully executed agreement from Grieger, Plaintiffs sought again to reduce the price.

182.    Without explanation as to Grieger's failure to immediately forward the fully executed purchase agreement to Plaintiffs on May 6, 2022, when he received it, Byrd forwarded the signed purchase agreement to Plaintiffs the next day. (**Exhibit 9**,  Byrd's May 7, 2022, email with the May 6, 2022, executed  20570 Park Place Purchase Agreement, "Park3.pdf,"attached).

### D.  The Purchase Agreement Terms

183.    The May 6, 2022, purchase agreement provided that Plaintiffs would sell the Property to Defendants and Defendants would purchase the Property from Plaintiffs for $3,300,000.00 in cash. *Id*.

184.    The cash purchase agreement was not contingent on financing but permitted Defendant Bulls to obtain a mortgage at their discretion:

```
459. OTHER:
     Buyer shall have the option of obtaining a mortgage prior to closing; however, this purchase
460. agreement is not contingent on financing.
```

Figure C: Exhibit 9, Lines 459-460 of Park Place PA that Buyer shall have the option of obtaining a mortgage

185.    The May 6, 2022 purchase agreement required the Buyers/Defendants Bulls to deposit $100,000.00 of earnest money into Coldwell Banker Realty's trust account within two business days of May 6, 2022, the final acceptance date of the agreement.[3]

---

[3] May 6, 2022, was a Friday.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

186.    The May 6, 2022, purchase agreement contained two contingencies: a 10-day Inspection contingency and a separate 10-day "Addendum to Purchase Agreement: Subsurface Sewage Treatment System[4] and Well Inspection Contingency."

187.    The Plaintiffs provided timely disclosure and proper notice of the presence of a well on the property.

188.    The Well-Inspection Contingency Addendum was drafted by Defendant Bulls' broker, Wexford Realty.

### E. Well-Inspection Contingency

189.    The Well-Inspection Contingency Addendum states:

> If the appropriate tests/inspections checked below [Private Well is checked] are not done and results provided within the time specified [10 calendar days], or waived in writing by the buyer, then the party not responsible for obtaining the test/inspection may declare this Purchase Agreement canceled by written notice to the other party, or licensee representing or assisting the other party, in which case this Purchase Agreement is canceled. If the party declares this Purchase Agreement canceled, Buyer and Seller shall immediately sign a *Cancellation of Purchase Agreement* confirming said cancellation and directing all earnest money paid here to be refunded to Buyer.

190.    On May 7, 2022, Byrd sent Plaintiffs a transaction timeline confirming the earnest money and contingency due dates, and cc'd Grieger. (**Exhibit 10**, Byrd's May 7, 2022, Transaction Timeline email to Plaintiffs).

---

[4] The property does not contain a sewage treatment system.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

**From:  Byrd, Chelsey** chelsey@cbburnet.com
**Subject:** Transaction Timeline - 20570 Park Place, Deephaven
**Date:** May 7, 2022 at 9:48 AM
**To:** Lauren Campoli lauren@campolidefense.com, mcampoli@gmail.com
**Cc:** Grieger, Mark D markgrieger@cbburnet.com

20570 Park Place, Deephaven

**Transaction Timeline:**

5/6/2022 - Final acceptance date ✔

5/10/2022 - Earnest money due: 2 business days

*Inspection/well contingency timeline: 10 days

5/16/2022 - Inspection deadline: EOD (midnight)

5/16/2022 - Well contingency deadline: EOD (midnight)

6/03/2022 - Closing Date

Figure D: Exhibit 10, Byrd's May 7, 2022, Transaction Timeline email to Plaintiffs

191.     Missing from Byrd's Transaction Timeline was Grieger's and Byrd's responsibility to upload the signed purchase agreement to Coldwell's Transaction Manager within 48 hours of the final acceptance date.

192.     Given the uncertainty of the buyers, Grieger and/or Byrd made another choice.

193.     Grieger and/or Byrd did not upload the May 6, 2022, fully executed Park Place purchase agreement to Transaction Manager within 48 hours of the May 6, 2022, final acceptance date.

194.     Grieger and Byrd held the deal.

## IX.    Coldwell Banker: Let's Hold the Deal.

195.     Holding the deal refers to a practice where the seller's real estate agent or broker delays submitting the fully executed purchase agreement to their brokerage within the required timeframe.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

38

196.    Coldwell instructs its agents to submit a fully executed purchase agreement to Transaction Manager, or directly to Coldwell, within 48 hours of the agreement's final acceptance date.

197.    The required timing of the upload to Transaction Manager - within 48 hours of final acceptance date - coincides with the earliest calendar due date (within two-business days) of the buyers' earnest money deposit due date on the standard Minnesota Association of Realtors (MAR) Purchase Agreement form.[5]

198.    For the real estate agent, the purpose of holding a deal is often a matter of convenience, aimed at avoiding the time-consuming process of uploading the agreement to Transaction Manager, managing the earnest money, and facilitating its return if the buyer cancels during the inspection contingency period.[6]

199.    Since the standard MAR Inspection contingency allows a buyer to cancel the purchase agreement for any reason during the inspection period, some agents delay submitting all deals or uncertain deals until the inspection contingency period ends, ensuring the deal will proceed to closing and, in turn, that they will be compensated.

200.    Coldwell does not use TrustFunds' electronic earnest money refund feature so refunding a buyer's earnest money after a cancellation becomes more time-consuming for Coldwell agents since they must coordinate the issuance of a refund check through Coldwell.

---

[5] The standard MAR Purchase Agreement form produced by Minnesota Association of Realtors (MAR) includes the verbiage: "[Earnest money] shall be delivered to listing broker [...] no later than two (2) Business Days after Final Acceptance Date." (**Exhibit 11**, Park Place Purchase Agreement, at 1, ln. 7-8).

[6] Pursuant to the standard MAR Purchase Agreement form, the buyer may cancel the agreement for any reason during the inspection period and receive their earnest money back. (*See*, Exhibit 9 at ln. 185-193).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

201.    It is a common yet discreet practice in the in industry for a seller's agent to delay submitting deals until all contingencies, such as home inspections, are satisfied, effectively avoiding the transactional effort required if the deal falls through.

202.    To explain Byrd's failure to submit the May 6, 2022 fully executed $3,300,000 Park Place deal, Byrd claimed, "I forgot."

203.    To explain Grieger's failure to submit the May 6, 2022 fully executed $3,300,000 Park Place deal, Grieger described it as routine practice, stating: "I, mean, we don't – there would be no reason to do that [upload the deal] until a contingen - - when there's contingencies sitting out there. It's not – for – it could end and not even be anything. So there would be no reason to do it [upload the deal] beforehand."

204.    In line with Grieger's routine practice of holding deals until contingencies are resolved, Grieger directed Byrd not to upload or formally submit the Park Place deal to Coldwell during the contingency period.

205.    Neither Byrd nor Grieger ever submitted Plaintiffs' fully executed $3,300,000 May 6, 2022 purchase agreement for 20570 Park Place with file name Park3.pdf, to Coldwell's Transaction Manager.

**A.  Holding the Deal = No Earnest Money**

206.    For Coldwell to retain the buyer's earnest money—whether submitted via TrustFunds or by check—a fully executed purchase agreement must be uploaded to Coldwell's system through Transaction Manager or otherwise formally submitted to Coldwell.

207.    Earnest money submitted via TrustFunds cannot settle into Coldwell's trust account unless and until the agent(s) submit the fully executed purchase agreement to Coldwell.



208.     As long as Grieger and Byrd continued to hold the Park Place deal, no earnest money deposit could settle into Coldwell's trust account for the 20570 Park Place transaction.

209.     Even if Bulls had submitted $100,000 in earnest money via TrustFunds on May 9, 2022, for the Park Place transaction, Grieger and Byrd's failure to submit the fully executed purchase agreement to Coldwell prevented the earnest money from settling into Coldwell's trust account

210.     As a result, no TrustFunds earnest money submission could settle in Coldwell's trust account for the Park Place transaction on May 16, 2022, or at any time thereafter, as long as Grieger and Byrd continued to hold the deal.

211.     Without the fully executed 20570 Park Place purchase agreement uploaded to Coldwell's Transaction Manager, or otherwise formally submitted to Coldwell as of May 18, 2022, the settlement of earnest money into Coldwell's trust account via TrustFunds on May 16, 2022, was factually impossible.

212.     Burnet Title, a "2022 World's Most Ethical Companies honoree," that does have at least one ethical employee, explained that because "Mark did not turn in anything to Coldwell (the purchase agreement, and other documents needed on their end) the only way Coldwell could have received the earnest money is through a wire and they never sent Coldwell a wire, ever. So, the buyers have had the earnest money the whole time …" (**Exhibit 12**, Email from Ms. Duca of Burnet to Plaintiff, dated February 3, 2023).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

**From:** Duca, Maddie (RTG) Maddie.Duca@burnettitle.com 
**Subject:** RE: Re: [External] 20570 Park Place
**Date:** February 3, 2023 at 3:34 PM
**To:** Lauren Campoli lauren@campolidefense.com

I was actually informed that we never received earnest money. It gets a little complicated, but since Mark did not turn in anything to Coldwell (the purchase agreement, and other documents needed on their end) the only way Coldwell could have received the earnest money is through a wire and they never sent Coldwell a wire, ever. So the buyers have had the earnest money the whole time unless they gave to their agent to give to your agent, but the agent never passed along a check either.



**Maddie Duca**
CLOSING COORDINATOR
Maddie.Duca@BurnetTitle.com
**P:** 952.974.3475 • **F:** 952.974.4869
11455 Viking Dr, Suite 310
Eden Prairie, MN 55344



Figure E: Exhibit 12, Email from Burnet to Plaintiff indicating Grieger did not turn in anything to Coldwell and "the buyers have had the earnest money the whole time [...]"

213.    Defendants Bull did not tender a $100,000 earnest money check or send a wire for $100,000 to Coldwell for the 20570 Park Place transaction.

214.    Defendants Bull did not submit $100,000 earnest money by means of TrustFunds to Coldwell's trust account for MLS listing #6160342, 20570 Park Place, on May 9, 2022.

215.    Grieger's and Byrd's failure to upload the Park Place deal to Transaction Manager, or otherwise formally submit the May 6, 2022 fully executed Park Place deal to Coldwell, prevented TrustFunds electronic earnest money settlement into Coldwell's trust account for the 20570 Park Place transaction.

**B. Holding the Deal = It's Routine**

216.    By holding the deal, Byrd and Grieger took a no-hassle wait-and-see approach to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

42

Bulls' contingency-laden and unlikely-to-close agreement, during the inspection contingency period (May 6, 2022 - May 16, 2022).

217.    This lackadaisical approach to Plaintiffs' transaction was nothing new to Grieger and Byrd whose routine practice consists of holding deals: "There isn't one thing that's different with this process than what happens each time." (**Exhibit 13**, Grieger's May 10, 2022 Text to Plaintiffs regarding lack of earnest money settlement).

218.    "Q: [...] you are supposed to upload the deal so that Coldwell Banker Realty can receive earnest money on a – on the deal? [objection omitted] [...] Is that your understanding of it? A: I've [Grieger] never really thought about that, but that – that's what happens." (Grieger Dep. at 488).

219.    Coldwell failed to retain and continue to retain Defendants Bulls' $100,000 earnest money deposit for the authentic May 6, 2022, 20570 Park Place purchase agreement.

220.    Under the doctrine of equitable conversion, the buyer obtains equitable title to the property upon the execution of a residential purchase agreement or contract for deed.

221.    Grieger and Byrd deliberately failed to upload the deal to Transaction Manager and failed to require that the Bulls wire $100,000 earnest money to Coldwell's trust.

222.    Grieger's and Byrd's deliberate omissions enabled Defendants Bulls to convert equitable title to Plaintiffs' $3,300,000 property with no money down.

## X.    Plaintiffs to Coldwell: Please Collect Earnest Money

223.    Plaintiffs had strong concerns that Bulls were not serious buyers.

224.     After the May 6, 2022 signing, Plaintiffs anticipated the forthwith payment of $100,000 earnest money pursuant to the agreement.



225.    On May 6, May 7, and May 8, 2022, the earnest money payment was not forthcoming from Bulls.

226.    On May 9, 2022, Plaintiffs urged Grieger and Byrd to collect the earnest money.

227.    Instead Grieger stalled.

228.    Grieger erroneously advised Plaintiffs that because May 7 and May 8 fell on a Saturday and a Sunday, respectively, that Defendant Bulls couldn't make a payment until May 9, 2022, a Monday.

229.    Grieger proffered Defendants' excuse to Plaintiffs: "No not yet, its done through ACH through something called trust funds…We will get notification once that's been initiated. Nothing could happen until today [May 9, 2022] relating to that [earnest money]."





Figure F: Text from Plaintiffs (Left) to Grieger (Right)

230.    TrustFunds electronic online earnest money payments can be initiated 24 hours a day, seven days a week.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

231. At the time, Grieger was likely aware of Burger's intention to circumvent the TrustFunds online earnest money delivery program with an in-person $5 convenience fee payment on Monday, May 9, 2022 during TrustFunds' business hours so that, "Nothing could happen until today [Monday, May 9, 2022] relating to that [earnest money]."

232. After signing the purchase agreement, Defendants Bull scheduled a five and half hour home inspection - from 1:30 p.m. to 7:00 p.m. - including radon testing, for Wednesday, May 11, 2022.

233. On the morning of May 9, 2022, Plaintiffs advised Byrd and Grieger that Plaintiffs would not permit the inspection if Grieger and Byrd failed to collect the $100,000 earnest money and submit proof of the same to Plaintiffs.

234. In a May 9, 2022, email to Byrd from Plaintiffs: "But we do need the earnest money deposit confirmation first."

235. In a May 9, 2022, text to Grieger from Plaintiff M. Campoli: "Hi Mark. We will need confirmation of earnest money before inspection. Thanks!"

236. In a May 9, 2022 text to Grieger from Plaintiff L. Campoli: "Earnest money needs to be taken care of first, of course. I hope you have questioned that."

237. On May 9, 2022, Byrd emailed Burger to inquire about the Bulls' unpaid earnest money.

238. Byrd indicated to Burger that Plaintiffs/sellers would not permit inspection unless Bulls' earnest money was submitted to Coldwell in accordance with the agreement.



239.    In a May 9, 2022, text between Grieger (left) and Burger (right) first disclosed during discovery in the state case, Burger claimed that TrustFunds was capped at $50,000 and asked for wiring instructions. (*See below*, Figure G, **Exhibit 14**).

> Hey! Good morning!  Are the buyers using trust funds to initiate the earnest money? Just checking... Thank you!

> TF capped at $50k
>
> Can you send wiring instructions?

Figure G: **Exhibit 14**, Burger's May 9, 2022 TrustFunds cap of $50K text to Grieger

240.    Byrd did not provide Coldwell's earnest money wiring instructions to Burger.

241.    If Byrd did provide Coldwell's wiring instructions to Burger, Coldwell, Burger, and Byrd failed and refused to disclose the communication containing those instructions to Plaintiffs.[7]

242.    Defendant Bulls' did not wire $100,000 to Coldwell's trust account for the Park Place transaction.

243.    Later, on May 9, 2022, Byrd replied to Burger that the cap on TrustFunds was actually $100,000 and recommended that Burger use electronic transfer via TrustFunds because it "may be less of a hassle."

---

[7] Plaintiffs requested all communications between Byrd and Burger during discovery in the state court case.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

XI.    **TrustFunds: Exclusive NorthstarMLS Escrow Delivery Provider**

A.  **Background of TrustFunds**

244.    TrustFunds LLC is the only online earnest money service integrated directly into the NorthstarMLS in Minnesota.

245.    TrustFunds was founded by its current President, Lynn Leegard, former in-house counsel for Edina Realty and former President of the Minnesota Association of Realtors.

246.    At Edina Realty, Leegard encountered many situations where real estate agents mishandled earnest money.

247.    Leegard conceived TrustFunds to "make things more secure for the buyers who were writing the checks and brokers and agents who were responsible for handling them."[8]

248.    With the support of NorthstarMLS' President John Mosey, Leegard secured a monopoly spot for the TrustFunds online earnest money program on every property listing on the NorthstarMLS.[9]  As such, TrustFunds has no known competitors.

249.    NorthstarMLS failed to properly vet TrustFunds'modified online merchant technology before permitting its integration into every NorthstarMLS' real estate listing for the purpose of transacting earnest money online for the real property.

250.    NorthstarMLS gave the false impression that it had vetted TrustFunds' technology, operations, security protocols, and suitability for delivering earnest money in compliance with the legal requirements of standard MAR purchase agreements.

---

[8] https://www.startribune.com/twin-cities-trustfunds-real-estate-homebuying/600199097/
[9] John Mosey, former CEO and President of NorthstarMLS, from 2002 to 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

251.    NorthstarMLS failed to ensure that home sellers listing their properties on its platform received direct notification of the status of TrustFunds' earnest money payments - or the absence of such payments - for their transactions.

252.    By presenting TrustFunds as a secure and reliable payment processor on all its listings, NorthstarMLS enables the equitable conversion of sellers real property without requiring any actual buyer payment in every TrustFunds transaction.

253.    Despite TrustFunds online command presence, its registered principal place of business is Leegard's residence in Blaine, Minnesota.



Figure H: TrustFunds registered principal place of business, 614 88th Avenue NE Blaine, as of April 2, 2024 secured by a lock box on the front door

### B.  What is TrustFunds?

254.    TrustFunds is a modified online merchant payment platform that combines features of a payment gateway and payment portal while operating as the point of sale for the earnest money transaction.

255.    TrustFunds does not actually deliver, nor hold, any earnest money.

256.    TrustFunds outsources the delivery of earnest money to ReliaFund, its third-party Automated Clearing House (ACH) processor.

257.    ReliaFund is a merchant ACH processor that provides an end-to-end technology platform that represents, according to ReliaFund, a "one-stop electronic payment processing services solution" via the ACH network.

258.    TrustFunds, utilizing a variant of ReliaFund's name and its technology, provides the buyer with an earnest money payment gateway that is auto-populated with the property's MLS Listing photo and data so that the buyer can verify the property under contract and submit their earnest money payment online.

259.    TrustFunds can only be accessed through the MLS by MLS members on MLS listings.

260.    A TrustFunds transaction is initiated by the buyer's agent after final acceptance of the purchase agreement.

261.    In every TrustFunds transaction that, by design, occurs after final acceptance of the purchase agreement, the buyer has already converted the equitable title of the sellers' real property with no money down.

262.    TrustFunds' recommendation regarding the inconvenient legal truth of equitable



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

50

conversion: "The buyer's agent could certainly include language in the purchase agreement informing the seller that it is the buyer's intention to submit the earnest money electronically using TrustFunds."

263.    With no means to enforce the collection and retention of earnest money through TrustFunds, Grieger admitted: "We are at the mercy of the buyer and the buyer's agent to do what they are supposed to do within the timeframe."

### C.  How TrustFunds makes money

#### i.    Buyer Convenience Fees

264.    Today, TrustFunds collects a buyer convenience fee of $8 on every TrustFunds transaction initiated by the buyer's agent.

265.    In 2022, the buyer convenience fee was $5.

266.    The TrustFunds' buyer convenience fee is submitted online at the same time the buyer submits their earnest money payment.

267.    According to its website data, TrustFunds has made millions of dollars in transactional fees alone.

#### ii.    Monthly Membership Fees

268.    TrustFunds also collects recurring monthly membership fees as set by TrustFunds.

269.    Every real estate agent that is a member of the NorthstarMLS is also a free member of TrustFunds and, as a buyer's agent, can initiate TrustFunds transactions.

270.    But, any MLS partner such as a broker, law firm, or title company, who wants to receive electronic earnest money from buyers into their designated trust account must pay a recurring monthly membership fee to TrustFunds.



271.    In other words, sellers' brokers who want to retain earnest money electronically from buyers via TrustFunds must remit recurring monthly membership fees to TrustFunds.

272.    In 2022, Coldwell Banker Realty and Wexford Realty paid recurring monthly membership fees to TrustFunds in order to receive buyers' earnest money into their respective TrustFunds linked trust accounts.

### iii.    Per Transaction Fees

273.    TrustFunds also charges monthly membership clients a per-transaction fee based on the volume of their transactions.

274.    The larger the brokerage, the higher the number of transactions, and the more fees TrustFunds received from that brokerage.

275.    For example, on the single day of May 16, 2022, Coldwell showed it transacted over $849,000 in earnest money using TrustFunds wherein TrustFunds collected a buyer convenience fee and charged Coldwell an additional transaction fee, on each transaction.

276.    Coldwell represents one of several high-volume brokerage clients of TrustFunds, remitting both monthly and transactional fees to TrustFunds with a membership agreement dating back to at least 2019.

277.    Even if a brokerage is not a paid member of TrustFunds, and therefore cannot receive earnest money into their brokerage trust account, any buyers' agent can initiate a TrustFunds transaction for earnest money so long as the recipient designated earnest money holder per the purchase agreement is a paid member of TrustFunds.

278.    TrustFunds collects its buyer convenience fee on every transaction regardless of whether the buyer's broker is a paid member of TrustFunds.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

### D.  How TrustFunds works

279.    TrustFunds is widely used because it is the only online electronic earnest money payment delivery option integrated directly into property listings on the NorthstarMLS and listings spanning 16 states.[10]

280.    TrustFunds is an online only earnest money payment option.

281.    A TrustFunds earnest money payment transaction is initiated by the buyer's agent via the MLS property listing after final acceptance of the purchase agreement for a subject property under contract and listed on NorthstarMLS.

282.    The parties to a TrustFunds transaction include the buyer's agent and brokerage, the seller's agent and brokerage, and any brokerage and/or designated trust account holder team members that are set up in the buyer and seller agents' TrustFunds profile to receive TrustFunds' email notifications (hereinafter "parties to the transaction").

283.    The actual seller of the property who is the beneficiary of the earnest money transaction, is not a party to the TrustFunds transaction.

### i.    Step 1: Buyer Agent Initiates Earnest Money Request

284.    First, the buyer's agent logs into the MLS with their MLS credentials to access the subject property's MLS Listing details page.

285.    The buyer's agent clicks the TrustFunds blue and green bird-like logo on the MLS listing details page to access TrustFunds. (**Exhibit 15**, Sample active MLS listing showing TrustFunds integration as of Leegard's deposition, April 22, 2024).

---

[10] TrustFunds advertises that its services cover listings in 16 states per TrustFunds' website data.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS



Figure I: Exhibit 15, New MLS Listing on April 24, 2024 showing TrustFunds integration (circled above by Leegard)

286.    Once the buyers' agent clicks on the TrustFunds icon on the property's listing, the buyer's agent fills out a "Notify Buyer" form to create an earnest money request for the listing. (**Exhibit 16**, Sample "Notify Buyer" form for 4010 Front Street).

287.    Leegard confirmed that in 2022 the "Notify Buyer" online payment form had a different format, but the form contained the same information as the example Leegard identified at deposition, shown below:



Figure J: Exhibit 16, "Notify Buyer" form to be filled out by buyer's agent to initiate TrustFunds earnest money payment request

288.    The "Notify Buyer" form auto-populates with the subject property's MLS Listing information including the MLS listing photo, property address, MLS number, and listing broker.

289.    After certifying that "the buyer has a fully executed purchase agreement for this property," the buyer's agent selects the "Earnest money held by:" that is the TrustFunds paid member entity/company designated in the purchase agreement to hold the earnest money.

290.    The buyer's agent then enters the buyer's name, buyer's email, and amount of earnest money to be paid.

291.    The buyer's agent also creates a secret word to convey to the buyer to verify the agent and/or buyer on the buyer's earnest money payment form.

292.    In May of 2022 and likely earlier, the buyer had to type in the secret word provided by their agent on the buyer's earnest money payment form.

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS



Figure K: Sample 2024 "Notify Buyer" Buyer Information fields to be filled out by buyer's agent to initiate TrustFunds earnest money payment request

293.    The buyer's agent confirms that the buyer will pay the TrustFunds convenience fee at the same time that the buyer submits their online earnest money payment.

294.    If the buyer's agent elects to pay the TrustFunds convenience fee on behalf of their buyer, the buyer's agent can add a payment account to TrustFunds that is charged when the buyer submits their earnest money payment to TrustFunds.

295.    The buyer's agent clicks "Notify Buyer" to complete the "Notify Buyer" form.

296.    Once the buyer's agent completes the "Notify Buyer" form and clicks "Notify



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Buyer," a cascade of unique real-time automatic email notifications from TrustFunds to the parties to the transaction begins.

### a. Agents and Buyer are Notified of Step 1

297.    Upon the buyer's agent's submission of the "Notify Buyer" form, TrustFunds automatically generates transactional data that is sent to its third-party email provider SendGrid and converted into real-time TrustFunds email notifications to the parties to the TrustFunds transaction.

298.    TrustFunds outsources its transactional emails to SendGrid, a cloud-based email delivery platform. SendGrid dispatches TrustFunds emails on behalf of TrustFunds. For the purpose of this Complaint, emails dispatched by SendGrid on TrustFunds' behalf based on data it receives from TrustFunds will be referred to as emails "from TrustFunds" or will be referred to as "TrustFunds email notification(s)".

299.    The first automated TrustFunds email notification that is dispatched to all the non-buyer parties to the transaction after the buyer's agent initiates the transaction is the "Earnest Money Request" notification.

300.    The "Earnest Money Request" TrustFunds email notification, with sender noreply@trustfunds.us.com, is sent to all the non-buyer parties to the subject TrustFunds transaction that are set-up to receive TrustFunds email notifications.

301.    In 2022, the automated real-time "Earnest Money Request" TrustFunds email notification stated, in relevant part that, "An email request to make an earnest money payment online via TrustFunds has been sent from [buyer agent's name] to the buyer of the property listed below."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

302.    The buyer's agent also receives a real-time automated "Earnest Money Request" TrustFunds email notification after the buyer's agent successfully submits the "Notify Buyer" form.

303.    The automated "Earnest Money Request" TrustFunds email notification confirms for all non-buyer parties to the TrustFunds transaction that the buyer's agent has initiated the earnest money request to the buyer of the subject property.

304.    If the non-buyer parties to the TrustFunds transaction for the subject property do not receive a real-time automated "Earnest Money Request" email notification from TrustFunds, it means that the buyer's agent has not successfully initiated a TrustFunds earnest money payment request using the TrustFunds "Notify Buyer" form.

### b.  TrustFunds Transaction Table shows "Sent"

305.    Once the buyer's agent successfully submits the "Notify Buyer" form, all the parties to the transaction, excluding the actual seller, have access to a MLS integrated TrustFunds transaction table related to the subject transaction within the TrustFunds program inside the MLS.

306.    Per TrustFunds online Frequently Asked Questions[11]:



Figure L: FAQ on TrustFunds' website

---

[11] https://trustfunds.us.com/faqs/



307.    All the parties to the TrustFunds transaction and their designated team members/administrative users have access to theTrustFunds transaction table for the subject property.

308.    Per TrustFunds' website: "All team members have access to the transaction data in the transaction tables."

309.    The transaction table auto-populates with transactional data in real-time as the earnest money transaction progresses.

310.    The TrustFunds transaction table auto-populates with "Sent", along with the date and meridian time that the buyer's agent initiated the TrustFunds payment request to the buyer by submitting the "Notify Buyer" form.



Figure M: Screenshot of the bottom portion of an authentic TrustFunds Transaction table generated by the agent after the buyer's agent initiated TrustFunds at 10:15 A.M. The top portion



(not shown here) of an authentic transaction table contains a thumbnail of the property's MLS Listing Photo

### ii.    Step 2-Buyer Makes Payment

311.    After the buyer's agent submits the "Notify Buyer" form at Step 1, the buyer receives an automated real-time "Payment Request Notification" TrustFunds email notifiation at the email address specified by the buyer's agent on the "Notify Buyer" form.

312.    The buyer's "Payment Request Notification" email from TrustFunds is generated when the buyer's agent completes and submits the "Notify Buyer" form in Step 1.

313.    The "Payment Request Notification" email contains a link that allows the buyer to access and complete a payment form on the TrustFunds platform to submit their earnest money payment.

314.    The buyer opens the "Payment Request Notification" email from TrustFunds and clicks the provided link to access the TrustFunds earnest money payment form for the subject property under contract.

315.    If the buyer's agent fails to successfully initiate a TrustFunds transaction using the "Notify Buyer" form for the subject property, the buyer of the subject property will not receive a "Payment Request Notification" email from TrustFunds.

### a.    TrustFunds Transaction Table show "Open"

316.    At the same time the buyer accesses the TrustFunds payment link, the MLS integrated TrustFunds transaction table updates and auto-populates with "Payment Form Opened" along with the date and meridian time that the buyer opened the payment form.

317.    The TrustFunds buyer payment form is auto-populated with the property's current



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

MLS Listing Photo, the address of the property, and a photo of the buyer's agent, so the buyer can verify the property for which they are submitting earnest money.



Figure N: Sample buyer's Earnest Money Payment Form showing MLS Listing Photo and Buyer's agent as published on TrustFunds website

318. The buyer confirms the subject property MLS listing photo, address, and the identity of their agent. The buyer enters their name and the bank account information from which the earnest money funds will be drawn.

319. The buyer affirms the secret word provided to the buyer by their agent.

320. The buyer checks off a box to agree to the TrustFunds convenience fee when the buyer is paying the convenience fee.

321. The buyer then clicks "Submit Payment" to submit the convenience fee and earnest money transaction for third-party processing by ReliaFund.



322.    The buyer's TrustFunds convenience fee is processed by the ACH processor at the same time as the buyer's earnest money payment.

323.    The convenience fee is delivered to TrustFunds' bank account via ACH processing, while the earnest money is delivered to the designated earnest money holder's trust account via ACH processing.

### b.  TrustFunds Transaction Table show "Submitted"

324.    At the same time the buyer submits payment, the parties' MLS integrated TrustFunds Transaction Table updates and auto-populates with "Submitted" along with the date and meridian time that the buyer submitted the payment.

325.    The buyer's agent receives a real time automatic "Confirmation of Earnest Money Payment" TrustFunds email notification that indicates the buyer submitted their payment.

### c. Agents are Notified of Buyer's EM Payment Submission

326.    Uniquely, the buyer's agent's automated real-time "Confirmation of Earnest Money Payment" TrustFunds email notification includes the date of anticipated settlement of the buyer's earnest money.

327.    Upon the buyer's earnest money submission, the non-buyer parties to the transaction receive an  automated "Earnest Money Payment Status Notice" TrustFunds email notification indicating that the buyer has submitted their payment and includes the amount of the payment.

### iii.    ACH Timing

328.    The Federal Reserve's ACH timeframe for processing and settling payments is the same whether submitting a payment electronically on-line using TrustFunds or physically delivering a check to the bank.



329.    In 2022, it took four (4) business days (excluding weekends and holidays) to settle and deposit the funds into the recipient's bank account, per TrustFunds website.

330.    Recently, and likely in response to the underlying state court litigation, TrustFunds extended its ACH processing time to five (5) days, to better accommodate agents' routine practice of holding deals past the inspection contingency.[12] By increasing the ACH processing time, a buyer's agent has more time to cancel the earnest money transaction using TrustFunds if a buyer cancels during the contingency period.

### iv.    Receipts

331.    The buyer receives a separate TrustFunds email convenience fee receipt for their convenience fee payment to TrustFunds.

332.    The buyer also receives an automatic real-time TrustFunds email notification, "Payment Fully Processed," once the earnest money ACH process is complete.

333.    Once the earnest money ACH process is complete, the non-buyer parties to the transaction receive an automated real-time TrustFunds email notification, "Settled," that includes the MLS number, the property address, the trust account holder's name, and the amount of earnest money settled.

334.    Since at least 2022, the non-buyer parties to the TrustFunds transaction receive the "Settled" TrustFunds email notification at, or within minutes of 6:00 a.m., on the date of settlement.

---

[12] Many sellers and their agents negotiate a five-day inspection period versus a 10-day inspection period, to protect the sellers' interest against a lame duck buyer.



### a. TrustFund Transaction Table shows "Settled"

335.    On the date the buyer's payment settles, the parties' TrustFunds transaction table updates and populates with "Settled" along with the date and time of 6:00 a.m.

### v. Total Automated Real-time TrustFund Notifications per Transaction

336.    In 2022, assuming the buyer's agent and broker opted into all TrustFunds email notifications for the subject transaction, they would each receive four (4) real-time automated email notifications from TrustFunds at various stages of the earnest money transaction: "Earnest Money Request," "Earnest Money Status Change" (Buyer Submitted Payment), "Confirmation of Earnest Money Payment" (including the anticipated settlement date), and "Settled" notification.

337.    In 2022, at the completion of a typical TrustFunds transaction, the buyer received four (4) automated email notifications from TrustFunds: The "Payment Request Notification" email, a "Payment Fully Processed" notification, a "Settled" notification, and a TrustFunds "Convenience Fee Receipt" email.

338.    In 2022, assuming the seller's agent and broker opted into all TrustFunds email notifications for the transaction, they would each receive three (3) real-time automated email notifications from TrustFunds at various stages of the earnest money transaction: "Earnest Money Request," "Earnest Money Status Change," and "Settled" notification.

### vi. "Earnest Money Request History" Report / Proof of Payment

339.    The "Earnest Money Request History" report for any given transaction contains the aggregate details for the completed transaction as reflected in the TrustFunds Transaction Table.

340.    The "Earnest Money Request History" report is auto-populated with the subject



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

property's MLS listing photo, the property address, the MLS number, TrustFunds invoice number, a ReliaFund number, the invoice number, the buyer's payment information, and the relevant dates and times the buyers' payment status changed.

341.    An authentic TrustFunds "Earnest Money Request History" report from 2022, printed in 2024, for an unrelated property is shown below:





Figure O: **Exhibit 17**, Authentic 2022 TrustFunds "Earnest Money Request History" report, redacted

342.     The dates and times on an authentic "Earnest Money Request History" report reflect, within minutes, the dates and times that the parties to the transaction received their unique automatic, real time TrustFunds payment status email notifications from TrustFunds.

343.     The buyer's agent can generate an "Earnest Money Request History" report for the

completed TrustFunds transaction at any time.

344.     The agent who generated the report is identified on the bottom of the "Earnest Money Request History" report, along with the date and time that that agent generated the report.

### a.  TrustFunds: No Real-Time Notification to Sellers

345.     By design or due to technological limitations, TrustFunds does not send automatic email notifications directly to the homeowner seller, who is the beneficiary of the earnest money transaction.

346.     TrustFunds only generates TrustFunds email notifications to the parties to the TrustFunds merchant transaction: the buyer, the agents, the brokers, and their respective team members as designated in the agents' TrustFunds profile.

347.     Brokers and agents, however, are financially disincentivized from reporting TrustFunds fraud because it lessens the chance that the deal will close and, in turn, lessens the chance the broker will receive their commission.

348.     TrustFunds is also financially disincentivized from reporting TrustFunds fraud, since doing so would expose the significant technological shortcoming and security vulnerabilities inherent in using an online merchant-based payment platform for processing earnest money transactions for real property.



349.    TrustFunds is further financially disincentivized from reporting TrustFunds fraud because it may reveal the liability of TrustFunds' high fee-paying customers like Coldwell, and/or jeopardize TrustFunds lucrative monopoly-spot on the NorthstarMLS.

### b. TrustFunds: No Real-Time Notification of Settlement

350.    TrustFunds advertises that it provides real-time tracking for brokers to view the status of every earnest money payment submitted using the TrustFunds program.

351.    According to TrustFunds website, if a transaction is made with TrustFunds, "You [the broker] and the agents involved receive real-time notification, every.step.of.the.way." (**Exhibit 18**, Screenshot of TrustFunds website as of July 16, 2024).

352.    TrustFunds promises that the brokers and agents can see when each payment is requested, which property it's for, the earnest money amount, when the buyer has submitted the funds, and when the funds clear into the brokers' trust account.

353.    TrustFunds can not, and does not, accurately report when earnest money funds clear into each individual brokers' designated trust account.

354.    Due to technological limitations of which Ms. Leegard was unable to elaborate, in 2022, 2023, 2024, and likely other years, each and every TrustFunds "Settled" email notification and TrustFunds Transaction Table reflects an earnest money settlement time of 6:00 a.m. on the date of settlement.

355.    Confirming the use of ReliaFund's merchant-based platform, Ms. Leegard stated: "TrustFunds doesn't settle any transactions [...] We don't have anything to do with when it settles. That's ReliaFund as the processor."

356.    In 2022, 2023, and 2024, all TrustFunds Earnest Money Payment Request History Reports report a settlement time of 6:00 a.m. on the date of settlement.



357.    Yet, all individual earnest money payments do not actually clear into individual brokers' trust accounts at 6:00 a.m. on the settlement date.

358.    When asked what the term "Settled" indicates, as it is the term TrustFunds uses on every Earnest Money Payment Request History Report, Ms. Leegard stated that it means: "That the ACH system has finished processing."

359.    TrustFunds "Settled" email notifications do not accurately report when earnest money actually settles into the trust accounts that are designated on the parties' fully executed purchase agreement

360.    Since at least 2022, the TrustFunds "Settled" email notifications and attendant transaction tables and "Earnest Money Request History" reports, all report a settlement time of 6:00 a.m.

361.    And yet, TrustFunds claims it provides real-time status updates at every step, even though it cannot accurately report the settlement time of any given transaction.  Despite these limitations, TrustFunds continues to present its service as a reliable earnest money delivery service, abdicating all duty to report the status of the transaction to the homeowner seller and prioritizing TrustFunds profit above all else.

### c.    TrustFunds: A System Vulnerable to Fraud

362.    More significantly, the TrustFunds merchant-based system is vulnerable to fraud.

363.    The TrustFunds email notification bodies are easy to replicate, modify and re-use, by TrustFunds and any agent or broker or other third-party who has previously used TrustFunds.

364.    The 2022 TrustFunds email notifications contained the popular, and ubiquitous font, Helvetica. The 2024 TrustFunds email notices contain the font, Roboto.

365.    Ms. Leegard could not identify any security measures in place to prevent a



criminally-minded agent from up-cycling the body of a TrustFunds email notification or an "Earnest Money Request History" report to fake a payment and its receipt.

366.    With a pre-determined settlement time of 6:00 a.m. on every TrustFunds "Settled" email notification and Earnest Money Payment Request History Report, a settlement notification in particular, can be built to suit.

367.    Moreover, though the presence of automated real-time TrustFunds email notifications in the designated recipients' email inboxes appears to be one method to corroborate that a transaction was initiated in accord with the data on any given "Earnest Money Request History" report, Leegard claimed that the real-time email notifications were merely for "convenience," not security.

368.    According to Leegard, TrustFunds does not save automatic emails generated as part of any given TrustFunds transaction for more than 90 days.

369.    Leegard, though a real estate attorney in risk management for over thirty-years, refused to acknowledge that the statute of limitations for breach of a real-estate purchase agreement for damages is six-years, and not 90 days.

### d. TrustFunds Conceals the Earnest Money Pathway

370.    TrustFunds program, premised upon ReliaFund's merchant technology, conceals the earnest money pathway from the buyer's account to the merchant/broker's account.

371.    By anonymizing both the buyers' payment account information and the recipient trust account information, TrustFunds conceals the earnest money pathway from the parties to the transaction and, collaterally, the seller-beneficiary of the funds.

372.    The seller has no means to independently verify the submission, or the settlement, of the down-payment on their property.



373.    The seller must rely solely on their agent and/or broker to accurately report the status of the earnest money transaction.

374.    For Coldwell, a larger brokerage that has multiple trust accounts linked to TrustFunds, TrustFunds further utilizes a proprietary algorithm to direct earnest money into a particular trust account based upon the undisclosed algorithm and Coldwell's directives to TrustFunds.

375.    TrustFunds "help-desk" will not provide information about the specifics of any given transaction over the phone, even to the seller-beneficiary of the earnest money in question.

376.    TrustFunds "help-desk" directs all inquiries about earnest money to the designated trust account holder/recipient of the funds, the same broker/clients who pay TrustFunds' monthly and transactional fees.

377.    Even after being served with a subpoena in the state court case, TrustFunds agreed and conspired with Coldwell to withhold the identification of the particular Coldwell trust account that was to receive the Park Place earnest money.

378.    TrustFunds and Coldwell failed and refused to disclose Coldwell's routing and account number for the purpose of receiving the alleged TrustFunds deposit for the Park Place transaction purportedly initiated by Burger and remitted by Bulls on May 9, 2022.

379.    Instead, TrustFunds actively sought to conceal the premeditated earnest money scheme to defraud involving TrustFunds, Burger, Bulls, and Coldwell, as described with particularity, below.

## XII.    May 9, 2022: Continued Events

380.    Though the deal was signed on the eve of May 6, 2022, Defendants Bull had financial trepidation about proceeding with the $3,300,000 purchase.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

381.    To proceed risk-free, Defendants Bull sought to retain their earnest money until the last possible time: within days of, and only if, closing.

382.    Defendants Bull, or J. Bull individually, agreed and conspired with Defendant Burger to fake and delay the $100,000 earnest money payment for Park Place.

383.    With no money down, Defendants Bull could inspect the home and re-negotiate the purchase price to their liking, or walk away risk-free, and with a complimentary copy of Plaintiffs' architectural plans.

384.    But, Burger had to appease the Plaintiffs/sellers who wanted proof of Bulls' $100,000 earnest money submission prior to inspection.

385.    Together, J.B. 1 and J.B. 2, devised a workaround for the TrustFunds earnest money payment process: bypass TrustFunds entirely, but - with TrustFunds' complicity - fabricate false evidence to make it appear as though the payment was processed through TrustFunds' system.

386.    Burger used his knowledge of the insecure TrustFunds merchant-based on-line program, its generic email receipts and predictable 6:00 a.m. settlement times and leveraged his fee-paying relationship with TrustFunds to effectuate the scheme.

387.    To circumvent TrustFunds, Burger tendered a $5 convenience fee check to TrustFunds from Bulls' UMB -4774 checking account on May 9, 2022, in real life.

388.    Bulls' $5 convenience fee check tender created the false appearance that a contemporaneous $100,000 TrustFunds earnest money transaction was also commenced.

389.    To create evidence of the non-existent deposit, the next day on May 10, 2022, Bull earmarked $100,000 and $5 in Bulls' UBS Financial Resource Management Account to



create false "bank-records" to suggest that the $100,000 deposit to Coldwell was made by Bull on May 10, 2022, when no such deposit occurred.

### XIII.    May 9, 2022: 12:31 p.m. Burger's Wire Fraud

#### A.  Burger failed to "Notify Buyer" at TrustFunds

390.    Burger did not successfully navigate to the 2022 Park Place MLS listing at MLS Listing #6160342 to click on the TrustFunds blue and green bird-like dashboard icon.

391.    Burger did not successfully complete the TrustFunds "Notify Buyer" form for the 20570 Park Place property on May 9, 2022.

392.    Burger did not successfully submit the TrustFunds "Notify Buyer" form for the 2022 Park Place property on May 9, 2022.

393.    Burger did not successfully initiate the TrustFunds electronic earnest money payment request to jessebull@hotmail.com for the MLS Listing #6160342 on May 9, 2022.

#### B.  Burger sent an email to Byrd - "Sent off through trust funds"

394.    Instead, Burger sent an email to Byrd on May 9, 2022, at 12:31 p.m. or 12:32 p.m. claiming that the earnest money payment was "sent off through trust funds." (**Exhibit 19**, May 9, 2022 Email to Byrd from Burger at 12:31 p.m.).[13]

#### C.  No Real-time Automated TrustFunds Email Notifications

395.    But, Coldwell, Grieger, Byrd, and I. Byrd did not receive the initial real time TrustFunds  "Earnest Money Request" email notification on or before 12:31 p.m. on May 9, 2022, to indicate that Burger had initiated the TrustFunds earnest money request to Jesse Bull for Park Place.

---

[13] Coldwell's production includes two versions of Burger's May 9, 2022, email to Byrd—one sent at 12:31 p.m. and another at 12:32 p.m.—one with hard returns between the text (Exhibit 19) and the other without hard returns.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

396.     Likewise, TrustFunds did not automatically generate or send an "Earnest Money Payment Request" notification email to J.Bull at jessebull@hotmail.com on or around 12:31 p.m. on May 9, 2022, because Burger did not successfully initiate the TrustFunds transaction using the "Notify Buyer" form for the 20570 Park Place listing.

**D.  Bull was not Notified to make Payment**

397.     As a result, J. Bull did not receive the automated real-time "Payment Request Notification" email from TrustFunds at jessebull@hotmail.com, prompting him to submit the $100,000 Park Place earnest money payment through TrustFunds.

398.     Without the TrustFunds "Payment Request Notification" email from TrustFunds containing a unique earnest money payment link for MLS Listing #6160342 at Park Place, Bull was unable to access - and did not access - a TrustFunds payment form for the Park Place earnest money.

399.     Without access to the unique TrustFunds payment form for Park Place, Bull could not, and did not, remit a $100,000 earnest money payment to Coldwell via TrustFunds on May 9, 2022.

400.     Defendants Bull did not deposit $100,000 earnest money with Coldwell through TrustFunds on May 9, 2022.

**E.  Byrd to Burger: "TrustFunds didn't notify us like normal"**

401.     On May 9, 2022, Grieger's transaction coordinator, Byrd, was awaiting the first TrustFunds "Earnest Money Request" notification from TrustFunds, which would indicate that Burger had initiated the TrustFunds request to J. Bull.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

402.     However, Byrd did not receive the first, or any subsequent, automated real-time email notifications from TrustFunds on May 9, 2022, confirming that Burger did not successfully initiate the TrustFunds transaction.

403.     Grieger did not receive the first, or any subsequent, automated real-time email notifications from TrustFunds on May 9, 2022, confirming that Burger did not successfully initiate the TrustFunds transaction.

404.     I. Byrd did not receive the first, or any subsequent, automated real-time email notifications from TrustFunds on May 9, 2022, confirming that Burger did not successfully initiate the TrustFunds transaction.

405.     Additionally, Coldwell, Grieger, Byrd, and I. Byrd did not have access to an MLS integrated TrustFunds Transaction Table for MLS Listing #6160342 on May 9, 2022, confirming that Burger did not successfully initiate the TrustFunds transaction for MLS Listing #6160342.

406.     Coldwell, Grieger, Byrd, and I. Byrd did not have access to an MLS integrated TrustFundsTransaction Table showing "Email Sent" at or before 12:31 p.m. on May 9, 2022, confirming that Burger did not initiate the TrustFunds transaction for Park Place.

407.     After receiving Burger's "sent off through trust funds" email at 12:31 p.m. and in the absence of a legitimate "Earnest Money Request" notification from TrustFunds prior to 12:31 p.m., Byrd replied to Burger at 12:51 p.m.: "For some reason TrustFunds didn't notify us like normal." (**Exhibit 20**, May 9, 2022, email from Byrd to Burger at 12:51 p.m., noting the absence of a typical TrustFunds notification, stating, "TrustFunds didn't notify us like normal").

### F.  TrustFunds at The Reserve

408.     At the time of Byrd's 12:51 p.m. email to Burger, Burger was nearing, or at, The Reserve at 724 Bielenberg Drive, Woodbury, Minnesota 55125.



409.     The Reserve is a co-working and office space facility located at 724 Bielenberg Drive, in Woodbury, Minnesota.

410.     The Reserve is accessible to the public from 8:00 a.m. to 4:00 p.m., Monday through Friday. A key card is not required for entry into The Reserve during those times.

411.     TrustFunds LLC had an unlimited coworking membership plan at The Reserve during the month of May 2022 and TrustFunds incurred incidental charges at The Reserve that month.

412.     The Reserve's unlimited coworking membership plan includes full time, unlimited access to the co-working space at The Reserve, Monday through Sunday, 7:00 a.m. until 10:00 p.m.

413.     The Reserve's co-working space in Woodbury is a spacious area with numerous tables, chairs, and work-stations that are open to the front entry of The Reserve.

**G.  $5 Convenience Fee Check: Burger and Bulls' Wire Fraud**

414.     Sometime before 12:58 p.m. Burger met with Alisa Legris, TrustFunds' trainer and technical support specialist, and/or Lynn Leegard and/or another as yet unidentified agent(s) of TrustFunds at The Reserve on May 9, 2022.

415.     TrustFunds is an exclusively on-line earnest money payment platform; and as Leegard claimed, TrustFunds does not accept in-person payments.

416.     Nonetheless, Burger tendered a check to TrustFunds in the amount of $5 for the TrustFunds convenience fee on behalf of Bulls on May 9, 2022.

417.     The $5 check Burger tendered to TrustFunds bore the name of Jesse J. Bull Lee A. Bull with UMB routing number 044000804; and a checking account number ending in -4774.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

418.    A routing number on a check is a nine-digit code that identifies the specific bank where the account is held and from which the funds will be drawn.

419.    The routing number is typically located at the bottom left corner of a check and is essential for directing the transaction to the correct bank during the clearing process.

420.    The routing number 044000804 belongs to UMB, N.A., in Missouri.

421.    The UMB, N.A., account ending in -4774 is a joint checking account held by Jesse J. Bull and Lee A. Bull at UMB, N.A.

422.    TrustFunds accepted Bulls' $5 convenience fee check tendered by Burger.

423.    TrustFunds generated an invoice number of 699294 for Bulls' $5 convenience fee payment.

424.    TrustFunds produced a receipt for the transaction at 12:58:17 p.m. on May 9, 2022. (**Exhibit 21**, TrustFunds receipt for Bulls' $5 TrustFunds convenience fee payment, dated May 9, 2022, showing payment details for MLS Listing #6160342.).



**TrustFunds**
**724 Bielenberg Dr**
**Woodbury,MN 55125**
**Tel: 888-249-1616**

**Date:** 05/09/22 12:58:17

AVS Street:
AVS Zip:
Routing #: xxxxxxxx0804
Account #: xxxxxxxx4774
Type: Check Sale
Ref #: 3117472340
Auth Code: 316420
Invoice: 699294
Order #: 699321
PO #: 699294
Customer Id: 6160342
Description: Buyer Trans Fee

**AMOUNT:  5.00**
**TAX:  0.00**
===============
**TOTAL:  5.00**

X_____
Jesse J Bull and Lee A Bull

Figure P: Exhibit 21, TrustFunds Convenience Fee Receipt for $5 check sale drawn on UMB account ending in -4774, showing invoice number 699294, at 12:58 p.m.

425.    Burger, with his distinct grandiose signature, did not sign the $5 convenience fee receipt on behalf of Bull.

426.    TrustFunds retained a copy of the $5 Check Sale receipt for tax purposes.

427.    TrustFunds provided a copy of Bulls' $5 convenience fee receipt to Burger.

428.    The TrustFunds $5 convenience fee receipt included the last four digits of UMB's routing number, -0804, and the last four digits of Jesse J Bull Lee A Bull UMB checking account, -4774.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

429.    The TrustFunds $5 convenience fee receipt contained the TrustFunds' invoice number of 699294.

430.    The TrustFunds $5 convenience fee receipt contained the Customer Id of 6160342, the MLS Listing Number of Park Place.

431.    Burger kept the Bulls' TrustFunds $5 convenience fee receipt and the information thereon, for later.

**H.  Coldwell: We Didn't Receive TrustFunds "Step 1"**

432.    Meanwhile, on the afternoon of May 9, 2022, Byrd did not receive "step one," the first real-time automatic TrustFunds email notification from TrustFunds.

433.    Byrd clarified at deposition, "There's an email that goes out and it lets you know that the buyer's agent has initiated the TrustFunds transfer.  So that's like - step one."

434.    The purpose of TrustFunds step one is to notify the non-buyer parties to the transaction that the buyer's agent initiated the TrustFunds transaction, and as Byrd confirmed: "So that is an email that you normally, I believe, get confirmation of saying, you know, 'Joel Burger has initiated TrustFunds.'"

435.    "Q:  So you did not get that one? A: I don't recall receiving that. I definitely did not receive it to my email, no, I did not. No."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

```
 8          A.      There is an email that goes out and it
 9   lets you know that the buyer's agent has initiated the
10   TrustFund transfer.  So that's like -- that's step
11   one.
12          Q.      Okay.
13          A.      So that is an email that you normally,
14   I believe, get confirmation of saying, you know, "Joel
15   Burger has initiated TrustFunds."
16          Q.      Requests?
17          A.      Yeah, exactly.  Something along those
18   lines, yeah.
19          Q.      So you did not get that one?
20          A.      I don't recall receiving that.  I
21   definitely did not receive it to my email, no, I did
22   not.  No.
```

Figure Q: **Exhibit 22**, Byrd Depo. Trans., at 176:8-22

436.    To advance the transaction, Byrd overlooked Step 1 - the crucial first "Earnest Money Request" TrustFunds notification, which was essential to confirm that Burger had initiated the process.

437.    Had Burger initiated the TrustFunds payment request to Bull as he claimed at or before 12:31 on May 9, 2022, the first automated TrustFunds email notification would have been sent from TrustFunds to Coldwell and/or Grieger and/or Byrd in real-time - at or before 12:31 p.m. on May 9, 2022 - confirming that the payment request to Bull was initiated by Burger.

438.    Neither Coldwell, Grieger, Byrd nor I. Byrd received the initial TrustFunds "Earnest Money Request" email notification at or before 12:31 p.m., which would have confirmed that Burger had indeed "sent off through trust funds," as he claimed.

439.    Neither Coldwell, Grieger, Byrd, nor I. Byrd, had access to or could view an MLS integrated TrustFunds transaction table for MLS Listing 6160342 because Bulls' $100,000 TrustFunds earnest money transaction did not exist.

**I.    Burger's TrustFunds Transaction Table: Wire Fraud**

440.    TrustFunds transaction tables are available to all agents and designated parties to the subject transaction for all TrustFunds transactions initiated by the buyer's agent.

441.    Since Burger failed to initiate the Park Place earnest money transaction through TrustFunds, no real-time TrustFunds Transaction Table was generated to show the status "every.step.of.the.way."

442.    Simply put, no authentic TrustFunds transaction table exists for the 2022 Park Place MLS Listing because Burger did not initiate an earnest money transaction through TrustFunds.

443.    As a result, Coldwell, Grieger, Grieger's team members - including Byrd and I. Byrd at the time - as well as Wexford Realty, and any other parties and agents involved in the transaction, were unable to view a TrustFunds transaction table for MLS Listing #6160342, Park Place.

444.    To compensate for both the missing TrustFunds "Earnest Money Request" email notification from TrustFunds and the absence of a genuine TrustFunds transaction table, Burger fabricated an "Email Sent" entry on an out-dated TrustFunds "Earnest Money Payment History" report altered to appear like a TrustFunds transaction table for Park Place.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

80

445.    Burger, acting alone or with the assistance of TrustFunds personnel at The Reserve, falsified an 'Email Sent' entry dated May 9, 2022, on an old-format "Earnest Money Payment History" report that was generated by an unidentified individual at 12:59 p.m. that same day.

446.    When questioned at his deposition about the origin of this May 9, 2022, "Transaction table," Burger stated that it appeared to be "a screen on TrustFunds that shows payment history" and that it was, "clipped from that system in TrustFunds."



Figure R: Out-dated Transaction Table sent from Burger to Byrd in an email at 1:00 p.m. on May 9, 2022[14]

447.    Burger's forged transaction table, unlike an authentic transaction table, does not contain the 2022 MLS listing photo of the Park Place property. (**Exhibit 23**, May 9, 2022 Email from Burger to Byrd at 1:00 p.m. containing out-dated Transaction Table reflecting "Email Sent" at 12:20 p.m.).

---

[14]  Burger's email to Byrd was produced in black and white format, lacking meta-data, by Burger on or around March 14, 2024, in 27-CV-23-6625. Burger's documents were not searchable and contained no metadata.


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

448. Burger's outdated forged transaction table, unlike a current authentic transaction table, is entitled "Earnest Money Payment History" whereas an authentic transaction table is entitled, "Earnest Money Request History" report.

449. Burger's forged transaction table, unlike an authentic transaction table, does not contain the copyright date of the TrustFunds notice and the name of the agent generating the report.

450. On May 9, 2022 at 1:00 p.m., Burger emailed the forged TrustFunds transaction table to Byrd. *Id*.

451. The transaction table falsely reflected that Burger had initiated the Park Place earnest money payment request to Bull on May 9, 2022 at 12:20 p.m.

452. Neither Coldwell, Grieger, Byrd, nor I. Byrd received an automated real-time "Earnest Money Confirmation" notification from TrustFunds confirming that Burger initiated the earnest money transaction for Park Place at or around 12:20 p.m., on May 9, 2022.

453. In fact, no automated real-time TrustFunds email notifications were ever sent from TrustFunds to Grieger, Byrd, Grieger's team, Burger, Wexford Realty or Coldwell for the Park Place transaction at MLS Listing #6160342.

**J. Coldwell's Indifference: Holding the Deal without Earnest Money**

454. Grieger failed and refused to contact TrustFunds or Coldwell's administrators to determine why, if Burger claimed he "sent [it] off," neither Byrd nor Grieger received the usual email notifications from TrustFunds.

455. At his deposition, Grieger could not identify his Coldwell supervisor, claiming that "it isn't like that" and that Grieger was answerable to the Minnesota Department of Commerce.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

456. Despite Byrd's noted TrustFunds irregularity, Grieger, C. Byrd, and I. Byrd each failed and refused to verify whether Burger had initiated the TrustFunds earnest money payment request to Bull on May 9, 2022.

457. Grieger and/or Byrd knew, or should have known, that Burger failed to initiate the TrustFunds earnest money payment request, making it factually impossible for Bulls to submit an earnest money payment through TrustFunds.

458. Despite this knowledge, Grieger, Byrd, I. Byrd, and Coldwell remained silent and complicit in Burger and Bull's scheme to defraud Plaintiffs of the earnest money deposit on Plaintiffs property, breaching their fiduciary duties to Plaintiffs, and knowingly allowing Burger's fraud to continue.

459. Grieger, Byrd, I. Byrd and Coldwell deliberately withheld critical information from Plaintiffs, failing to disclose that Burger had not initiated the TrustFunds payment request, that Byrd and Grieger had not received any TrustFunds email notifications from TrustFunds, and that Bulls had not remitted the $100,000 earnest money payment to Coldwell through TrustFunds.

460. Instead, Grieger and Byrd chose to actively participate in the fraudulent scheme, facilitating the conditions that enabled Burger to issue another fraudulent TrustFunds notice via email to Byrd.

## XIV. May 9, 2022: 12:51 p.m. Wire Fraud

### A. Byrd to Burger: Can you forward the EM Confirmation when you get it?

461. Authentic automated real-time TrustFunds email notifications do not come from individual brokers or agents, like Burger; they come directly from TrustFunds to the designated parties to the transaction.



462.    By 12:50 p.m., on May 9, 2022, Grieger and Byrd still had not received the initial TrustFunds email notification that would indicate Burger had initiated a TrustFunds transaction for Park Place.

463.    By 12:50  p.m., on May 9, 2022, Grieger and Byrd still had no MLS integrated TrustFunds transaction table for Park Place to monitor the transaction "every.step.of.the.way," as there was no transaction to follow.

464.    With no pending TrustFunds transaction and no active transaction table in Grieger's, Byrd's, I. Byrd's, or Coldwell's TrustFunds transaction list for MLS #6160342 Park Place, Byrd emailed Burger: "Could you forward the confirmation that it [earnest money] was submitted when you get it?" (Exhibit 23**,** May 9, 2022 Email from Byrd to Burger at 12:51 p.m asking Burger to forward the TrustFunds confirmation when he gets it).

**B.  Grieger: I'm not capable of that [checking for TrustFunds emails]**

465.    Grieger professed ignorance of the TrustFunds system despite confirming that nearly all of Coldwells' earnest money transactions involve TrustFunds and that it's "been years since I've [Grieger] seen a check."

466.    Grieger, as the Park Place listing agent, claimed for the first time on February 26, 2024, that Grieger was unable to check his emails for TrustFunds notifications related to the Park Place property, testifying at his deposition, "I'm not capable of that."

**C. Burger to Byrd: TrustFunds Step 2, The Next Phase of Deception**

467.    To initiate an earnest money transaction through TrustFunds, the buyer's agent must first complete Step 1 - submitting the "Notify Buyer" form via the subject property's MLS listing page. Without this action, the buyer will not receive a payment request notification email from TrustFunds and cannot submit earnest money for the property through TrustFunds.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

468.    Since Burger failed to initiate the first step of the TrustFunds transaction for Park Place, Burger had to fabricate the appearance that Bull submitted the $100,000 earnest money without the unique payment link generated by TrustFunds that is sent to the buyer.

469.    By bypassing TrustFunds Step 1 - the "Notify Buyer" form submission - Burger jumped straight to creating false "evidence" that Step 2, the buyer's earnest money payment submission, had occurred through TrustFunds, even though no legitimate payment process was initiated.

470.    To falsify Bulls' completion of Step 2, Burger altered the content of a prior TrustFunds "Earnest Money Status Change" notification email, either from Burger's or Wexford Realty's records, or sourced online.

471.    Burger then created a fraudulent TrustFunds "Earnest Money Status Change" notification email using one of his multiple email addresses, embedding the modified content from the original TrustFunds notification.

472.    Burger's forged "Earnest Money Status Change" notification claimed that Bull had submitted a $100,000 payment to Coldwell via TrustFunds at 2:33 p.m. on May 9, 2022.[15]

473.    To complete the deception, Burger adjusted the subject line, date, and time of the email to make it appear as if it were a legitimate forward of an authentic TrustFunds notification received at 2:33 p.m. that same day.

474.    At 2:33 p.m., on May 9, 2022, Burger emailed the forged TrustFunds "Earnest Money Status Change" notification to Grieger and/or Byrd from one of his many email addresses.

---

[15] To date, Coldwell, Grieger, and Byrd, have failed and refused to disclose Burger's forged TrustFunds "Earnest Money Status Change" email that Burger emailed to Grieger and/or Byrd on May 9, 2022, at or around 2:33 p.m.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

475.    Grieger later admitted that the notice did not come directly from TrustFunds, stating, "Joel received the [Status Change] notice and then sent it to Chelsey who sent it to you [Plaintiffs]."

476.    However Grieger and/or Byrd and/or I. Byrd knew that authentic, real-time TrustFunds notifications are sent directly from TrustFunds to the parties to the transaction, not relayed by agents or brokers.

477.    Burger did not receive any authentic TrustFunds email notifications for the Park Place listing because he never initiated the TrustFunds transaction, meaning no TrustFunds notifications would be generated by TrustFunds or sent to any party - including Burger himself.

478.    The false TrustFunds submission notice that Burger emailed to Grieger and/or Byrd falsely indicated that Jesse Bull had submitted an earnest money payment of $100,000 on May 9, 2022 using TrustFunds. (**Exhibit 24**, May 9, 2022 Email to Plaintiffs from Byrd containing Burger's forged "Earnest Money Status Change" email).





Figure S: Exhibit 24, TrustFunds Email body Byrd received from Burger and forwarded to Plaintiffs on May 9, 2022, at 2:38 p.m.

479.    Byrd's "Earnest Money Payment Status" email, which purported that Bull submitted $100,000 via TrustFunds to Coldwell on May 9, 2022, is not authentic.

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

480.    This earnest money payment status notice was, in actuality, an email from Burger to Grieger and/or Byrd, crafted by Burger using a TrustFunds email body to create the false appearance that Bull had made a $100,000 payment through TrustFunds when, in fact, no such payment occurred.

| Chelsey Hagen-Byrd | February 08, 2024 |
|---|---|

Page 190

```
 1   received it from Mark Grieger's email account?
 2        A.    I don't think I feel comfortable saying
 3   100 percent for sure it came from Mark's, but that is
 4   typically how this works, is that that would go to
 5   Mark.  I, you know, want to make sure that -- could
 6   have been an email forwarded from Joel.  I don't know.
 7        Q.    Okay.  That was going to be my next
 8   question.
 9        A.    Sure.
10        Q.    Is there a possibility that this was an
11   email forwarded to you by Joel Burger?
12        A.    Yeah, there's a poss -- there's a
13   possibility.
```

Figure T: Byrd Depo. Trans., at 190, indicating that the payment notice was from Joel Burger

481.    Though heavily couched, Burger admitted that the May 9, 2022 TrustFunds "Earnest Money Status Change" "notification" he emailed to Byrd was not authentic.

482.    "Q: Do you know whether it's [May 9 "Earnest Money Status Change" Email] an authentic notice that was sent, Mr. Burger? [Clarifying question omitted] A: My knowledge is I am not a computer expert and I cannot guarantee this is authentic."

483.    On May 9, 2022, Defendants Bull did not submit a $100,000 earnest money payment via TrustFunds to Coldwell's trust account.

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

88

484.    But Byrd and/or Grieger, intent on holding the deal to prevent earnest money deposit while pushing the transaction past the inspection contingencies period, knowingly accepted the fake TrustFunds notice from Burger.

## XV.    Byrd: "I Clean It Up"

485.    As a transaction coordinator with experience, Byrd knew or should have known that Burger had not initiated a TrustFunds earnest money request, that the submission notification from Burger was not authentic, and that Bull had failed to remit the $100,000 earnest money to Coldwell via TrustFunds on May 9, 2022.

486.    Byrd and/or I. Byrd, acting independently or with the approval and/or willful blindness of Grieger, knowingly and actively assisted in perpetuating Bulls' and Burger's earnest money fraud scheme.

487.    Byrd offered that she had a  routine of accessing Grieger's emails, forwarding them to herself, and deleting the forward and header information: "So its common for me to clean the email(s) up [...]."

488.    Fully aware that Burger's and Bull's TrustFunds payment notification was forged, Byrd likewise 'cleaned up' Burger's purported TrustFunds email notification from May 9, 2022.

489.    Specifically, Byrd deleted Burger's email address pathway and header information, including the forwarding notation that revealed the 'TrustFunds notification' originated from Burger rather than TrustFunds

490.    By sanitizing and then removing Burger's 'TrustFunds' email header and forward information, Byrd concealed critical evidence of Bull's and Burger's earnest money fraud, allowing the fraudulent scheme to thrive unchecked.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

491.    Additionally, Byrd, either independently or under the direction of Grieger, Burger, and/or Coldwell, deleted Burger's forged May 9, 2022, 2:33 p.m. email to conceal the earnest money fraud.

## XVI.    Byrd's Wire Fraud: Notice Sent to Plaintiffs

492.    On May 9, 2022, at 2:38 p.m., Byrd forwarded Burger's fake TrustFunds submission notice to Plaintiffs from her own email address. (*See*, Exhibit 24.)

493.    Even with some working knowledge of TrustFunds, due to Byrd's 'spring cleaning' Plaintiffs could not detect that the notice had originated with Burger.

494.    To Plaintiffs, the earnest money submission email appeared legitimate, as though Byrd had received it directly from TrustFunds and then forward it once to them.

495.    Relying on this apparent authenticity, Plaintiffs accepted Byrd's email as true, believing that Defendants Bull had submitted the $100,000 earnest money payment on May 9, 2022.

496.    Byrd, expecting Plaintiffs' acknowledgement of her 'proof' of the $100,000 earnest money submission, grew irritated when Plaintiffs did not immediately respond to her cleaned-up version of Burger's 'notice' of the non-existent payment on May 9, 2022.

497.    In a follow-up email on May 10, 2022, Byrd pressed Plaintiffs, stating:

> I asked yesterday that one of you please confirm receipt of my email with the EM transaction receipt and that did not happen. I am assuming you did not see my email yesterday about the earnest money being submitted? You were watching that so closely, so I was surprised when I got no response even though it was requested.

498.    Plaintiffs replied to Byrd with an inquiry about settlement timing, to which Byrd responded:  "I'll let you know immediately when that [settlement] happens [...]"



499.    But, since Burger did not initiate the TrustFunds transaction on May 9, 2022, Coldwell and its agents never received an authentic "Settled" TrustFunds notification from TrustFunds for Park Place MLS listing #6160342.

500.    The only "Settled" notification that Coldwell and/or its agents Grieger and Byrd received were forgeries from the desktop of Joel Burger on an undisclosed date, in black and white photocopy format, lacking metadata.

501.    In the state court action, Coldwell did not, and could not, produce any authentic, real-time TrustFunds email notifications from TrustFunds for the Park Place transaction, including the "Settled" notification.

## XVII.    May 10, 2022: Bulls' Day Late and $100,000 Short Wire Fraud

502.    Burger and Bull agreed that J. Bull would also actively participate in the earnest money scheme to defraud.

503.    J. Bull was to earmark $100,000 "earnest money" and a $5 TrustFunds convenience fee in Bull's UBS Financial Resource Management Account (RMA) to create "evidence" suggesting that J. Bull made the TrustFunds payment from his UBS RMA account on May 10, 2022 to Coldwell.

### A.  "Earmarking"

504.    In the context of a resource management account, "earmarking" refers to the practice of designating a specific amount of funds for a future purpose or goal.

505.    Although earmarked funds remain part of the overall account balance, they are administratively separated and may appear as a debit to aid in budgeting and financial planning, helping to reserve funds for the intended purpose.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

91

506.    However, proof of earmarking is not proof that an actual debit from the underlying bank account to the designated party has occurred.

507.    But, Bull failed to even earmark the $5 or $100,000 in his UBS RMA account on May 9, 2022, as planned with Burger, to create 'evidence' consistent with Burger's forged TrustFunds submission notice dated May 9, 2022.

508.    With Bulls' one-day-late and $100,000-short attempt to fabricate May 9, 2022 evidence for the earnest money fraud scheme he orchestrated with Burger, the scheme began to unravel, creating a critical loose end.

509.    One day later, on May 10, 2022, Bull earmarked $5 and $100,000 in his UBS Financial resource management account.

| May 10 | Withdrawal | ACH WITHDRAWAL TrustFunds REF#:063112140750826 | -5.00 |
| May 10 | Withdrawal | ACH WITHDRAWAL UBS BANK USA REF#:231271360006280 | -1,557.29 |
| May 10 | Withdrawal | ACH WITHDRAWAL Coldwell Banker REF#:063112140752853 | -100,000.00 |

Figure U: **Exhibit 25**, Bulls' May 2022 select RMA entries on May 10, 2022

510.    Bull earmarked the funds to create the appearance of an ACH Withdrawal for the $100,000 earnest money payment to Coldwell and the $5 convenience fee to TrustFunds on May 10, 2022.[16]

511.    However, Bull's earmarking date of May 10, 2022, did not align with Burger's forged TrustFunds email notification dated May 9, 2022, nor with Burger's May 16, 2022, forged "Earnest Money Payment History" report, which also reflected a May 9, 2022, payment date.

**B.  RMA**

---

[16] In the state court case Bulls claimed inconsistently that their earnest money payment was made on or around May 9, 2022, or May 10, 2022, by one of J. Bull's unidentified UBS Financial team members, and later J. Bull claimed J. Bull made the payment using TrustFunds.

512.    UBS Financial offers clients, like Bulls, the RMA, which is a brokerage account combining investment management and cash management services.

513.    UBS Financial handles the investment-related aspects of the account, such as managing securities and advising clients on their portfolios.

514.    Bulls' UBS Resource Management account, designated as DXXXX28, is a pledged account.

515.    A pledged account is an account that is pledged as collateral for a loan or credit facility.

516.    Bulls' DXXXX28 resource management account is not a commercial banking account.

**C.  UMB Bank N.A.**

517.    UMB serves as the clearing bank or custodian for certain banking functions associated with Bulls' UBS RMA.

518.    UMB provides certain commercial banking services to UBS RMA clients such as providing check-writing services, issuing debit cards, and processing checks and/or debit card payments.

519.    UMB acts as the underlying financial institution that supports the cash management services that UBS provides to its clients through the RMA, but UMB does not handle the investment side of the account.

520.    UBS Financial's relationship with UMB allows UBS Financial to offer more comprehensive financial services by partnering with UMB, a commercial bank, for day-to-day transactional functions, while UBS focuses on wealth management and investments.

521.    In short, UMB provides commercial banking services for cash management



functions in an RMA at UBS Financial, while UBS manages the investments and overall account.

### D.  No Direct ACH: Bulls' RMA Account Lacks TrustFunds ACH Compatibility

522.     Thus, a TrustFunds ACH transaction cannot be made by J. Bull directly from Bulls' DXXXX28 RMA brokerage account.

523.     The buyer's TrustFunds ACH earnest money payment form requires an ACH-compatible bank routing number and checking account number.

524.     In other words, J. Bull cannot enter "DXXXX28," his RMA brokerage account number into TrustFunds' online payment form to submit the earnest money payment directly from J. Bull's brokerage account, using TrustFunds.

525.     Bulls' UBS Financial RMA is serviced by UMB Bank N.A., who provides commercial bank services to UBS Financial clients.

526.     In at least May 2022, Bulls maintained a UMB checking account in the name of Jesse J. Bull Lee A. Bull, with routing number 044000804 and account number ending in -4774.

527.     During her deposition, L. Bull confirmed the existence of her UMB checking account, estimated to be between three and ten years old or older. "Q: Okay. So you have a checkbook? A: Yes. Q: Okay. What does that link to? A: A bank. Q: Which one? A: It's called UMB." (**Exhibit 26**, L. Bull Depo. Trans., at 89:15-22).

528.     The $5 TrustFunds convenience fee submitted by Burger on May 9, 2022, was withdrawn from Bulls' UMB checking account ending in -4774 and remitted to TrustFunds on the same date.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

529.    The $100,000 earmarked on May 10, 2022, in Bull's RMA was not withdrawn from Bull's UMB checking account ending in -4774, nor was it remitted to Coldwell on May 9, 2022, via TrustFunds.

530.    Bull did not make a $100,000 earnest money payment from Bulls' -4774 UMB checking account to Coldwell for the Park Place transaction on May 9, 2022, or at any time.

531.    With intent to deceive, Defendants Bull, Burger, and Trucke presented the earmarked funds in DXXXX28, Bull's pledged Resource Management Account - a type incompatible with an ACH TrustFunds transaction - as 'proof' of a $100,000 earnest money deposit to Coldwell on May 10, 2022.

532.    With intent to deceive, Defendants UBS Financial and UMB failed and refused to disclose Bulls' checking account records for Bulls' UMB commercial checking account ending in -4774, to conceal the functioning of Bulls' RMA and the lack of $100,000 earnest money deposit to Coldwell on May 9, 2022.

533.    Thus, with the intent to deceive, Defendants Bulls, Defendant Trucke, and Defendant Burger passed off earmarked funds in DXXXX28, Bulls' pledged resource management account – an account incompatible with an ACH TrustFunds transaction – as "proof" of Bulls' never made $100,000 earnest money deposit to Coldwell on May 10, 2022.

534.    To smooth over Bulls' evidentiary blunder, Burger sought written confirmation from Byrd regarding their mutual TrustFunds fraud and Byrd's complicity in the earnest money scheme: "Chelsey - this [earnest money] was deposited yesterday [May 9, 2022], please confirm on your end.  I know you said you weren't getting notifications." (*See,* Exhibit 20).

535.    Byrd received no TrustFunds notifications from TrustFunds for the Park Place transaction on May 9, 2022; a fact she admitted at deposition in 2024.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

536.    Yet, on May 10, 2022 Byrd confirmed her knowing participation and complicity in the earnest money scheme to defraud: "Hey Joel, thank you so much for following up!  The email did finally come a little after I messaged you, so we are all good here!"

537.    Byrd was referring to her receipt of Burger's email(s) containing the forged TrustFunds transaction table and/or the "Earnest Money Status Change" submission notification that Burger emailed to Byrd after Byrd messaged, "For some reason we aren't receiving notifications as usual."

538.    Notably, Defendants Bulls did not assert a loss of $100,000, or any loss of interest on that amount as damages in the state court case for over two years.

## XVIII.    May 11, 2022: The Inspection

539.    Plaintiffs accommodated Bulls' extensive home inspection upon receipt of Byrd's May 9, 2022, email purporting to be a receipt for Bulls' deposit of $100,000 to Coldwell via TrustFunds on May 9, 2022.

540.    Prior to the inspection, Plaintiffs signed a radon inspection form as requested by Defendants Bull. (**Exhibit 27**, Radon Test Notification form, signed by L. Campoli).

541.    Charles Miller was scheduled to test for radon on the same day as the home inspection on May 11, 2022.

542.    Defendants Burger and Bull hired John Christianson of Inspector7 to perform a six-hour home inspection; from 1:30 p.m., until 7:30 p.m., at Park Place.

543.    Christianson arrived late, in a rusty white pick up truck, bearing no company logo.

544.    Christianson had no uniform or business card.

### A.  L. Bull: I Want You to Like It.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

545.   At around 4:30 p.m., on May 11, during the inspection period, Plaintiff M. Campoli re-entered his home to retrieve soccer cleats for his occasionally forgetful nine-year-old son.

546.   Upon entering, Plaintiff observed J. Bull and L. Bull in the northwest corner of the living room where L. Bull was consoling J. Bull, who appeared to be weeping with his face turned toward the window.

547.   Plaintiff M. Campoli overheard L. Bull saying, "This will be your house too. I want you to like it," while rubbing J. Bull's back.

548.   As Plaintiff walked through the kitchen, he passed Burger, who was pacing with his hands behind his back, visibly sweating.

549.   After retrieving his son's cleats, Plaintiff M. Campoli left the house and immediately related his observations to L. Campoli.

550.   Shortly thereafter, around 5:30 p.m., Plaintiff L. Campoli called Grieger to voice her continued concern that the Bulls were unwilling or unable to proceed with the purchase.

551.   In his characteristically flippant manner, Grieger replied, "Chill, honey." And when L. Campoli asked about the status of the earnest money, Grieger admitted that it had not yet settled.

552.   Meanwhile, under the direction of Grieger and/or I. Byrd, Byrd continued holding the deal to prevent earnest money settlement via TrustFunds at Coldwell.

553.   Byrd scheduled exterior spring marketing photos for May 12, 2022, with a follow-up shoot on May 13, 2022.

**B. Inspection: Paid by Burger, in Cash of unknown origin**



554.    Back at the house, Burger handed over $1,125 in cash to Christianson on the south-side of the property, purportedly as payment for the home inspection.

555.    When asked about the source of the cash, Burger responded, "my bag": Q: Where was that $1,125 coming from? Burger: That would have been my bag. (Burger Depo. 96:8-9).

556.    Despite stating the cash payment came from "[his] bag," when asked about the source of the funds, Burger repeatedly claimed, "I do not know."

557.    At the conclusion of the inspection, after 7:30 p.m., Christianson photographed the cash while seated in his truck.



Figure V: **Exhibit 28**, Christianson's photo of cash from Burger on May 11, 2022

558.    Christianson, duly served for deposition via Zoom in the state court case on April 11, 2024, failed to appear for his deposition. (**Exhibit 29**, Affidavit of Service for Zoom Deposition of J. Christianson).

559.    Plaintiffs' subsequent efforts to contact Christianson to reschedule the deposition were unsuccessful.

560.    Defendants Bull did not assert inspection costs as damages in the state court matter.

### C.  Appraised Value: $3,300,000

561.    Defendants Bull obtained an appraisal of Park Place.

562.    A property appraisal was conducted on May 10, 2022 by Travis William Schwab.

563.    The Park Place property appraised at $3,300,000, the contract price.

564.    In an email to Defendants' counsel with Burger cc-ed, J. Bull asserted that the appraisal was "pre-paid" and therefore not recoverable.

565.    Defendants Bull did not assert appraisal costs as damages in the state court matter.

**XIX.    Well-Inspection Contingency**

566.    Defendants Bulls' and Burger knew, as early as May 10, 2022,  that the companies they contacted to inspect the well would be unavailable before the well-inspection deadline of May 16, 2022.

567.    In a May 10, 2022 email to Grieger, Burger stated, "Stodola is backed up until the 17th. Kathy has me on a wait list. I am going to reach out to (sic) owner of McCarthy well who does our golf course work to see if they can get out there sooner.  They're based in Shakopee and he owes me one. Stay tuned on that."



From: Joel Burger <jburger@wexfordrealty.com>
Sent: Tuesday, May 10, 2022 12:54
To: Byrd, Chelsey <chelsey.Byrd@cbburnet.com>; Grieger, Mark D
<MarkGrieger@cbburnet.com>
Cc: Erin Bailey <erin@wexfordrealty.com>
Subject: RE: Park final

Team CB,

Few updates:

1. Buyers are electing to get a mortgage, you will likely see an appointment request
   for that as well for an appraisal through showing time
2. I'm working on a separate radon inspection as well whom buyer has a relationship
   with.  I'll facilitate access as soon as I hear back
3. Water/well testing - Stodola is backed up until the 17th.  Kathy has me on a wait
   list.  I'm going to reach out to owner of McCarthy well who does our golf course
   work to see if they can get out there sooner.  They're based in Shakopee and he
   owes me one.  Stay tuned on that
4. Lastly – we are likely going to have an amendment to assign purchase to buyer
   controlled LLC.  I'll wait on that until we get through the inspection period

Thank you!

Joel Burger
WEXFORD Realty

Figure W: **Exhibit 30**, Email between J. Burger, C. Byrd, and M. Grieger, dated May 10, 2022

568.    With no earnest money down, the well-inspection contingency deadline was of

little consequence to Defendants Bull who - through Burger - planned to breach the well

contingency.

569.    In a May 13, 2022, text exchange between Defendants' broker Joel Burger, and

Mark Grieger, Burger wrote:

570.    **Burger:** "[...] both companies unable to complete on time…no problem having

those results by monday.[17] [...] Thinking we can extend the scope of the inspection after monday

specific to a pass/fail on the water test [...] I have full faith everything is just fine, but she's a

doctor[18] and will want that assurance and verification. [...]"

---

[17] Monday, May 16, 2022.
[18] L. Bull is a veterinarian.

> Thinking we can extend the scope of the inspection after monday specific to a pass/fail on the water test. I have full faith everything is just fine, but she's a doctor and will want that assurance and verification. Call me when you have a free moment
>
> Thanks mark!

Figure X: Text Message sent from Burger to Grieger, dated May 13, 2022

571.    **Grieger:** "You should send me something in writing and signed that says what you want to do relating to the water test, Can you do that?"



Figure Y: May 13, 2022 Texts between Grieger (right) and Burger (left)

572.    However, Burger did not provide anything to Grieger in writing regarding the water test.

573.    Burger did not obtain a signed amendment to the purchase agreement to extend the scope of the well-inspection beyond the midnight, May 16, 2022, contingency deadline.

574.    Instead, Defendants scheduled a well-inspection for May 17, 2022. (*See* 27-CV-23-6625, Index. No. 6, Answer of Defendants, at 2, para. 6, "Admit"). According to



Stodola Well, the company scheduled to test the well on May 17, 2022: "The cost for this test is $445.00. It will be 2-3 business days to get the tests back." (**Exhibit 31**, May 10, 2022, Email exchange with Stodola Well).

575.    Even if Defendants Bull had permission to conduct the test on May 17, 2022, the results would take an additional two to three business days, necessitating either an amendment to the purchase agreement or a waiver of the well-contingency in writing, signed by Bulls.

**XX.    May 13, 2022: Earnest Money Still Unpaid**

576.    On May 13, 2022, Plaintiffs again inquired about the earnest money: "Mark, we are still in the dark here. Are they in or out?  My condition is not good and we need to assess our options today." (**Exhibit 32**, Text from L. Campoli to Grieger, at 9:09 a.m. on May 13, 2022; s*ee below* Figure Z).





Figure Z: Exhibit 32, May 13, 2022 Text between Grieger (left) and L. Campoli (right)

577.    Grieger's response: "I'm in a meeting until about 10 [... contact you after." *Id*.

578.    Grieger had advised Plaintiffs via email that the earnest money hadn't settled, but noted "it will probably settle tomorrow or Monday."[19] (**Exhibit 33**, Grieger's May 12, 2022 email to Plaintiffs, falsely asserting the earnest money would settle).

---

[19] Monday, May 16, 2022, the last day of the inspection period, and likely when Grieger and/or Byrd  intended to upload the deal if Bull didn't cancel during the inspection period.



579.    Grieger knew, however, that no earnest money could settle at Coldwell as long as he and Byrd continued to hold the deal, but he kept that information to himself.

## XXI.    Same-Day Radon Test Request

580.    Defendants Bull did not test for radon, as scheduled, during the six-hour inspection on May 11, 2022.

581.    On May 13, 2022, Burger texted Grieger to demand a same-day radon test.

582.    In turn, Grieger texted Plaintiffs, "I was just notified that the guy was not able to get there on Wednesday as planned. He'll have the results by Monday which is our inspection deadline." (Exhibit 32).

583.    Plaintiffs, unaware that the first radon test was not performed as scheduled on May 11, 2022, were notified just hours before the second radon inspection was to occur.

584.    Neither Grieger nor Burger sent a ShowingTime[20] request to Plaintiffs to accept or reject the second radon appointment.

585.    Grieger, who lives less than a block away from Plaintiffs, did not offer to open the door on behalf of Plaintiffs, for the second radon inspection.

586.    Still without proof of earnest money settlement on May 13, 2022, Plaintiff was not agreeable or physically able, to accommodate the same-day second radon test demand, texting: "Mark please cancel the radon test. I am unable to let this person in."

587.    Grieger's reply: "I'm in a meeting and running to another. Joel sent a text saying the radon guy left."

---

[20] ShowingTime is a home-showing and inspection appointment app used by agents and home sellers to schedule and receive approval for showings and inspections, among other things.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## XXII.    Plaintiffs Ask Grieger to Act in Their Best Interest

588.    As Plaintiff's medical condition became increasingly unstable, Plaintiffs informed Grieger around noon on May 13, 2022, that they sought to cancel the transaction.

589.    With half the business day remaining, Grieger tipped off Burger that the deal might not proceed.

590.    Meanwhile Grieger also connected with Finance and Commerce, a daily business news outlet, to report on the transaction.

## XXIII.    May 13, 2022 - Deephaven Farmhouse Sale for $4.1 Million

591.    Grieger, or other Coldwell agents to be identified in discovery, provided Finance and Commerce with false information about the Park Place transaction.

592.    Grieger and/or Coldwell reported that Grieger had listed 20570 Park Place and that it sold for $4,100,000 on April 22, 2022.

593.    Predictably, Burger saw the Finance and Commerce publication - printed "on Friday the 13th no less" - and contacted Tony Maurer, broker at Coldwell Banker Realty in Wayzata.

594.    Burger attached a screen-shot of the news release, which effectively served as an advertisement for Grieger and Coldwell.

595.    The article included an accurate description and address of Park Place with an advertised closing price of $4,100,000 on April 22, 2022, with Grieger listed as the seller's agent. (*See below*, Figure AA).





**Residential: Deephaven farmhouse draws $4.1 million**

A five-bedroom, five-bath, 7,300-square foot modern farmhouse in Deephaven has sold for $4.1 million. The cash sale closed on April 22.

The home was built in 2012 on 0.6 acres at 20570 Park Place. The online list of amenities is impressive, including two dishwashers, two washers and dryers, two Subzero refrigerators, a Wolf range, three fireplaces, home audio-visual system with Lutron lighting and an electric vehicle charger in the three-car garage. Finishes include hardwood throughout; slate and cedar accents, as well as granite, soapstone, and marble countertops.

Mark Grieger of Coldwell Banker Realty in Wayzata represented the seller.

| ✉ Email | 🖶 Print | in LinkedIn | ⓕ Facebook | 🐦 Twitter | 🟠 Reddit |

Figure AA: Coldwell's false press-release of May 13, 2022

596.    Instead of disavowing the false news, Grieger reacted with feigned surprise, exclaiming: "Wow! The facts are so misconstrued that it's shocking! Amazing that they would publish that." (**Exhibit 34**, Grieger's Finance and Commerce response email).

597.    Benefitting from the publicity for himself and Coldwell, Grieger - alongside Coldwell, Tony Maurer, and Anywhere RE - did nothing to remove the false article for nearly a year despite knowing the listing and sale information was entirely fabricated.

598.    In February 2023, almost a year later, Plaintiff discovered the publication and personally contacted Finance and Commerce to have the advertisement removed.

599.    Yet even after February 2023, Coldwell continued to advertise Plaintiffs' residence as 'closed' or 'for sale' on various Coldwell affiliated agents' websites via its MLS feed.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

600.     To generate leads for Grieger and/or other Coldwell agents in Wayzata, at least one such Coldwell website listed the property status as 'for sale' with MLS Listing photos from 2022, as of October 15, 2024.[21]

601.     At some point, Coldwell and/or Anywhere RE and/or Anywhere Integrated, and/or MLS removed the 2022 listing photos of Plaintiff's residence from MLS and Travis Senenfelder's personal Coldwell-affiliated website.

602.     However, Grieger and/or Coldwell's false article in Finance and Commerce on May 13, 2022 – at a time when only Grieger, Byrd, and Burger were aware of Plaintiffs' intent to cancel – encouraged Defendants Bull to pursue control over the equitable title to Plaintiffs' residence for profit, while also positioning Coldwell to force a closing and secure its commission.

## XXIV.     May 13, 2022 - Only the $5 Convenience Fee Settles

603.     In May 2022, ReliaFund's ACH processing time for TrustFunds transactions was four business days, excluding weekends and holidays.

604.     On May 13, 2022, Bulls' $5 convenience fee, tendered by Burger to TrustFunds on May 9, 2022, and processed by ReliaFund in accord with its 4-business day processing time, successfully settled at TrustFunds.

605.     However, Bulls' $100,000 earnest money payment, which had not been submitted to TrustFunds contemporaneously with the $5 TrustFunds convenience fee on May 9, 2022, did not settle at Coldwell's trust account on May 13, 2022.

---

[21] https://travissenenfelder.com/property/20570-park-place-nst6160342



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

606.    Since Bulls' $100,000 earnest money payment was never submitted via TrustFunds on May 9, 2022 along with the $5 convenience fee, ReliaFund had no $100,000 earnest money funds to process for MLS Listing #6160342.

607.    Bulls' $100,000 earnest money did not settle at Coldwell's trust account on May 13, 2022, because Bull did not remit an online TrustFunds earnest money payment from Bulls' -4774 UMB checking account on May 9, 2022, to Coldwell.

## XXV.    May 13, 2022: Planned Contingency Default

608.    On May 13, 2022, Grieger failed to disclose to Plaintiffs that, as per Burger's text to Grieger that same day, Defendants Bull planned to breach the well-contingency: "Thinking we can extend the scope of the inspection after monday (sic)." (**Exhibit 35**, Burger's May 13, 2022, Text to Grieger regarding extension of well-inspection contingency).

609.    Grieger, motivated by self-interest and potential for commission, chose not to inform Plaintiffs of Bulls' and Burger's  planned default or their earnest money fraud.

610.    And despite knowing that Defendants Bull were on the verge of defaulting on the well-contingency that, by its plain terms, gave Plaintiffs an option to cancel, Grieger chose not to inform Plaintiffs of that either.

611.    Grieger also failed to advise Plaintiffs to wait until May 16, 2022 – the expiration of the well-contingency – and Defendants' planned default, to sign the cancellation.

612.    Instead, Grieger communicated with Burger, disclosing private details about Plaintiffs' situation: "He [Grieger] was supremely rattled - I would have kept that under wraps if I was him until I had real information to share so it was definitely a raw reaction on his part."

613.    Following this, Burger texted Bull: "Month early delivery isn't out of the question."



614.    Plaintiffs waited for a response from Grieger regarding their proposed alternatives to signing a cancellation, but none was forthcoming.

615.    Instead, on the morning of May 14, 2022, Grieger prioritized a meeting and other social obligations over communicating with Plaintiffs.

616.    As a result, Grieger failed and refused to respond to Plaintiffs' inquiries on the morning of May 14, 2022.

## XXVI.    May 14, 2022: Plaintiffs' Cancellation Amidst Deception

617.    Still without proof that Bulls' earnest money had settled and with no communication from Grieger, Plaintiffs signed a cancellation shortly after noon on May 14, 2022. (**Exhibit 36**, Cancellation of Purchase Agreement, signed by Plaintiffs on May 14, 2022).

618.    Based on Grieger's and Byrd's repeated representations, both oral and written, that Defendants Bull had remitted $100,000 on May 9, 2022, via TrustFunds to Coldwell, Plaintiffs believed that Defendants Bull had made the deposit.

619.    Plaintiffs' May 14, 2022, cancellation therefore directed the $100,000 earnest money to be returned to Defendants Bulls and offered to cover any of Bulls' out-of-pocket and inspection costs.

620.    In her email to Grieger on May 14, 2022, Plaintiff provided both a lawful directive to obtain the counter-signed cancellation from Defendants Bull and a clear statement of the contractual grounds for Plaintiffs' cancellation:

> Mark, [...] you advised the other party earnest money had not actually been deposited with CBB and was still floating; as well, that the sellers were seeking an extension to the inspection contingency to get the well water tested outside the timeframe proscribed by the PA because they had no one set up on or before the May 16th deadline.

(**Exhibit 37**, May 14, 2022, Email to Mark Grieger from Plaintiff, at 4).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

621. Plaintiff requested swift and peaceful action because: "I would like to decrease my stress as it is not healthy for me or the baby. Thank you, Lauren + Mike." *Id.*

622. In his email reply, Grieger concealed both the Bulls' failure to submit the earnest money and the participation of Grieger and Byrd in Bulls' and Burger's earnest money fraud. Grieger asserted falsely:

> The earnest money was sent via trust funds by the buyers on Monday and once I received notification from trust funds of that happening Chelsey forwarded you that notice. The money is sent to Coldwell Banker's trust account and once the ACH clears (5-7 days) we get another notice from trust funds saying the earnest money is "settled". We are currently waiting for the "settled" notification.

*Id*, at 3.

623. Although Grieger knew that the unfulfilled well-contingency provided further grounds for Plaintiffs' cancellation, he also concealed Burger's and Bulls' planned default. He claimed: "I told you about a conversation with the buyer's agent about possibly extending the well/water test timeline [...] there hasn't been further discussion about the well/water test." *Id.*

624. Yet, at his deposition, Grieger admitted he knew from his communications with Burger prior to May 16, 2022 that Bulls could not perform the well-test on time.

## XXVII. Bulls' Reply: Decline to Sign

625. On May 14, 2022, Burger and Grieger spoke before Grieger sent Plaintiffs' signed cancellation to Burger.

626. During their conversation, they discussed that Burger's clients, the Bulls, should refuse to sign the cancellation: "Per our conversation."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

627.    Grieger failed and refused to obtain the counter-signed cancellation. Byrd and I.Byrd, too, failed and refused to secure the counter-signature.

628.    Byrd revealed her disloyalty and malicious disregard for Plaintiffs' interest in an email disclosed by Coldwell in September 2024: "When are you going to tell Lauren that the buyers aren't signing the cancellation (which I think is great honestly)? I feel like I'm watching a movie over here, on the edge of my seat to see what happens next!!" (**Exhibit 38**, Byrd's Email to Grieger, dated May 14, 2022, and disclosed by Coldwell on September 14, 2024).

629.    After communication with Burger, Bulls decided not to sign Plaintiffs' May 14, 2022, cancellation of purchase agreement.

630.    Bulls failed and refused to sign Plaintiffs' May 14, 2022, cancellation.

631.    At 9:37 p.m., on May 14, 2022, Grieger forwarded Burger's reply to Plaintiffs: "Mark, Spoke with our clients and we are going to politely decline to sign the cancellation and work towards a successful closing on Friday, June 3. Thank you! Joel Burger Wexford Realty."

632.    To obstruct Plaintiffs' ability to reach Burger directly, Grieger removed the header from Burger's email, concealing the time and source of Burger's response.

633.    Plaintiff requested Joel Burger's email address from Grieger, who provided info@wexfordrealty.com—an address that Burger had not used to send Bulls' cancellation response or prior communications with Grieger or Byrd.

634.    Plaintiffs requested immediate termination of the exclusive right to sell listing agreement with Coldwell in writing.

## XXVIII.    Coldwell to Plaintiffs: We Refuse to Terminate the Listing Agreement

635.    Coldwell failed and refused to terminate its listing agreement with Plaintiffs despite Plaintiffs' written requests to do so.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

636.    The brokerage agreement contained a six month "tail" period ensuring Coldwell's commission under certain circumstances, even if the property sold up to six months after the initial listing term.  Moreover, the agreement could only be terminated upon written agreement of the parties, Coldwell and Plaintiffs, respectively.

637.    But, in refusing termination, Coldwell remained obligated to fulfill its fiduciary responsibilities to Plaintiffs.

638.    Coldwell's motivation was profit driven. Burger noted, "They [Coldwell] have not canceled their contract with their clients and have no interest in doing so since they provided a service and also expect this to close." (**Exhibit 39**, Burger's May 25, 2022, Email to Deena Cole).

639.    Burger further recounted that Grieger, "called [Burger] out of the blue…and said he's going to fight for his commission with his own money if he has too (sic)," and "He's all red hot we all performed…"

640.    In his email to Maurer, Burger also inquired whether Coldwell would pursue its/his commission.

641.    Plaintiffs subsequently requested that Coldwell remove their home from the MLS. Coldwell failed and refused to do so.

642.    Instead, without Plaintiffs' knowledge or consent, Coldwell designated the Park Place listing as "TNAS" (Temporarily Not Available for Showing) for the remainder of the contract term.

643.    Byrd inaccurately informed Plaintiffs that 20570 Park Place was removed from MLS on May 15, 2022, though it remained listed in TNAS status until August 31, 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

644.    Even after the listing agreement expired, Grieger gave permission to Byrd to provide Burger with all the listing photos of Place at Burger's request. And she did.

## XXIX.    May 16, 2022: Burger's Fabricated "Earnest Money Payment History" Report

### A.  Burger: Let's Make "Evidence"

645.    On May 16, 2022, following his client's refusal to sign the Plaintiffs May 14, 2022, cancellation, Burger created a TrustFunds "Earnest Money Payment History" report, to show, "this is record that we deposited our earnest money [...]" (**Exhibit 40**, Burger's May 16, 2022, Email to L. Bull with Burger's TrustFunds "Earnest Money Payment History" report attached).

646.    Burger likely chose May 16, 2022, as it was both the final day of the inspection period and, after consultation with Grieger, the only date that Plaintiffs did not inquire about the settlement of the $100,000 payment in writing.

647.    To fabricate this evidence, Burger manually populated an outdated TrustFunds "Earnest Money Payment History" report template, which lacked the 2022 MLS Listing Photo of Park Place.

648.    Older format TrustFunds transaction tables and earnest money payment history reports do not contain the MLS Listing photo thumbnail, making them easier to replicate using basic cut-and-paste techniques.

649.     Using this older format, Burger filled in the report fields with fabricated timestamps: "Sent" at 12:20 p.m., "Payment Form Opened" at 2:31 p.m., "Submitted" at 2:33 p.m., and "Settled" at 6:00 a.m., on May 16, 2022. (**Exhibit 41**, Burger's TrustFunds "Earnest Money Payment History" report, dated May 16, 2022, at 4:54 p.m.)



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

113

### B. Burger: Fraudulent Use of $5 TrustFunds Convenience Fee Receipt to Fake Bulls' $100,000 EM Payment

650.    Burger manually populated the "Earnest Money Payment History" report to reflect an amount of $100,000.

651.    Burger populated the invoice number field using the same invoice number generated by TrustFunds for the $5 TrustFunds convenience fee, which Burger tendered on Bulls' behalf on May 9, 2022, at The Reserve.

652.    To maintain consistency, Burger entered the same UMB checking account information associated with the Bulls, using both the UMB routing number (044000804) and the last four digits of their bank account number (-4774). These details matched those on the original $5 convenience fee transaction receipt.

653.    Burger then screenshotted and/or otherwise reproduced the "Earnest Money Payment History" report as "proof" of Bulls' non-existent $100,000 earnest money transaction. Burger created this document on or around 4:54 p.m. on May 16, 2022, and shortly after, at 5:03 p.m., emailed it to Lee Bull at feic0006@umn.edu, writing, "Lee â€" (sic) forgot to tag you on this. (sic) this is record that we deposited our earnest money and shows the history on that." (Exhibit 40).

654.    Burger also sent the same "Earnest Money Payment History" report to Jesse Bull at Jesse.Bull@ubs.com stating: "Deposit information for your earnest money jb#2 [...]" *Id*.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS





Figure BB: Exhibit 41, Burger's TrustFunds Earnest Money Payment History, dated May 16, 2022, at 4:54 p.m.

655.    Burger's May 16, 2022, 4:54 p.m., TrustFunds "Earnest Money Payment History" report provided to the Bulls for future use, is not authentic.

**C.  Plaintiffs to Burger: Your Times Don't "Match Up"**

656.    In legitimate TrustFunds transactions, both the earnest money payment and the TrustFunds convenience fee are processed online and at the same time.

657.    In this case, the $5 TrustFunds convenience fee receipt from May 9, 2022, shows a $5 fee tendered at 12:58 p.m. for Jesse Bull at The Reserve.

658.    Therefore, if Bulls had indeed submitted a $100,000 earnest money payment alongside the $5 convenience fee on May 9, 2022, the "Earnest Money Payment History" report would reflect the same 12:58 p.m. submission time - not 2:33 p.m.

659.    However, Burger's fabricated "Earnest Money Payment History" report shows Bull did not purportedly open the TrustFunds earnest money payment form until 2:31 p.m. on May 9, 2022.  This discrepancy - showing a 95 minute gap between the $5 convenience fee tender and the alleged $100,000 earnest money payment - is inconsistent with any legitimate online contemporaneous earnest money plus buyer convenience fee, TrustFunds transaction.

660.    Burger's TrustFunds report, which claims a $100,000 earnest money payment by Bull at 2:33 p.m. on May 9, 2022, is therefore not authentic.

661.    In reality, Burger used the TrustFunds invoice number generated by TrustFunds for the uncoupled, in-person $5 convenience fee payment to populate a fabricated  to create a false record of a $100,000 never-made earnest money payment.

662.    For just $5, Burger created a misleading "payment history report" of a $100,000 earnest money payment using the $5 invoice number from the convenience fee he tendered at The Reserve.

663.    But, Burger also overshot the TrustFunds ACH settlement timeline by three days.

664.    In 2022, TrustFunds' ACH processing took four business days excluding weekends and holidays.

665.    If Bull had made an actual TrustFunds earnest money payment on May 9, 2022, at 12:58 p.m. or even at 2:33 p.m., contemporaneous with the $5 convenience fee payment, Bulls' $100,000 earnest money payment would have settled at Coldwell on May 13, 2022 - not May 16, 2022.

666.    Jesse Bull did not receive a TrustFunds earnest money payment request email from TrustFunds, open the TrustFunds payment form, or submit an earnest money payment to Coldwell using TrustFunds at any time on May 9, 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

116

667.    Bulls did not deposit Bulls' $100,000 earnest money with Coldwell via TrustFunds on May 9, 2022.

## XXX.    Plaintiffs to Coldwell: We Have Retained Counsel

668.    Plaintiffs retained Taft Law and expressly informed Grieger and Coldwell that they no longer had authority to act on Plaintiffs' behalf.

669.    Despite this notification, Coldwell repeatedly continued to communicate with Joel Burger into 2024, fully disregarding Plaintiffs' retention of legal representation.

670.    In May 2022, Anthony Maurer, a broker at Coldwell's Wayzata office, assumed control of the listing from Grieger, Byrd, and I. Byrd.

671.    Yet, Coldwell and Maurer still failed and refused to disclose to Plaintiffs' counsel that Grieger and Byrd held the Park Place deal, and continued to hold it as of May 16, 2022, effectively preventing the deposit of earnest money for the Park Place property even if the payment had been made.

## XXXI.    May 16, 2022: Well-Water Contingency Default

672.    The contingency unambiguously states that Defendants were to perform the well-water inspection or waive the contingency within ten-calendar days of May 6, 2022, the final acceptance date. (**Exhibit 42**, Well-Water Inspection Contingency).

673.    The Defendants Bull did not perform the well-water inspection within the ten-day timeframe. (27-CV-23-6625, Index. No. 6, Answer of Defendants, at 2, para. 6, "Admit").

674.    The Defendants Bull did not submit a signed waiver of the contingency within the ten-day timeframe or at any time thereafter. *Id,* at para. 7, "Admit."

675.    Plaintiffs had no contractual obligation to permit a well-inspection on May 17, 2022, after the contingency period had already expired.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

117

676.    On May 16, 2022, Defendants Bull even with two-days advance notice of Plaintiffs signed cancellation, failed and refused to waive the well-contingency, in writing, and signed by Defendants Bulls prior to the expiration of the well-contingency.

677.    The Park Place well-contingency expired at midnight on May 16, 2022.

678.    As of the expiration of the well-contingency, and in the absence of Bulls' signed waiver, the 20570 Park Place deal was lawfully canceled by Plaintiffs regardless of whether the Bulls signed off on it.

679.    The fact that Defendants Bull "politely decline[d] to sign the cancellation" on May 14, 2022, did not alter the validity of the agreement or the obligations it imposed upon Bulls to perform the contingency or waive the contingency in writing and signed by Bulls prior to May 16, 2022.

680.    Defendants Bull still had to comply with the contingency that Joel Burger drafted and Defendants Bulls signed.

681.    The Plaintiffs May 14, 2022, cancellation, though early, was legally operative as of the expiration of the well-contingency at midnight on May 16, 2022, in the absence of performance of the well-test or Bulls' timely waiver of the well-contingency in writing and signed by Defendants Bull.

682.    Thus, as of May 16, 2022, Park3.pdf  was canceled by Plaintiffs pursuant to the operation of the well-contingency.

683.    Coldwell, Grieger, Byrd, I. Byrd, Wexford, and Burger, knew that Bulls had defaulted on the well-contingency.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

118

684.     But, Coldwell, Grieger, Byrd, I. Byrd, Wexford and Burger, with significant monetary incentive to force the deal, actively concealed Defendants Bull's default from Plaintiffs.

685.     Coldwell, Grieger, Byrd, I. Byrd, Maurer, Rehman, Baker, and Burger did not advise Plaintiffs that Defendants Bulls failed to timely waive the well-contingency in writing and signed by Buyers, pursuant to the purchase agreement.

686.     Grieger, now showing his own appetite for betrayal, remained decidedly silent: "Not to mention that's a completely separate issue relating to the cancellation of a purchase agreement. I could respond telling her that but I'm not going to." (**Exhibit 43**, May 14, 2022, Email to Maurer from Grieger regarding failure to communicate with Plaintiffs about cancellation).

687.     Coldwell, via its broker, Maurer, Vice President of Sales, Tom Rehman, and President, Matt Baker, failed to disclose to Plaintiffs that as of midnight on May 16, 2022, Bulls well-contingency default coupled with Plaintiffs express directives to Grieger and signed cancellation effectively canceled the 20570 Park Place deal.

688.     Yet, Coldwell, even with knowledge of Burger, Grieger and Byrd's earnest money fraud, and Bulls' two contractual defaults, still failed and refused to obtain a counter-signed cancellation.

689.     Coldwell furthermore failed to discharge Maurer, Rehman, Baker, Grieger, C. Byrd., and/or I. Byrd, to date.

690.     Anywhere RE and Anywhere Integrated also failed and refused to discharge Maurer, Rehman, Baker, Grieger, C. Byrd, and I. Byrd, to date.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

119

691.    Instead, motivated by profit, Coldwell via Coldwell's leaders Maurer, Rehman, and Baker, together with Wexford Realty put together a plan to reinvigorate what they knew, or should have known, was a dead deal.

## CHAPTER 2: THE FRAUD SCHEME

### XXXII.    May 17, 2022: Burger to Coldwell: "I Need Clarity"

692.    In an effort to salvage the deal and its attendant commissions, Burger pursued a conversation with Coldwell on May 17, 2022, that was captured on Coldwell's voicemail: "Uh, I need to get some clarity for our clients. It's been four days and Marks Boned (sic) by this. NBA (sic) [...] If you can make a few minutes for me today [May 17, 2022] and just we can touch base and get a plan together. I really appreciate it. Thank you."

693.    Maurer, referencing his May 17, 2022, return phone call to Burger stated: "I had a most pleasant and productive conversation with Joel Burger… as such Joel and I felt it best for the three of us to conduct a collective call in which to discuss options."

### XXXIII.    May 18, 2022: Coldwell and Wexford's Clandestine Meeting

694.    On May 18, 2022, at or around 9:00 a.m. and without Plaintiffs' knowledge or consent, Maurer and Rehman held a phone conference with Burger.

695.    Upon deposition, Burger stated that the conversation with Maurer and Rehman entailed: "trying to find factual information that would be mutually beneficial for everyone's best interests" and to "help us understand where this transaction was going to go [...]"

696.    Burger did not, and would not, elaborate on the substance of the approximately 30 minute conversation; Burger denied discussing the Bulls' unpaid $100,000 earnest money.

697.    Upon information and belief, Burger knew or learned that Coldwell held the deal so that even if Bulls had made the $100,000 deposit using TrustFunds pursuant to the May 6,



2022, purchase agreement, no earnest money could settle in Coldwell's trust account prior to the Plaintiffs' May 16, 2022, cancellation of the agreement or afterwards.

698.     Burger did not disclose to Maurer and Rehman that, with Burger's assistance, Bull failed and refused to remit the $100,000 earnest money to Coldwell via TrustFunds.

699.     But Maurer and Rehman, lacking any authentic TrustFunds transactional data, knew that Bull failed and refused to remit the $100,000 earnest money to Coldwell via TrustFunds on May 9, 2022.

700.     In a May 18, 2022, email to Maurer from Tammy McWain, trust account Administrator nine (9) days after Bulls' purported submission of the earnest money: "This is in regard to 20570 Park Place…. Were we to receive EM?? This deal is NOT pending. Currently an active listing with us. NO PA or anything other than listing paperwork in the file. How would you like me to handle this?" (**Exhibit 44**, May 18, 2022, Email to Maurer from Tammy McWain regarding the lack of purchase agreement and earnest money for the Park Place transaction).

## XXXIV.     Coldwell:  Unable to Enforce the Well Contingency

701.     Coldwell could not enforce the well-contingency after Coldwell, Grieger and Byrd failed to retain Bulls' $100,000 earnest money.

702.     Coldwell "handled it" by concealing Defendants Bulls' well-contingency default from Plaintiffs.

703.     Coldwell failed and refused to inform Plaintiffs that Bulls had not provided a written and signed waiver of the well-contingency after failing to perform the test.

704.     At no point did Coldwell, Grieger, and Byrd disclose to Plaintiffs that Defendants Bull failed to submit a signed waiver of the well-contingency before its expiration.



705.    At Grieger's deposition, Coldwell and its attorneys Lind Jensen PA, actively concealed Defendants Bulls' well-contingency default by steering Grieger's deposition answers to create the impression that Grieger was vacuous and oblivious to the contingency.

For example:

**Q**: I mean, did you know back on May 16, 2022, that they breached the contingency?

**RICK LIND**: He said he can't recall.[22]

**GRIEGER**: I can't recall. I -

706.    Lind Jensen PA, continued to actively interfere with Plaintiffs' discovery efforts to conceal Coldwell's continued operation and management of the earnest money fraud scheme. During Grieger's deposition, Lind directed Grieger's testimony away from Defendants Bull's well-contingency default and toward Grieger's alleged ignorance and incompetence, attempting to frame the issue as a breach of fiduciary duty rather than deliberate fraud:

**Q**: I understand that. But, did you realize - let me use the word realize. When did you realize that, oh, the defendants breached the well contingency?

**LIND**: He's not said he's realized it.

**GRIEGER**: I didn't realize it.

707.    By emphasizing Grieger's purported lack of awareness, Lind Jensen PA and Coldwell sought to obscure their active role in facilitating Defendants Bulls' criminal misconduct, thereby concealing the intentional and conspiratorial nature of Coldwell's fraud.

708.    On May 16, 2022, and thereafter Coldwell could not enforce the well-contingency to induce Bulls' signature on the cancellation because Coldwell failed to retain and continue to retain Bulls' $100,000 earnest money.

---

[22] Rick Lind, standing in for Sloneker, was retained by Coldwell to defend Grieger's deposition.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

709.    Thus, there was no financial motivation for Bulls to sign the cancellation even after defaulting on the contingency because Bulls had already obtained equitable title to Plaintiffs' residence, then valued at $3,300,000, with no money down.

710.    Since Coldwell could not enforce the contingency which gave Plaintiffs the option to declare the agreement canceled, Coldwell concealed Defendants Bulls' defaults from Plaintiffs.

## XXXV.    Accord and Satisfaction

711.    Coldwell and/or Bulls and/or Burger came to an "accord and satisfaction" and/or "waiver" of claims on May 18, 2022, or afterwards.

712.    Coldwell recognized its significant liability to Plaintiffs and potential liability to Defendants Bull for its role in holding the deal and its negligent and fraudulent acts.

713.    However, Coldwell's liability to Plaintiffs was far greater, as Coldwell had purposefully facilitated the unlawful equitable conversion of title to Plaintiffs' residence to Bulls without earnest money, while Grieger and Byrd participated in Burger and Bulls' fraudulent earnest money scheme.

714.    To resolve these risks, Coldwell catered to Bulls, who had knowledge of the scheme and demanded compensation for their "efforts" and their silence.

715.    As further discovery will reveal, Coldwell agreed to remit $100,000 of its own funds as "earnest money" for Jesse Bull on the canceled Park Place purchase agreement.  This allowed Burger, Bulls, and Coldwell to conceal their liabilities: Burger and Bulls for faking a $100,000 TrustFunds payment, and Coldwell for holding the deal while Grieger and Byrd managed the scheme by concealing Bulls' default on the well-contingency, and materially misrepresenting the status of the earnest money transaction to Plaintiffs.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

123

716.    To induce Bulls to sign Plaintiffs' May 14, 2022, without Bulls' funds in Coldwell's trust account, Coldwell deposited $100,000 of its own money into its "Trident" account for Jesse Bull.

717.    Coldwell's deposit of $100,000 into Trident for Jesse Bull, in and affecting interstate commerce, created the false appearance that Bulls had submitted their $100,000 earnest money for Park Place and that Coldwell retained it.

718.    On or around May 18, 2022, Coldwell confirmed the deposit with Maurer and Rehman via email: "The $100,000 for Jesse Bull is in Trident. Joel is happy. All is well."

719.    In exchange for this financial accommodation and Coldwell's nondisclosure of Bulls' earnest money and well-contingency defaults, Bulls agreed to waive any claims against Coldwell.

720.    Coldwell, Maurer, Rehman, Baker, Bulls, and Burger, also agreed to remain silent - even in litigation - about the circumstances surrounding Coldwell's $100,000 remittance into Trident "for Jesse Bull." They further agreed not to disclose to Plaintiffs, or in future proceedings, that Burger had forged the TrustFunds notices and "Earnest Money Payment History" report to fake Bulls' 100,000 earnest money payment all while Coldwell held the deal to prevent earnest money settlement in Coldwell's trust.

721.    With this agreement in place, Coldwell, Burger, and Bulls aimed to pressure Plaintiffs to remit Bulls' ransom fee or close the deal under extortionate circumstances, absolving themselves of wrongdoing while securing their commissions.

722.    Burger emailed Coldwell in smug recognition of his leverage over Coldwell's fraud that resulted in unjust enrichment of $100,000 for Jesse Bull; in his email Burger thanked Coldwell for "looking out for the little guy in the room."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

124

723. Yet, despite Coldwell's $100,000 remittance for Jesse Bull to conceal its liability, Bulls still refused to sign Plaintiffs' May 14, 2022, cancellation.

724. For Burger and Bulls, the earnest money scheme to defraud was just getting fired up, and Coldwell was fueling the fire.

## XXXVI. Coldwell: No TrustFunds Notifications

725. By the morning of May 18, 2022, the earnest money had not settled in Coldwell's trust account for 20570 Park Place via TrustFunds because Burger failed to initiate the TrustFunds transaction, and Coldwell failed to upload the deal.

726. As a result, Coldwell and its designated parties to the transaction did not receive any authentic TrustFunds email notifications for the transaction associated with MLS Listing #6160342, nor could it produce any such notifications.

727. To conceal the absence of these notifications from Plaintiffs on May 18, 2022 - five days after a legitimate May 9, 2022 earnest money payment would have settled at Coldwell – Coldwell relied on Burger, whose expertise in creating false expense receipts was well within his wheelhouse.

728. Burger assisted Coldwell in aligning their stories and fabricating evidence of the appearance of a legitimate TrustFunds transaction for Park Place.

## XXXVII. Wolf to Burger: "All I have is emails and texts from Mr. Grieger saying it hadn't hit the account yet."

### A. Burger's call to Taft, between 2:49 p.m. and 3:03 p.m.

729. On May 18, 2022, between 1:19 p.m. and 2:49 p.m. Taft Law, via Attorney Matthew Wolf (Wolf) attempted to reach Burger six times via several different phone numbers Wolf obtained for Burger from online sources.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

125

730.    Wolf left two messages for Burger.

731.    Wolf sought to discuss, among other things, the missing earnest money because, "all I have is emails and texts from Mark Grieger saying that it hasn't hit the account yet."

732.    Burger returned Wolf's call at some time between 2:49 p.m. and 3:03 p.m.

733.    Wolf requested proof of earnest money deposit from Burger.

734.    At the time, Burger was then in possession of Burger's forged "Earnest Money Payment History" report dated May 16, 2022 at 4:54 p.m., the document Burger previously emailed to L. Bull at feic0006@umn.edu on May 16, 2022, purporting to be proof of Bulls' $100,000 payment to Coldwell. (*See*, Exhibit 40-41, Burger's "Earnest Money Payment History" report of May 16, 2022, at 4:54 p.m.).

735.    Burger, knowing his "Earnest Money Payment History" report was fake, did not immediately forward the forged "Earnest Money Payment History" report to Wolf during Burger's phone call with Wolf that occurred between 2:49 p.m. and 3:03 p.m.

736.    Instead, Burger, reverting to his initial payment delay tactic with Byrd, told Wolf that TrustFunds was capped at $50,000 and therefore Bulls remitted two TrustFunds' payments of $50,000 each, and the transaction was delayed.

737.    In the absence of any documentation from Burger to immediately substantiate Burger's claims, Wolf advised Burger he was going to follow-up with Maurer at Coldwell.

738.    In an email on Wednesday, May 18, 2022, at 3:17 p.m., from Wolf to Burger commemorating their earlier call: "Thank you for the discussion this afternoon. As discussed, we are rescinding the attached cancellation which was sent to you. I'll look for your confirmation or a receipt of the earnest money having been deposited. It looks like all I have is emails and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

126

texts from Mark Grieger saying that it hasn't hit the account yet. Thanks!" (**Exhibit 45**, May 18, 2022, Email to Burger from Wolf at 3:17 p.m.).

### B.  Burger's call at 3:06 p.m. to TrustFunds

739.    On May 18, 2022, at 3:06 p.m., shortly after his call with Wolf ended, Burger preemptively contacted TrustFunds.

740.    The call from Burger to TrustFunds was connected for five minutes and twenty-six seconds, from 3:06 p.m. until 3:11 p.m.

741.    TrustFunds' employee Kim McFarlin answered Burger's call.

742.    McFarlin conducted a typical help-desk intake to determine the identity of the caller and the nature of the call.

743.    Burger provided Ms. McFarlin with his name, brokerage affiliation, MLS Listing number at issue, the amount of the earnest money, Jesse Bull's name and email, the seller's brokerage and the settlement date and 6:00 a.m. time that Burger pre-filled on the fictitious "Earnest Money Payment History" report that Burger planned on tendering to Wolf.

744.    The purpose of Burger's call to TrustFunds was not to confirm the earnest money payment he and Bull purposefully faked, but to see what TrustFunds would say to Wolf, when, or if, Wolf called TrustFunds.

745.    Per the TrustFunds call record of Kim McFarlin on May 18, 2022, at 3:18 p.m. just after the call:

> Joel was calling in for confirm (sic) that this payment settled.  He said he received a phone call from the attorney for the seller saying CB did not have the money. I let him know he could reach out to the listing agent Mark Grieger or to Tammy McWain to confirm they received the funds. He will let us know if he needs anything else.

(**Exhibit 46**, May 18, 2022, Inbound call from Joel Burger at 3:06 p.m.).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

127

746.    At deposition Burger was confronted with McFarlin's intake and the fact that Burger, and not McFarlin, provided the May 16, 2022 at 6:00 a.m., settlement date during the call intake. Burger claimed, "I do not recall if Kim McFarlin provided that information to me or not." (**Exhibit 47**,  Burger Depo. Trans., at 351:9-14).

747.    TrustFunds did not confirm the settlement of Bulls' two $50,000 earnest money payments totalling $100,000 of earnest money.

748.    TrustFunds did not confirm a settled date and time of May 16, 2022, at 6:00 a.m.

749.    TrustFunds did not confirm or deny whether or not Jesse Bull remitted a $100,000 earnest money payment(s) to Coldwell using TrustFunds on May 9, 2022.

750.    TrustFunds failed and refused to disclose to Burger that no earnest money submission was made by the Defendants Bull utilizing TrustFunds for the Park Place MLS listing #6160342 on May 9, 2022.

751.    If TrustFunds did expressly state to Burger that TrustFunds had 'no record' of the transaction(s); TrustFunds failed to note that salient fact on its call log.

752.    To conclude the call, TrustFunds referred Burger to Coldwell.

753.    But, Burger already knew that Coldwell was not holding J. Bull's earnest money, both because Coldwell held the deal and because Burger didn't initiate TrustFunds, and then falsified a $100,000 TrustFunds payment submission notice to Byrd.

754.    Burger was satisfied that, after over five minutes, TrustFunds' "help desk" would not definitively state that no TrustFunds transaction had taken place, which justified Burger's continued use of the forged TrustFunds documents with Plaintiffs' counsel.

755.    At deposition, Burger confirmed TrustFunds' blind allegiance to protecting the



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

confidentiality of brokers who pay TrustFunds' fees: "Kim McFarlin is not authorized to give me information…"

### C. Burger's call at 3:18 p.m. to Coldwell: Let's Get our Stories Straight

756.    Two-minutes after his call with TrustFunds ended, Burger called Coldwell at 3:18 p.m. and left a message regarding the earnest money.

757.    Coldwell returned Burger's call shortly thereafter.

758.     Burger related to Coldwell what Burger told Plaintiff's counsel regarding Bulls' two $50,000 deposits to explain the "delay."

759.    Upon information and belief, Burger also shared with Coldwell that TrustFunds help desk response would not pose an impediment to Burger's and Coldwell's use of Burger's forged May 16, 2022 "Earnest Money Payment History" report as "proof" of Bulls' non-existent $100,000 payment.

760.    Burger reassured Coldwell that if Wolf called TrustFunds, TrustFunds "help desk" would refer Wolf to Coldwell.

## XXXVIII.    Coldwell to Wolf: Two $50K Earnest Money Deposits, and its Delayed

761.    Wolf contacted Maurer between 3:46 p.m. and 4:04 p.m., on May 18, 2022.

762.    Coldwell did not initially answer Wolf's call.

763.    Coldwell, with Maurer and Rehman now on the line, returned Wolf's call shortly before 4:04 p.m.

764.    Maurer echoed what Burger claimed; that Bulls initiated two $50,000 earnest money deposits via TrustFunds.

765.    Maurer explained that due to the dollar amount that there was likely a processing delay of some sort and settlement at Coldwell had not yet occurred.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

766.    Maurer advised Wolf he would work on getting confirmation of the earnest money payment to Plaintiffs' counsel.

767.    Maurer and Rehman failed to disclose to Plaintiffs counsel that Coldwell held the deal, and, as a result, Coldwell did not retain and continue to retain Bulls' $100,000 earnest money for Park Place and consequently, no settlement would ever occur.

768.    Maurer and Rehman failed to inform Plaintiffs' counsel that Bulls had defaulted on the well-contingency by not providing Coldwell with a signed waiver of the well-contingency prior to its expiration on May 16, 2022.

769.    Maurer and Rehman failed to disclose to Plaintiffs' counsel that, in the absence of a waiver of the well-contingency, signed, and in writing by the Buyers by May 16, 2022, that Plaintiffs effectively canceled the agreement as of midnight on May 16, 2022.

770.    Maurer and Rehman failed to disclose to Plaintiffs' counsel that Coldwell remitted, or agreed to remit, $100,000 for Jesse Bull in place of the $100,000 that Bulls' and Burger faked "using" TrustFunds.

771.    Maurer and Rehman acted as if the purchase agreement was in full force and effect and conveyed that the earnest money settlement was delayed.

**XXXIX.    Burger's 31-Minute Wire Fraud**

772.    But, now, emboldened by TrustFunds' ambiguity and Coldwell's complicity in Burger's and Bulls' earnest money scheme to defraud, Burger drafted an email reply to Attorney Wolf to show "proof" of Bulls' earnest money payment. (**Exhibit 48**, Burger's May 18, 2022, Email to Wolf containing forged TrustFunds "report" for $100,000 and "client's bank" snippet).

773.    The fact that Coldwell told Wolf there was no earnest money settlement as of May 18, 2022, because it was delayed, was not a deterrent to Burger.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

774.    With confidence in TrustFunds allegiance to its fee paying customers, and TrustFunds systemic failure to directly notify sellers about the status of their own transaction, Burger created proof of a $100,000 earnest money that did not exist.

### A. Burger to Wolf: Here's the Earnest Money Proof

775.    Burger composed an email to Wolf using the same forged "Earnest Money Payment History" report dated May 16, 2022, at 4:54 p.m. that Burger emailed to Jesse and Lee Bull, on May 16, 2022. (*See,* Exhibits 40-41).

776.    To beef up Burger's "proof" of Bulls' fake $100,000 earnest money payment, Burger also produced an excel-like snippet of a table, with numerals in red font, purporting to be "From client's bank." (Exhibit 48).

777.    The truncated table shows only two entries with a date of May 10, 2022: "ACH WITHDRAWAL TrustFunds …. -$5.00" and "ACH WITHDRAWAL Coldwell Banker… -$100,000." *Id.*

778.    The entries for "client's bank" are inconsistent with the appearance of Bulls' earmarked entries on Bulls' May 10, 2022, UBS RMA account; there is an unrelated transaction between the two purported debits on Bulls' UBS RMA account entries whereas the debits from Burger's snippet appear sequentially, one after the other.

779.    At deposition Burger testified, consistent with Burger's action of tendering an isolated $5 payment to TrustFunds, that Burger provided Wolf with proof of the $5 convenience fee payment, not the $100,000.

780.    But, Burger's intention, just like his email to Wolf, was quite clear: to provide false proof of Bull's never-made $100,000 TrustFunds deposit to Coldwell for 20570 Park Place.



781.     To lessen the chance that Wolf would follow-up with TrustFunds, Burger materially misrepresented the substance of his earlier conversation with TrustFunds, indicating that McFarlin confirmed that, "this did go through without incident and still shows complete on their end."

782.     To complete the email to Plaintiffs' counsel, a stern disapproval of Coldwell's informant, "If you have records of whom you spoke to at Coldwell Banker… I would appreciate being able to follow-up with them directly." (*See*, Exhibit 48).

783.     Burger's email to attorney Matthew Wolf on May 18, 2022 at 3:55 p.m., 31 minutes after his unproductive TrustFunds' call enabled Bulls' continued fraud: "I've verified in three different locations that this earnest money has indeed been deposited. Please see below:"



Figure CC: Exhibit 48, Burger's May 18, 2022, Email to Wolf containing forged TrustFunds "report" for $100,000 and "client's bank" snippet

784.    Wolf was persuaded by Burger's email "proof" of Bulls' earnest money payment.

785.    Wolf, acting upon Burger's email and TrustFunds information therein, conveyed to Plaintiffs that Defendants' Bull's earnest money was in order.

786.    But, Wolf's email, asserting that Plaintiffs would rescind the cancellation upon proof of the earnest money deposit, was legally inoperative to revive the Park Place purchase agreement, canceled as of midnight May 16, 2022.

787.    Plaintiffs did not execute a new purchase agreement for Park Place with Defendants Bull.



**XL.    Late Afternoon May 18, 2022: No Upload to Transaction Manager**

**A.  I Forgot to Upload the Deal**

788.    As of the morning of May 18, 2022, Grieger and/or Byrd and/or Coldwell were still holding the 20570 Park Place deal (Park3.pdf) that effectively prevented the settlement of earnest money in Coldwell's trust account, even if the payment had been made.

789.    On May 18, 2022, Byrd claimed that her delay in uploading the deal to Transaction Manager was: "I forgot;" and at Byrd's deposition in February of 2024, Byrd maintained this highly improbable explanation.

790.    Byrd also offered at deposition that maybe Tammy McWain "popped in" or Tony [Maurer] was in the office that day and instructed Byrd to submit the deal to Coldwell through Transaction Manager because Byrd forgot.

791.    But, Byrd's and Grieger's testimony in 2024, suggesting she and/or Grieger uploaded Park3.pdf  on May 18, 2022, was also false.

792.    Neither Grieger nor Byrd upload Park3.pdf ever, because as they and Coldwell well-knew, yet concealed from Plaintiffs, Park3.pdf was canceled by operation of the well-contingency that Bulls' defaulted upon as of midnight May 16, 2022.

793.    Coldwell could not lawfully upload Park3.pdf on May 18, 2022 or thereafter, because it was canceled as of midnight on May 16, 2022.

**B.  Coldwell: We can't upload the Park Place canceled deal**

794.    Coldwell could not legally upload a canceled purchase agreement to Transaction Manager.

795.    Coldwell could not legally retain buyer earnest money on a canceled purchase agreement either.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

### C. Coldwell: Make it Appear that We Uploaded the Park Place Deal

796. To create the appearance that Park3.pdf was uploaded to Transaction Manager and in turn, that Bulls' earnest money was retained by Coldwell, Byrd and/or another Coldwell agent or employee emailed the file Park3.pdf to: WayzataMN@mycbhomebase.com.

797. The file Park3.pdf did not include Plaintiffs' signed cancellation.

798. The act of emailing Park3.pdf to WayzataMN@mycbhomebase.com did not, in and of itself, constitute an upload to Transaction Manager.

799. On May 18, 2022, instead of uploading the Park3.pdf document to Transaction Manager, Byrd and/or Grieger and/or Coldwell uploaded a "MyDeals Transaction Sheet" to Transaction Manager that listed the document, "Park3.pdf.", to create the false appearance in the state court action that Park3.pdf was uploaded to Transaction Manager, when it was not. (**Exhibit 49**, Grieger's "My Deals Transaction Sheet" dated May 18, 2022).

### XLI. May 20, 2022: Coldwell: Let's Upload a New Deal

### A. Coldwell's Park Place Ghost Deal

800. Since Coldwell could not lawfully upload Park3.pdf because it was canceled by Plaintiffs, Coldwell devised a contract cancellation/commission-protection work-around.

801. Coldwell, using vestiges of Park3.pdf, created an entirely new Park Place deal, entitled "Bull Purchase Agreement.pdf." (hereinafter "Ghost Deal").

802. Coldwell forged this new purchase agreement, the Ghost Deal, in a fraudulent effort to revive the undisclosed canceled status of the Park3.pdf deal.

803. Coldwell removed Plaintiffs' and Defendants Bulls' signed well-water contingency addendum from the Ghost Deal as well as the Plaintiffs' May 14, 2022, signed cancellation pursuant to the Bulls' contingency default.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

804. To secure their commission perks and avoid suspicion, Coldwell staged a *Weekend at Bernie's*-style contractual cover-up - dressing up the void agreement, expelling Plaintiffs' damaging signed cancellation poison-pill, and making it appear valid and enforceable despite being legally dead.

805. To achieve the complete effect, Coldwell's Ghost Deal, at least as of May 22, 2024, was for a property located at "20 507 Park Place," an address that does not exist in Excelsior, Minnesota. (**Exhibit 50**, Ghost Deal for 20 507 Park Place attached to Rehman's Affidavit at 27-CV-23-6625, at Index No. 77, filed by Sloneker on May 29, 2024).



11. Said earnest money is part payment for the purchase of the property located at
12. Street Address: 20 507 Park Place
13. City of Deephaven _____, County of Henne pin _____,
14. State of Minnesota, Zip Code 55331 _____, legally described as BLOCK 001 COTTAGEWOOD SHORES THAT PART OF LOT 3 LY
15. ING SLY OF A LINE RUNNING FROM A PT IN THE WLY LINE OF SAID LOT DIS 158 59/100 FT SLY FROM THE NW COR OF SAID LOT TO A PT IN THE ELY LINE OF SAID LOT
16. Said purchase shall include all improvements, fixtures, and appurtenances on the property, if any, including but not
17. limited to, the following (collectively the "Property"): garden bulbs, plants, shrubs, trees, lawn watering systems,

Figure DD: Coldwell's Ghost Deal as of May 22, 2024 with address of 20 507 Park Place

806. The Ghost Deal for 20 507 Park Place contained a purchase price of $3,250,000; not $3,300,000.

807. The Ghost Deal required earnest money of $100,000 but not for 20570 Park Place; instead, the Ghost Deal reads: "Said earnest money is part payment for the purchase of the property located at Street Address: 20 507 Park Place."

808. For the Ghost Deal, a deal that Plaintiffs never signed, Coldwell remitted $100,000 into Trident for Jesse Bull on May 18, 2022.

809. But, Coldwell failed to retain and continue to retain Bulls' $100,000 for the authentic Park Place deal, Park3.pdf, or the Ghost Deal that replaced it.

810.    Plaintiffs did not sign Coldwell's Ghost Deal for 20 507 Park Place or agree to its terms.

811.    Instead, Coldwell recycled Campolis' signature pages from Park3.pdf and affixed them, and other pages of the Park3.pdf agreement, to the Ghost Deal.

812.    In this way, Coldwell made it appear as though the 20 507 Ghost Deal was the authentic Park Place purchase agreement between the parties, for which Coldwell was retaining $100,000 earnest money, all in an effort to conceal Defendants Bulls' default and Coldwells' long-term inability to enforce the well-contingency due to Coldwell's, Maurer's, Rehman, Baker's and Grieger's and Byrds' participation in Bulls' and Burger's earnest money scheme to defraud Plaintiffs.

813.    To conceal Coldwell's failure to retain Bulls' $100,000 earnest money and Bulls' earnest money non-payment, the Park Place 20 507 Ghost Deal would simply disappear from Coldwell's Transaction Manager, if Park3.pdf closed.

814.    If Park3.pdf did not close, Coldwell would hold Coldwell's $100,000 pursuant to the Ghost Deal and refer to it ambiguously as, "the Park Place transaction," with the hope that one day Coldwell's $100,000 would motivate Bulls to sign Plaintiffs' cancellation.

815.    On May 20, 2022, Coldwell uploaded the Park Place Ghost Deal to Transaction Manager without Plaintiffs May 14, 2022 signed cancellation.

816.    Coldwell's upload of this non-existent Ghost Deal to Transaction Manager was the means by which Coldwell repeatedly claimed in matter 27-CV-23-6625 that Coldwell held $100,000 earnest money for the Park Place deal; it wasn't the same deal.

817.    Coldwell's upload of the Ghost Deal to Transaction Manager on May 20, 2022, was also the means by which Coldwell repeatedly deceived Plaintiffs and Hennepin County



District Court, that Coldwell held the "earnest money" for the Park Place deal; it wasn't the same deal.

818.    Coldwell and/or its parent company was holding Coldwell's own $100,000 pursuant to the Ghost Agreement uploaded by Coldwell to Transaction Manager on May 20, 2022.

819.    And because the Ghost Deal related to a non-existent address on Park Place, there was no MLS listing from which a TrustFunds transaction could be initiated by Burger or anyone else.

820.    Coldwell has not retained and continued to retain Jesse Bull's $100,000 earnest money pursuant to the authentic 20570 Park Place purchase agreement from May 9, 2022, to September 13, 2024.

## XLII.    May 20, 2022: No Earnest Money

821.    Coldwell, and its leaders Maurer, Rehman, and then President Matthew Baker, all agreed and conspired to forge the 20 507 Park Place purchase agreement and deposit $100,000 of Coldwell's funds as "earnest money" to conceal Coldwell's routine practice of holding deals that, necessarily results in Coldwell's failure to retain earnest money on behalf of seller-clients and conversion of equitable title of sellers' real estate with no money down.

822.    With Coldwell's $100,000 "earnest money" on deposit for Jesse Bull, and free equitable title to Park Place, Bulls still had no financial motivation to sign a cancellation and relinquish their unlawful control of Plaintiffs' title.

## XLIII.    Fairways and Greens LLC's $100,000 Payment to Bulls

823.    Shortly after the signing of the Park Place purchase agreement, Defendants Burger and Bull agreed that F & G, LLC would take the title to Park Place.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

824.     Burger texted Bull: "This sale triggers getting into the business journal or finance and commerce with your name. May want to title in fairways and greens, then move to a trust, ect if you want to stay under the radar [...]" (**Exhibit 51**, May 6, 2022, Text between Burger and Bull).

825.     Burger: "My only nightmare is that guy out of Jacksonville." *Id*.

826.     Burger's text to Bull likely referred to Jason Cory, 49, of Jacksonville who was sentenced to 32 months in prison for federal tax evasion; Cory used his CEO position to cause more than $1.5 million to be deposited into the bank accounts of a shell company he controlled, falsified emails, and used money directed to the shell company to pay for personal expenses.[23]

827.     "Holy F***********!!!!" replied Bull. *Id.*

---

[23] https://www.justice.gov/opa/pr/former-florida-ceo-sentenced-prison-tax-evasion



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS



Figure EE: Exhibit 51, Text between Burger (right) and Bull (left)

828.    Even with knowledge of the potential consequences, Burger, J. Bull and L. Bull

remitted Bulls' $100,000 unpaid Park Place earnest money through Bulls' shell company F & G,

LLC.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

829.    On or around May 18, 2022, Burger and Bull executed a Fairways and Greens, LLC resolution drafted by Defendant Darji wherein F & G, LLC was to increase J. Bull and L. Bull's capital accounts by $50,000 each, for a total of $100,000. (**Exhibit 52**, F & G, LLC Park Place Resolution).

830.    On or around the same day of F & G, LLC's signed resolution, UBS Financial capital accounts belonging to J. Bull and L.Bull were increased by $50,000 each.

831.    A similar F & G, LLC resolution was signed for Bulls' subsequent purchase at 5 Webster Place, wherein the earnest money amount was $20,000 and Bulls' capital accounts were each increased by $10,000 by F & G, LLC. (**Exhibit 53**, F & G, LLC 5 Webster Place Resolution).

832.    Upon information and belief, J. Bull and L. Bull wrote the $100,000 unpaid Park Place earnest money off as a business expense in 2022.

833.    In and around July 2022, Mary Bull (Jesse Bull's mother) and Jesse Bull, purchased a black Audi SQ7 with red disc brakes with a fair market value of around $100,000.

834.    L. Bull drove the Audi SQ7 in 2022 but Bulls sold it prior to J. Bull's deposition on May 6, 2024.

**XLIV.    May 20, 2022: Plaintiffs Forfeit Earnest Money**

835.    On May 17, 2022, Plaintiffs were to close on Plaintiffs' new home.

836.    Given Plaintiffs' medical situation, Plaintiffs sought more time to close on their new home.

837.    Campolis paid taxes to the seller for delaying the closing to May 20, 2022, with the hope that circumstances would change. They did not.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

141

838.    The concern remained that if anything happened during the move, Plaintiff would not have enough time to get to the hospital.

839.    Campolis chose to prioritize the health and well-being of mother and child.

840.    The Campolis' choice came at a cost of $100,000 earnest money, which Campolis forfeited to the seller in the circumstances, pursuant to the purchase agreement they signed.

## XLV.    TitleNexus, LLC

### A.  A Title Company Providing a Wide Array of Services for Profit

841.    TitleNexus is a title company with multiple locations in and around the Minneapolis area.

842.    TitleNexus is owned by attorney Brian Hoelscher, Benji Merfeld, Kristene Gafkjen, and Deena Cole.

843.    TitleNexus provides a full panoply of services for its clients that some title companies will not entertain, such as third-party redemption.

844.    For a fee, TitleNexus also engages in transactions that extend beyond title services for the purchase or sale of real estate.

845.    TitleNexus utilized its escrow account(s), at least in and around May 2022, as a receptacle for "more than one but less than one-hundred" of Burger and Bull's mutual clients' UBS funds for expenses of various kinds.

846.    In exchange for TitleNexus' escrow account repository and check-writing services for Bull's and Burger's mutual clients, TitleNexus received fees and Joel Burger received fees.

847.    Prior to June 2022, Burger and Bull were long-term referral sources for TitleNexus and they "sent us [TitleNexus] multiple deals."



### B. TitleNexus Receipt of Park3.pdf Purchase Agreement

848.    On May 7, 2022, TitleNexus received the purchase agreement, Park3.pdf, from Joel Burger via email.

849.    TitleNexus reviewed the purchase agreement that included an all-cash $3,300,000 purchase price inclusive of a $100,000 earnest money deposit to be made by Bulls within two days of final acceptance date of May 6, 2022, two contingencies, and the buyers' option to obtain a mortgage.

850.    TitleNexus had knowledge of the terms and conditions of the Park Place purchase agreement, Park3.pdf.

851.    TitleNexus did not receive Plaintiffs' May 14, 2022, signed cancellation lacking Bulls' signatures from Burger.

852.    If TitleNexus did receive Plaintiffs' May 14, 2022 signed cancellation, TitleNexus ignored it, they claimed, because it was not fully executed by Bulls.

### C. "We are not closing"

853.    On May 25, 2022, Burger sent an email to D. Cole stating: "We are still moving UBS down the path of closing an they do not have this latest information [...]" (**Exhibit 54**, May 25, 2022, Email from Burger to Cole indicating that Burger is moving UBS down the path of closing).

854.    Prior to June 2, 2022, TitleNexus did not advise UBS Bank that the deal was off.

855.    TitleNexus was also, per Burger's input, preparing the file for closing.

856.    "Long story, the seller backed out and decided NOT to sell, fired their agent, Coldwell Banker has an attorney, the sellers have an attorney and the buyers have an attorney [...] we are not closing, but again, the buyer is acting in good faith and then going after the


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

143

sellers." (**Exhibit 55**, June 2, 2022, Email to TitleNexus owner Hoelscher from Cole advising "we are not closing" but, buyer is "going after the sellers").

857.    So that Bulls could "go after the sellers," TitleNexus scheduled, and maintained, the closing date at 11:30 a.m., June 3, 2022, at 500 Washington Avenue South, #1035, Minneapolis, Minnesota 55415.  TitleNexus provided Burger and the Bulls parking instructions via email. (**Exhibit 56**,  Email from TitleNexus to Bulls and Burger regarding scheduled closing date and time of June 3, 2022, at 11:30 a.m., at TitleNexus).

858.    To that end, TitleNexus was also in communication with the UBS loan officer and Bull's colleague, T.J. Mundy, who directed TitleNexus to title the property in Fairways and Greens LLC's name, and not Bulls'.

859.    Burnet Title, Plaintiffs' Coldwell-affiliated title company, aware of the Bulls' impending sham closing, and also aware that no earnest money had been deposited with Coldwell, failed to advise Plaintiffs or their counsel of the scheduled closing date, time, and location.

### D.  UBS Bank USA

860.    Meanwhile, UBS Bank was preparing Bulls' mortgage documents.

861.    Between May 9, 2022, and June 3, 2022, Defendant J. Bull applied for a $2,000,000 mortgage for the Park Place purchase, through Bulls' UBS affiliated lender,  UBS Bank.

862.    J. Bull did not disclose earnest money credit of $100,000 on his Park Place loan application.

863.    J. Bull failed to provide UBS Bank with proof of any $100,000 earnest money deposit to Coldwell prior to June 2, 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

144

864.    J. Bull did not amend his Park Place loan application prior to June 2, 2022.

865.    J. Bull's Park Place loan application shows no earnest money credit for Park Place. (**Exhibit 57**, J. Bull Park Place UBS Bank Loan Application).



Figure FF: **Exhibit 57**, Defendant J. Bull's only UBS Loan Application for Park Place, dated May 9, 2022, showing no earnest money credit

866.    The lender, UBS Bank, reviewed the Park Place purchase agreement to confirm the terms and conditions of the agreement, the amount of earnest money specified, and the involved parties.

867.    To assess Bulls' creditworthiness, UBS Bank reviewed Bulls' loan application, including debt-to-income ratio, credits, assets, liabilities, and employment status.

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

868.    Since J. Bull was employed by UBS Financial, UBS Bank's loan originator was Bulls' colleague TJ Mundy, to whom Bull made many referrals in the past.

869.    TJ Mundy DocuSigned Bulls' $2,000,000 UBS Bank loan application even-though Bull had made at least one dummy entry on the application: "Phone 111-111-1111" and Bull had not disclosed any earnest money credit of $100,000 even though that is what the purchase agreement required.

870.    At no point, prior to issuing a Final Loan Commitment, did TJ Mundy require an updated loan application from J. Bull.

871.    UBS Bank proceeded with underwriting the loan.

872.    UBS Bank, via its loan underwriter, did not confirm any transfer of $100,000 earnest money funds from Bulls' UMB checking account -4774 to Coldwell using TrustFunds on May 9, 2022.

873.    UBS Bank, via its loan underwriter, did not verify that J. Bull had earnest money credit of $100,000, operating as a deposit on the property, prior to issuing its Park Place Closing Disclosure on May 26, 2022.

874.    UBS Bank, after review of J. Bulls' financial accounts for the purpose of underwriting UBS Bank's $2,000,000 loan to J. Bull, determined that J.Bull had no earnest money credit of $100,000 for Park Place as of May 26, 2022.

875.    UBS Bank knew that J. Bull had not deposited $100,000 with Coldwell within two days of the final acceptance date of the Park Place purchase agreement and therefore had no earnest money credit to disclose.

**E.  Loan Deficiency Notice**

876.    On May 27, 2022, UBS Bank sent a loan application deficiency letter to J. Bull.



877.    In UBS' May 27, 2022, letter, UBS Bank indicated that J. Bull's loan application was deficient. The documentation that J. Bull was lacking included:

(1) Survey - Borrower to order and satisfy any survey requirement(s) the Title Company may require for the transaction;

(2) Operating Agreement - Borrower(s) to provide a copy of the LLC's Operating Agreement: including any and all amendments. Borrower(s) to certify documentation as true, correct and completed by suitable authorized representative of the company not more than 90 days in advance of closing;

(3) Members, Managers or Officers Certificate - Borrower(s) to provide Member's, Manager's or Officer's Certificate: Certifying: (1) copy of resolutions or other necessary management approval authorizing the loan transaction; (2) authorization of member, manager, or other suitable senior representative of the company to execute the documents related to the loan; and (3) listing the members, managers (if any) and officers (if any) of the company. Documentation must be the original from, dated not more than 30 days in advance of closing;

(4) Articles of Organization - Borrower(s) to provide for Articles of Organization: (or otherwise titled documents filed with governmental authorities for the creation of the corporation), including any and all amendments. Borrower(s) must certify documentation as true, correct and complete by the applicable governmental authorities not more than 90 days in advance of closing;

(5) Certificate of Good Standing - Borrower(s) to provide Certificate of Good Standing for the LLC as provided by the applicable governmental authorities not



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

more than 30 days in advance of closing (or such other date as required by the

title insurance company);

(6) Homeowner's Insurance Requirements - Borrower(s) will be required to have

homeowner's insurance which includes coverage for windstorm, hurricane, hail

damage, or other perils;

(7) Hazard Insurance Declaration Page - Hazard Insurance Policy Binder Declaration

Page naming lender as loss payee and verifying coverage is equal to the lesser of

either 100% of the replacement cost (new) or the unpaid balance of the mortgage,

but not less than 80% of the insurable value; and

(8) Hazard Insurance Maximum Deductible - Hazard Insurance Policy/Binder must

not exceed the allowable deductible of the higher of $1,000 or 5% of the policy

face amount, unless state law requires a higher maximum deductibility.

878.    J. Bull failed to correct all the deficiencies noted by UBS Bank prior to June 2,

2022.

879.    Bull questioned TJ Mundy about whether Bull could use another loan, a SBL

(securities backed loan), to make the downpayment on the loan for Park Place. (**Exhibit 58**, May

19, 2022, Email to TJ Mundy from J. Bull regarding use of SBL for downpayment on Park

Place).

**F.  Park Place Loan Commitment**

880.    Despite the outstanding Park Place loan application deficiencies, TJ Mundy sent a

Final Loan Commitment letter to J. Bull through the UBS loan portal on or around May 30,

2022.



881.    Despite the outstanding Park Place loan application deficiencies, Tobin Johnson, Senior Wealth Management Banker of UBS Bank requested another Final Loan Commitment letter from TJ Mundy on behalf of J. Bull on June 1, 2022.

882.    Johnson's email to Mundy, sent on June 1, 2022, at 12:52 p.m., states: "TJ, Does Jesse have his Final Loan Commitment Letter or whatever doc (sic) says he's fully approved and ready to close? If not, can you send it to him? I've also recommended he get a Verification of Assets letter through his branch to show multiple ways in which he's ready to close…Tobin"

883.    In response, Mundy emailed another Final Loan Commitment to J. Bull on June 1, 2022. (**Exhibit 59**, June 1, 2022, Email from TJ Mundy to J. Bull with Final Loan Commitment attached).

884.    But, J. Bull did not sign the UBS Bank Final Loan Commitment Letter for Park Place. (**Exhibit 60**, Unsigned Loan Commitment Letter from UBS to Bull, at 27-CV-23-6625, Index 118).

885.    J. Bull did not lock-in an interest rate for the Park Place loan because he failed and refused to sign the prematurely issued UBS Bank Final Loan Commitment Letter from T.J. Mundy on June 1, 2022.

886.    Thereafter, J. Bull still failed and refused to sign the UBS Final Loan Commitment Letter for Park Place.

887.    J. Bull's Park Place loan application remained deficient into November 2022.

**G.  Park Place Closing Disclosure: No Earnest Money Credit**

888.    UBS Bank must abide by "TRID" which stands for Truth in Lending Act (TILA) and Real Estate Settlement Procedures Act (RESPA) Integrated Disclosure.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

889.    TRID combines the disclosures required by TILA and RESPA into two main forms: (1) Loan Estimate and (2) Closing Disclosure.

890.    The Loan Estimate is provided to borrowers within three business days of applying for a mortgage, and outlines the terms of the loan, projected monthly payments, closing costs, and other important details.

891.    By law, the closing disclosure must be provided by the lender to the borrower at least three business days before closing.

892.    The closing disclosure details the final loan terms, including the exact costs of the mortgage and any other fees associated with the closing process.

893.    A Park Place Closing Disclosure was completed by UBS Bank on May 26, 2022, prior to the scheduled closing date of June 3, 2022.

894.    Prior to May 26, 2022, UBS Bank did not revise Bull's $2,000,000 Park Place closing disclosure to include $100,000 earnest money credit for the Park Place transaction.

895.    On May 26, 2022, J. Bull's Park Place UBS loan application showed no earnest money credit for the Park Place transaction because Bulls did not deposit $100,000 with Coldwell Banker Realty between May 9, 2022, and May 26, 2022.

896.    On May 26, 2022, J. Bull's UBS Bank Park Place Closing Disclosure showed no earnest money credit for the Park Place transaction because Bulls did not deposit $100,000 with Coldwell Banker Realty between May 9, 2022 and May 26, 2022.

897.    UBS Bank's Park Place closing disclosure indicated that Bulls' "Loan Estimate" generated from Bulls' loan application and "Loan Final" generated by UBS Bank after underwriting, were unchanged. (**Exhibit 61**, May 26, 2022 Park Place Closing Disclosure at 2).



898.    The May 26, 2022, Park Place Closing Disclosure shows that Bull "increased" his earnest money payment by $100,000 at closing on June 3, 2022, to compensate for the $100,000 he did not deposit with Coldwell within two days of final acceptance date of the Park Place purchase agreement.

899.    If Bulls' had made the $100,000 earnest money deposit to Coldwell within two days of the final acceptance date of the Park Place purchase agreement, the Park Place closing disclosure would indicate that the "Loan Estimate" and "Loan Final" had changed with respect to "Down Payment/Funds from Borrower" to reflect the borrower's prior earnest money payment.

900.    If Bulls' had made the $100,000 earnest money deposit to Coldwell within two days of the final acceptance date of the Park Place purchase agreement, the Closing Disclosure would indicate Bulls "decreased" the deposit payment by $100,000 because it was already paid by the borrower prior to the date of the closing disclosure.

901.    Instead, Bulls' Park Place Closing Disclosure states that Bulls "increased this payment [deposit]" by $100,000 because as of May 26, 2022 the $100,000 had not been previously deposited by Bulls into Coldwell's trust. (*Id.* at 3).

### H.  TitleNexus: No Earnest Money Credit

902.    On June 2, 2022, one day before closing, Sherri Ryan of UBS Bank sent the Park Place closing package to Deena Cole at TitleNexus via secure portal email.

903.    The closing package included Bulls' Park Place loan application, Bulls' Closing Disclosure, and other mortgage documents.

904.    In total, the Park Place closing package sent to Deena Cole from Sherri Ryan was over 50 pages in length.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

151

905.    Deena Cole, acting within the scope of her employment and consistent with her job responsibilities, reviewed the Park Place UBS closing package on June 2, 2022, sent by Sherri Ryan of UBS Bank USA via secure portal.

906.    Cole knew, after review of the UBS Park Place closing package and/or UBS Park Place loan application and/or UBS Park Place closing disclosure that Jesse Bull had no $100,000 earnest money credit as of June 2, 2022, for the Park Place transaction.

907.    Cole knew that Bulls failed and refused to submit an earnest money deposit to Coldwell within two days of final acceptance of the May 6, 2022 purchase agreement because the UBS lender documents reflected no $100,000 earnest money credit.

908.    In the alternative, Deena Cole did not review the UBS closing package on June 2, 2022, sent by Sherri Ryan of UBS Bank USA via secure portal because Cole knew that the deal was not going to close on June 3, 2022.

909.    Deena Cole did not review the UBS closing package on June 2, 2022, sent by Sherri Ryan of UBS Bank because Cole knew that the "closing" was a sham to set up the sellers for a lawsuit and Cole's was to create the appearance that Jesse Bull could perform at closing.

910.    The June 2, 2022, UBS lender documents sent by Sherri Ryan to Deena Cole, consistent with Bulls' Park Place loan application and Bulls' Park Place UBS closing disclosure, show that Bulls had no earnest money credit on the Park Place deal as of June 2, 2022. (*See*, Exhibits 60, 61).

911.    On June 2, 2022, Deena Cole emailed Brian Hoelscher indicating that the lender was unaware that the deal was off and TitleNexus anticipated receipt of $2,000,000 from the lender the following day.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

912. TitleNexus' attorney-owner Brian Hoelscher instructed Cole that she "should tell the lender what is going on" and "Don't just do anything the buyer attorney says." (**Exhibit 62**, June 2, 2022, 10:15 a.m., Email from Hoelscher to Cole regarding UBS Bank; Exhibit 55, "Don't just do anything the buyer attorney says").

913. Hoelscher failed to intervene to inform the lender of the situation and neglected to supervise Cole to ensure compliance with the law.

914. Cole did not contact the lender to inform them that the deal was off.

915. Rotman, fully aware that Bulls had not paid the $100,000 earnest money on the canceled Park Place agreement, advised Bulls to remit the full purchase price, including the unpaid earnest money, at "closing".

916. Rotman's instruction was intended to create the false appearance that Bulls could fully perform, enabling them - through Rotman - to fraudulently leverage equitable title to Plaintiffs' residence.

917. Yet, Rotman was not the only one giving instructions.

**XLVI.    June 2, 2022: The Wire Fraud Conspiracy**

918. On June 2, 2022, Joel Burger explained with particularity the specifics of the sham closing in an email to Deena Cole at TitleNexus, Jesse Bull, Whitney Ward at UBS Financial, and Erin Bailey at Wexford Realty.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

**From: Joel Burger** joel@burgercompanies.com
**Subject:** UBS / Title Nexus
**Date:** June 2, 2022 at 9:36 AM
**To:** Deena Cole deena@titlenexus.com,  Ward, Whitney Jo  whitney.ward@ubs.com
**Cc:** Erin Bailey  erin@wexfordrealty.com,  Jesse Bull Jesse.Bull@ubs.com

Whitney/Deena

Copying you both so you can respectively send secure instructions for a wire to each other.

UBS is going to wire $3,300,000 to Title Nexus so we can illustrate in good faith we have funds to close this sale.  Deena, will defer to you on adjusting that number I know you have incomplete numbers based on your counterpart at Burnet Title not being able to complete her job.

Once we have evidence that wire is at Title Nexus, we are going to send that right back to UBS.

Closing will not happen tomorrow.  We are working on a delayed closing scenario but attorney wants to be able to show that we are good to close on time tomorrow.

Thanks everyone!  Call if you have questions.

Joel Burger

Figure GG: **Exhibit 63**, June 2, 2022 Email from Burger to co-Defendant conspirators

919.    "Closing will not happen tomorrow [June 3, 2022]," Joel Burger emailed Deena Cole of TitleNexus, Whitney Ward of UBS Financial, Erin Bailey of Wexford Realty, and Jesse Bull at UBS Financial. *Id*.

920.    "UBS is going to wire $3,300,000 to TitleNexus so we can illustrate in good faith we have funds to close this sale [...] Once we have evidence the wire is at Title Nexus, we are going to send that [$3,300,000] right back to UBS," Burger directed, "Call if you have any questions. Joel Burger." *Id*.

921.    Per Burger's directions, UBS Financial and TitleNexus exchanged wiring instructions.

922.    TitleNexus and/or Cole did not "adjust that [cash to close] number" of $3,300,000 to reflect an earnest money credit of $100,000.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

923.    Cole did not adjust the $3,300,000 purchase price to account for a $100,000 earnest money deposit because no such deposit had been made by Bulls as of June 2, 2022.

924.    To feign performance and "go after the sellers," Bulls needed to transfer the full $3,300,000 purchase price without applying the $100,000 earnest money credit, as no such deposit had been made by Bulls with Coldwell under the legitimate 20570 Park Place transaction as of June 2, 2022.

925.    As Ms. Cole explained during her deposition: In some transactions, when the seller's broker's commission exceeds the buyer's earnest money on deposit, the earnest money is not transferred to the buyer's title company at closing. Instead, it is accounted for as a buyer credit by the title company during the closing process.

926.    In short, the buyer is not required to make the earnest money payment twice, regardless of whether the actual funds remain with the seller's brokerage as commission compensation.

927.    Thus, if Bull had made the $100,000 earnest money payment to Coldwell prior to June 2, 2022, TitleNexus would have adjusted the cash-to-close by $100,000 to reflect the earnest money credit, even if the funds remained with Coldwell.

928.    However, because Bull did not make the $100,000 earnest money deposit to Coldwell prior to June 2, 2022, Cole did not adjust the $3,300,000 purchase price to account for a $100,000 buyer earnest money credit.

929.    To demonstrate his ability to perform, Bull needed to wire at least the full purchase price of $3,300,000 including the $100,000 unpaid earnest money.[24]

---

[24] The $3,300,000 was likely deficient in any event because it did not include additional typical buyer costs and TitleNexus' fees.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

**XLVII.     June 3, 2022: The Sham Closing**

### A.  The Circular Wire Transfer

930.     Defendants TitleNexus, J. Bull, Wexford Realty, Burger, and UBS Financial and/or UBS Bank, agreed and conspired with each-other to effectuate the sham closing utilizing wire transfers of U.S. currency affecting interstate commerce.

931.     On June 3, 2022, Whitney Ward, acting under the direction of Defendant J. Bull and using the resources of UBS Financial and/or UBS Bank, prepared a wire transfer in the amount of $3,300,000 according to J. Bull's instructions.

932.     The designated beneficiary of the wire transfer was Jesse Bull, as specified by Ward during its preparation.

933.     Jesse Bull was designated as both the sender and the beneficiary of the wire transfer as shown on the IMAD/OMAD wire transfer receipt. (**Exhibit 64**, Federal IMAD/OMAD Wire Receipt).

### B.  The Wire Transfer was not Cash or a Mortgage

934.     The $3,300,000 wire transfer from J. Bull's UBS account to his Crown Bank account originated from a UBS Financial or UBS Bank line of credit account.

935.     The funds did not come from a checking or savings account containing cash belonging to Jesse or Lee Bull.

936.     The UBS line of credit wire did not qualify as either Bulls' cash or a mortgage as required under the terms of the Park Place purchase agreement.

### C.  The Wire Transfer Included Bulls' $100,000 unpaid earnest money



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

937.    Jesse Bull's $3,300,000 wire transfer from his UBS line of credit account to his Crown Bank account included the $100,000 previously unpaid earnest money for the Park Place transaction.

938.    In case 27-CV-23-6625, Defendant Ryan Trucke confirmed on the record that the $3,300,000 wire transfer included the $100,000 earnest money: "All the funds, to our knowledge – the earnest money funds as well as the closing funds – were deposited with the title company [TitleNexus] that was closing the transaction." (**Exhibit 65**, Motion Hearing Trans., at 24 -25, August 23, 2023 in 27-CV-23-6625).

939.    Trucke also claimed that he and others were unaware of the funds' subsequent transfer, stating:

> "we weren't aware that the funds – when the closing did not occur – went back to Coldwell Banker Burnet, which is where our confusion originally started with. We were under the understanding that the title company still had the $100,000 earnest money funds because they had all of the funds..." *Id.*

### D.  False Representations by Trucke

940.    Despite these statements on the record, Trucke and Bull were fully aware that the $100,000 earnest money had never been transferred by TitleNexus to Coldwell Banker Burnet.

941.    To conceal this fact, Trucke falsely asserted that TitleNexus still held the $100,000 earnest money, claiming, "the title company still had the $100,000 earnest money funds because they had all the funds."

942.    Trucke's false claim was consistent with J. Bull's Exhibit B, a fictitious TitleNexus ledger Burger and/or Bulls obtained from TitleNexus showing only a one-way transfer of $3,300,000 to TitleNexus.



### E. The Creation of Fictitious TitleNexus Single Balance Ledger

943.    On June 3, 2022, Defendants Burger, J. Bull, and L. Bull arrived at TitleNexus before noon as part of their plan to collect the fabricated TitleNexus Single Balance Ledger as "evidence." (*See,* Exhibit 63).[25]

944.    Burger and the Bulls sat at a closing table for approximately 15 minutes, waiting for TitleNexus to produce the desired "evidence"—a document indicating that the UBS wire transfer to Jesse Bull had been deposited into a Crown Bank account maintained by TitleNexus.

945.    However, TitleNexus did not receive a deposit of $3,300,000 in purchase funds, including the $100,000 earnest money, for the Park Place transaction. Although TitleNexus maintained the Crown Bank account to which the $3,300,000 was transferred, the funds remained under the name of Jesse Bull, the designated beneficiary.

946.    Furthermore, Bulls failed to sign the buyer documents necessary to authorize the purchase of Park Place and the disbursement of sale proceeds. Without these authorizations, TitleNexus lacked legal authority to disburse the $3,300,000 to Plaintiffs, the sellers of Park Place, either on June 3, 2022, or at any other time.

947.    Despite knowing that the $3,300,000 was nothing more than a circular wire transfer remaining under Jesse Bull's control, TitleNexus knowingly proceeded to fabricate the Single Balance Ledger.

948.    Cole's decision was not only reckless, but intentional, aimed at creating the false appearance of compliance with the purchase agreement and facilitating the fraudulent scheme orchestrated by Burger and Bull to "set up the sellers".

---

[25] At deposition, Burger and J. Bull denied attending the closing in-person and later, after confrontation with Cole's testimony, Burger claimed, "I do not recall."



949.    While Burger and Bulls waited at TitleNexus, Deena Cole entered data into TitleNexus' computer system to generate the Single Balance Ledger, which falsely represented a one-way transfer of $3,300,000 to TitleNexus, concealing the circular nature of the transaction.

950.    Cole then transmitted the Single Balance Ledger, along with the false information it contained, to a connected printer at TitleNexus to produce the "evidence" that Burger and Bull were anticipating.

951.    First, Cole printed a partial Single Balance Ledger at 12:00:23 p.m. This initial ledger reflected only the one-way transfer of $3,300,000, which included Bulls' $100,000 earnest money, to TitleNexus on June 3, 2022. (**Exhibit 66**, June 3, 2022, TitleNexus Partial Single Balance Ledger).





Figure HH: **Exhibit 66**, TitleNexus Partial Single Balance Ledger produced by Cole on June 3, 2022, and e-filed in Hennepin County on July 26, 2023, by Trucke as Exhibit B to Trucke's Complaint

952.    The partial Single Balance Ledger provided to Burger and Bull at their request concealed what TitleNexus had agreed and conspired to do: wire the money back to UBS when the closing failed to occur.

953.    Thus, TitleNexus and Cole, acting within the scope of her employment and using interstate wires, produced a false and fraudulent ledger that falsely represented Bull had remitted $3,300,000 to TitleNexus, including the $100,000 unpaid earnest money.

954.    The partial Single Balance Ledger also reflected that TitleNexus retained the $3,300,000, inclusive of the $100,000 earnest money, when the closing failed to occur.

955.    Approximately thirty-eight seconds later, at 12:01:01 p.m. on June 3, 2022, Cole printed another Single Balance Ledger. This second ledger falsely indicated that the $3,300,000 had been returned to Jesse Bull. (**Exhibit 67**, June 3, 2022, TitleNexus Single Balance Ledger showing a return of $3,300,000 to Jesse Bull).





## Single Ledger Balance Report

**Selection Criteria**

| | |
|---|---|
| Trust Account: *1306059* | Trust Account Description: *Crown Bank NEW* |
| Trust Account Number: *1306059* | |
| File ID: *MP-102276* | Client / Matter: *Fairways and Greens, LLC* |
| Responsible Party: *Deena Cole* | Ledger Comment: |
| Settlement Date: *06/03/22* | Property: *20570 Park Pl/Excelsior MN 55331* |
| Starting Date: | |
| Ending Date: | |

| Ref/Ck Number | Trans. Date | Payee Name Memo | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| **Incoming Wires** | | | | | |
| | 06/03/22 | funds from buyer - Jesse Bull | Wire In | | $3,300,000.00 |
| | | **Total of 1 Incoming Wire:** | | | **$3,300,000.00** |
| **Pending Checks** | | | | | |
| | | TitleNexus, LLC | | | $8.00 |
| | | Title - Rec'd Service Fee/E fi | | | |
| | | Lauren Campoli and Michael Campoli | | | $3,288,775.00 |
| | | TitleNexus, LLC | | | $5,965.00 |
| | | Settlement Agents Fees | | | |
| | | Old Republic National Title Insurance C | | | $1,147.50 |
| | | Title Charges | | | |
| | | Hennepin County Register of Deeds | | | $16,172.00 |
| | | Government Charges | | | |
| | | **Total of 5 Pending Checks:** | | | **$3,312,067.50** |
| **Outgoing Wires** | | | | | |
| | 06/03/22 | Jesse Bull | Wire Out | | $3,300,000.00 |
| | | file cancelled/return buyer funds | | | |
| | | **Total of 1 Outgoing Wire:** | | | **$3,300,000.00** |

| | | |
|---|---|---|
| **Report Totals:** | **Balance:** | **$0.00** |
| | **Balance including pending items:** | **$(3,312,067.50)** |

| | | |
|---|---|---|
| PTW9AADJ | Page 1 of 1 | Date of Report: 6/3/22 |
| | | Time of Report: 12:01:01PM |
| | | Report By: deena |

Figure II: **Exhibit 67**, TitleNexus Single Balance Ledger, dated June 3, 2022 at 12:01:01 p.m.

956.    Even TitleNexus' second Single Balance Ledger was factually inaccurate.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

957.    The $3,300,000 in purchase funds, including the $100,000 earnest money, were not returned to Jesse Bull's personal savings, checking, or brokerage account.

958.    Instead, the funds were wired from Crown Bank to a UBS line of credit account.

959.    Jesse Bull was unwilling or unable to perform, but with TitleNexus' complicity in the earnest money scheme to defraud, Burger and Bulls secured false "evidence" from TitleNexus to make it appear as though he did.

### F.  Bulls' Failure to Perform at Closing

960.    Bulls and Burger failed to secure a signed amendment to the purchase agreement to title the property in Fairways and Greens LLC's name, the entity for which the mortgage was underwritten. Additionally, Bulls failed and refused to sign the buyer documents for Park Place, which were necessary to authorize the disbursement of funds by TitleNexus.

961.    Without signed buyer documents, TitleNexus could not disburse the $3,300,000 line of credit funds to Plaintiffs on June 3, 2022, in accordance with the purchase agreement. TitleNexus further lacked the authority to disburse these funds because they remained in Bulls' name, and Bulls had not transferred the funds to TitleNexus.

962.    As of June 3, 2022, Bulls' UBS Bank loan application remained deficient.

963.    Deena Cole acknowledged that the closing could not proceed, stating, "we didn't have the funds from the lender."

964.    Cole further confirmed that even if Plaintiffs had arrived at TitleNexus ready to close, they would not—and could not—have received the $3,288,775 check falsely listed as "seller proceeds" on TitleNexus' Single Balance Ledger.

### G.  Return Wire to UBS Bank



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

965.     In furtherance of Burger and Bulls' scheme, TitleNexus instructed Crown Bank to prepare a $3,300,000 same-day return wire, that included Jesse Bulls' $100,000 previously unpaid earnest money, back to the UBS line of credit account from which it originated.

966.     After obtaining the "evidence" in the form of the partial Single Balance Ledger, which falsely depicted a one-way transfer of $3,300,000 from Jesse Bull to TitleNexus, Burger and Bull left TitleNexus.

967.     The sham closing was designed to create the appearance of contractual compliance without Bulls ever incurring actual financial risk.

968.     Bull suffered no financial harm from Crown Bank's same-day return of UBS's funds to his UBS line of credit.

969.     To date, Bull has not alleged Coldwell's or TitleNexus' retention of the $100,000 earnest money, or any interest accrued during its purported two-year retention, as actual damages in his state court lawsuit against Plaintiffs.

970.     At no time did Coldwell retain Jesse Bull's $100,000 earnest money for the authentic Park Place deal; instead, Coldwell deposited its own substitute funds on Bull's behalf.

971.     TitleNexus likewise never retained, nor does it currently retain, the $100,000 Park Place earnest money.

## XLVIII.    The Extortionate Conduct: June 2022 to Present

### A.  L.J. Rotman demands $330,000

972.     Defendant Bulls enlisted the assistance of attorney L.J. Rotman in the lead-up to the scheduled closing on  June 3, 2022.

973.     Rotman, a prominent Minneapolis real-estate attorney whose "mere presence on a case signifies the stakes," is a self-described "good friend" of the Bulls.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

974.    Both J. Bull and L.J. Rotman are members of Golden Valley Country Club (GV) where they play golf.

975.    It is unclear whether Rotman was formally retained or was providing legal assistance to Bulls as a personal favor or at a significantly discounted rate from his 2016 published rate of $810 per hour.

976.    Rotman was fully aware that Defendants Bulls failed to deposit the $100,000 earnest money with Coldwell within two business days of May 6, 2022, as required by the Park Place purchase agreement.

977.    Rotman failed to disclose Defendants Bulls' initial $100,000 earnest money default to Plaintiffs or their counsel.

978.    Instead, Rotman advised Bulls to cure their $100,000 earnest money default by remitting the full purchase price of $3,300,000, inclusive of their unpaid earnest money, at the "closing" on June 3, 2022. On that day, Burger, J. Bull, and L. Bull went to TitleNexus with the express purpose of "setting up the sellers" and obtaining fabricated "evidence" from TitleNexus, purporting falsely that Bull deposited $3,300,000, inclusive of the unpaid earnest money, with TitleNexus in compliance with Rotman's directive.

979.    After leaving TitleNexus, Burger reported back to Rotman via email that Bulls' UBS wire transfer of $3,300,000 had been returned same-day to UBS, on June 3, 2022.

980.    Rotman was fully aware that Bulls had neither deposited the $100,000 earnest money nor waived the well-contingency as required under the purchase agreement, effectively misappropriating equitable title to Plaintiffs' residence so that, after participating in the sham closing, Rotman could leverage their ill-gotten gains.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

165

981.    Rotman knew that Bulls had neither deposited the $100,000 earnest money for the Park Place contract nor waived the well-contingency in writing, as required.

982.    Rotman was also aware that Plaintiffs' May 14, 2022 signed cancellation became legally operative as of midnight on May 16, 2022, canceling the 20570 Park Place purchase agreement, even without Bulls' signatures.

983.    Rather than disclose the canceled status of the purchase agreement and Bulls' defaults to Plaintiffs' counsel, Rotman conspired to further the objectives of the Bull Enterprise, perpetuating the earnest money scheme and advancing Bulls' "long-game" extortion plan, which leveraged Plaintiffs' home and medical circumstances for profit.

984.    To conceal Bulls' defaults, Rotman materially misrepresented the facts to Plaintiffs' counsel and demanded $330,000 from Plaintiffs as a condition for Bulls to sign the May 14, 2022, cancellation.

985.    Rotman further claimed that this $330,000 payment would be in addition to the $100,000 "earnest money," which he knew—or acted with reckless disregard for the fact — that Coldwell had substituted Coldwell's $100,000 on behalf of Bull around May 18, 2022.

986.    Plaintiffs, unaware of Bulls' defaults and the ongoing earnest money fraud, were induced to offer $25,000 under significant pressure, including medical challenges and the demands of caring for young children.

987.    In orchestrating this scheme, Rotman, along with Burger, Bulls, Coldwell, TitleNexus, Cole, TrustFunds, Trucke, and Brutlag P.A., did more than unlawfully convert equitable title to Plaintiffs' $3,300,000 residence; they stole the joy of Plaintiffs' pregnancy and childbirth, replacing it with fear and uncertainty.

**B.  L.J. Bull to Rotman: I want to litigate / lock it up.**



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

988.    On June 15, 2022, at 1:06 p.m., Wolf emailed Rotman: "L.J., Any update from your client or on the appraisal? Lauren was admitted to the hospital so getting a response from them may be a little slower, but I'm hoping we can keep this moving forward even in light of those circumstances. Thanks."

989.    Shortly after receiving this email, Rotman forwarded it to Joel Burger (jburger@wexfordrealty.com) and Jesse Bull (jesse.bull@ubs.com), on June 15, 2022, shortly thereafter.

990.    In response to the news of Plaintiff Lauren Campoli's hospitalization and Wolf's request for Bull's appraisal to assess actual damages, Jesse Bull revealed his true intentions: "Retain the ability to buy the house (litigate, lock it up), BUT be able to walk away at any time. How do we do this? … I have no issue playing the long game."

**From:** Bull, Jesse <jesse.bull@ubs.com>
**Sent:** Thursday, June 16, 2022 11:33 AM
**To:** Rotman, Lewis J. <lrotman@hinshawlaw.com>
**Cc:** Joel Burger <jburger@wexfordrealty.com>
**Subject:** RE: 20570 Park Place, Deephaven, MN

Thoughts and next steps:

Can we set a time to get together at GV?

Remember: We are dealing with the ▨▨▨ She has a history of things like this working in her favor.

I want this to work in our favor. Retain the ability to buy the house (litigate, lock it up), BUT be able to walk away at any time. How do we do this?

-   send format notice of default, insisting that the seller schedule a time to close
-   Reserving the right to terminate the contract at any time before closing of escrow

I have no issue playing the long game. I do have concern if they put the house to us during a time when real estate prices are down.

Jesse

Figure JJ: **Exhibit 68**, June 16, 2022, Email from J. Bull to Rotman regarding J. Bull's intentions: "Retain the ability to buy the house (litigate, lock it up), BUT be able to walk away at any time."



991.    Bulls' intentions were clear: to weaponize litigation as a tool for maintaining

long-term leverage over Plaintiffs' title to extort Plaintiffs for profit and under the guise of

damages while preserving the option to abandon the deal at any moment.

992.    Yet, as Rotman, Trucke, and Bulls knew, Bulls had twice defaulted on the

then-cancelled contract, foreclosing any damages claim.

993.    Rotman's response on June 21, 2022, offered conservative foreshadowing:

> Jesse, until the PSA is terminated, Seller may perform, ie allow you to inspect and
> then take the actions to close, try to force you to close even though Seller's
> performance was not timely, and if you don't close, try to pursue the remedies of
> specific performance, damages or termination and retention of the earnest money.
> Please let me know a good time for a call today to discuss. Thanks.

(**Exhibit 69**, June 21, 2022, Email from Rotman in response to J. Bull).

994.    However, Coldwell's $100,000 on deposit on behalf of Jesse Bull created perverse

effects by eliminating Bulls' financial risk of losing his own $100,000.  Instead of discouraging

Bulls' "long game, Coldwell's substitution of Coldwell's $100,000 as Bulls' "earnest money"

continued to fuel Bulls' extortion plan at Plaintiffs' expense eliminating Bulls' financial risk.

995.    With Coldwell's $100,000 on deposit in place of Bulls' $100,000, the "long

game" of wielding equitable title to Plaintiffs' residence under the threat of judicial sale became

a lucrative extortion tool, potentially yielding profits far beyond Coldwell's $100,000 deposit for

Jesse Bull.

996.    To that end, on June 21, 2022, Rotman demanded $275,000 from Plaintiffs in four

days' time:

> I understand that the Bulls will agree to accept $275,000 if we can wrap this up
> quickly and on acceptable terms. While you surely don't need my help to
> convince your clients of their damage exposure, perhaps you want to remind them
> that interest rates have risen sharply since the scheduled date of closing and are



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

continuing to rise… Please let me know by Friday, June 24, if this is an amount that your clients are prepared to pay. Thanks.

997.    Rotman falsely represented that Bulls had a substantial damages claim premised upon a sharp rise in interest rates even though Rotman knew that Bulls' loan application was still deficient and Bulls had failed to lock-in an interest rate for the Park Place loan.

998.    Rotman, still concealing Bulls' earnest money fraud and well contingency default, induced Plaintiffs, under false pretenses and significant fear of economic and legal consequences to offer $25,000 to Bulls for a signed cancellation.

999.    In a subsequent email to Plaintiffs' counsel rejecting Plaintiffs' $25,000 offer Rotman indicated he was going to "turn it over to litigation [...]"

## C. Brutlag, Trucke, Doherty, P.A. Joins the Conspiracy

1000.    In or around August 2022, Defendants retained attorney Ryan Trucke, Esq. (Trucke) of Brutlag, Trucke, and Doherty, P.A. (Brutlag P.A.).

1001.    Brutlag P.A. is managed, in part, by Trucke who is identified on the MN Secretary of State website as its CEO.

1002.    Trucke's firm, which is largely real-estate based, has a reputation for taking matters on contingency.

1003.    In and around May 2022, Trucke was facing a number of civil lawsuits involving Trucke's personal unpaid debts: *Wells Fargo Bank, N.A. v. Ryan J Trucke* (10-CV-22-481), *Discover Bank v. Ryan J Trucke* (10-CV-22-985), *Citibank, N.A. v. Ryan J Trucke* (10-CV-23-238), and *Spring Oaks Capital SPV, LLC v. Ryan J Trucke* (10-CV-23-1134).

1004.    Trucke was financially motivated to conceal Bulls' contractual defaults to wield equitable title to Plaintiffs real property for his own quick profit as well, and with Coldwell's



$100,000 on deposit for Jesse Bull, there seemed to be no financial downside to Trucke and Brutlag P.A.'s participation in the earnest money scheme to defraud Plaintiffs.

### D. Forced Judicial Sale

1005.   On September 12, 2022, Trucke in collaboration with Defendant J. Bull, threatened the forced judicial sale of Plaintiffs' residence unless Plaintiffs remitted $225,000 to Defendants Bull within twenty-five (25) days. (**Exhibit 70**, September 12, 2022, Demand Letter to Plaintiffs for $225,000 or a forced judicial sale).

1006.   "That offer [$25,000] does not adequately represent the increased cost my clients will incur to purchase an alternate property and fails to acknowledge the risk exposure of your clients - which includes a judicially forced sale of the Property under a judicially controlled timeline."

1007.   With knowledge that Plaintiffs had rightfully canceled the agreement, that Bulls' had fraudulently converted equitable title to Plaintiffs property and that Bulls defaulted on the well contingency, Trucke wrote: "To prevent enforcement of the Purchase Agreement by specific performance, my clients indicate that payment of $225,000.00 on or before October 7, 2022 is required to resolve this matter."

1008.   Struggling to recover from the accident and then caring for a newborn who required continued medical care, Plaintiffs were fearful of serious economic and/or legal harm and suffered significant anxiety and emotional distress.

1009.   On October 7, 2022, via Attorney Matt Wolf, Plaintiff M. Campoli implored Bulls to consider a monetary offer of resolution. It was, again, met with rejection. (**Exhibit 71**, October 2, 2022, Taft Letter to Trucke and Defendants Bull with attached Letter from M. Campoli).



1010.   With little to suggest Trucke read M. Campoli's letter, Trucke replied minutes later asking whether Taft would accept service of a Summons and Complaint.

1011.   That same day, Burger received a copy of Taft's correspondence, including M. Campoli's letter, and emailed it to Deena Cole at TitleNexus.

1012.   The subject line of Burger's message: " Update ;) " (**Exhibit 72**, October 7, 2022, Burger's email to Cole including M. Campoli's letter with subject "Update ;)"



Figure KK: Exhibit 72, Burger's email to Cole on October 7, 2022

**E.  5 Webster Place**

1013.   On or around October 21, 2022, Defendants Bull entered into a purchase agreement for 5 Webster Place, the vacant lot adjacent to their own property located at 3 Webster Place.

1014.   The home on 5 Webster Place was inexplicably consumed by fire sometime before the purchase agreement was signed and the entire structure was demolished.

1015.   L. Bull advised TitleNexus via email that F & G, LLC would take title to 5 Webster Place. (**Exhibit 73**, November 11, 2022, L. Bull Email to TitleNexus).

### F. Second Loan Deficiency Notice

1016.   On November 2, 2022, UBS Bank sent Defendants Bull another Park Place loan deficiency notice.

1017.   The November 2, 2022 letter from TJ Mundy on behalf of UBS Bank to Defendants Bull, indicated that the Bulls' Park Place loan application remained deficient.

1018.   J. Bull failed and refused to correct the outstanding deficiencies as noted on UBS's November 2 letter:

> (1) Appraisal - Appraisal for subject property to support estimated value and/or purchase price. Appraisal must be reviewed and approved by UBS Bank USA. (*See* **Exhibit 74**, November 2, 2022, UBS Loan Application Deficiency Letter).

> (2) Certificate of Good Standing for LLC - Borrower(s) to provide Certificate of Good Standing for the LLC as provided by the applicable governmental authorities not more than 30 days in advance of closing (or such other date as required by the title insurance company). *Id*.

> (3) Asset Statements - Most recent two months asset statement to document UBS assets. All pages must be included. *Id*.

1019.   On November 2, 2022, Diane Britt, a loan coordinator at UBS Bank, emailed TitleNexus to demand cancellation of the Park Place purchase agreement due to J. Bull's non-compliance.

1020.   In an email dated November 2, 2022 from Diane Britt of UBS Bank: "Hi Deena, This file is being withdrawn. Please cancel. Jesse Bull, 20570 Park Pl, Excelsior, MN 55331." (**Exhibit 75**, November 2, 2022, Email from UBS Bank USA to TitleNexus).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1021.   But,  UBS Bank did not obtain a signed cancellation of the Park Place purchase agreement.

1022.   Deena Cole forwarded UBS Bank's email regarding cancellation to Burger, and Burger concealed Bulls' incomplete loan application indicating that Bulls', "Rate lock expired" and also, "Keep open just no loan as of now."

### G.  November 2, 2022: Bulls' Signed Cancellation

1023.   On or around November 2, 2022, Bulls purportedly signed Plaintiffs' May 14, 2022, cancellation in response to UBS Bank's demand for cancellation due to Bulls' non-compliance.

1024.    Burnet Title's closing agent, Sandy Glieden, alleged that Burnet Title received a cancellation "verbally, over the phone."

1025.   Burnet Title failed and refused to obtain a physical or electronic copy of the cancellation, which Coldwell, Maurer, and/or Grieger possessed.

1026.   Burnet employee Britany Joshua recorded in Burnet's file on or around November 10, 2022, the notation: **"Buyer/Lender Cancel,"** and subsequently closed the file.

1027.   Burnet Title failed and refused to inform Plaintiffs of the Buyer/Lender cancellation or any associated details regarding the circumstances that resulted in the closure of Burnet's file.

1028.   Coldwell, Maurer,  and/or Burnet Title instructed Britany Joshua and other employees at Burnet Title not to notify Plaintiffs of Bulls' alleged signing of the May 14, 2022, cancellation.

1029.   At deposition, TitleNexus attempted to obscure knowledge of Bulls' signed cancellation by claiming a lack of recollection:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

**Q**: My question is: were you aware of whether or not you or any other person that you are aware of, Joel Burger or the Bulls, contacted Burnet Title and indicated that they [Bulls] had signed a cancellation?

**A**: I don't recall.

**Q**: Did you [Deena Cole] personally call and make any representations about cancellation to Burnet Title?

**A**: I don't recall.

1030.   Despite knowledge of Bulls' professed cancellation, Burnet Title, Coldwell, Maurer, and Grieger failed and refused to obtain a copy of the signed cancellation or any confirmation of its existence.

1031.   Furthermore, Burnet Title, Coldwell, Maurer, and Grieger failed to disclose to Plaintiffs that Bulls had signed—or claimed to have signed—Plaintiffs' May 14, 2022, cancellation.

### H.  Defendant Bulls' Drive-Bys

1032.   Between August 2022 and December 2024, for the purpose of intimidation, Defendant L. Bull and/or J. Bull drove by Plaintiffs Park Place residence more than once in a light color Toyota 4Runner SUV, at least once in a black Audi SQ7 with red disc brakes, and at least once, around nightfall, in a Toyota Sequoia.

### I.  Trucke's $225,000 Demand

1033.   On November 16, 2022, Trucke wrote another demand letter, reiterating the demand for $225,000, and again asking Taft Law, if it would accept service of a Summons and Complaint on behalf of Michael and Lauren Campoli. (**Exhibit 76**, November 16, 2022, Bull/Trucke Demand Letter for $225,000).  In this letter, Trucke falsely claimed that Bulls' non-existent "rate lock" had expired and they incurred "very real" damages in excess of $700,000.


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

### J.  December 5, 2022: Specific Performance Deadline Ends

1034.    Under the 20570 Park Place purchase agreement, the statute of limitations for specific performance was, at the latest, six months from the scheduled closing date of June 3, 2022, ending on December 3, 2022.

1035.    Despite repeated threats by Defendant Trucke to force a judicial sale, Bulls failed to initiate any suit for specific performance or damages by the deadline.

1036.    Since December 3, 2022, fell on a Saturday, Plaintiffs waited until Monday, December 5, 2022, anticipating that Defendants would follow through on their legal threats to invoke fear and leverage against Plaintiffs.

1037.    However, no such action was commenced by Bulls on or before December 5, 2022. This failure underscored Bulls' lack of earnest intent to purchase the property or pursue specific performance, revealing Bulls' disingenuous motives.

1038.    Seeking some measure of closure, on December 6, 2022, Plaintiff L. Campoli presented herself at Hennepin County Sheriff's Office to accept service, and confirmed that no action had been commenced.

### K.  December 15, 2022: Defendants Bull Close on 5 Webster Place

1039.    On December 15, 2022, Defendants Bull proceeded with the scheduled closing on 5 Webster Place, a transaction that confirmed their lack of intent to pursue the purchase of 20570 Park Place.

1040.    Burger acted as the broker for this deal, representing the Bulls in a transaction with elderly, unrepresented sellers.

1041.    Burger failed to disclose to the elderly sellers at 5 Webster Place that Burger was the manager of F & G, LLC, the entity that would take title to 5 Webster Place.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

175

1042.   Moreover, Burger failed to disclose to the elderly sellers at 5 Webster Place that Bulls were still under contract to purchase 20570 Park Place for $3,300,000 in cash, potentially influencing the sellers' decisions regarding their property's sale.

1043.   Additionally, Burger and/or Bull and/or TitleNexus encouraged the unrepresented elderly sellers to utilize TitleNexus for their closing services, which the sellers ultimately accepted, designating TitleNexus as the earnest money holder for the transaction.

1044.   As the sole title company in this deal, TitleNexus collected both the buyer and seller's titling fees.

1045.   In keeping with the lack of disclosure, TitleNexus also failed to inform the elderly sellers that Bulls were still under contract to purchase 20570 Park Place for $3,300,000 in cash, potentially impacting the sellers' decisions regarding the terms of their property's sale.

## XLIX.     December 15, 2022 - February 2023: Bulls' Build Plans

1046.   Defendants Bull, then in possession of a complimentary copy of Plaintiffs' Park Place architectural plans, started to move forward with various architect meetings related to a potential build project at 5 Webster Place.

1047.   After multiple architect meetings, offered free of cost to Defendants Bull, Defendants Bull failed to select an architect and move forward with the project.

1048.   On May 29, 2024, F & G, LLC, with Burger as its broker, sold 5 Webster Place for $600,000, that was $100,000 over what they paid.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

176

## CHAPTER 3: THE COVER-UP

**L.    Plaintiffs' December Investigation: The Search for a Signed Cancellation**

### A.  Burnet - December 2022

1049.   With no clear explanation as to why a financial advisor would abandon $100,000 earnest money in a non-interest bearing account for over six-months, Plaintiffs sought answers from Burnet Title.

1050.   Burnet Title emailed Plaintiffs a copy of Burnet's internal business record entitled, "Transaction Information Sheet," which noted, "Buyer/Lender Cancel."  Burnet explained that the "Transaction Information Sheet" is a form submitted by agents to update them on a deal's status, and that this form had been submitted by Grieger, the seller's agent, on or around November 10, 2022.

1051.   The "Buyer/Lender Cancel" form was received by Brittany Joshua at Burnet Title on the same date, November 10, 2022.

1052.   However, by December 6, 2022, Brittany Joshua was no longer employed by Burnet Title.

1053.   Burnet Title could not produce a copy of the actual signed cancellation referenced on its Transaction Information Sheet. (**Exhibit 77**, Burnet's Transaction Information Sheet reflecting a "Buyer/Lender Cancel" for 20570 Park Place). They instead referred Plaintiffs to Coldwell Banker Realty.

1054.   Burnet Title immediately contacted Grieger to alert Grieger that Plaintiff would be calling Grieger.

1055.   Plaintiffs reached out to Grieger who claimed he had forgotten the names of the buyers, had not reviewed the file in months, and " I don't know anything about anything," stating



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

177

he would need to "ask Tony[Maurer]." Grieger further alleged that Burnet was reporting "fake news" regarding his possession of the Bulls' signed cancellation.

1056.   Grieger denied that he sent the November 10, 2022, Transaction Information Sheet to Burnet reflecting that Grieger had possession of a signed cancellation for 20570 Park Place.

1057.   Plaintiffs continued to request additional records regarding the cancellation from Burnet Title.  In response, Burnet Title's agent, Xong Vang, provided a copy of the 20570 Park Place purchase agreement without Plaintiff's May 14, 2022 signed cancellation with the message: "get a subpoena."

## B.  Burnet: February 2023 - Buyers Retained Earnest Money

1058.   Without a subpoena in hand, Plaintiff visited Burnet Title's Eden Prairie office on February 2, 2023, to investigate further.

1059.   At the front desk, Ms. Maddie Duca reviewed Burnet's file and located the Buyer/Lender cancellation memo.  She confirmed that Burnet had no signed cancellation on file.

1060.   Seeking clarification, Ms. Duca contacted Chelsey Byrd who redirected Ms. Duca to Tony Maurer;  Byrd claimed the transaction "got a little funky" and she was no longer involved.

1061.   Plaintiff then requested information regarding the $100,000 earnest money, which Plaintiffs believed Coldwell continued to hold. On February 3, 2023, Ms. Maddie Duca followed up via email, informing Plaintiffs: "The buyers have had the earnest money the whole time." (Exhibit 12, February 3, 2023, Email to Plaintiffs from Burnet/Duca regarding lack of Earnest Money).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1062.   Shortly after sending this email, Maurer instructed Ms. Duca and/or Burnet Title to cease all communication with Plaintiffs and Burnet Title complied.

1063.   In the upcoming days, Plaintiffs were unable to reach Burnet by email or phone to explain the basis of Ms. Duca's statement that "the buyers have had the earnest money the whole time" or to explain the absence of a signed Buyer/Lender Cancellation on file.

1064.   By silencing Burnet Title, Maurer perpetuated the earnest money scheme to defraud, concealing the conspiracy and its wrongful acts while blocking Plaintiffs' efforts to clarify the irregularities in the transaction that resulted in fabricated TrustFunds status updates and the retention of earnest money by the buyers.

### C.  Coldwell's Fixer

1065.   On or around February 3, 2023, Plaintiffs received an unexpected call from Ryan Platske, a Coldwell agent with whom Plaintiffs had maintained an amicable relationship. Platske, who was on vacation with his wife in Miami, spoke to Plaintiff for approximately 40 minutes. After exchanging pleasantries, the conversation unfolded as follows:

> **PLATSKE**: But, what do you want?

> **L. CAMPOLI**: I just want to know what happened.

1066.   Plaintiff, now aware of Burnet's February 3, 2023, email stating that "the buyers have had their earnest money the whole time," asked Platske for an explanation. Platske responded by hinting at Grieger's routine practice:

> **PLATSKE**:  Oh, Mark held the deal.

1067.   But Platske refused to elaborate on what "holding the deal" entailed or its practical consequences - that Coldwell could not have retained Bulls' earnest money while the deal was on hold, even if it had been paid via TrustFunds.

1068.   With awareness of Plaintiff's post-concussion confusion and memory loss, Platske attempted to clarify, stating that the "we" in Ms. Duca's email referred to Burnet Title, not Coldwell. And, since the deal did not close, "we"/ Burnet Title, did not receive the earnest money because the transaction had not closed.

1069.   While trying to follow the money trail and Platske's reasoning, Plaintiff asked, "If the money is not at Burnet, then where is the money?" Platske replied, "Coldwell."

1070.   Plaintiff accepted Platske's explanation believing him to be trustworthy and of good character, just the qualities Coldwell preyed upon to "fix" their fraud.

**D.  TrustFunds "Help-Desk"**

1071.   In February 2023, Plaintiffs attempted to contact TrustFunds to follow-up on Grieger's and Byrd's repeated claims that Bull had submitted a payment on May 9, 2022 via TrustFunds.

1072.   TrustFunds did not respond to Plaintiffs' calls in February 2023.

1073.   In March 2023, Alexis Legris of TrustFunds answered Plaintiffs' call.

1074.   Legris did not inform Plaintiffs that the Burger/Bull May 9, 2022 TrustFunds "transaction" was nonexistent.

1075.   Legris did not disclose that there was no $100,000 TrustFunds transaction for MLS #6160342, 20570 Park Place on May 9, 2022, or any other date.

1076.   Instead, consistent with TrustFunds'  broker-friendly "help-desk" protocol, TrustFunds rerouted Plaintiffs to Coldwell.

**E.  Maurer's Wire Fraud**

1077.   On February 6, 2023, Plaintiffs contacted Maurer, Coldwell's broker, via email to seek clarity on their legal options and requested a full accounting from Coldwell, including, "All



TrustFunds records regarding your account; and a complete trust/escrow ledger for your file and all funds collected or disbursed on your account [for 20570 Park Place]."

1078.   On February 8, 2023, Maurer responded by email, cc-ing Rehman and Baker.

1079.   Maurer, acting alone, or agreeing and conspiring with Rehman and/or Baker, emailed Plaintiffs two versions of Burger's out-dated and forged TrustFunds "Earnest Money Payment History" reports for Park Place: one dated May 27, 2022, and the other February 8, 2023. (**Exhibit 78**, Forged "Earnest Money Payment History" reports tendered to Plaintiffs by Maurer).

1080.   Both of the "Earnest Money Payment History" reports emailed by Maurer lacked the 2022 MLS listing photo thumbnail of 20570 Park Place.[26]

1081.    Maurer explained, "The Trust Funds Accounting dated May 27, 2022, was the receipt provided by this third-party system, utilized in our industry for the distribution of the earnest money deposits, and effectively placed in archive, as customary and required in the transaction file."

1082.   Upon information and belief, Maurer and/or Rehman received the May 27, 2022, iteration of Burger's forged TrustFunds "Earnest Money Payment History" report on May 25 or May 27, 2022, from Burger, via LinkedIn.

1083.   Plaintiffs replied with a copy of Ms. Duca's email, asking: "Dear Mr. Maurer, Please help me understand the below email I received from Burnet title [email was copied below] [...] Could you please confirm that you have $100,000 earnest money in your CB trust account for this file, and that this $100,000 is in your account right now?"

---

[26] On May 25, 2022, Tony Mauer accepted Joel Burger's invitation on LinkedIn; on May 27, 2022, Tom Rehman accepted Joel Burger's invitation on LinkedIn.



1084.   To conceal Burger, Bulls, Grieger, Byrd, and Coldwell's operation and management of the Bull Enterprise in furtherance of the earnest money fraud scheme, Maurer insisted that Duca was mistaken.

1085.   Maurer claimed:

"The Burnet Title representative is incorrect in that, as evidenced in the Trust Funds Payment History provided previously, the earnest money was electronically submitted on May 9, 2022, at 3:33 p.m. (sic) and accordingly settled into the Trust Account of Coldwell Banker Realty on May 16, 2022, at 6:00 a.m."

1086.   Maurer further attempted to conceal the truth of Ms. Duca's statement by emailing Plaintiff a Transaction Manager "My Deals Transaction Sheet" dated May 18, 2022 containing an entry with file name "Park3.pdf"

1087.   Maurer falsely claimed that this transaction sheet showed that Grieger had uploaded the fully executed purchase agreement for Park Place, as required, on May 18, 2022.

1088.   But, as Maurer well-knew, Grieger did not ever upload, or otherwise submit as required, the authentic May 6, 2022 purchase agreement, Park3.pdf.

1089.   Maurer stated falsely: "Grieger did submit, as required, to Coldwell Banker Realty, the documents pursuant to the transaction and accordingly they were placed into the transaction file."

1090.   Consistent with Platske's explanation, Maurer emailed Plaintiffs: "The Earnest Money was not transferred to Burnet Title as no transaction was effectively closing and have (sic) remained in the Coldwell Banker Realty Trust Account."

1091.   However, Maurer knew that earnest money would not have been transferred to Burnet Title even if the transaction were closing, as closing funds are typically sent to the buyer's title company (TitleNexus), not the seller's title company (Burnet Title).



1092.   Moreover, Maurer was aware that Coldwell had uploaded a Ghost Deal as a Park Place placeholder, keeping Coldwell's $100,000 in Trident as "earnest money" for Jesse Bull on the look-alike Park Place transaction.

1093.   The $100,000 of "earnest money" attributed to Jesse Bull in Trident was, in fact, Coldwell's own funds.

1094.   With lingering concern, L. Campoli dispatched a certified letter on March 7, 2023, seeking confirmation of Maurer's emailed statements. (**Exhibit 79**, March 7, 2023, Certified Letter to Maurer from L. Campoli).

1095.   At the end of the letter, Plaintiff requested: "If your email information [regarding the earnest money] is not accurate, and you do not have $100,000 of earnest money deposited by Jesse Bull for the purchase of my residence in Coldwell Banker Realty's Escrow account for this transaction, please immediately provide accurate information to me about the status and location of the earnest money, in writing. Thank you for your consideration. Sincerely, Lauren Campoli."

1096.   In his March 10, 2023, reply, with Matt Baker and Tom Rehman cc-ed, Maurer acknowledged receipt of L. Campoli's certified letter, stating: "Per the previous communications exchanged by Mr. Rehman and myself, we reconfirm that Coldwell Banker Realty is and remains in receipt of the earnest money in the amount of $100,000 deposited pursuant to the Purchase agreement upon your property 20570 Park Place, Deephaven, Minnesota, Hennepin County."

1097.   Maurer's response, carefully worded and formally courteous, contained material misrepresentations about the earnest money and failed to disclose that the "earnest money" it held was Coldwell's money for the Ghost Deal Coldwell created.



1098.   Maurer's misrepresentation persuaded Plaintiffs, leading them to rely, to their legal detriment, on the assurance that Jesse Bull deposited earnest money with Coldwell for Park Place in 2022.

1099.   In the months that followed, Plaintiffs based their legal decisions on Coldwell's, Maurer's, Rehman's, and Baker's continued false and fraudulent assertions regarding Bulls' earnest money.

### F.   Tom Rehman's Wire Fraud

1100.   Tom Rehman, VP of Sales at Coldwell, also responded by email to Plaintiffs February - March 2023 request for an accounting and proof of Bulls' $100,000 earnest money deposit with Coldwell.

1101.   In an effort to fabricate "proof" of this non-existent deposit, Coldwell and/or Rehman created, or directed the creation of, a falsified NRT document, purporting to show that Jesse Bull made an ACH deposit on May 16 2022. (**Exhibit 80**, March 10, 2023, NRT Document attached by email to Plaintiff from Rehman).

1102.   This NRT document appeared to be a screenshot of an editable internal form with drop down fields for Coldwell's inputs, rather than an authentic bank record.



Figure LL: Screenshot of NRT document sent to Plaintiffs by Rehman

1103.   The NRT document is not an authentic bank record.

1104.   Notably, the field for "Days in Bank" is blank, confirming only what Plaintiffs

discovered over a year and a half later, that Jesse Bulls' $100,000 earnest money for 20570 Park Place that was to be deposited with Coldwell on or before May 10, 2022, spent zero days in Coldwell's trust account. *Id.*

1105.   Coldwell, along with Maurer, Rehman, Baker, Grieger and Byrd, were unable to produce an authentic TrustFunds settlement notice for the transaction.

### G.   Anywhere RE Mail Fraud

1106.   In early 2023, Anywhere RE and/or Anywhere Integrated, claimed that "Coldwell Banker Realty is holding the earnest money" through its Illinois in-house counsel and emailed Plaintiff unidentified documents that Anywhere RE/Integrated claimed was, "showing the deposit of the earnest money in this matter." (**Exhibit 81**, March 14, 2023, Email from Anywhere RE's counsel with unidentified documents attached).



Figure MM: "Deposit Report" with date range 01/01/1900 - 01/01/2099

1107.   One such document, titled "Deposit Report, " included a date range spanning from "01/01/1900 to 01/01/2099" and was almost entirely redacted.

1108.   The only visible entry, on the third page, read: "Trans Date: 5/16/22, Created By: Katherin E Swee, Trans Description: TrustFunds, Deposit Type: ACH, Payer: Jesse Bull, Check #: Trust, Deposit Date 5/16/22, and  Amount: $100,000." *Id*, at 4.



| 5/16/2022 | 9365 | KATHERIN E SWEE | 92203402-2022-00214-1 | 9220340222000774 | Trust Funds | ACH | JESSE BULL | | TRUST | 5/16/2022 | $100,000.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|

Figure NN: Single unredacted line-item entry related to Jesse Bull on "Deposit Report"

1109.   Accompanying the "Deposit Report" was a "Transaction Search Report" that included a single "Value Date" of May 16, 2022, a redacted account number, and an amount of $849,169. The suggestion was that Coldwell received Bulls' $100,000 in Coldwell's account on May 16, 2022  and the total earnest money retained by Coldwell via ReliaFund on May 16, 2022 was $849,100. (**Exhibit 82,** "Transaction Search Report," dated May 16, 2022).

1110.   But, the heavy redactions negated Plaintiffs' ability to authenticate the documents, and TrustFunds' refused to produce Coldwell's transaction data to sellers without a subpoena, and later, even with a subpoena. Plaintiffs had to rely on the word of Anywhere RE and/or Anywhere Integrated that Coldwell received Bulls' $100,000 on May 16, 2022.

1111.   Anywhere RE and/or Anywhere Integrated wrote, "I have been informed that Coldwell Banker Realty is holding the earnest money related to the attached purchase agreement." (**Exhibit 83**, Anywhere RE's "Purchase Agreement Bull.pdf" lacking well-contingency addendum and Plaintiffs' signed cancellation).

1112.   However, the "attached purchase agreement" was yet another iteration of Coldwell's Park Place Ghost Agreement, which contained the address of 20570 Park Place but excluded the well-contingency addendum and May 14, 2022 cancellation that Plaintiffs signed.

1113.    Upon noticing the missing cancellation, Plaintiff inquired about its absence: "My husband and I signed a cancellation on May 14, 2022, via DocuSign.  I do not see that signed cancellation in your attached file." (**Exhibit 84**, March 14, 2023 Reply to Anywhere RE's counsel inquiring about lack of Plaintiffs' signed cancellation).

1114.    Anywhere RE and/or Anywhere Integrated did not respond to Plaintiff's email regarding the absence of Campolis' signed cancellation.

## LI.    Defendants Obtain Other Real Property Through Earnest Money Fraud Scheme

### A.  16175 Crosby Cove Purchase Agreement with $100,000 earnest money

1115.    On February 9, 2023, F & G, LLC with Defendant Burger as its authorized signer, executed a purchase agreement for 16175 Crosby Cove.

1116.    The property, 16175 Crosby Cove, was listed by Coldwell Banker Realty.

1117.    The terms of the Crosby Cove purchase agreement included $2,395,000 cash with the option to obtain a mortgage; $100,000 earnest money within two days of final acceptance date, and a 10-day Inspection contingency.

1118.    On the Crosby Cove purchase agreement Burger signed, Burger disclosed that, "Buyer is a Minnesota LLC and the authorized signer is a licensed real estate broker."

1119.    The Defendants Bull, with the assistance of Darji and L. Bull, signed another amendment/Resolution to F & G, LLC in advance of the purchase for F & G, LLC to increase J. Bulls' and L. Bulls' capital accounts prior to closing on Crosby Cove.

### B.  Coldwell failed to obtain signed cancellation of Park Place

1120.    Coldwell did not disclose to its seller-clients of Crosby Cove that Bull was still under contract to purchase Coldwell's seller-client's Park Place property for $3,300,000 cash.



1121.   Coldwell, driven by profits, failed to obtain and/or disclose a signed cancellation of the $3,300,000 Park Place cash purchase agreement from Bull prior to brokering Bulls another property.

1122.   Burger, the authorized signer for Crosby Cove and with an interest in F & G, LLC, further failed to disclose the open Park Place purchase agreement on the Crosby Cove purchase agreement that Burger executed on F & G's behalf.

1123.   Burger, the authorized signer for Crosby Cove and with an interest in F & G, LLC,  likewise failed to disclose to the Crosby Cove sellers that Bull was still under contract on a $3,300,000 cash deal.

### C.  Burger: Let's "Use" TrustFunds

1124.   Burger again sought to "use" TrustFunds to "deposit" the $100,000 Crosby Cove earnest money.

1125.   But, Coldwell's seller's agent Barry Berg, related that TrustFunds earnest money delivery was not an option because Crosby Cove was not listed on the MLS; and TrustFunds is only available on active MLS Listings.

1126.   Burger indicated to Berg on or around February 9, 2023, that Bull would remit a check to Coldwell for the $100,000 earnest money.

1127.   The 16175 Crosby Cove $100,000 earnest money payment was due to Coldwell within two business days of the final acceptance date of February 9, 2023.

1128.   Bulls failed and refused to deposit $100,000 earnest money with Coldwell within two business days of the final acceptance date of February 9, 2023 for the Crosby Cove deal.



1129.   Coldwell via its agent Berg, failed to disclose to the Crosby Cove sellers that Bulls' failed to remit Bulls' $100,000 earnest money to Coldwell within two days of final acceptance date of the Crosby Cove purchase agreement.

1130.   Instead, Coldwell concealed the Bulls' earnest money default from the sellers.

1131.   Coldwell, who was on notice of Bulls' and Burger's Park Place earnest money fraud scheme, again failed to intervene to demand compliance with the purchase agreement.

**D.  Bulls: No $100,000 Earnest Money Down on Crosby Cove**

1132.   Since TrustFunds fraud was not an option on the off-MLS Crosby Cove listing, Burger and Bull devised a more rudimentary scheme to create the appearance that the earnest money payment was made on time for Crosby Cove.

1133.   Bull back-dated a $100,000 earnest money check to the date of February 10, 2023 to Coldwell. (**Exhibit 85**, Copy of UMB -4774 check back-dated to February 10, 2023).



Figure OO: Exhibit 85, Bulls' back-dated $100,000 earnest money check for Crosby Cove

1134.    The $100,000 16175 Crosby Cove earnest money check was to be drawn from UMB Bank, n.a., with routing number 044000804 from the checking account Jesse J. Bull Lee A. Bull, ending in -4774.

1135.    The Bulls' UMB -4774 checking account was the same account that Bull testified, under oath, from which Bull remitted $100,000 earnest money to Coldwell for the Park Place deal on May 9, 2022, via TrustFunds.

1136.    The $100,000 Crosby Cove check was delivered by Burger and/or Bull to Berg's/Coldwell's office sometime between 6:09 a.m., on March 31, 2023, but before closing on April 3, 2023.

1137.    Berg admitted during a phone call that the earnest money for Crosby Cove was "late."

1138.    Coldwell, consistent with its practice of concealing buyer default(s) from its clients to secure its commission, failed to disclose to its Crosby Cove seller clients that Bulls' $100,000 earnest money payment was not deposited with Coldwell within two days of the final acceptance of the Crosby Cove purchase agreement.

**E.  Bull: Failure to Disclose $3,300,000 Liability to obtain $1,700,000 Mortgage**

1139.    To secure a $1,700,000 mortgage for Crosby Cove without signing a cancellation of the Park Place purchase agreement, Bulls failed and refused to disclose on their UBS Bank loan application that they were still under contract to purchase Park Place for $3,300,000 cash. (**Exhibit 86**, March 31, 2023, Crosby Cove Loan Application).

1140.    Neither J. Bull nor L. Bull disclosed the $3,300,000 cash liability associated with the Park Place purchase agreement on their loan application.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

190

1141.   TJ Mundy failed and refused to obtain a signed cancellation of the Park Place purchase agreement or require that J. Bull disclose the $3,300,000 cash liability on his Crosby Cove loan application.

1142.   Nonetheless, TJ Mundy approved the loan application even with actual knowledge of the open Park Place purchase agreement constituting Bulls' undisclosed $3,300,000 cash liability.

1143.   Further, as of March 31, 2023—just days before closing and as indicated on Bull's signed loan application—J. Bull had $0 earnest money credit on the Crosby Cove deal.

**2b. Other Assets and Credits You Have**    ☐ Does not apply

Include all other assets and credits below. Under Asset or Credit Type, choose from the types listed here:

Assets
- Proceeds from Real Estate Property to be sold on or before closing
- Proceeds from Sale of Non-Real Estate Asset
- Secured Borrowed Funds
- Unsecured Borrowed Funds
- Other

Credits
- Earnest Money
- Employer Assistance
- Lot Equity
- Relocation Funds
- Rent Credit
- Sweat Equity
- Trade Equity

| Asset or Credit Type – use list above | Cash or Market Value |
|---|---|
| Earnest Money | 0.00 |
| | |
| | |
| | |
| Provide TOTAL Amount Here | |

**2c. Liabilities - Credit Cards, Other Debts, and Leases that You Owe**    ☐ Does not apply

List all liabilities below (except real estate) and include deferred payments. Under Account Type, choose from the types listed here:
- Revolving (e.g., credit cards)  - Installment (e.g., car, student, personal loans)  - Open 30-Day (balance paid monthly)  - Lease (not real estate)  - Other

| Account Type – use list above | Company Name | Account Number | Unpaid Balance | To be paid off at or before closing | Monthly Payment |
|---|---|---|---|---|---|
| Revolving | UBS BANK USA | 5919 | $19,065.00 | ☐ | $397.00 |
| Revolving | BK OF AMER | 3846 | $1,220.00 | ☐ | $25.00 |
| Revolving | CITI | 9276 | $1,071.00 | ☐ | $41.00 |
| Revolving | TARGET/TD | 0654 | $264.00 | ☐ | $30.00 |
| Revolving | SYNCB/VERIZO | 4817 | $214.00 | ☐ | $30.00 |
| Revolving | FNB OMAHA | 6910 | $207.00 | ☐ | $35.00 |
| Revolving | JPMCB CARD | 9230 | $116.00 | ☐ | $35.00 |

Borrower Name: Jesse J Bull
Uniform Residential Loan Application    2 of 8
Freddie Mac Form 65 · Fannie Mae Form 1003
Effective 1/2021

GURLA20NLO_S 0718
GURLA20S    (CLS)
03/31/2023 06:09 AM PST

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

191

Figure PP: Exhibit 86, Crosby Cove loan application as of March 31, 2023, showing "0.00" Earnest Money

1144.   UBS Bank's closing disclosure dated March 31, 2023, also showed that from the date of Bull's initial mortgage application and at least until March 31, 2023, Bull had no earnest money credit of $100,000 on deposit with Coldwell for Crosby Cove. (**Exhibit 87**, March 31, 2023, Crosby Cove Closing Disclosure).

1145.   Defendant Burger signed the mortgage and closing documents on behalf of F & G, LLC, all showing that at least as of March 31, 2023, Defendants Bull had not deposited $100,000 earnest money with Coldwell pursuant to the 16175 Crosby Cove purchase agreement.

1146.   Defendants Bull had no earnest money credit of $100,000 on the Crosby Cove deal, as of March 31, 2023, at 6:09 a.m.

1147.   Defendant Burger did not admit at deposition that Bulls did not deposit $100,000 earnest money with Coldwell pursuant to the Park Place purchase agreement and Bulls did not deposit $100,000 earnest money with Coldwell pursuant to the Crosby Cove purchase agreement.

1148.   To conceal Coldwell's pattern of failing to retain earnest money payments and/or disclose earnest money defaults to sellers, Coldwell claimed to Plaintiff that it overnighted Bulls' Crosby Cove check to Arizona in February.

**LII.    February 22, 2023: Letter Notice of Failed Well-Contingency to Bulls**

1149.   On February 22, 2023, through Taft Law, Plaintiffs again declared the 20570 Park Place Purchase Agreement canceled pursuant to the failed well inspection contingency and again requested Defendants Bull produce a signed cancellation pursuant to the plain language of the



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Purchase Agreement. (**Exhibit 88,** Taft Correspondence including Plaintiffs' February 21, 2023, cancellation).

1150.   The Plaintiffs February 21, 2023, signed cancellation directed the $100,000 earnest money that Coldwell repeatedly confirmed that Coldwell retained from Bulls on May 9, 2022, to be returned to Defendants Bull.

1151.   Still without financial motivation to outweigh continued control over equitable title to Plaintiffs' residence with no money down, Defendants Bull failed and refused to sign Plaintiffs' February 21, 2023, Cancellation.

## LIII.    Declaratory Cancellation

### A.  Plaintiffs' April 1, 2023 Declaratory Cancellation

1152.   On April 1, 2023, through Huffman, Usem, Crawford, Greenberg & Smith P.A. (HUCGS, PA), Plaintiffs served a Declaratory Cancellation of the Purchase Agreement pursuant to Minn. Stat. § 559.217, Subd. 4, without right to cure, based upon the Defendants' failure to complete the well inspection or waive the inspection contingency. (**Exhibit 89**, Plaintiffs' Notice of Declaratory Cancellation).

1153.   The required notice pursuant to Minn. Stat. § 559.217, Subd. 4, and served upon Defendants on April 1, 2023, stated that:

> The cancellation will be confirmed 15 days after service of this notice upon you unless before then you secure from a district court an order that the confirmation of cancellation of the purchase agreement be suspended until your claims or defenses are finally disposed of by trial, hearing or settlement. Your action must specifically state those facts and grounds that demonstrate your claims or defenses [...]

*Id*.

1154.   The required notice pursuant to Minn. Stat. § 559.217 Subd. 4, and served upon



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Defendants on April 1, 2023, also provided that,

> If within the time period specified in this Notice, you serve your own notice under Minnesota statutes, section 559.217, your purchase agreement will be immediately canceled, but your entitlement to earnest money must be determined by a court or determined by arbitration if agreed to by the parties.

*Id.*

1155.   The fifteenth calendar day after April 1, 2023, was April 16, 2023. (*See* 27-CV-23-6625, Index #6, Answer of Defendants, para. 2, "Admit").

1156.   For the purpose of a proceeding pursuant to Minn. Stat. § 559.217, Subd. 8 designates the initiating party's attorney as agent for service of all summons, complaints, orders, and motions made in connection with an action by the party upon whom the notice is served to restrain the cancellation, and any responsive notice of cancellation as described in Subdivision 2.

1157.   Plaintiffs' attorney Craig Greenberg, of HUCGS, PA, was Plaintiffs' attorney and agent for service, pursuant to Subd. 8.

1158.   Upon information and belief, on April 14, 2023 one day before the expiration of the cancellation period, Defendants Bull directed a process server to Dr. Campoli's office in Wyoming, Minnesota when he was performing medical procedures.

1159.   Upon information and belief, on April 14, 2023, one day before the expiration of the cancellation period, Defendants Bull also directed a process server to the side entry of Campolis' residence after nightfall.

1160.   Plaintiffs' then five-year-old daughter was badly frightened, and has since slept with the lights on.

**B.  Defendants Failed to Timely Act**



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

194

1161.   Defendant Trucke contacted Plaintiffs' counsel to negotiate a signed cancellation that eliminated reference to Bulls' well-contingency default. Trucke noted in an email to J.Bull, "They [Plaintiffs] are not selling the house."

1162.   Defendants sham litigation plan, per Trucke's email to Wexford Realty and J.Bull: "I am going to ask him [Greenberg] to remove the language regarding the well inspection. If they are willing to do that, my suggestion is to sign the Cancellation, collect the earnest money and then move forward with suit." (**Exhibit 90**, April 5, 2023, Email from Trucke to Wexford Realty and Bull).

1163.    Defendants Bull signed a cancellation of the Park Place purchase agreement.

1164.   Coldwell acknowledged that, at an undisclosed time, "Bulls cancelled (or attempted to cancel)," the Park Place purchase agreement.

1165.   After signing the cancellation, Defendants Bull and/or an entity under their control received or gained access to, $100,000 of Coldwell's funds, which had been deposited on behalf of Jesse Bull as a substitute for Bull's earnest money in the Park Place transaction.

1166.   Between May 16, 2022, and December 5, 2024, Coldwell remitted $100,000 of its own funds to Jesse Bull, Lee Bull, and/or an individual or entity that accepted the $100,000 on behalf of Bulls.

1167.   To date, Anywhere RE, Anywhere Integrated, and Coldwell has failed and refused to disclose Defendants Bulls' signed cancellation to Plaintiffs.

1168.   On or around April 1, 2023, Plaintiffs declined Bulls' "offer" to remove the well-contingency default language from Plaintiffs' February 22, 2023 cancellation demand, thereby preserving its legal efficacy.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

195

1169.   Defendant Trucke was furthermore on notice of the 15-day statutory timeframe with which to act pursuant Minn. Stat. § 559.217.

1170.   In Trucke's email of April 13, 2023 to Burger and Bull: Our deadline to respond to the statutory cancellation is tomorrow [April 14, 2023]. (**Exhibit 91**, Trucke's email, dated April 13, 2023, indicating that statutory cancellation deadline is April 14, 2023).

1171.   Despite the statutorily designated attorney service contact, Defendants did not timely secure from the court an order suspending Plaintiffs' purchase agreement cancellation and bring forth their claims, in accordance with Minn. Stat. § 559.217, Subd. 4(c).

1172.   Despite the statutorily designated attorney service contact, Defendants did not serve their own Declaratory Cancellation of the Purchase Agreement, pursuant to Minn. Stat. § 559.217, Subd. 4, within 15 days of April 1, 2023.

### C.  Defendants April 17, 2024 Declaratory Cancellation

1173.   On April 17, 2023, through Defendant Trucke, Defendants Bull served a sham Notice of Declaratory Cancellation of the Purchase Agreement pursuant to Minn. Stat. § 559.217, Subd. 4, asserting, "Sellers' refusal to close on the sale of the property"as the basis of their cancellation and naming TitleNexus as the earnest money holder for purposes of cancellation. (**Exhibit 92**, Bulls' Notice of Declaratory Cancellation naming TitleNexus as the earnest money holder).

1174.   Minn. Stat. § 559.217, Subd. 4, relates to an unfulfilled condition of the purchase agreement, which by the terms of the purchase agreement, cancels the purchase agreement.

1175.   The failure to close is not an unfulfilled condition, which by its terms, cancels the agreement.

### D.  Defendants Identify TitleNexus as the earnest money holder



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1176.   Defendants Bull identified TitleNexus, not Coldwell, as the earnest money holder for the purpose of cancellation on Defendants Notice of Declaratory Cancellation, pursuant to Minn. Stat. § 559.217, by and through their attorney, Defendant Trucke.



20570 Park Place
Deephaven, MN  55331
PID# 24-117-23-2-0011

2.   ☐ Seller ☒ Purchaser is serving this Notice of Declaratory Cancellation ("Notice") on the other party, and on
(check the applicable box)
→ TitleNexus, LLC, the third party who is holding the earnest money paid pursuant to the Purchase Agreement for purposes of confirming
(insert name of holder of earnest money)
the cancellation of the Purchase Agreement.

Figure QQ: Exhibit 92, Defendants Bull identify TitleNexus as the earnest money holder

1177.   Defendants Bull did not serve TitleNexus with their April 17, 2023, Notice of Declaratory Cancellation, pursuant to Minn. Stat. § 559.217, Subd. 4.

1178.   Defendants Bull did not serve Coldwell with their April 17, 2023 Notice of Declaratory Cancellation, pursuant to Minn. Stat. § 559.217, Subd. 4.

**LIV.    Coldwell Banker Served by Plaintiffs with Plaintiffs' § 559.217 Notice**

1179.   On April 4, 2023 Coldwell was duly served with Plaintiffs' April 1, 2023 Declaratory Notice along with correspondence from Craig Greenberg, Esq. (**Exhibit 93**, April 3, 2023, Correspondence including Plaintiffs' April 1, 2023, Notice of Declaratory Cancellation and Affidavit of Service on Coldwell).

1180.   Coldwell did not respond to Plaintiffs' April 3, 2023, correspondence that included Plaintiffs April 1, 2023, Notice of Declaratory Cancellation served upon Bulls.

1181.   Upon service of Plaintiffs' April 3, 2023, correspondence and Plaintiffs April 1, 2023, Notice of Declaratory Cancellation, identifying Coldwell as the earnest money holder,

Coldwell failed to confirm or deny the presence of Defendants Bulls' $100,000 earnest money in Coldwell's trust account since May 9, 2022, for Plaintiffs' Park Place property.

1182.    Coldwell disregarded Plaintiffs' counsel's April 3, 2023, correspondence and attendant April 1, 2023, Notice of Declaratory Cancellation.

1183.    On April 25, 2023, after the Declaratory Cancellation period expired, Plaintiffs' counsel served an Affidavit of Cancellation pursuant to Minn. Stat. § 559.217, Subd. 7, upon Coldwell. (**Exhibit 94**, Affidavit of Cancellation of Craig Greenberg, Esq.).

1184.    Minn. Stat. § 559.217, Subd. 7(b) specifies:

> When a cancellation under this section has been completed, the party who served the notice, or that party's attorney, may execute an affidavit stating that the party caused a notice of cancellation to be served upon the other party, that the other party neither complied with the actions required in the notice, if applicable, nor obtained a court order suspending the cancellation, and that the property is residential real property.

1185.    Attorney Greenberg's affidavit indicated that, "the other party neither complied with the actions required in the Notice, if applicable, nor obtained a court order suspending the cancellation within the statutory time, and that the property is residential real property…" *Id.*

1186.    Attorney Greenberg furthermore advised Coldwell that Defendants Bull identified TitleNexus as the earnest money holder but that TitleNexus denied holding any earnest money for the Park Place transaction. (**Exhibit 95**, April 25, 2023, Correspondence from Greenberg to Coldwell regarding Plaintiffs compliance with Minn. Stat. § 559.217).

1187.    Plaintiffs requested, via attorney Greenberg, that Coldwell, the designated earnest money holder, release $100,000 earnest money to Plaintiffs, pursuant to Minn. Stat. § 559.217, Subd. 7(d).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1188.    Minn. Stat. § 559.217, Subd. 7(d) states that, "Except as provided in subdivision 2, the affidavit of cancellation, when delivered to a third party holding earnest money under the purchase agreement, is a sufficient basis for that person to release the earnest money to the party initiating and completing the cancellation."

1189.    Plaintiffs fully complied with Minn. Stat. § 559.217, Subds. 4 and 7.

1190.    And, because Defendants' Bulls' Notice of Declaratory Cancellation was frivolous, containing reference to the sham closing and circular wire transfer facilitated at and by Burger and TitleNexus, Defendants failed to serve Coldwell or TitleNexus with their Declaratory Notice of  Cancellation, as required by the statute.

1191.    Defendants failed to secure with the court an Order suspending the Plaintiffs' cancellation.

1192.    Yet, Coldwell failed and refused to remit $100,000 earnest money that Coldwell claimed was in its possession for Plaintiffs Park Place property, to Plaintiffs.

1193.    Coldwell failed to confirm or deny the presence of Defendants Bulls' $100,000 earnest money in Coldwell's trust account for Plaintiffs' 20570 Park Place property since May 2022.

## LV.    Bulls' Sham Litigation

### A. *Bull v. Campoli* - April 13, 2023

1194.    In an effort to negate Plaintiffs' April 1, 2022, Declaratory Cancellation served upon Bulls, Defendants Bull, by and through, Defendant Trucke, drafted, but failed to serve, a civil suit against Plaintiffs dated April 13, 2022, and naming TitleNexus as the earnest money holder. (**Exhibit 96**, Unfiled and Unserved suit *Bull v. Campoli*, drafted by Defendant Trucke).

1195.    In the un-served suit, *Bull v. Campoli*, Defendants Bull asserted Bulls deposited



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

$100,000.00 earnest money with the title company [TitleNexus], not Coldwell Banker Realty. *Id,* at Count ii, para. 11.

1196.   Trucke's unserved suit, *Bull v. Campoli*, did not name Coldwell or its parent company.

> 11.    In conjunction with the execution of the Contract, Plaintiffs deposited $100,000.00 in earnest money with the title company.
>
> 12.    Despite Defendants' refusal to complete the Contract terms, the title company has retained and continues to retain Plaintiffs' earnest money deposit.

Figure RR: Exhibit 96, Bulls allege deposit of $100,000 in earnest money with the title company

1197.   In Paragraph 12 of their unserved Complaint, Defendants Bull asserted that, "the title company [TitleNexus] has retained and continues to retain Plaintiffs' earnest money deposit." *Id*.

1198.   Defendant Trucke asserted that Bulls' earnest money was deposited with TitleNexus because Defendants Bull failed and refused to deposit Bulls' $100,000 earnest money for 20570 Park Place with Coldwell via TrustFunds, or by any other means.

**B.** *Bull v. Campoli and Reology Brokerage Group, LLC d/b/a Coldwell Banker Realty* **- April 26, 2023**

1199.   On or around April 26, 2023, Defendants Bull, by and through Defendant Trucke, served Coldwell with a frivolous civil suit. (**Exhibit 97**, Bulls' Complaint naming Campolis, Reology, and Coldwell as defendants).

1200.   Campolis were named in, but not served with, the Bull Complaint naming Coldwell.



1201.   Defendants Bull and Trucke named Coldwell to create the false appearance that Coldwell retained Bulls' $100,000 earnest money.

1202.   In this iteration of Bulls' Complaint, Bulls asserted that Defendants Bull deposited $100,000.00 earnest money with Coldwell Banker Realty.

> 13.   In conjunction with the execution of the Contract, Plaintiffs deposited $100,000.00 in earnest money with Coldwell Banker Realty.
>
> 14.   Despite Defendants' refusal to complete the Contract terms, the title company has retained and continues to retain Plaintiffs' earnest money deposit.

Figure SS: Exhibit 97, *Bull v. Coldwell,* dated April 26, 2022, asserting Bull deposited $100,000 in earnest money with Coldwell Banker Realty

1203.   Yet, despite pleading that Defendants deposited $100,000 earnest money with Coldwell Banker Realty in Paragraph 13, Bulls maintained in Paragraph 14, that, "the title company [TitleNexus] has retained and continues to retain Plaintiffs' earnest money deposit." *Id*.

1204.   Defendant Bulls attached "Exhibit B" (*infra*, at Figure HH), the Partial Single Balance Ledger prepared by TitleNexus, only reflecting the one-way flow of $3,300,000 inclusive of Bulls' $100,000 earnest money, to TitleNexus.

1205.   "Exhibit B" created the false appearance that TitleNexus retained and continued to retain Bulls' $100,000 earnest money when the closing did not occur even though Burger, Bulls, Rotman and Trucke knew that the entire $3,300,000 was part of a fraudulent circular transfer of funds from Jesse Bull to Jesse Bull to create the illusion that Jesse Bull performed at closing.

1206.   Defendants Bull did not serve this iteration of the Bulls' suit, or "Exhibit B," upon Plaintiffs.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1207.   Defendants Bull did not file their sham suit against Coldwell in Hennepin County District Court.

1208.   Defendants Bull did not dismiss their unfiled suit against Coldwell.

1209.   On or around April 26, 2024, Defendants Bull's unfiled suit against Coldwell was dismissed with prejudice by operation of law for Bulls/Trucke's failure to file with the court within one year of commencement pursuant to Minn. R. Civ. P. 5.04(a).

**C.  Coldwell's Answer to Bull Complaint - May 12, 2023**

1210.   On or around May 12, 2023, Coldwell Answered Defendants' unfiled suit. (**Exhibit 98**, Coldwell's Answer to Bulls' unfiled suit).

1211.   Coldwell's reply to Defendants Bull's claim at Paragraph 13 that Plaintiffs [Bulls] deposited $100,000 in earnest money with Coldwell Banker Realty: "Coldwell Banker admits only that Plaintiffs deposited $100,000 in earnest money in connection with the anticipated transaction." *Id.*

> 9.    With respect to the allegations of Paragraph 13 of Plaintiffs' Complaint, Coldwell Banker admits only that Plaintiffs deposited $100,000 in earnest money in connection with the anticipated transaction.

Figure TT: Exhibit 98, Coldwell's Answer to Bulls' unfiled suit

1212.   Coldwell admitted, "**only that** Plaintiffs deposited $100,000 in earnest money in connection with the anticipated transaction."

1213.   Coldwell did not admit that Bulls deposited $100,000 with Coldwell because Bulls did not deposit $100,000 with Coldwell pursuant to the May 6, 2022, 20570 Park Place purchase agreement.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1214.   At the time of Coldwell's Answer, Coldwell was then in possession of Defendant Bulls' "Exhibit B" the Partial Single Balance Ledger, that only reflected the one-way flow of $3,300,000 to TitleNexus and not its same-day return to UBS Bank.

1215.   The Bulls' Partial Single Balance Ledger, later labeled "Exhibit B," created the false appearance that Bulls "deposited" $3,300,000, inclusive of Bulls' previously unpaid $100,000 earnest money, on June 3, 2022, to TitleNexus and that TitleNexus retained the funds.

1216.   At the time of Coldwell's Answer, Coldwell knew or should have known that J. Bull failed and refused to make a $100,000 deposit to Coldwell using TrustFunds on May 9, 2022 and that Burger's TrustFunds notifications and "Earnest Money Payment History" reports were forged.

1217.   But, to continue to conceal Bulls', Burgers', Wexford's, Coldwell's, Maurer's Rehman's, Baker's, Grieger's, and Byrd's, earnest money fraud scheme, Coldwell could not outright deny Paragraph 13 of the Bull Complaint. Coldwell's truthful answer, an outright denial that Bull deposited $100,000 with Coldwell, would, in turn, reveal the earnest money scheme to defraud and Coldwell's liability in it.

1218.   Thus, Coldwell's vague partial admission to Paragraph 13 of the Bull Complaint, that Bulls, "deposited $100,000 in connection with the anticipated transaction", referred to Coldwell's understanding of Bulls' $100,000 "deposit" remitted to TitleNexus "in connection with the anticipated transaction," on June 3, 2022 as reflected in Bulls' "Exhibit B," the Partial Single Balance Ledger.

1219.   With respect to Coldwell's Answer to Bulls' claim that "the title company has retained and continues to retain Plaintiffs' earnest money deposit, Coldwell answered: "[...]



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Coldwell Banker admits only that Plaintiffs' [Bulls] earnest money continues to be held pending the outcome of this dispute between Plaintiffs [Bulls] and the Campolis."

1220.   If Coldwell had retained and continued to retain Bulls' $100,000 earnest money since May 9, 2022, for the Park Place transaction, Coldwell's Answer to Bulls' claim that the title company retained and continues to retain Bulls' $100,000 earnest money should have been, "Deny."

### D.  Coldwell's Affirmative Allegations: Accord and Satisfaction and/or Waiver

1221.   In paragraph 17 of its Answer, Coldwell "affirmatively alleges that Bulls' claims may be barred in whole or in part by doctrines of waiver, accord and satisfaction, and failure to mitigate damages". *Id.* at 17.

1222.   Coldwell's affirmative allegations of "accord and satisfaction" and/or "waiver" relate to Bulls' and Coldwell's heretofore undisclosed, but to-be-discovered, agreement wherein Coldwell remitted $100,000 of Coldwell's funds for Jesse Bull as a substitute for Jesse Bull's unpaid earnest money in exchange for a waiver of Bulls' claims against Coldwell, among other things.

1223.   Shortly after Coldwell was served with the Bull Complaint, and seeing Campolis named therein, Sloneker called Plaintiffs' counsel, Greenberg, and had a phone conversation.

1224.   During his call with Greenberg, Sloneker assured Greenberg that Coldwell had the earnest money for the Park Place transaction.

### LVI.   Plaintiffs' Declaratory Action

#### A.  *Campoli v. Bull*: 27-CV-23-6625

1225.   Plaintiffs commenced an action on May 2, 2023, in Hennepin County District Court to declare the purchase agreement canceled pursuant to the failed well-contingency, which, by its terms, canceled the agreement.

1226.   Acting in detrimental reliance on Coldwell's material misrepresentations, Plaintiffs' state court action was limited to liquidated damages in the amount of $100,000, the earnest money amount, pursuant to Minn. Stat § 559.217, Subd. 4, and the default provisions of the purchase agreement.

### B.  Defendants' Bull Sham Counterclaim

1227.   On May 18, 2023, Defendants Bull counterclaimed for breach of contract and unspecified damages. (*See* 27-CV-23-6625, at Index No. 6).

1228.   Defendants Bull again alleged in their counter-claim that, "In connection with the execution of the contract, Defendants deposited $100,000 with Coldwell Banker Realty;" yet, "...the title company retained and continues to retain the Defendants' earnest money deposit." *Id*, at 3.

1229.   Defendants Bull did not name and serve TitleNexus, Defendants' alleged earnest money holder, with the 27-CV-23-6625 suit and Bulls' counter-claims.

1230.   Defendants Bull did not name and serve Coldwell with the 27-CV-23-6625 suit and Bulls' counterclaims.

1231.   Defendants Bull did not join Coldwell to the 27-CV-23-6625 suit because Coldwell did not retain or continue to retain Defendants Bull's $100,000 earnest money for the authentic 20570 Park Place transaction.

### C.  Coldwell Named, But Not Served by Bulls



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

205

1232.    To create the false appearance that Defendants Bull made a $100,000 earnest money deposit to Coldwell without commencing an action against Coldwell, Defendant Trucke listed "Burnet Realty LLC d/b/a Coldwell Banker Realty" as "Another Defendant" on their May 18, 2023, Answer and Counterclaim. (**Exhibit 99**, Bull Answer and Counterclaim).



Figure UU: Exhibit 99, Answer and Counterclaim, dated May 18, 2023, listing Burnet Realty LLC d/b/a Coldwell Banker Realty as "Additional Defendant"

1233.    But, Defendant Trucke, on behalf of Defendant Bulls, did not serve Coldwell Banker Realty with 27-CV-23-6625 including Bulls' counterclaims, pursuant to the accord and satisfaction and/or waiver with Coldwell, that prevented it.

1234.    Bulls' named Coldwell but did not serve Coldwell to create the false appearance that Coldwell legitimately retained Bulls' $100,000 earnest money. *Id*.

1235.    Plaintiffs provided Rule 11 safe-harbor notice to Defendants Bull both on their



contradictory pleadings regarding the earnest money and their claim for unspecified damages.

1236.   Defendants Bull did not amend their pleadings or withdraw their damages claim, even after Rule 11 notice, to date.

**D. August 23, 2023: Plaintiffs' Motion to Dismiss**

1237.   Plaintiffs moved to dismiss Defendants Bull's Counterclaim, pursuant to Rule 12, and for Rule 11 Sanctions. (*See*, 27-CV-23-6625 at Index Nos. 8, 9, 12, 13).

1238.   Without standing or notice to Plaintiffs or the Court, Attorney Matthew Sloneker appeared on behalf of Coldwell at the motions hearing on Plaintiffs' Rule 11 and Rule 12 motions on August 23, 2023.

1239.   To explain Sloneker's unannounced appearance, Sloneker advised the Court that Coldwell had not been served with 27-CV-23-6625 but that Coldwell was served with Bulls' April 26, 2023 unfiled, yet undismissed, case. Sloneker: "[...] the Bulls started a lawsuit, which named my client as a Defendant, and we answered that Complaint. It hasn't been filed, and it hasn't been dismissed."

1240.   But, then, even after confirming Coldwell's lack of standing at the hearing in 27-CV-23-6625, Sloneker made certain factual representations about the matter: "Then in their [Bulls'] counterclaim here in this case, they've added my client to the caption but not served my client with anything. And my reading of the counterclaim, as it pertains to my client, is essentially, that my client is holding this money and allegations to that effect."

**i.     Sloneker's Fraud**

1241.    Sloneker, cloaked in the credibility that the profession commands, asserted: "The reason I'm here is that my client and/or its parent company is holding the $100,000 in earnest money in their trust account, and we want to be rid of it."



1242.   Sloneker, an agent of Lind Jensen P.A., sought to remit $100,000 U.S. currency into court escrow, so that his client, Coldwell, "is out of this." (Motion Hearing Trans., Aug. 23, 2023, at 18-19).

1243.   Sloneker, acting alone or at the direction of Anywhere RE, and/or Anywhere Integrated, and/or Lind Jensen P.A.,was eager to offer up Coldwell's multi-billion dollar parent-company's $100,000 petty cash pursuant to an "oral motion under Rule 67."

1244.   Coldwell and/or Anywhere RE and/or Anywhere Integrated sought to conceal their ongoing operation and management of the Bull Enterprise's earnest money scheme to defraud Plaintiffs.  By attempting to remit the $100,000 by oral motion, Coldwell created the false appearance that Coldwell had legitimately retained Bulls' $100,000 funds, thereby obscuring the fraudulent nature of their actions, circumventing future discovery, and protecting the enterprise.

1245.   The Hennepin County District Court responded: "You would have to make a formal motion. There isn't a motion that I would recognize today. But if the parties are able to reach a stipulation and file a stipulation to that effect, it occurs to me that it would simplify matters."

### ii.   Trucke's Fraud

1246.   Trucke, for his part, alleged a number of falsehoods, known by him to be false, to survive Rule 12 dismissal without Coldwell's $100,000 yet on deposit with Hennepin County Court Administration.

1247.   Trucke falsely alleged that: "The sellers provided the dates that they were available to do the – to do the inspections – excuse me. The inspections were scheduled, and then following them being scheduled, they were canceled by the sellers, and the buyers were denied



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

208

access – buyers being the Defendants in this particular instance. Shortly after that, the sellers served a notice of cancellation at that point."

1248.   Trucke's assertion that "the inspections [...] were canceled by the sellers," after Defendants Bull had a six-hour home inspection that was to include radon-testing, and included a meeting with a home-builder, and where the Defendants Bull received a 137-page inspection report, was patently false.

1249.   Regarding the earnest money, Trucke stated: "The exhibit at TitleNexus [Exhibit B, Partial Single Balance Ledger] showed that all of the funds, to our knowledge – the earnest money funds as well as the closing funds – were deposited with the title company that was closing the transaction.  Following that, we weren't aware that the funds – when the closing did not occur – went back to Coldwell Banker Burnet, which is where our confusion originally started with. We were under the understanding that the title company still had the $100,000 earnest money funds because they had all of the funds […]" (Motion Hearing Trans., Aug. 23, 2023, at 24-25).

1250.   Bull's $100,000 earnest money was not transferred from TitleNexus to Coldwell Banker Burnet on June 3, 2022 after the closing did not occur, or anytime thereafter.

### iii.   Coldwell's Proposed Stipulation

1251.   In an effort to advance Defendants' fraudulent scheme without exposing it, Sloneker, on August 23, 2023, submitted a Petition and Stipulation, along with a proposed order, to Plaintiffs' counsel, Greenberg.

1252.   Coldwell's proposed Petition referred to Coldwell's "information and belief" that $100,000 "in earnest money" had been"paid by Defendants."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1253.    Though the Petition and Stipulation that created the appearance that Coldwell held Bulls' $100,000 earnest money, Coldwell sought to deposit what it described as "$100,000 in disputed funds" that it "alleges is in its possession." (**Exhibit 100**, Coldwell's Proposed Stipulation and Petition).

1254.    Plaintiffs' counsel requested evidence that Coldwell held Jesse Bull's $100,000 earnest money in connection with the May 6, 2022 purchase agreement for 20570 Park Place, to date. (**Exhibit 101**, September 7, 2023, Email reply to Sloneker from Greenberg requesting proof of earnest money payment).

1255.    Coldwell later, and into late 2024, produced over 1,700 pages of documents that suggested an earnest money payment was made by J. Bull on May 9, 2022, and included Burger's forged TrustFunds' "Settled" notification.

1256.    However, not a single document in the 1700 page production constituted authentic documentation that Coldwell retained or continued to retain Bulls' $100,000 earnest money for 20570 Park Place from May 9, 2022 onward.

1257.    Plaintiffs requested that Coldwell interplead the $100,000 Coldwell claimed to possess, pursuant to Minn. R. Civ. Pro. 22.

1258.    However, Coldwell had no chain of custody showing retention of Bulls' $100,000 earnest money payment via TrustFunds from May 9, 2022, onward.

1259.    Without a chain of custody of Bulls' $100,000, Coldwell could not interplead the "disputed funds" it claimed to hold, pursuant to the demands of Minn. R. Civ. P. 22, Interpleader.

1260.    Defendants Bull agreed to sign Coldwell's stipulation that also required a dismissal of Bulls' sham April 26, 2023 unfiled suit against Coldwell.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1261.   Plaintiffs, however, declined to sign Coldwell's stipulation to remit the disputed

funds into Court without definitive proof that Coldwell had retained Bulls' $100,000 earnest

money as a down payment on their residence for nearly two years.

## CHAPTER 4: DISCOVERY

**LVII.    Plaintiffs' Discovery Efforts and Findings**

1262.    The Hennepin County Court denied Plaintiffs' Rule 11 and Rule 12 motions,

largely due to Trucke's material misrepresentation of facts regarding the inspection and

Defendants Bull's professed "confusion" about the status of their own earnest money.

1263.   Fully aware of their own fraudulent scheme, Defendants Bull had no need for

costly discovery and avoided it.

1264.   Defendants Bull conducted no timely discovery and attended no witness

depositions in 27-CV-23-6625, except for their own.

1265.   As a result, Plaintiffs bore the entire cost of depositions, subpoenas, and related

witness expenses.

1266.   Plaintiffs' discovery efforts were laborious and costly.

1267.   All subpoenaed parties, now named as defendants, resisted full compliance with

Plaintiffs' subpoenas by withholding full production of relevant documents and submitting

forged materials to create the false appearance of Bulls' earnest money payment.

1268.   Coldwell, TitleNexus, UMB, UBS Financial, TrustFunds, Burger, and Wexford

Realty collectively obstructed the process in an effort to conceal the fraudulent scheme.

1269.   After evading service for over a month, Burger provided most of his disclosures

in black-and-white photocopied format, resulting in unsearchable PDFs with no metadata.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1270.   Burger provided select text messages in color to intimidate Plaintiffs. In one such color text message, Burger produced a photo of a firearm, dated April 11, 2023, several days after Bulls were served with Plaintiffs April 1, 2023, Notice of Declaratory Cancellation of Purchase Agreement.

1271.   At deposition, Burger explained that J. Bull was purchasing a firearm.

1272.   Burger could not explain the relevance of the firearm text he produced to Plaintiffs, but admitted withholding a number of other texts that Burger unilaterally deemed irrelevant to the case.





Figure VV: April 11 Texts between Bull (L) and Burger (R)

1273.   The text reply from Bull contained a coded reference to Burger's criminal incident at the airport wherein Burger was arrested for possession of a firearm and disorderly conduct in a secured area of the airport. Burger was on probation as a result of the incident when



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

213

he orchestrated the Park Place earnest money scheme to defraud, and enlisted numerous members of the Bull Enterprise to further the fraudulent scheme.[27]

1274.  Defendants Bull failed and refused to satisfactorily answer Plaintiffs' Interrogatories and Requests for Production and, even after the Court granted, in part, *Plaintiffs Motion to Compel Discovery* on July 15, 2024; Defendants still refused to comply.

1275.  Plaintiffs *Motion for Discovery Sanctions,* for Defendants flagrant disregard for the Minnesota Civil Rules of Procedure and the Court's Order, is currently under advisement.

**A.  Defendants Bull Failed to Comply with Discovery**

1276.  The state court matter would have ended swiftly had Defendants Bull complied with discovery and produced their UMB -4774 checking account records for May 2022; the checking account referenced on both TrustFunds' convenience fee receipt and Burger's forged TrustFunds "Earnest Money Payment History" report.

1277.  To prolong the resolution of the action and maximize the time Defendants Bull could exploit Plaintiffs' equitable title or assert a claim for damages upon a future property sale, Defendants Bull deliberately withheld Bulls' UMB -4774 checking account records, including account statements and transactional documents, which remain undisclosed to date.

1278.  As part of their ongoing deception, Defendants Bull repeatedly disclosed their UBS Financial RMA account, presenting fabricated debits from Bulls' DXXXX28 account to falsely represent an earnest money payment to Coldwell that was never made from Bulls DXXXX28 account, or any account.

---

[27] According to MNCIS court records, Burger's probation was discharged in July 2022.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1279.   Moreover, Defendants Bull conspired with UBS Financial and UMB to deliberately withhold checking account and transactional records related to Bulls' UMB -4774 account.

1280.   To date, Defendants Bull have failed to produce a single authentic TrustFunds email notification sent to jessebull@hotmail.com from TrustFunds or any proof of payment reflecting Bulls' $100,000 earnest money deposit through TrustFunds.

1281.   There are no authentic TrustFunds email notifications for MLS Listing # 6160342 because Jesse Bull did not deposit $100,000 earnest money with Coldwell using TrustFunds on May 9, 2022 for MLS Listing #6160342.

### B.  Defendant UBS Failed to Comply with Discovery

1282.   Plaintiffs still endeavored to obtain discovery despite Bulls' pattern of fraud and concealment.

1283.   In September 2023, a subpoena duces tecum was served upon UBS Financial by HUCGS, PA.

1284.   UBS Financial failed and refused to remit Bulls' transactional records for Bulls' UBS Financial related UMB commercial checking account ending in -4774.

1285.   UBS Financial claimed that Bulls' UBS Financial RMA Account ending in D6XXX28 and UMB's checking account ending in -4774 constituted the same account.

1286.   UBS Financial then claimed that the -4774 account did not exist: "A ' -4774 account' does not exist," wrote UBS in-house counsel on January 12, 2024 to Plaintiffs' counsel.

1287.   UBS Financial, hinging its reply on the apparent technicality that the -4774 account was held at UMB, not UBS Financial, then clarified that UBS Financial's response to



Plaintiffs' September 2023 subpoena duces tecum was only for, "all accounts held at UBS Financial Services."

1288.   UBS Financial failed and refused to write an affidavit of no-record in response to Plaintiffs' subpoena with respect to Bulls' UBS Financial's related UMB commercial bank checking account ending in -4774.

1289.   In January 2024, UBS Financial did agree to conduct a search for email communications, per the Plaintiffs' subpoena duces tecum, and created a search using search terms selected by UBS Financial to include:

1. UBS Custodians: **Whitney Ward, TJ Mundy, Sherri Ryan, Dianne Britt, Joel Burger**[28] and

2. Search Terms:

1.   "**@titlenexus.com**" OR "**@wexfordrealty.com** OR "**@burgercompanies.com**" AND (**"Bull"** OR **"Fairways"** OR **"20570"** OR **"Park"**);

2. "Jesseandlee@gmail.com" OR "jesse.bull@ubs.com" OR "Feic0006@unm.edu";[29]

3. Date Range: May 1, 2022 to May 1, 2023.

1290.   On February 22, 2024, UBS Financial's in-house counsel indicated via email that, "There were more hits to review than expected, totaling approx. 5,916. I asked the vendor to do a

---

[28] Plaintiffs' counsel replied to UBS Financial to clarify that Joel Burger was not a UBS custodian.

[29] Plaintiffs' counsel did not notice UBS Financial's spelling error – indicating "unm" instead of "umn" in UBS Financial's search term for L. Bull's emails at Feic0006@unm.edu.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

rolling production, meaning they will process the responsive documents in batches so we aren't waiting for the full review to be completed before getting everything out the door to you."

1291.   However, before any of those 5,916 responsive communications were produced to Plaintiffs, UBS Financial's in-house counsel inexplicably withdrew from the matter.

1292.   On or around March 6, 2024, UBS Financial retained, "outside counsel for UBS Financial Services, Inc. and Whitney Ward related to this matter."

1293.   On March 11, 2024, and three days prior to Ward's deposition, outside counsel contacted Plaintiffs' counsel to, "make sure the deposition was not an exercise in futility." Outside counsel emailed, "One item we wanted to address with you ahead of time is that Ms. Ward was not involved in the $100,000 earnest money transaction."

1294.   But, upon Ward's deposition, on March 14, 2024, it was discovered that Ward executed the $3,300,000 wire, inclusive of Bulls' unpaid $100,000 earnest money, to TitleNexus on June 3, 2022.

1295.   And, as of the date of Ward's deposition on March 14, 2024, Ward's title, and wire-transfer duties, had changed.

1296.   On March 18, 2024, UBS Financial's outside counsel further clarified that she represented UBS Financial Services Inc., and also UBS Bank.

1297.   On March 18, 2024 UBS Financial/UBS Bank refused to disclose the 5,916 responsive communications UBS Financial's in-house counsel previously designated for production responsive to Plaintiffs' subpoena.

1298.   UBS Financial/UBS Bank's outside counsel emailed,  "I have confirmed that all responsive documents have been produced" and proffered that, "there were only 337 responsive



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

217

emails;" coincidentally, the same 337 emails that Plaintiffs' counsel had already received from UBS Financial's former in-house counsel.

**C. Defendant UMB Failed to Comply with Discovery**

1299.   Plaintiffs retained local counsel in Kansas City, Missouri to serve a subpoena duces tecum upon Defendant UMB located in Missouri.

1300.   To effectuate service of the out-of-state subpoena, Plaintiffs made an ex-parte application with the Jackson County Court, in Missouri.

1301.   Plaintiffs obtained a signed subpoena duces tecum and served UMB on or around February 28, 2024. (**Exhibit 102**, Subpoena Duces Tecum for UMB via ex parte application of local counsel in Jackson, Missouri and served on UMB, N.A., in Missouri on or around February 28, 2024).

1302.   Plaintiffs requested documents and records related to Defendants Bulls' UMB -4774 checking account as designated on Burger's purported TrustFunds "Earnest Money Payment History" report dated 5/16/22, Maurer's TrustFunds "Earnest Money Payment History" reports dated 5/27/22 and 2/8/23, and Bulls' $100,000 Crosby Cove earnest money paper check. *Id*.

1303.   In response, on March 11, 2024, UMB replied by email with attached correspondence from Ryan Gutierrez of UMB indicating that UMB "did not locate any responsive documents for a UMB account ending 4774." (**Exhibit 103**, March 11, 2024, UMB Response letter stating no records found).

1304.   In response to Plaintiffs' further inquiry, on March 18, 2024, UMB replied by email with attached correspondence from Ryan Gutierrez of UMB indicating that, "while the checks and transactions have UMB's routing number on them, we have no records for our



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

218

client's customer accounts.  It appears that this account belongs to TrustFunds, LLC." (**Exhibit 104**, March 18, 2024, UMB Response letter stating this account belongs to TrustFunds LLC).

1305.    UMB provided the phone number of 888-249-1616 for TrustFunds. *Id.*

1306.    UMB later claimed via email that Defendants had no accounts at UMB.

1307.    Then, after claiming that Bulls' had no accounts at UMB and that the -4774 account belonged to TrustFunds, LLC on March 18, 2024, UMB emailed documents UMB claimed were responsive only to request  #10 on Plaintiffs' amended subpoena duces tecum that consisted of what appears to be Bulls' HSA account records at UMB. (**Exhibit 105**, May 29, 2024, UMB response letter stating it produced responsive documents to request #10 only).

1308.    Plaintiffs provided UMB a copy of Bulls' $100,000 check with memo line: "16175 Crosby Cove" bearing UMB's routing number of 044000804 and account number -4774 for UMB 's reference to locate Bulls' checking account and records.

1309.    UMB claimed that it did not maintain a checking account for Jesse J. Bull or Lee A. Bull.

1310.    Plaintiffs, suspecting UMB's narrow and technical read of the Plaintiffs' broad subpoena, requested the checking account documents of "Jesse J. Bull Lee A. Bull", just as their names appear on the Crosby Cove UMB check, without "and" or "or."

1311.    UMB failed and refused to disclose Bulls' -4774 checking account statements and records for transactional data related to funds undeniably drawn from their institution at routing number 044000804.

1312.    UMB replied via email and attached correspondence that, "UMB was unable to locate responsive documents."



1313.   UMB was put on notice of litigation on September 19, 2024, and still, UMB

failed and refused to disclose Bulls' UMB  -4774 checking account records, statements, and

transaction history from May 2022 to May 2023 for transactions involving interstate commerce

that were drawn from its institution.

1314.   UMB dispatched a defensive reply via email correspondence threatening legal

action against Plaintiffs and asserting, "To the best of UMB's knowledge, account number

XXXXXX4774 is maintained by UBS Financial Services, Inc."

1315.   Plaintiffs requested that UMB write an affidavit of no-record related to Bulls'

UMB -4774 checking account to end any misunderstanding on Plaintiffs' part.

1316.   UMB failed and refused to write an affidavit of no-record related to Bulls' UMB

-4774 checking account.

### D.  Defendants Seek Unreasonable Fees to Obstruct Discovery

#### i.   TitleNexus seeks $12,014 in fees

1317.   On June 20, 2024, TitleNexus filed a motion seeking $12,014 in costs and fees,

citing the "storage fees" allegedly incurred after TitleNexus deleted records and emails related to

its involvement in the earnest money scheme to defraud. (*See*, 27-CV-23-6625, at Index Nos.

86-91).

1318.   Despite TitleNexus' knowledge of Bulls'pre-meditated plan to "set up the sellers"

as early as June 2022, and its duty to maintain records - including tax records per IRS policy -

TitleNexus deleted key documents and emails with Bull, Burger, UBS Financial, and UBS Bank,

detailing the conspiracy, the fraudulent circular wire transfer of funds from UBS Financial, and

Defendants' respective roles in the conspiracy.



1319.   But, to deter Plaintiffs' discovery, TitleNexus passed along the costs incurred to retrieve its deleted documents to conceal the conspiracy and TitleNexus' involvement in it.

1320.   At the hearing on July 19, 2024, Plaintiffs argued that TitleNexus' fee request was wholly unreasonable, given that its owner, Defendant Deena Cole, knew that the "closing" was intended to fabricate "evidence" Deena Cole produced in anticipation of a lawsuit against the Plaintiffs/sellers.  The Court ultimately ordered Plaintiffs to pay the fees, reasoning that TitleNexus had incurred costs to recover the files as a third-party. (*See*, Index No. 112, at Transcript of TitleNexus Discovery Fees Hearing, on July 19, 2024).

1321.   Plaintiffs' fully complied with the Court's Order and, within three (3) business days, remitted the fees to TitleNexus for the evidence it deleted, and for which Defendants Bull Burger, and UBS Financial were likewise in possession, but failed and refused to produce.

### ii.  TrustFunds LLC seeks $2,947.50 in fees

1322.   Similarly, to discourage Plaintiffs' discovery of TrustFunds' involvement in the Bull Enterprise and earnest money fraud scheme, TrustFunds sought an additional $2,947.50, from Plaintiffs in addition to other fees and costs Plaintiffs already remitted to TrustFunds. (*See*, 27-CV-23-6625, at Index No. 69).

1323.   TrustFunds chose not to bring its motion for fees before the court, knowing that doing so could lead to the exposure of its own unlawful conduct and the fact that it sought payment for its forged and fraudulent documents and TrustFunds "records" that TrustFunds literally produced in response to Plaintiffs' subpoena.

### E. TrustFunds' Production & Deposition



1324.   On or around September 12, 2023, TrustFunds was served with a cover letter and subpoena duces tecum by HUCGS, P.A., to produce TrustFunds records and notifications related to Bulls' alleged May 9, 2022, $100,000 TrustFunds transaction for Park Place.

1325.   Handwritten on the cover letter by Ms. Leegard were the notes, "May 18, 2022 claimed to have EM $100,000" and "Roughly paid - May 2022 - April 2023."

1326.   TrustFunds lacked any authentic record of $100,000 TrustFunds transaction by Bulls on May 9, 2022, for the Park Place MLS Listing #6160342.

1327.   Since Burger failed to initiate the TrustFunds transaction using the "Notify Buyer" form, there were no transactional records for TrustFunds to produce to Plaintiffs related to MLS Listing #6160342.

1328.   Faced with this absence of records, TrustFunds had two options: it could submit an affidavit confirming no record of the transaction - thus exposing the Defendants' operation of the Bull Enterprise through a pattern of racketeering as well as TrustFunds overt acts in furtherance of the conspiracy - or it could fabricate TrustFunds "records" to mask the conspiracy and TrustFunds' liability.

1329.   With Coldwell's assurances that, "the money went to Coldwell Banker," (Leegard Depo. Trans., at 393:23-4) and an agreement between Coldwell and TrustFunds/Leegard that Leegard would not disclose Coldwell's trust account details for the Park Place transaction, TrustFunds opted to create false records of a May 9, 2022, earnest money transaction that never occurred.

1330.   With no authentic record of any $100,000 earnest money payment by Bulls' on May 9, 2022, using TrustFunds, TrustFunds doubled-down on its acceptance of an isolated $5



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

222

convenience fee payment to circumvent its own on-line TrustFunds earnest money delivery process.

A.  **TrustFunds' Wire Fraud / "Records"**

1331.   To create the false records, TrustFunds gathered information about the dates and times Burger proffered on the May 16, 2022, 4:54 p.m., forged "Earnest Money Payment History" report.

1332.   Fully aware that J.Bull had not made a TrustFunds payment for $100,000 on May 9, 2022 and that there would be no actual TrustFunds email notifications to recover per Plaintiffs' subpoena, TrustFunds emailed Twilio SendGrid to request copies of TrustFunds' email message bodies. (**Exhibit 106**, TrustFunds email to Twilio SendGrid requesting message bodies).

1333.   Twilio SendGrid advised TrustFunds that they do not save message bodies for more than 72 hours and, "If TrustFunds created a template for the language used for the email notifications then you may be able to pull that language directly from your account." *Id*.

1334.   TrustFunds then obtained out-dated TrustFunds email notification message body templates from its account or from Burger, to comport with the out-dated templates Burger tendered to Byrd and Byrd to Plaintiffs.

1335.   TrustFunds produced via email, a series of what TrustFunds falsely asserted were authentic "Email PDFs" reflecting the actual email notifications that were sent to the parties to the Park Place transaction. (**Exhibit 107**, TrustFunds "Email PDFs" produced by TrustFunds to Plaintiffs reflecting non-existent TrustFunds transaction).

1336.   In TrustFunds' words:  [TrustFunds] "provided the body of the templates that were sent out of SendGrid at the time of the transaction."



1337.   TrustFunds then passed off the message bodies to Plaintiffs and their counsel as evidence that the Bulls' $100,000 TrustFunds transaction actually occurred on May 9, 2022.

1338.   TrustFunds electronically produced a "Earnest Money Fully Processed" email PDF with Jesse Bull's name on it, purporting to be a receipt that was distributed to Bull after Bull made the $100,000 TrustFunds payment. (**Exhibits 108**, TrustFunds "Earnest Money Fully Processed" "email PDF" created by TrustFunds in the name of Jesse Bull;  **Exhibit 109**, TrustFunds "Settled" notification created by TrustFunds even though no earnest money ever settled at Coldwell for the Park Place transaction.)

1339.   Leegard testified that Bulls made a $100,000 payment to Coldwell using TrustFunds.

1340.   Leegard confirmed in an email: "Based on the records we sent you, there was only one payment in the amount of $100,000."[30]

1341.   To perpetuate the earnest money fraud scheme, TrustFunds, through its counsel, also emailed Defendant Trucke a copy of TrustFunds' "Email PDF" production so that Defendant Trucke and Defendants Bull could utilize the very TrustFunds "receipts" Bull was unable to provide for his non-existent payment.

1342.   But, TrustFunds/Leegard's production was inconsistent and rife with errors commonly found in cases of forgery of otherwise automated documents.

1343.   Since Bull, Burger and TrustFunds uncoupled the $5 convenience fee payment from the never-made $100,000 earnest money payment, there existed a single bona-fide receipt

---

[30] Based on Maurer's and  Burger's previous representations to Wolf that two $50,000 earnest money payments were made by Bulls using TrustFunds causing a delay, Plaintiffs subpoena requested records of both transactions.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

for the $5 TrustFunds convenience fee payment; the $5 receipt from the check sale at The Reserve at **12:58 p.m.** on May 9, 2022.

1344.   The $5 convenience fee check sale at The Reserve on May 9, 2022, triggered ReliaFunds' predictable 4-business day ACH processing timeline, a timeline that is the same whether tendering a check to the bank or making a payment electronically online.

1345.   Leegard could not conceal or dispose of the ReliaFund ACH record of the $5 convenience fee payment made on May 9, 2022, on behalf of Bulls at The Reserve since it constituted TrustFunds' income for tax purposes.

1346.   TrustFunds produced its redacted ReliaFund ACH record of Bulls' $5 convenience fee payment showing the settlement date of May 13, 2022 at TrustFunds, 4 business days after the payment was made by Burger on behalf of Bulls on May 9, 2022. (**Exhibit 110**, ReliaFund $5 ACH record of settlement on May 13, 2022).

1347.   But, in an effort to maintain the appearance that a TrustFunds transaction for $100,000 earnest money occurred at the same time that the $5 convenience fee was submitted by Burger on behalf of Bull on May 9, 2022 per TrustFunds online program, TrustFunds, acting at the direction of Leegard, produced a number of TrustFunds email notification bodies (the email PDFs) indicating a settlement date of **May 13, 2022**. (*See*, Exhibits 107 at TF 34, TF 33 showing May 13, 2022, not May 16, 2022, as the settlement date).

1348.   For example, TrustFunds and Leegard produced the body of a "Confirmation of Earnest Money Payment" email notification.  As previously described, Burger should have received this "Confirmation of Earnest Money Payment" notification email upon Bulls' submission of the $100,000 payment using the TrustFunds payment form.



1349.   The TrustFunds "Confirmation of Earnest Money Payment" created by Leegard states, "Jesse Bull has submitted their earnest money payment through TrustFunds. The payment may appear on the buyer's bank account within 1-2 business days, and will finish processing on **5/13/2022**. Your TrustFunds Transaction page will show the  settled status once the funds have fully deposited into the trust account you selected." (**Exhibit 111**, TrustFunds forged "Confirmation of Earnest Money Payment" notification indicating a settlement date of May 13, 2022).

1350.   But, May 13, 2022, was inconsistent with Burger's forged "Earnest Money Payment History" report and Burger's forged "Settled" email notification that both "reported" a settlement date of May 16, 2022, not May 13, 2022.

1351.   May 13, 2022, was also inconsistent with Maurer's statement to Wolf that Coldwell had no earnest money settlement as of May 18, 2022, because it was delayed.

1352.   May 13, 2022, was also inconsistent with Anywhere RE's and Coldwell's entire document production reflecting, consistent with Burger's fraud, that the earnest money settled on May 16, 2022.

1353.   The TrustFunds email notification bodies that Leegard electronically transmitted and passed off as evidence of the TrustFund email notifications that were sent to the parties at the time of the "transaction," all contained the earnest money settlement date of May 13, 2022, consistent with the actual $5 convenience fee settlement date of May 13, 2022, and not Burger's preferred, but forged "Earnest Money Payment History" report date of May 16, 2022.

1354.   Notably, for this reason, Burger did not forge the "Confirmation of Earnest Money Payment" notification because Burger would have had to populate May 13, 2022, as the settlement date, a date that would surely arouse suspicion because Plaintiffs had written



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

confirmation from Grieger that no earnest money payment was settled at Coldwell on May 13, 2022, or May 14, 2022.

1355.   To solve the May 13, 2022, settlement date/forgery tell problem as well as the absence of a single authentic email notification for the transaction in the possession of any of the parties listed in Leegard's "Email PDF" distribution list inboxes, Leegard downplayed the significance of authenticating a transaction using the presence or absence of automated real-time TrustFunds email notifications stating, "And the email notifications are courtesy only. The way to verify transactions is to look at a transaction table." And, "We know what transactions were sent regardless of an email."

1356.   But, for Park Place MLS Listing #6160342, there was no TrustFunds transaction table in existence to verify because Burger failed to initiate the TrustFunds transaction and made an uncoupled $5 convenience fee payment instead.

1357.   In a brazen effort to conceal the earnest money fraud scheme and TrustFunds complicity in it; TrustFunds forged an "Earnest Money Request History" report for the 20570 Park Place 2022 listing with the "Settled" date of May 16, 2022, at 6:00 a.m.

1358.   But, TrustFunds forgery of a non-existent and otherwise automated "Earnest Money Payment History" report for a $100,000 never-made payment was itself fraught.

1359.   TrustFunds could not simply reproduce Burger's out-dated "Earnest Money Payment History" report both because it was outdated and therefore inconsistent with any other authentic "Earnest Money Payment History" report for May 2022 onward, and because the new format for an authentic TrustFunds Transaction Table and "Earnest Money Request History" report generated for a 2022 transaction after 2022 includes a thumbnail photo of the subject property's MLS Listing photo.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

227

1360.   TrustFunds therefore forged a TrustFunds "Earnest Money Request History" report" and referred to it at deposition as the TrustFunds "transaction table" to verify Bulls' $100,000 non-existent TrustFunds' transaction for Park Place.

1361.   But, it was impossible for TrustFunds to successfully forge the 2022 Park Place Transaction Table in the then-current transaction table format that included the Park Place property's 2022 **snowy day** MLS listing thumbnail photo.

1362.   The 2022 MLS snowy-day listing photo was removed from MLS in and around February 2023 or thereafter; seven months before HUCGS PA subpoena duces tecum was issued to TrustFunds.

1363.   Moreover, since Burger failed to initiate TrustFunds, a process that would have preserved the 2022 MLS Park Place snowy day listing photo in an authentic and reproducible TrustFunds' Transaction table, there was no authentic TrustFunds Transaction Table for TrustFunds to reproduce.

1364.   To solve this MLS thumbnail photo and forgery problem, TrustFunds regenerated an authentic TrustFunds Transaction Table for Plaintiffs completed 2018 TrustFunds earnest money transaction to Coldwell for 20570 Park Place in 2018.

1365.   TrustFunds then manipulated the Plaintiffs 2018 authentic TrustFunds table by populating the same dates and times utilized by Burger including the fake May 16, 2022 settlement date, but maintained the **sunny day** thumbnail 2018 MLS listing photo of Park Place. (**Exhibit 112**, TrustFunds forged "Transaction Table" for 2022 Park Place using 2018 MLS Listing photo).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS





20570 Park Place
Deephaven, MN 55331
MLS #: 6160342

| Buyer: | Jesse Bull |
|---|---|
| Earnest Money Amount: | $100,000.00 |
| Name on Bank Account: | Jesse J Bull and Lee A Bull |
| Routing Number: | 044000804 |
| Bank Account Number: | ********4774 |
| Funds Held By: | Coldwell Banker Realty |

| Listing Agent: | Mark Grieger |
|---|---|
| Listing Broker: | Coldwell Banker Realty |
| Buyer's Agent: | Joel Burger |
| Buyer's Broker: | Wexford Real Estate |

| Status | Date |
|---|---|
| Email Sent | May 9, 2022, 12:20 PM |
| Payment Form Opened | May 9, 2022, 2:31 PM |
| Submitted | May 9, 2022, 2:33 PM |
| Settled | May 16, 2022, 6:00 AM |

Invoice: 699294                              RF Number: 35222464

This earnest money request history report was generated at Sep 14, 2023, 10:24 PM by Cody Osegard.

Portions Copyright © 2023 Regional Multiple Listing Service of Minnesota, Inc. All rights reserved.

Figure WW: Exhibit 112, TrustFunds "Transaction Table" for Park Place created by Cody Osegard of TrustFunds

1366.   Thus, when Plaintiff L. Campoli, now acting as counsel, reviewed the TrustFunds Transaction Table— which Leegard had sworn under oath to be verification of Bulls' $100,000 earnest money payment for the 2022 Park Place listing on May 9, 2022—Plaintiff immediately recognized the house she purchased in 2018, not the house she was selling in 2022. She further realized that the transaction table, its contents, and Leegard's testimony collectively constituted fraud.

1367.   And Leegard realized it too, Leegard questioned the relevance of the deposition questions about the 2018 MLS listing photo on the 2022 transaction table, and when Leegard was asked about the photo's origin, Leegard replied, "Well, it's from the MLS."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1368.  But then, there was yet another loose end for TrustFunds to fraudulently conceal: the $5 convenience fee receipt. To conceal the in real life $5 payment at The Reserve, TrustFunds claimed that it did not maintain an office at The Reserve in 2022.

1369.  TrustFunds then created an electronic version of the TrustFund $5 convenience fee receipt with a time of May 9, 2022, at 2:58 p.m., a time that could easily be mistaken for 12:58 p.m. during a cursory review. (**Exhibit 113**, TrustFunds forged electronic email convenience fee receipt).

1370.  To align with Burger's forged "Earnest Money Payment History" report—which falsely claimed that Bull submitted his $100,000 payment at 2:33 p.m. on May 9, 2022—TrustFunds populated the electronic version of the convenience fee receipt with a time after 2:33 p.m. This was done to conceal the impossibility of a $100,000 earnest money payment being made at 12:58 p.m., as listed on the genuine $5 convenience fee receipt—93 minutes before Bull supposedly even opened the earnest money payment form, according to Burger's forged payment history report.

1371.  TrustFunds populated an electronic TrustFunds Convenience Fee Receipt for $5 at 2:58 p.m., and testified falsely, "It's the body of the message that went to the buyer."

1372.  But, as TrustFunds knew, the electronic version of the $5 convenience fee receipt never went to jessebull@hotmail.com on or around 2:58 p.m. on May 9, 2022, or on any other date.

1373.  TrustFunds' electronic convenience fee receipt forgery also had a notable tell; TrustFunds inserted "Jesse J. Bull and Lee A. Bull" for both the Buyer(s) and Name(s) on Account fields of the electronic TrustFunds email "receipt."





Figure XX: Exhibit 113, TrustFunds false Electronic Convenience Fee Receipt May 9, 2022

1374.   In an authentic electronic TrustFunds convenience fee receipt, the Buyer(s) and Name(s) on Account fields are populated by the buyer's agent and buyer, respectively.

1375.   But, as confirmation of Burger's and TrustFunds' forgeries of TrustFunds' documents for the Park Place transaction, Burger populated "Jesse Bull" for the buyer field, and "Jesse J. Bull and Lee. A. Bull" for the "Name(s) on Account" payer field in Burger's forged "Earnest Money Payment History" report.  While TrustFunds/Leegard populated "Jesse J. Bull and Lee A. Bull" for both Buyer(s) and Name(s) on Account fields on their forged receipt.

1376.   Both documents cannot be authentic for the same transaction.

1377.   TrustFunds' and Burger's TrustFunds documents for Park Place are inconsistent, and they are not real.

1378.   Perhaps, with assurances from Coldwell that Coldwell had the earnest money, TrustFunds and/or Leegard felt immune from the consequence of forging documents related to a $100,000 non-existent earnest money transaction representing the down-payment on Plaintiffs' real property.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

231

1379.   Perhaps, TrustFunds and/or Leegard was leveraged by Burger, who threatened to expose the technological shortcomings of using TrustFunds to transact earnest money like tennis shoes online, or reveal the relative simplicity with which a $100,000 earnest money "payment" can easily be faked by remitting a $5 convenience fee payment to a willing TrustFunds employee instead.

1380.   Perhaps, and as the discovery may reveal, TrustFunds' acceptance of a $5 in-person payment was not an isolated event but part of a covert, insider practice regularly utilized as a Monday-Friday earnest money work-around.

1381.   But, whatever its rationale, one thing is clear: honesty is not TrustFunds' policy.

**ii.  May 16, 2022 "Settled" Date: A Factual Impossibility**

1382.   Coldwell's unlawful hold of the Park Place deal that extended past May 16, 2022, prevented any settlement of earnest money via TrustFunds on May 16, 2022 at Coldwell.

1383.   The settlement of earnest money for the authentic Park Place deal, while the deal was still withheld from Coldwell's system by Grieger and Byrd, was factually impossible on May 16, 2022.

1384.   After May 16, 2022, Coldwell still held the Park Place deal.

1385.   Coldwell never did upload the authentic Park3.pdf to Transaction Manager because, as of midnight on May 16, 2022, because it was canceled.

1386.   Thus, no earnest money could settle on May 16, 2022, or any other date, at Coldwell for the authentic May 6, 2022, 20570 Park Place deal; and as such, each and every TrustFunds "notification" or "bank document" and "Earnest Money Payment History" report with the date of May 16, 2022 is, necessarily, false and fraudulent.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1387.   In short, Coldwell's infinite hold of the canceled Park Place deal, which prevented earnest money settlement in Coldwell's trust, revealed the Achilles' heel of the Bull Enterprise's earnest money fraud scheme: no earnest money could settle in Coldwell's trust on May 16, 2022, or at any time thereafter, while the deal was held and then canceled.

1388.   While Coldwell did upload another deal, the Ghost Deal, on or around May 20, 2022 to its system, the Ghost Deal was for an off-MLS non-existent property at 20 507 Park Place.

1389.   Since Coldwell's Ghost Deal for 20 507 Park Place did not have an MLS Property Listing or MLS listing number, no TrustFunds payment could be initiated and submitted for the Ghost Deal, an off-MLS listing either.

### iii. Trucke's False TrustFunds' "Affidavit of ANTHONY MAURER"

1390.   On April 24, 2023, just two days after Leegard's deposition, Defendant Trucke, operating alone, or at the direction of Defendants Burger and Bull, drafted an "Affidavit of Anthony Maurer" to be signed by Maurer of Coldwell.

1391.   Trucke directed Burger: "Joel: Attached is an Affidavit of Anthony Maurer. Please share with him and ask that he confirm that I have the details correct.  If correct, ask that he sign, notarize and return to me. Thank you! Ryan J. Trucke" (**Exhibit 114**, Unsigned Affidavit of Anthony Maurer drafted by Defendant Trucke for Burger to relay to Coldwell).

1392.   The affidavit, as drafted by Trucke stated falsely that:

To my [Maurer's] knowledge, the earnest money deposit by Jesse and Lee Bull for the purchase of 20570 Park Place, Deephaven, Minnesota was made through TrustFunds LLC on May 9, 2022. My office received notification of the deposit on May 9, 2022. Burnet Realty, LLC d/b/a Coldwell Banker Realty officially received the funds on May 9, 2022. Coldwell Banker Realty is currently in possession of the $100,000 earnest money deposit. The earnest money deposit has



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

been continuously in possession of Coldwell Banker Realty since May 9, 2022 and has not left our account at any time.

*Id.*

1393. All of the above factual assertions in Trucke's "Affidavit of Anthony Maurer" are false.

1394. Burger forwarded Trucke's email to Maurer stating, "Tony - let me know if this is something we can get from you. I'll send a courier to pickup if acceptable. Let me know if I need to run this by Tom [Rehman], thank you!" (**Exhibit 115**, Email from Burger to Maurer requesting signature on Trucke's proposed "Affidavit of Anthony Maurer").

1395. Maurer did not sign the affidavit prepared by Trucke.

**F. Coldwell's Motion to Quash and Rule 67**

1396. On May 1, 2024, Plaintiffs served Coldwell with a Rule 30.02(f) subpoena for deposition in the state court matter.

1397. On May 14, 2024, the eve of its deposition, Coldwell filed a motion to quash Plaintiffs' subpoena for deposition and petitioned the court, pursuant to Rule 67, to remit what it claimed was Bulls' $100,000 into Court. (*See*, 27-CV-23-6625 Index No. 75, Coldwell's Third-party Motion to Quash filed May 14, 2024 by Sloneker).

1398. Coldwell did not, and could not, show chain of custody of Bulls' $100,000 earnest money funds pursuant to the authentic May 6, 2022 Park Place purchase agreement.

1399. Since Bull did not deposit Bulls' $100,000 earnest money to Coldwell via TrustFunds on May 9, 2022, or any other date, Coldwell had no chain of custody of Bulls' funds from May 9, 2022, to date.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1400.    Coldwell sought to deposit Coldwell's $100,000 that Coldwell remitted "for Jesse Bull" as part of its undisclosed accord and satisfaction with Bull, and pursuant to the Ghost Agreement Coldwell brokered in place of the Plaintiffs' authentic, but canceled, 20570 Park Place deal.

1401.    To conceal that the true origin of the earnest money was Coldwell and not Bull, Coldwell did not submit to Hennepin County Court a single bank account record to reflect Bulls' alleged deposit of $100,000 into Coldwell's trust account despite dumping over 1700 pages of documents on Plaintiffs while proclaiming many of them to be "evidence" of Bulls' $100,000 payment.

1402.    Coldwell furthermore did not submit to Hennepin County Court a single TrustFunds email notification, TrustFunds Transaction Table, or TrustFunds "Earnest Money Payment History" report as proof that Bull remitted an earnest money payment of $100,000 to Coldwell for Park Place.

1403.    Sloneker could not submit documents known to be forged, yet each purported TrustFunds email notification, transaction table, and history report constitutes a false and fraudulent document forged by Burger, Coldwell, and/or TrustFunds to falsely reflect Bulls' non-existent $100,000 earnest money payment.

1404.    So, in support of Coldwell's claim that Coldwell had possession of the Bulls' $100,000 earnest money pursuant to the Plaintiffs' Park Place agreement, Coldwell submitted a single affidavit, signed by Thomas Rehman, Coldwell's long-time Vice-President of Sales Administration.



1405.   In his cryptic affidavit, Rehman referred to the Ghost Agreement that Coldwell created and uploaded to its system on May 20, 2022, to fraudulently resuscitate the canceled Park Place agreement.

1406.   Rehman's affidavit and Sloneker's motion, relied entirely on the particulars of the Ghost Agreement attached to Rehman's affidavit, for the non-existent address of 20 507 Park Place with a purchase price of $3,250,000.

1407.   The Ghost Agreement, constituted a look-alike Park Place purchase agreement but with some notable edits as effectuated by Coldwell.

1408.   Rehman's attached Ghost Agreement owed its present vitality to the fact that Coldwell removed Bulls' well-contingency addendum and Campolis signed cancellation pursuant to that addendum default from the Ghost Agreement.

1409.   To deceive Plaintiffs and the Court, Rehman attached Campolis signature pages and the Counter-offer addendum from the authentic, previously canceled, 20570 Park Place purchase agreement to make it appear that the agreement for which Coldwell held $100,000 was the original Park Place deal, when it was not.

1410.   Sloneker's motion was likewise purposefully deceptive, and fraudulent, referring to the purchase price of $3,250,000 and not $3,300,000 to conceal that Rehman had not attached the authentic Park Place deal and Sloneker could not submit, or motion to submit, Coldwell's $100,000 on the authentic Park Place deal because it was canceled by Plaintiffs.

1411.   At the zoom hearing, when specifically asked by the Court when and by what means Coldwell received Bulls' earnest money, Sloneker replied falsely and fraudulently with the intent to deceive: "TrustFunds."



1412.   On September 13, 2024, acting individually or at the direction of Anywhere RE and/or Anywhere Integrated and/or Lind Jensen PA, Sloneker utilized interstate wires via ACH to deposit $100,000 of Coldwell's funds into Hennepin County District Court.

1413.   Coldwell's $100,000 deposit of U.S. currency to Hennepin County Court escrow did not constitute Jesse Bulls' funds in Coldwell's possession since May 9, 2022.

1414.   Now, only the simple truth of the case remains: "The buyers have had their earnest money the whole time."

### CHAPTER 5: PREDICATE ACTS OF RACKETEERING

LVIII.   **Hobbs Act, Interference with commerce by threats or violence (18 U.S.C. § 1951(b)(2)**

1415.    Under the Hobbs Act, 18 U.S.C. § 1951, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The Act encompasses situations where defendants, through coordinated threats and misrepresentations, instill a legitimate fear of severe financial or legal consequences, thus coercing individuals into decisions that benefit defendants.

1416.   Defendants conspired to engage in extortion under the Hobbs Act, with the specific intent to retain control over Plaintiffs' property unlawfully by instilling a fear of economic harm should Plaintiffs not consent.

1417.   Defendants' threats of legal action to Plaintiffs were wrongful in that Defendants had fraudulently obtained equitable title to Plaintiffs real property, and with no genuine deposit upon Plaintiffs' property. Thus, the basis of all Defendants' wrongful threats of suit and judicial sale of Plaintiffs' residence were unlawful, and frivolous.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1418.  Defendants had no legal basis to threaten legal action, but they did so anyway utilizing their fraudulent hold on Plaintiffs' equitable title as their fear-inducing leverage, for profit.

1419.  By wielding equitable title in this manner, Defendants caused significant fear in Plaintiffs for over two years, of serious economic, legal, and potentially physical consequences.

1420.  Defendant attorneys Rotman and Trucke, acting with knowledge of Defendants' earnest money fraud and well-contingency breach, wrongfully threatened Plaintiffs with litigation and a judicial sale, respectively, to induce fear of severe economic loss. By wielding the power of equitable title to a $3,300,000 residence, these attorneys exploited Plaintiffs vulnerable position, repeatedly asserting that failure to comply with Defendants' demands would result in costly litigation and potential loss of the property at an inconvenient time. Further operating with knowledge of Plaintiffs' medical situation, information that Plaintiff voluntarily shared with Rotman and Trucke, added an element of fear of physical harm to Defendants' threats because, as Defendants well knew, Plaintiff feared that moving, whether by choice or by court order, would jeopardize the health of mother and child. In an email to Burger from Plaintiff on May 18, 2022: "If anything were to happen [to my unborn child], I would never forgive myself."

1421.  Through a series of coordinated actions, predicate extortionate acts unique to each Defendants' specific role in the conspiracy, Defendants knowingly and wilfully sought to compel Plaintiffs' compliance with demands that provided Defendants with financial gain and continued control of the Plaintiffs' real property.

1422.  By way of example, from at least in or about May 2022 through October 2024 and ongoing, for the purpose of executing the scheme to defraud described above, the Individual



Defendants listed below used extortionate conduct by means of wrongful threats and coercion to instill a legitimate fear of significant economic loss, and potentially, physical harm in the absence of Plaintiffs' consent to Defendants' continued control of equitable title all in violation of 18 U.S.C. § 1951:

| Defendant | Date | Predicate Act of Extortion/Action Taken | Method of Coercion | Purpose/Impact |
|---|---|---|---|---|
| Byrd | May 2022 -present | Withheld earnest money status from Plaintiffs and continued to conceal earnest money fraud | Concealment of Burger/Byrd's forged TrustFunds notifications and lack of authentic TrustFunds documents and notifications | Plaintiffs consented to Defendants' unlawful sustained control of equitable title believing Defendants had fulfilled their obligations. |
| Rotman, J. Bull, L. Bull | June 2022 | Threatened litigation and suit without basis; concealed earnest money default and contingency breach | Economic harm of $330,000 for a signed cancellation via legal threat | Induced Plaintiffs to offer $25,000 And permit continued control of equitable title |
| Rotman | June 2022 | Threatened litigation and suit without basis; concealed earnest money default and contingency breach | Verbal demand of improvement in offer or Plaintiffs will face suit | Induced Plaintiffs to offer $25,000 and permit continued control of equitable title |
| Rotman | June 2022 | Threatened litigation and suit without basis; concealed earnest money default and contingency breach | Emails Plaintiffs' counsel demanding $275,000 in four days time or Bulls will litigate | Induced Plaintiffs to offer $25,000 and permit continued control of equitable title |



| Rotman | August 2022 | Threatened litigation and suit without basis; concealed earnest money default and contingency breach | Emails Plaintiffs that, "$25,000 will not settle this matter. Unless your clients meaningfully improve their settlement offer, the Bulls have asked me to turn this matter over to litigation counsel in order to pursue their remedies. Please advise." | Induced Plaintiffs to leave $25,000 offer open and permit continued control of equitable title |
| Trucke, J. Bull, L. Bull | September 2022 | Threatened judicial sale without basis; concealed earnest money default and contingency breach | Trucke, in collaboration with J. Bull and L. Bull, demands $225,000 to avoid a forced judicial sale. | Induced Plaintiffs to re-offer $25,000 and permit Defendants' continued control of equitable title |
| Grieger | May 2022 - present | Withheld earnest money status and fraudulently represented earnest money status to Plaintiffs.<br><br>Failed to disclose Grieger's routine practice of holding deals to prevent earnest money deposit until the contingency period ends but with no means of enforcing the contingencies on behalf of sellers.<br><br>Failed to disclose | Concealment of Burger/Byrd's forged TrustFunds notifications and lack of authentic TrustFunds documents<br><br>Concealment of Grieger's failure to upload the deal resulting in failure to retain earnest money<br><br>Concealment of well-contingency breach | Plaintiffs consented to Defendants' sustained control of equitable title believing Defendants had fulfilled their monetary and contractual obligations. |

| | | Bulls' well-contingency default on May 16, 2022. | | |
|---|---|---|---|---|
| Coldwell | May 2022-present | Ratified decisions of agents Byrd, Grieger, and Maurer as well as Rehman and Baker to withhold information about failed earnest money and defaults | Economic coercion through concealment and validation of illegal acts | Plaintiffs consented to Defendants' sustained control of equitable title falsely believing Coldwell's representations that Defendants had complied with the purchase agreement under Coldwell's authority |
| Anywhere RE | Various dates | Misleading communications by counsel to Plaintiffs via email, concealing material facts about earnest money status and proffering false records of Bulls' never-made payment | Wire fraud through interstate communications | Plaintiffs detrimentally relied on counsel's false statements and concealment in assessing best course of legal action. |
| Anywhere RE, Coldwell, Maurer, Rehman, Baker | May 18, 2022 or thereafter | Transmitted and/or conspired to transmit $100,000 on behalf of Jesse Bull, misrepresenting it as an earnest money deposit to conceal Coldwell's routine and secretive practice of holding deals to prevent | Wire fraud through interstate communications | Plaintiffs were coerced into believing Bull had fulfilled the financial commitment, thereby consented to Defendants' retained control of Plaintiffs' property. |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| | | earnest money deposit, and failure to supervise agents or discipline them. | | |
|---|---|---|---|---|

1423.   Defendants acted in concert, utilizing both threats of baseless legal action and fabricated documentation and wire fraud to manipulate Plaintiffs into consenting to Defendants' fraudulent control of Plaintiffs' equitable title. Defendants retained control over Plaintiffs' property under false pretenses, coercing Plaintiffs' compliance through legitimate fear of severe financial harm, reputation damage, and, given Plaintiffs' unique medical vulnerability, potential physical harm. These coordinated acts of extortion, spanning multiple years, constitute a pattern of predicate racketeering acts under 18 U.S.C. § 1961(1), and relatedly, supports Plaintiffs' RICO claims under 18 U.S.C. § 1962.

## LIX.    Wire Fraud (18 U.S.C. § 1343)

1424.    The Individual Defendants, by and through each other and the Corporate Defendants, engaged in a systematic and ongoing earnest money scheme with the intent to defraud, deceive, mislead, and/or fraudulently convert equitable title to Plaintiffs' real property and retain equitable title to Plaintiffs' real property for over two years for financial gain.

1425.   Defendants knowingly devised or knowingly participated in the earnest money scheme or artifice to defraud Plaintiffs and/or to obtain the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, or promises, and by concealment of material facts and Defendants transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or

sounds for the purpose of executing the earnest money scheme, all in violation of 18 U.S.C. § 1343.

1426.   In particular, Defendants knew or could foresee that the interstate wires would be used to transmit false and fraudulent TrustFunds notices, false and fraudulent emails and documents related to the earnest money, and false and fraudulent affidavits, exhibits, and legal pleadings culminating in Coldwell's fraudulent transmission of $100,000 of Anywhere RE's and/or Anywhere Integrated and/or Coldwell's U.S. currency, affecting interstate commerce, to Hennepin County Court Administration to create the false appearance that Defendant Bulls had remitted $100,000 earnest money to Coldwell for the Park Place transaction in May 2022.

1427.   Defendants acting singly and in concert, personally or through the Corporate Defendants (or their agents), used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering executing, concealing, conducting participating in, or carrying out a scheme to defraud Plaintiffs, and likely the IRS, within the meaning of 18 U.S.C. § 1343.

1428.   It is not possible for Plaintiffs to plead with particularity all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications – such as Coldwell's and Bulls' undisclosed accord and satisfaction – are within the exclusive control and within the exclusive knowledge of Defendants and other presently unknown individuals.

1429.   By way of example, however, from at least in or about May 2022 through October 2024 and ongoing, for the purpose of executing the scheme to defraud described above, the Defendants specifically used the interstate wires or caused the interstate wires to deliver each and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

every false, forged, deceptive, and misleading communications described herein and in the table below, for the purpose of executing the scheme to defraud Plaintiffs.

1430.   On or about the dates listed below, in the State and District of Minnesota and elsewhere, the Defendants, as set forth below, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signal, and sounds, including, but not limited to, the following:

| Defendant | Type of Wire | Date of Transmission | Description |
|---|---|---|---|
| Grieger, Coldwell | Text | May 9, 2022 | Grieger texts Plaintiffs indicating falsely that no earnest money could be submitted until May 9, 2022, at the same time Grieger and Byrd hold the deal to purposefully prevent earnest money deposit to Coldwell. |
| Grieger, Coldwell | Text | May 9, 2022 | Grieger texts Plaintiffs stating falsely: "I just found out TrustFunds is capped at $50,000. In the process of getting Joel Coldwell Banker's wire transfer information. Joel to let me know when the wire has been initiated." |
| Burger, Wexford | Email | May 9, 2022 | Burger emails Byrd at 12:32 p.m. falsely claiming that Burger initiated TrustFunds for Park Place: "Sent off through TrustFunds." |
| J. Bull | ACH | May 9, 2022 | Bull writes a $5 convenience fee check to TrustFunds on Bulls' UMB -4774 account to uncouple the $5 convenience fee from the earnest money deposit and tenders it for payment via ACH to create a false TrustFunds' invoice number |
| Burger, Wexford | ACH | May 9, 2022 | Burger tenders Bulls' $5 uncoupled convenience fee check to TrustFunds for ACH processing via ReliaFund and |

|  |  |  | affecting interstate commerce |
|---|---|---|---|
| TrustFunds | Receipt | May 9, 2022 | TrustFunds generates and prints a $5 convenience fee check receipt from TrustFunds online programming source for Burger/Bulls' check tender affecting interstate commerce, with invoice number 699294 for receipt of Bulls' $5 check tender payment. |
| Burger, TrustFunds | Online TrustFunds Transaction Table | May 9, 2022 | Burger, acting alone and/or with the assistance of TrustFunds, accesses an out-dated transaction table and screenshots or receives and/or uses a "clip" from the training screen from TrustFunds online programming source populated with a false date and time reflecting that Burger "initiated" TrustFunds at 12:20 p.m., on May 9, 2022. |
| Burger | Email | May 9, 2022 | Burger emails Byrd the forged TrustFunds Transaction Table, on or around 1:00 p.m., on May 9, 2022, showing "Email Sent" at 12:20 p.m., falsely purporting that Burger initiated a TrustFunds online transaction at 12:20 p.m., on May 9, 2022, to Bull to conceal that Burger failed to initiate the TrustFunds transaction at all. |
| Burger, Wexford | Email | May 9, 2022 | Burger emails Byrd a forged TrustFunds Earnest Money Payment Status Change payment notification which consists of a forged TrustFunds email body purporting to show that Bull remitted $100,000 to Coldwell using TrustFunds on May 9, 2022, around 2:33 p.m. |
| Byrd, Coldwell | Email | May 9, 2022 | Byrd, knowing Burger's TrustFunds payment "notification" email is false and fraudulent because it is not from TrustFunds, deletes Burger's email header and pathway and forwards the forged TrustFunds notification body to Plaintiffs in an email that Byrd purports is proof of Bulls' $100,000 EM deposit. "Lauren and |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| | | | Mike - Please see below for a confirmation email verifying that the EM has been submitted to Coldwell Banker." ***_Please confirm receipt of this email***_ |
|---|---|---|---|
| Byrd, Coldwell | Email | May 9, 2022 or thereafter | Byrd deletes Burger's email containing Burger's forged TrustFunds payment notification of $100,000 from Byrd's Coldwell online email inbox to conceal Bulls, Burger, and Byrd's earnest money scheme to defraud Plaintiffs. |
| Byrd, Coldwell | Email | May 10, 2022 | Byrd emails Plaintiffs to demand confirmation of receipt of Byrd's fraudulent email forward containing Byrd's cleaned up version of Burger's forged TrustFunds notification as "proof" of Bulls' $100,000 earnest money deposit to Coldwell. |
| Burger, Wexford | Email | May 10, 2022 | Burger emails Byrd asserting that he knew Byrd was not getting TrustFunds notifications, and materially misrepresenting that, "this [earnest money] was deposited yesterday," (May 9, 2022). |
| Byrd, Coldwell | Email | May 10, 2022 | Byrd emails Burger with false confirmation of Byrd's receipt of an email suggesting falsely Byrd received a TrustFunds notification even though Byrd did not receive any TrustFunds notifications from TrustFunds regarding Bulls' non-existent transaction. Yet, Byrd falsely confirmed receipt of a TrustFunds notification falsely suggesting that Bull had made a deposit, "the email did finally come a little after I emailed you, so we are all good here!" |
| J. Bull, UBS Financial | Electronic Bank Entries | May 10, 2022 | J.Bull electronically earmarks $100,000 to Coldwell and $5 to TrustFunds on Bulls' UBS Financial RMA Account D6XXXX28, to create the false appearance of an actual debit of $100,000 on May 10, 2022 by Coldwell but where no debit by Coldwell was made on May 10, 2022. |



| Grieger, Coldwell | Email | May 12, 2022 | Grieger replies by email to Plaintiffs materially misrepresenting that the earnest money will probably settle tomorrow or Monday: "No new news about the earnest money.  It will probably settle tomorrow or Monday." But Grieger knew that any settlement was a factual impossibility while Grieger continued to hold the deal preventing settlement. |
| --- | --- | --- | --- |
| Grieger, Coldwell | Email and/or Phone and/or Text Communications | May 13, 2022 | Grieger and/or Coldwell and/or Coldwell's agents falsely report and/or issue a press release to Finance and Commerce via phone, text, or email, that Grieger had listed, and sold, 20570 Park Place for $4.1 Million on April 22, 2022. |
| Grieger, Coldwell | Email | May 14, 2022 | Grieger emails Plaintiffs, while still holding the deal to prevent earnest money deposit and states falsely that Grieger received a TrustFunds submission notice when, in actuality, Grieger received no authentic TrustFunds notices from TrustFunds for the Park Place transaction: "The earnest money was sent via trust funds (sic) by the buyers on Monday and once I received notification from trust funds (sic) of that happening Chelsey forwarded you that notice… We are currently waiting for the settled notification." |
| Burger, Wexford | Email | May 16, 2022 | Burger populates and emails an out-dated TrustFunds "Earnest Money Payment History" report utilizing the $5 convenience fee invoice number of 699294 to forge a TrustFunds look-alike report for Bulls' never-made $100,000 deposit to Coldwell and sends it to J. Bull stating, "Deposit information for your earnest money jb#2." |
| Burger, Wexford | Email | May 16, 2022 | Burger populates and emails an out-dated TrustFunds "Earnest Money Payment History" report utilizing the $5 |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

247

|  |  |  | convenience fee invoice number of 699294 to forge a TrustFunds look-alike report for Bulls' never-made $100,000 deposit to Coldwell and sends it to L. Bull purporting it to be "record that we deposited our earnest money and shows the history on that." |
| --- | --- | --- | --- |
| Coldwell, Anywhere RE, Anywhere Integrated | Wire/ACH Transfer or Bank Transfer | May 18, 2022 | Coldwell remits $100,000 of Coldwell's funds for Jesse Bull into "Trident" per its agreement with Bulls viaer Burger to conceal Grieger and Byrd's unlawful hold of the deal that prevented earnest money deposit and Bulls' earnest money fraud scheme that Grieger and Byrd knowingly perpetuated. |
| Burger, Wexford | Phone call | May 18, 2022 | Burger tells Plaintiffs' counsel Wolf that TrustFunds is capped at $50K and the TrustFunds transaction is delayed. |
| Maurer, Rehman | Phone call | May 18, 2022 | Maurer and Rehman advise Wolf that, due to the dollar amount, there was a processing delay and that earnest money settlement had not yet occurred. Maurer and Rehman fail to advise Wolf that no earnest money payment was deposited by Bull to Coldwell or that Bulls' breached the well contingency as of May 16, 2022 rendering Plaintiffs cancellation legally operative. |
| Burger, Wexford | Email | May 18, 2022 | Burger emails Wolf false "proof" of Bulls' earnest money payment including forged bank entries from Bulls' account on May 10, 2022, Burger's forged "Earnest Money Payment History" report of May 16, 2022, at 4:54 p.m., as well as a material misrepresentation of Burger's phone call with TrustFunds. |
| Byrd, Coldwell | Email | May 18, 2022 | Byrd emails Park3.pdf to wayzataMN@mycbhomebase.com without the Plaintiffs signed cancellation of May 14, 2022. |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

248

| Byrd, Grieger, Coldwell | Upload to Transaction Manager | May 18, 2022 | Byrd and/or Grieger and/or Coldwell uploads MyDeals Transaction Sheet to Transaction Manager that lists the document Park3.pdf to create the false appearance that Byrd and/or Grieger uploaded Park3.pdf to Transaction Manager on May 18, 2022, and without Plaintiffs signed cancellation. |
|---|---|---|---|
| Darji | Drafting and Email of F & G, LLC Park Place Resolution | May 18, 2022 | Darji drafts and emails F & G, LLC's new corporate resolution asserting falsely that Bulls' deposited $100,000 with the sellers of Park Place; and that F & G, LLC was to increase J. Bull's and L. Bull's capital accounts by $50,000 each as of the signing of the resolution. |
| J. Bull | Transfer of $100,000 of U.S. currency | May 18, 2022 | J. Bull transfers U.S. currency totalling $100,000 in two equal amounts of $50,000, to J. Bull and L. Bull's capital accounts per the F & G, LLC corporate resolution J. Bull and L. Bull signed. |
| Maurer, Rehman, Baker, Coldwell's counsel, Anywhere RE, Anywhere Integrated's counsel | Upload to Transaction Manager | May 20, 2022 | Maurer and/or Rehman and/or Baker or to be discovered individuals and/or corporate counsels upload a new deal (referred to herein as the Ghost Agreement) for a non-existent address of 20 507 Park Place (Bull Purchase Agreement.pdf) to replace the canceled 20570 (Park3.pdf) deal. Maurer and/or Rehman removed the well-contingency addendum signed by the parties on the original deal and removed Plaintiffs' May 14, 2022, signed cancellation. |
| Mundy, UBS Bank | Upload and/or Transmission via UBS Financial Portal to Bull | May 22, 2022 | Mundy remits a Final Loan Commitment Letter on behalf of UBS Bank to Bull to create the false appearance that UBS Bank is prepared to fund the loan despite the multiple outstanding deficiencies preventing it. |
| Burger, Wexford | Email | May 25, 2022 | Burger emails Cole and/or TitleNexus falsely claiming that, "we have not seen an |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| | | | official cancellation." |
|---|---|---|---|
| Mundy, UBS Bank | Email | June 1, 2022 | Mundy remits a Final Loan Commitment Letter on behalf of UBS Bank to Bull via email after receiving email instruction from Torbin Johnson explaining that the purpose of the Final Loan Commitment Letter was to show that J. Bull was prepared to close. Mundy sends another Final Loan Commitment Letter to J. Bull to create the false appearance that UBS Bank is prepared to fund the $2,000,000 loan on June 3, 2022 despite the outstanding deficiencies preventing it. |
| Burger, Wexford | Email | June 2, 2022 | Burger emails instructions to co-defendants Cole at TitleNexus, Ward at UBS Financial, and Bull at UBS Financial regarding the execution of the Bulls' sham closing that includes fraudulently wiring $3,300,000 inclusive of $100,000 unpaid earnest money, to Jesse Bull at an account maintained by TitleNexus and TitleNexus' return wire back to UBS Financial's line of credit account to create the false appearance that Bull performed at closing and deposited the closing funds with TitleNexus. |
| Cole, TitleNexus | Email | June 2, 2022 | Cole emails Ward writing instructions for Bulls' account at Crown Bank maintained by TitleNexus. |
| Ward, UBS Financial | Email | June 2, 2022 | Ward emails Cole return wiring instructions for UBS Financial. |
| Ward, UBS Financial | Wire Transmission of $3,300,000 of U.S. currency | June 3, 2022 | Ward submits a wire of $3,300,000 U.S. currency from a UBS Financial line of credit account to Jesse Bull as the beneficiary of the wire at Crown Bank. |
| UBS Financial | Wire transmission of $3,300,000 of | June 3, 2022 | UBS Financial supervisor approves Ward's wire of $3,300,000 U.S. currency, including J. Bull's unpaid $100,000 earnest |



| | U.S. currency | | money, from Jesse Bull's UBS Financial line of credit account to Jesse Bull, as the beneficiary of the wire at Crown Bank. |
|---|---|---|---|
| Cole, TitleNexus | Email of Computer Print-Out | June 3, 2022 | Cole prints and emails a Partial Single Balance Ledger using TitleNexus' computer programs and/or online programs at the request of Burger and Bull to produce false "evidence" of the $3,300,000 incoming wire, inclusive of the $100,000 earnest money, to TitleNexus and omits data related to the return wire back to UBS Financial to create the false appearance that Bulls' performed at closing. Cole personally delivers and/or emails the fraudulent single balance ledger(s) to Burger and/or Bull. |
| Cole | Email of Computer Print-Out | June 3, 2022 | Cole prints and emails a second Single Balance ledger using TitleNexus' computer programs and/or online programs showing a return wire of $3,300,000, inclusive of the $100,000 earnest money, to Jesse Bull. Cole personally delivers and/or emails the second Single Balance ledger to Burger and/or Bull. |
| Cole | Email or Phone Call | June 3, 2022 | Cole instructs Crown Bank to wire UBS' $3,300,000 line of credit funds back to UBS Financial. |
| Burger | Email | June 3, 2022 | Burger emails Rotman to report that Bull wired $3,300,000 for closing and that the funds were all wired back to UBS Financial on the same day. |
| Rotman | Email | On or around June 6, 2022 | Rotman dispatches an email to Taft Law demanding $330,000 from Plaintiffs while aware of Plaintiff's medical condition and conceals Bulls' $100,000 earnest money fraud and well-contingency breach. |
| Rotman | Email | June 21, 2022 | Rotman dispatches email demanding $275,000 in four days' time while aware of Plaintiff's medical condition and |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

251

| | | | concealing Bulls' $100,000 earnest money fraud and well-contingency breach and later emails a threat to "turn it over to litigation" for non-payment. |
|---|---|---|---|
| Trucke, Brutlag, PA | Email with Attached Correspondence | September 12, 2022 | Trucke, in collaboration with J.Bull, emails Plaintiffs' counsel, threatening a forced judicial sale of Plaintiffs' residence unless Plaintiffs remit $225,000 to Bulls within 25 days; Trucke falsely represents that Bulls complied with all contingencies of the agreement and are prepared to close subject to reinspection of the property. |
| Trucke, Brutlag, PA | Email | October 7, 2022 | Trucke emails a request for Taft Law to accept service of a summons and complaint he knows to be frivolous while continuing to conceal and actively perpetuate Bulls' $100,000 earnest money fraud and well-contingency default. |
| Trucke, Brutlag, PA | Email with Attached Correspondence | November 15, 2022 | Trucke emails demand for $225,000; and again requests Taft Law to accept service of a summons and complaint he knows to be frivolous while continuing to conceal and actively perpetuate Bulls' $100,000 earnest money fraud and well-contingency default. |
| Burnet Title | Phone call | On or around December 6, 2022 | Plaintiffs call Burnet Title to inquire about the status of purchase agreement and Burnet Title advises it does not have an actual signed cancellation in its file and that the earnest money "appears to be in order." |
| Maurer, Coldwell | Email | February 6, 2023 | Maurer emails two outdated and forged "Earnest Money Payment History" reports populated by Burger and/or Coldwell using Burger's transactional data to Plaintiffs purporting that the payment history reports constituted "receipts" of the Park Place earnest money transaction. |
| Maurer, | Email | February 8, | Maurer emails a MyDeals Information |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| Coldwell | | 2023 | sheet to Plaintiffs, listing the attachment Park3.pdf, and falsely asserts to Plaintiff that Grieger uploaded the deal as he was required to do, and that Ms. Duca is wrong. Maurer, Rehman, and Baker continue to conceal Bulls' well-contingency default and $100,000 earnest money default. |
|---|---|---|---|
| TrustFunds | Phone Call | March 7, 2023 | Plaintiffs call TrustFunds to inquire about the status of the earnest money payment. TrustFunds fails to disclose it has no record of Bulls' $100,000 earnest money payment on May 9, 2022, to Coldwell using TrustFunds and that the transactional information and "Earnest Money Payment History" report, in Plaintiffs' possession from Coldwell was fraudulent. TrustFunds refuses to give any information to Plaintiffs over the phone and redirects Plaintiffs to Coldwell. |
| Rehman | Email | March 9, 2023 | Rehman falsely asserts in an email to Plaintiffs that Bull made his deposit and Coldwell retained Bulls' earnest money on May 16, 2022. |
| Maurer, Coldwell | Email | March 10, 2023 | Maurer emails a response to Plaintiffs' certified letter to Coldwell requesting an accounting of Bulls' earnest money for Park Place. Maurer continues to conceal Bulls' $100,000 earnest money default to perpetuate Bulls' fraudulent scheme and Coldwell's complicity in it: "We [Maurer and Rehman] reconfirm that Coldwell Banker Realty is and remains in receipt of the earnest money in the amount of $100,000 deposited pursuant to the Purchase agreement upon your property 20570 Park Place, Deephaven [...]" |
| Anywhere RE | Email | March 14, 2023 | Anywhere RE, via its in-house counsel James French, emails Plaintiffs a redacted "Deposit Report" dated 1900 - 2099 with a single line item, for Jesse Bull, visible. Anywhere RE purported that the |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| | | | |
|---|---|---|---|
| | | | unidentified false document was "showing the deposit of the earnest money in this matter." |
| Anywhere RE | Email | March 14, 2023 | Anywhere RE, via its in-house counsel James French, sends an email to Plaintiffs, "I have been informed that Coldwell Banker Realty is holding the earnest money [...]" |
| Trucke | Email | April 13, 2023 | Trucke prepares and emails a copy of Bulls' frivolous and fraudulent lawsuit against Plaintiffs to Bulls and Burger asserting that Defendants deposited $100,000 in earnest money with the title company and, "the title company has retained and continues to retain [Bulls'] earnest money." Bulls and Burger ratify the false pleading. |
| Sandy Glieden, Burnet Title | Email | April 21, 2023 | Sandy Glieden emails Deena Cole and falsely asserts that Bulls' earnest money for Park Place is in "Coldwell's Trust Account." |
| Cole | Email | April 21, 2023 | Cole emails Burger and Bull and falsely asserts that TitleNexus "received a letter today from the seller's attorney stating TitleNexus was holding the $100,000 in EM," even though Cole received no such letter. Cole falsely asserts that she verified that Coldwell Banker is holding the funds. |
| Trucke | Email | On or around April 26, 2023 | Trucke prepares and commences a lawsuit and transmits it by means of the internet to a process server and/or to Coldwell to create the appearance that Coldwell retained Bulls' $100,000. Trucke falsely alleges that, "In conjunction with the execution of the Contract, Plaintiffs [Bulls] deposited $100,000 in earnest money with Coldwell Banker Realty" and that the, "title company has retained and continued to retain Plaintiffs' earnest money deposit." |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| Sloneker | Phone Call | On or around May 12, 2023 | Sloneker calls Plaintiffs' counsel to assure Greenberg that Coldwell has the earnest money for the Park Place Transaction. To perpetuate Bulls' earnest money fraud, and conceal Coldwell's culpability in the earnest money fraud scheme,  Sloneker materially omits that the earnest money constitutes Coldwell's funds "for Jesse Bull" and not Jesse Bull's funds. |
|---|---|---|---|
| Rehman, Coldwell | Email | May 16, 2023 | Rehman dispatches an email to Plaintiffs containing a screenshot of an unidentified document with the letters NRT on it. Rehman purports that this document is proof that Bulls deposited $100,000 with Coldwell on May 16, 2022. |
| Trucke | E-file | May 18, 2023 | Trucke electronically files a frivolous Answer and Counterclaim on behalf of Bulls perpetuating the earnest money fraud scheme by alleging falsely that, Bulls made a $100,000 deposit to Coldwell and, "the title company retained and continues to retain the Defendants' earnest money deposit" and, after having served a Notice of Declaratory Cancellation, seeks unspecified damages. |
| Trucke | E-File | May 18, 2023 | Trucke e-files the Answer and Counterclaim on behalf of Bulls and names, but does not serve, "Burnet Realty LLC" to create the false appearance that Coldwell retained the funds and Bulls are suing Coldwell for their return. |
| Trucke | Remote Zoom Court Appearance Involving Interstate Communications | August 23, 2023 | Trucke falsely asserts on the record that the earnest money and the closing funds were deposited with TitleNexus, Trucke stated falsely, "We were under the understanding that the title company still had the $100,000 earnest money funds because they had all the funds," but no actual deposit of earnest money or purchase funds was made to TitleNexus by Bulls. J. Bull wired money to himself at a Crown Bank |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

255

| | | | account maintained by TitleNexus. |
|---|---|---|---|
| Sloneker | Remote Zoom Court Appearance Involving Interstate Communications | August 23, 2023 | Sloneker, without notice or standing, asserts on the record, "my client and/or its parent company is holding the $100,000 in earnest money in their trust account" to create the false appearance that Bull made the earnest money payment to Coldwell and conceal Coldwell's participation in the fraud. |
| Leegard | Email | September 18, 2023 | Leegard, via TrustFunds agent Cody Osegard, sends an email falsely claiming that, "you can see [on the Payment History Report] the money settled into Coldwell Banker's Trust Account on May 16, 2022." The email also states falsely, "I have attached a redacted screen shot of Coldwell Banker's daily deposit report for May 16, 2022, and as you can see, the deposit for this transaction is listed," to perpetuate the earnest money fraud and TrustFunds' complicity. |
| Leegard | Email | October 6, 2023 | Leegard emails Plaintiffs' counsel falsely asserting, "the only transaction we have for Jesse Bull is the one we have provided you." But Leegard referred to the transaction she created. to perpetuate the earnest money scheme to defraud. |
| TrustFunds, Leegard | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" document, "Earnest Money Confirmation" materially misrepresenting that Jesse Bull made a TrustFunds payment and payment will finish processing on **5/13/2022**. (TF 00033). |
| TrustFunds, Leegard | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" document "Confirmation of Earnest Money Payment" stating that "Jesse Bull has submitted their earnest money payment through |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| | | | TrustFunds. The payment may appear on the buyer's bank account within 1-2 business days" with expected settlement date of **5/13/2022** materially misrepresenting that Jesse Bull made a TrustFunds payment and payment that will settle on **5/13/2022.** (TF00034). |
|---|---|---|---|
| TrustFunds, Leegard | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" asserting that the earnest money from Jesse Bull in the amount of $100,000.00 has been **Submitted,** to conceal TrustFunds' complicity in the fraudulent scheme, and, that Bull never made a TrustFunds payment on May 9, 2022. (TF00035). |
| TrustFunds, Leegard | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" electronic format Convenience Fee Receipt with time of 2:58 p.m. purporting it is an authentic convenience fee receipt for Bulls' convenience fee payment on **5/09/2022.** (TF00036). |
| TrustFunds | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "Earnest Money Request History" report that Leegard purports is verification that Bulls' TrustFunds transaction occurred. The "report" contains the same fraudulent dates and times as Burger's outdated TrustFunds table to create the false appearance that Burger's and TrustFunds' reports are authentic. (TF00046). |
| TrustFunds | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" TrustFunds' "Settled" notification addressed to "Hi Minnesota," which states, "Jesse Bull has a new status of **Settled**." (TF00047). |
| TrustFunds | Email | On or around January 2, 2024 | Lynn Leegard and/or TrustFunds sends Plaintiffs forged "email PDF" "Earnest Money Fully Processed" with Jesse Bull's |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

257

| | | | |
|---|---|---|---|
| | | | name on it, stating "Your earnest money payment has finished processing and the funds have been deposited into the trust account at Coldwell Banker Realty." (TF00048). |
| UMB NA | Email | March 18, 2024 | UMB, NA sends an email claiming that TrustFunds LLC holds Defendants Bull's -4774 account, and provides the phone number of +1 (888) 249-1616 for TrustFunds. |
| UMB NA | Email | March 18, 2024 | UMB sends an email to Plaintiffs' counsel in Missouri claiming that Defendants Bull had no accounts at UMB, NA. |
| UMB NA | Email | March 18, 2024 | UMB replies after reviewing Bulls' $100,000 check tender for Crosby Cove drawn from UMB, that, "it did not have a checking account for Jesse J. Bull or Lee A. Bull." UMB failed and refused to write an affidavit of no record. |
| UBS Financial | Email | March 20, 2024 | UBS Financial emails Plaintiffs that the -4774 account did not exist. |
| UBS Financial | Email | March 25, 2024 | UBS Financial emails Plaintiffs and claims that Bulls' DXXXX28 and Bulls' UMB -4774 account are the same account. UBS Financial fails to produce the account and transaction records associated with Bulls' related commercial UMB -4774 checking account, or an affidavit of no record. |
| Anywhere RE | Email | April 16, 2024 | Anywhere RE sends email to Plaintiff indicating falsely that it cannot produce proof of Plaintiffs' 2018 TrustFunds transaction for 20570 Park Place, "I have spoken to Coldwell Banker staff who indicated they can only access the TrustFunds link in the MLS on pending transactions. Below I have included a screenshot of list # 4907632 so you can see this for yourself.  There is no TrustFunds link for list # 4907632.  I trust this will |



| | | | |
|---|---|---|---|
| | | | close the matter." |
| Trucke | Email | April 24, 2024 | Trucke, in an effort to create "evidence" where none exists and to conceal the earnest money fraud scheme he chose to perpetuate, writes and emails an affidavit to be delivered by Burger and signed by Maurer regarding TrustFunds, asserting falsely that Coldwell received a May 9, 2022, TrustFunds payment. |
| Burger | Email | April 24, 2024 | Burger emails Maurer the affidavit drafted by Trucke asserting, falsely, that Coldwell received Bulls' May 9, 2022, TrustFunds' payment and demands Maurer sign the affidavit |
| Sloneker, Rehman, Coldwell | E-File | May 14, 2024 | Sloneker moves to quash Plaintiffs' Minn. R. Civ. P. 30.01 for the corporate deposition of Coldwell to continue to conceal the origin of the $100,000 Coldwell professed was Bulls' earnest money and Sloneker moves the court to quash per Minn. R. 45.03 (a) and petitions the court to accept $100,000 from Coldwell pursuant to Minn. R. Civ. P. 67.02 in Coldwell's and Sloneker's effort to conceal the scheme to defraud and obtain a liability waiver for its/his participation. |
| Rehman, Coldwell | E-file | May 14, 2024 | Rehman submits a false and materially misleading affidavit to create the false appearance that Bull remitted $100,000 to Coldwell as earnest money pursuant to the false and fraudulent Ghost Agreement Rehman attached to his affidavit. |
| Rehman, Coldwell | E-file | May 14, 2024 | Rehman attaches and transmits a fake purchase agreement (referred to herein as the Ghost Agreement) for the non-existent address of 20 507 Park Place. Rehman swears and affirms holding the $100,000 earnest money for the Ghost agreement to create the false appearance that Coldwell retained Bulls' $100,000 on the previously |



| | | | canceled authentic Park Place agreement. |
|---|---|---|---|
| UMB NA | Email | May 29, 2024 | UMB sends an email to Plaintiffs counsel in Missouri alleging that Defendants Bull has HSA accounts at UMB, NA, after previously denying that Bulls had any accounts at UMB, NA and that UMB, NA had no records to produce. |
| Sloneker, Lind Jensen PA, Coldwell, Anywhere RE, Anywhere Integrated | Remote Zoom Court Appearance Involving Interstate Communications | June 14, 2024 | In a Zoom court proceeding, Matthew Sloneker, Esq. of Lind Jensen PA on behalf of Coldwell, acting individually or at the direction of Anywhere RE and/or Anywhere Integrated, falsely asserts that the earnest money payment was "transferred through an entity called TrustFunds." Sloneker, knowing that the TrustFunds documents are false and fraudulent, perpetuates fraud upon the Court:<br><br>MR. SLONEKER: "The money, Your Honor, is transferred through an entity called TrustFunds, and I don't know if they've been before this Court on the discovery issues that plaintiff is seeking from them. But that's the entity that facilitates that earnest money transfer. If anybody knows the timing and that, it's them."<br><br>Sloneker references the Bull Enterprise's concealment plan, to obstruct Plaintiffs discovery through excessive discovery fees and claims of "undue burden." |
| Sloneker, Lind Jensen PA, Coldwell, Anywhere RE, Anywhere Integrated | Wire Transmission / ACH Transmission | September 13, 2024 | On September 13, 2024, Sloneker and or Lind Jensen PA, acting individually, or at the direction of Coldwell, Anywhere RE and/or Anywhere Integrated, remits via wire and/or ACH transaction $100,000 in U.S. currency from Coldwell's business account to Hennepin County District Court, constituting wire fraud to create the false and fraudulent appearance that Coldwell |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

260

| | | | retained Bulls' $100,000 from Bulls' non-existent TrustFunds transaction on May 9, 2022, and that Coldwell held in Coldwell's trust until September 13, 2024. |
|---|---|---|---|
| Trucke, J.Bull, L. Bull | E-File | October 23, 2024 | Trucke transmits via e-file J. Bull's sham Affidavit through e-file in support of Bulls' Summary Judgment motion falsely swearing and affirming J. Bull made an earnest money payment to Coldwell, and and attaches and e-files J. Bull's false and fraudulent TrustFunds "Earnest Money Payment History" report dated May 16, 2022 at 4:54 P.M.further redacted by Trucke to obscure the TrustFunds "Earnest Money Payment History" report reference to Bulls' UMB -4774 account. |
| Trucke, Burger | E-File | October 23, 2024 | Trucke transmits via e-file Burger's sham Affidavit in support of Bulls' Summary Judgment motion, falsely asserting that co-conspirator, Chelsey Byrd, confirmed receipt of the earnest money on May 10, 2022.<br><br>Burger then materially misrepresented in his sham affidavit that, "Throughout the transaction, the earnest money remained with Coldwell." Burger materially omitted that the "earnest money" he referenced was Coldwell's not Bulls'. |
| Sloneker, Lind Jensen PA | Email | November 5, 2024 | Sloneker emails Plaintiffs' counsel that on some prior undisclosed date and time, "Bulls canceled (or attempted to cancel) the Purchase Agreement." Anywhere RE, Anywhere Integrated, Sloneker, Coldwell, Bulls, and Trucke refused to produce the Bulls' signed cancellation or the accord and satisfaction between Bulls and Coldwell. |

1431.   All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications.

1432.   Some or all of the communications described above appear in named Defendants and their accomplices' legal pleadings, personal affidavits, exhibits and motions in 27-CV-23-6625, to perpetuate the ongoing earnest money scheme to defraud Plaintiffs.

1433.   None of the communications described above disclose that the $100,000 of U.S. currency of and affecting interstate commerce and now on deposit with Hennepin County Court Administration are Coldwell's funds.

1434.   None of the communications described above disclose that Coldwell failed to retain and continue to retain Bulls' $100,000 funds since May 9, 2022.

1435.   None of the communications described above disclose that Burger and Bulls forged the TrustFunds email notifications, forged the TrustFunds transaction table, and forged the outdated TrustFunds "Earnest Money Payment History" report and that no TrustFunds transaction of $100,000 by Jesse Bull occurred on May 9, 2022 or any other date for MLS Listing #6160342.

1436.   Each use of the interstate wires described above was deliberately executed by Defendants with the specific intent to defraud Plaintiffs. Defendants utilized the wires to conceal Defendant Bulls' failure to remit the required earnest money deposit, thereby facilitating the unlawful conversion of equitable title to Plaintiffs' real property. The wires were further used to perpetuate the false appearance of compliance with contractual obligations through false or fraudulent pretenses, representations, and promises, and to obstruct Plaintiffs' ability to uncover Defendants' fraudulent scheme by suppressing critical information and misleading Plaintiffs, other parties and the court. These acts were calculated to deceive Plaintiffs, shield Defendants



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

from accountability, and unjustly enrich the Defendants at Plaintiffs' expense. Each instance of

wire use constitutes a violation of 18 U.S.C. § 1343 and is racketeering activity under 18 U.S.C.

§ 1961(1)(B).

**LXI.     Money Laundering  (18 U.S.C. § 1956 & 18 U.S.C. § 1957)**

1437.   Plaintiffs allege that Defendants, including Bulls, Burger, F & G, LLC, and Darji,

knowingly engaged in money laundering activities as part of a pattern of racketeering to further

their fraudulent earnest money scheme.  These actions satisfy the federal definitions of money

laundering under federal law pursuant to 18 U.S.C. § 1956 and 18 U.S.C. § 1957, constituting

predicate acts of racketeering under 18 U.S.C. § 1961 for purposes of a civil RICO claim.

1438.   In violation of 18 U.S.C. § 1956 (Laundering of Monetary Instruments): Plaintiffs

allege that Defendants, including Bulls, Burger, and F &G, LLC, conducted financial

transactions with intent to (1) conceal the nature, source, and ownership of funds obtained

through fraud, (2) promote the continuation of their scheme through reinvestment of these funds,

and (3) evade federal reporting requirements by structuring transactions to avoid detection.

1439.   In violation of 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property

Derived from Specified Unlawful Activity): Plaintiffs further allege that Defendants knowingly

engaged in monetary transactions involving proceeds derived from fraudulent activities, with

transactions exceeding $10,000.

1440.   On or about the dates listed below, in the State and District of Minnesota and

elsewhere, the Defendants, knowingly engaged in money laundering under 18 U.S.C. § 1956 and

§ 1957, to further the scheme described above:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

263

| Defendant | Date | Description | Purpose |
|---|---|---|---|
| J.Bull | May 10, 2022 | Earmarks $100,000 and $5 in UBS Financial RMA account, DXXXX28, to create the appearance of an actual payment to Coldwell, without an actual transfer of funds to Coldwell via TrustFunds on May 9, 2022. J. Bull proffered this false UBS "record" multiple times via fraudulent wire communications. | To conceal the unpaid earnest money, the illicit gains retained by Burger/Bull |
| Burger | May 11, 2022 | Remittance of $1125 cash from unknown source to conceal origin of funds and/or obtain expense write-offs for J. Bull, L. Bull, and/or F & G, LLC. J. Bull cannot assert his inspection costs as damages in the state court case. | To conceal the origin of cash funds |
| Darji | On or around May 18, 2022 | Drafts a F&G, LLC corporate amendment falsely stating that Defendant Bull deposited $100,000 with the seller Plaintiffs of Park Place. The amendment further stated that F & G, LLC would increase the capital accounts of J. Bull and L. Bull by $50,000 each, purportedly as payment for the assignment of the Park Place purchase agreement. This amendment misrepresented the source and legitimacy of the funds to create a false record of the illicit proceeds from the earnest money fraud scheme. | To conceal and legitimize the origin of $100,000 of U.S. currency associated with the earnest money fraud scheme |
| J. Bull | May 18, 2022 | Bull withdraws $100,000 in a transfer of U.S. currency to increase J. Bull and L. Bull's capital accounts by 50k each, thereby concealing the $100,000 proceeds of the unlawful gains from the earnest money fraud scheme. | To conceal, legitimize and profit from the illicitly retained $100,000 of U.S. currency that constitute the proceeds of the fraudulent scheme |
| F & G, LLC | May 18, 2022 | F & G, LLC remits $100,000 of U.S. currency to increase the capital accounts of J. Bull and L. Bull purportedly for the "assignment" of then-canceled Park Place purchase agreement to conceal the unpaid earnest money and | To conceal and legitimize the $100,000 proceeds of the fraudulent |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

264

| | | maintain unlawful control of equitable title of Plaintiffs' property. | scheme |
|---|---|---|---|
| L. Bull | May 18, 2022 | Accepts $50,000 increase in her capital account from F & G, LLC, as recorded in the corporate amendment prepared by Darji. | To obscure the source of illicit funds and integrate proceeds into personal capital |
| J. Bull | May 18, 2022 | Accepts $50,000 increase in his capital account from F & G, LLC, as recorded in the corporate amendment prepared by Darji. | To obscure the source of illicit funds and integrate proceeds into personal capital |
| Darji | Various dates | Continued drafting additional corporate amendments for F & G, LLC, submitted to TitleNexus, detailing funds remitted to increase the Bulls' capital accounts. These amendments aligned the capital increases with earnest money amounts for subsequent property transactions. | To create a false record of capital that mirrors earnest money on multiple properties, obscuring the retention of earnest money by Bull on subsequent properties |
| J. Bull, L. Bull | On or around June - July 2022 | J. Bull purchases an Audi SQ7 with red disc brakes in the name of J. Bull and Mary Bull with fair market value around $100,000 and driven by L. Bull. (J. Bull and/or L. Bull purchased another vehicle for L. Bull to drive after L. Bull was deposed wherein L.Bull stated "I don't know" over 360 times and disclaimed all knowledge regarding the lawsuit, the well-contingency, the earnest money, or her alleged damages. | To integrate proceeds of the fraudulent scheme into personal assets, to conceal the origin of funds by registering Mary Bull, and to provide an outlet for laundered money |



1441.   Together, the financial transactions detailed above constitute a coordinated and sustained effort by Defendants to conceal, legitimize, and reinvest proceeds obtained through the fraudulent scheme.

1442.   These acts of money laundering served to obscure the true nature and source of the funds, promote the continuation of their scheme to defraud Plaintiffs, and evade detection by federal authorities.

1443.   By structuring these transactions to resemble legitimate capital infusions and corporate amendments, Defendants created a false record that allowed them to retain and control funds derived from unlawful activities, falsely inflate Bulls' financial position and secure illicit gains at Plaintiffs' expense. These deliberate actions, taken in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1957, constitute a pattern of racketeering activity, constituting predicate acts under 18 U.S.C. § 1961 to further Defendants' ongoing scheme to defraud.

## CHAPTER 6: DAMAGES

### I.    Compensatory Damages

1444.   The Individual Defendants, by and through each other and the Corporate Defendants, engaged in a systematic and ongoing earnest money scheme to defraud, deceive, mislead, and to convert equitable title to Plaintiffs $3,300,000 residence with no money down for the purpose of profit. This long-term earnest money scheme to defraud, unlawfully clouded title to Plaintiffs' real property since May 6, 2022 and has, at all times, caused actual damages to Plaintiffs.

1445.   At the time Defendants fraudulent actions clouded title, the property had a market value of $3,300,000.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1446.   Due to the clouded title, the Plaintiffs were unable to sell the property to another buyer at fair market value, refinance or secure loans using the property as collateral, or generate income or other business opportunities associated with the Property.

1447.   The Plaintiffs suffered economic harm in the form of lost profits and opportunity costs, including lost sale opportunities at a time when the interest rates were lower and there were more potential buyers for the property.

1448.   Due to the lost sale opportunities, Plaintiffs lost $100,000 earnest money on the property for which they were under contract to close on in May 2022; and, after forfeiting Plaintiffs' $100,000 earnest money due, in part, to Defendants lack of financial commitment to proceed with the sale, the same property sold two-weeks later for approximately $400,000 more than Plaintiffs' contract price.

1449.   Due to the lost purchase opportunity in 2022, Plaintiffs financing cost of 2.6%, over 30 years, was $2,294,359.40. Today, for a same-price replacement property, Plaintiffs financing cost is 6.6%, and over the course of a 30 year-loan for which Plaintiffs were locked in, is now $6,755,693.07.

1450.   The Plaintiffs also refinanced a favorable short-term mortgage with a five-year interest rate of 3.125% on Park Place anticipating a sale of their Park Place residence prior to January 2025. Beginning in January 2026, Plaintiffs' will face a variable interest rate up to 8% on their current Park Place mortgage.

1451.   On May 6, 2022, Defendants Bull fraudulently converted equitable title to Plaintiffs' property without investing any money. With no intention to purchase the property, Bulls demanded a ransom of, at minimum, $225,000, from the Plaintiffs to release their



fraudulent grip on Plaintiffs' title. The Defendants Bull exerted undue pressure and control over the Plaintiffs' rightful property, causing fear, severe stress and uncertainty about ownership.

1452.   The Plaintiffs suffered emotional distress due to the Defendants' extortionate conduct and fraud, including severe anxiety over the potential loss of the property or significant financial damage, emotional anguish caused by the defendant's unlawful ransom demands, sleeplessness, mental exhaustion, and personal disruption resulting from the prolonged uncertainty and litigation required by Defendants' long-term refusal to sign a cancellation.

1453.   Plaintiffs emotional injuries are aggravated by the named Defendants malicious and intentional actions, even while having knowledge of Plaintiff's medical hardships, to conceal the earnest money fraud scheme for profit, to manipulate the Plaintiffs' financial position to their benefit and exploit the Plaintiffs' property for their own gain.

1454.   The Plaintiffs incurred legal expenses, fees, and costs in excess of $100,000 for outside legal representation, costs, and fees to defend against Bulls' fraudulent scheme and sham suit for over two years, to bring a Notice of Declaratory Cancellation, to file a lawsuit to clear title, to take witness depositions, to file responsive pleadings and numerous briefs and exhibits relating to motions for discovery and  sanctions as well as to litigate third-party discovery motions intended by those third parties (now defendants herein), to conceal  Bulls' earnest money scheme to defraud and each Defendants' role in the scheme.

## II.    Punitive Damages

1455.   Plaintiffs seek punitive damages under state law claims due to Defendants' intentional, malicious, and fraudulent conduct. Defendants engaged in an ongoing, coordinated scheme specifically designed to inflict harm upon Plaintiffs, causing substantial fear, suffering, and mental anguish.  Each Defendant deliberately chose to violate the law by forging documents,



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

making material misrepresentations, and participating in a myriad of unlawful fraudulent actions with the intent to deceive - both in and out of court. These acts were aimed at unlawfully controlling equitable title to Plaintiffs' property for profit at a time when Plaintiffs were particularly vulnerable, demonstrating a reckless and callous disregard for Plaintiffs' rights and well-being.

### III.    Emotional Distress and Loss of Enjoyment of Life During a Critical Life Event

1456.   As a result of Defendants' actions, Plaintiffs experienced an irreplaceable loss of joy and peace during the emotionally significant period surrounding the birth of their child.  The financial uncertainty, undue stress and manipulation inflicted by Defendants robbed Plaintiffs of a once-in-a-lifetime family experience, transforming what should have been a time of celebration and bonding into one overshadowed by fear, anxiety, and distress. This profound emotional harm constitutes a severe loss of enjoyment of life and has caused lasting damage to Plaintiffs' well-being, directly attributed to Defendants' malicious profit-driven scheme that was perpetrated, facilitated, and concealed by Plaintiffs' fiduciary Coldwell.

### <u>CAUSES OF ACTION</u>

### Introduction to Federal Racketeer Influenced and Corrupt Organizations (RICO) Racketeering and Conspiracy Allegations

1457.   Plaintiffs allege that all named Defendants, with the exception of NorthstarMLS, knowingly and willfully entered into an agreement and conspired to engage in a scheme to defraud Plaintiffs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

1458.   Plaintiffs allege that the conduct of certain Defendants named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c). Specifically, Congress has defined "racketeering" to include wire fraud, or committing fraud by means of electronic transmissions



over wire, extortion, or wrongfully obtaining property by consent through means of coercion or fear, and money laundering, or conducting financial transactions to conceal the origins of money obtained through illegal activities. 18 U.S.C. § 1961(1).

1459.    The Defendants named in the RICO counts engaged in multiple instances of extortion, wire fraud, and money laundering, constituting predicate acts, summarized in Chapter 5 above and incorporated herein by reference.

1460.    As detailed below, Plaintiffs allege three different causes of action for federal RICO violations. In summary, Section 1962(d) provides relief against those who conspire to violate the racketeering laws, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, and Section 1962 (a) provides relief against parties who use income generated through a pattern of racketeering activity. All Defendants, with the exception of NorthstarMLS, are liable under (d) and a number of Defendants are liable under (c) and/or (a).

1461.    18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee [...]"



## COUNT 1

*RICO Conspiracy - 18 U.S.C. § 1962(d)*
*(Agreement to Participate in a Pattern of Racketeering Activity)*

**All Named Defendants** (1-32, 34), except NorthstarMLS (33)

The Enterprise

1462.   Plaintiffs incorporate by reference and re-allege all paragraphs set forth above.

1463.   Each named Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) & 1962 (c) because each Defendant is an individual or entity capable of holding "a legal or beneficial interest in property."

1464.   All named Defendants collectively formed an association-in-fact enterprise (hereinafter, the "Bull Enterprise") , in that they are a group of individuals, corporations, associations, legal entities, unions and/or groups of individuals associated in fact, as defined under 18 U.S.C. § 1961(4).

1465.   The Bull Enterprise is an ongoing organization, formal and informal, whose members function as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

1466.   The Bull Enterprise operates through coordination and cooperation among Defendants to carry out the unlawful pattern of racketeering activity that consisted of, but was not limited to, the acts of extortion, wire fraud, and money laundering described with specificity in paragraphs 1422, 1430, and 1440 above, respectively, and incorporated herein by reference.

1467.   The Bull Enterprise exists independently of the racketeering activity that underlies its purpose.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

271

1468.   The Bull Enterprise is engaged in and its activities affect interstate and foreign commerce.

## Purpose of the Enterprise

1469.   The primary purpose of the Bull Enterprise is to execute, facilitate and conceal an earnest money fraud scheme whereby Defendants Bull secretly and fraudulently retained contractual earnest money while wielding equitable title to Plaintiffs' residence for their long-term financial gain. Defendants coordinated to obstruct the discovery of their profit-driven and conspiratorial actions, falsified transaction records, and concealed breaches of fiduciary and contractual duties.  Through a series of unlawful acts - including forged TrustFunds notifications, forged transaction records, manipulation of bank entries, and withheld bank disclosures - Defendants concealed the absence of a genuine earnest money deposit, ensuring that the scheme, and Defendants' unlawful grip on equitable title to Plaintiffs' home, remained undetected.  This was not an isolated act, but a concerted and prolonged effort to defraud Plaintiffs, undermining their financial and property interests for over the span of two years.

## Structure of the Enterprise

1470.   The Bull Enterprise was structured as a coordinated association of individuals and entities working in concert to fraudulently control Plaintiffs' earnest money and property interests and to conceal the unlawful fraudulent acts and liabilities of the Enterprise's members. The Enterprise included real estate brokers, financial service providers, title companies, and affiliated agents, each contributing specific functions that advanced the Bull Enterprise's purpose.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1471.   Roles of Key Participants: The structure of the Bull Enterprise was such that each Defendant held a defined role, facilitating certain specific aspects of the scheme within their scope of employment. For example:

A.  Plaintiffs' Real Estate Agents and Brokers: (E.g., Grieger, Byrd, Coldwell) Plaintiffs' real estate agents and brokers managed communications with Plaintiffs while materially misrepresenting the status of the earnest money deposit, provided false assurances that earnest money was submitted, proffered forged TrustFunds notifications from Burger while actively concealing and facilitating Burger's forgery, withheld transaction documents to delay the detection of the fraudulent scheme, responsible for concealing the lack of settlement of earnest money funds, and concealed Bulls' contractual defaults from Plaintiffs even during discovery in the state court case.

B.  Defendants' Real Estate Agent and Broker: (Burger) Burger utilized the instrumentalities of his brokerage, his broker membership with TrustFunds, and his relationship with TrustFunds to forge a $100,000 TrustFunds payment submission notification, a "Settled" notification, and a TrustFunds "Earnest Money Payment History" report; Burger facilitated the accord-and-satisfaction with Bulls and Coldwell leveraging Coldwell's hold of the deal to Bulls' financial benefit, Burger was responsible for setting up the sham closing at TitleNexus, obtaining false "evidence" Bull could close the deal, and providing false affidavits regarding the earnest money deposit in the state court action.

C.  Financial Service Providers: (E.g. UBS Financial, UBS Bank, UMB, TrustFunds) UBS Bank was responsible for providing loan commitment documents prematurely to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

create the false appearance that Bull could close the deal, UBS Financial and UMB were to withhold the transactional records to Bulls' UMB -4774 account to conceal that no legitimate earnest money payment was made by Bull, TrustFunds was to maintain that the payment was actually made and forge TrustFunds payment notices reflecting the $100,000 non-existent transaction and its "Earnest Money Payment History" report.

D. Title Companies: (TitleNexus, Burnet Title) TitleNexus was responsible for creating "evidence" of Bulls' performance at closing for Bull to utilize in future litigation he had planned against Plaintiffs. Defendants TitleNexus and Burnet also played a critical role in the Enterprise by remaining silent regarding the absence of the earnest money deposit and the fraudulent nature of the documents involved. Despite knowledge of irregularities in the transaction records and loan documents showing no earnest money credit, the title companies failed to disclose these discrepancies to Plaintiffs or relevant authorities. By withholding information about the true status of the earnest money deposit and the legitimacy of Defendants' representations, these title companies facilitated the ongoing concealment of the scheme, allowing the Bull Enterprise to unlawfully retain control over Plaintiffs' property interest so that Defendants could extort Plaintiffs, or sue them, for profit.

E. Legal and Managerial Defendants: (E.g., Burger, Maurer, Rehman, Baker, Coldwell, Rotman, Trucke, Sloneker) Defendants Burger, Maurer, Rehman, Baker, Coldwell, Rotman, Trucke, and Sloneker provided oversight and support, ensuring that breaches of fiduciary duties and contractual defaults were concealed, withholding legally



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

274

operative documents, and furthering the Enterprise's ability to operate undetected in pursuit of insuring its profits, in and out of court.

1472.    The Enterprise operated as a continuous unit, with Defendants coordinating to execute the fraudulent scheme through a series of interdependent unlawful acts including extortion and wire fraud. Each Defendant's role contributed to a unified strategy of misrepresenting financial transactions, forging transaction records, and concealing contractual breaches over a long period of time and throughout litigation. These coordinated actions enabled Defendants to sustain control over Plaintiffs' earnest money and property interest to date.

1473.    Most individual Defendants acted within the scope of their employment with corporate entities, including but not limited to, Anywhere RE, Anywhere Integrated, Coldwell Banker Realty, Wexford Realty, TrustFunds, TitleNexus, UBS Bank, UBS Financial, Burnet Title, Brutlag PA, and Lind Jensen PA. The corporate entities are therefore vicariously liable for the actions of their agents who were carrying out the Enterprise's scheme to defraud within the scope of their employment and where the corporate entities ratified, and benefitted from, their employees' unlawful conduct. These corporate Defendants made financial and reputational gains, by perpetuating the scheme to conceal their legal liabilities and maintain their lucrative business operations. To increase market exposure, Coldwell retained control over Plaintiffs' listing, listing photos, and a false online press release indicating Grieger listed and then sold Park Place for $4.1 million dollars, as well as advertising the Park Place property as "For Sale" on at least one Coldwell agent's website continuously and, as late as, October 15, 2024.

1474.    It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Bull Enterprise.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

275

1475.   Plaintiffs allege that one or more named Defendants in Count 2 below, Racketeer Influenced and Corrupt Organization Act (Federal RICO), 18 U.S.C. § 1962 (c) violated 18 U.S.C. § 1962 (c) and therefore one or more named Defendants in Count 2 constitute "Operator/Managers" of the conspiracy.

1476.   Plaintiffs plead that all named Defendants herein Count 1 agreed and conspired with one or more Operator/Managers named in Count 2 to commit two predicate acts of racketeering for the purpose of Count 1, to further advance the criminal endeavor.

1477.   All named Defendants herein Count 1 intended to, or agreed to, further an endeavor of the Operator/Manager(s) named in Count 2 to conduct or participate, directly or indirectly, in the conduct of the affairs of the Bull Enterprise through a pattern of racketeering activity (See, Paragraphs 1421, 1429, 1439), which, if completed, would satisfy all elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

<u>The Racketeering Conspiracy</u>

1478.   Beginning in or around 2022, and continuing through on or about the date of this Complaint, both dates being approximate and inclusive, within the District of Minnesota, and elsewhere, all named Defendants, together and with other persons known and unknown, being persons employed by or associated with the Bull Enterprise, which was engaged in, or the activities of which affected interstate commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962 (c) that makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity [...]" 18 U.S.C. § 1962(c).


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

276

1479.   All named Defendants in Count 1 were aware of the Bull Enterprise's goals, and acted in concert, coordinating and supporting each other's unlawful activities, to achieve the objectives of the Bull Enterprise, including predicate acts of:

A. **Hobbs Act - Extortion** 18 U.S.C. § 1951- whereby Defendants fraudulently obtained equitable title to Plaintiffs' property with consent by materially misrepresenting that the earnest money payment was made but where the Defendants failed to make the payment and then utilized fear induced by Defendants' threats of a forced judicial sale to continue to wield equitable title, then valued at $3,300,000, for profit.

B. **Wire Fraud** -  18 U.S.C. § 1343 - whereby Defendants devised the earnest money scheme to defraud to obtain Plaintiffs' money and property by means of fraudulent representations via wire communications to create the false appearance that Coldwell retained the earnest money funds and to conceal that Defendants Bull failed to remit the earnest money funds to Coldwell, pursuant to the Park Place Purchase Agreement.

C. **Money Laundering** - 18 U.S.C. §§ 1956 and 1957 - Defendants conducted financial transactions with proceeds derived from specified unlawful activities, including wire fraud and Hobbs Act extortion, with the intent to promote or conceal the illegal activity. Defendants engaged in money laundering by processing and transferring the unpaid $100,000 earnest money proceeds obtained by wire fraud through their shell company, F & G, LLC as a means to further the unlawful scheme. By moving funds to disguise their origin and conceal the scheme's operation, Defendants' financial transactions met the federal criteria for money laundering.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Overt Acts

1480.  Plaintiffs allege that Defendants knowingly and willingly entered into an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962 (d). Each Defendant's actions and support were essential to the success and continuity of the Bull Enterprise and concealment of its members' unlawful acts.

1481.  Plaintiffs further allege that each Defendant, with knowledge of the Enterprise's fraudulent objectives, conspired to further its purpose, either by personally engaging in acts of fraud, extortion, money-laundering, concealment, and misrepresentation, or by supporting those acts.  This agreement and mutual intent constitutes a conspiracy to violate 18 U.S.C. § 1962(c) making each Defendant liable under § 1962(d).

1482.  It was further part of the conspiracy that each defendant agreed that a conspirator Operator/Manager would commit at least two acts of racketeering activity in the conduct of the affairs of the Bull Enterprise.

1483.  In furtherance of the conspiracy, and to affect the object and purposes thereof, all named Defendants herein committed various overt acts as described with particularity in paragraphs 1422, 1430, 1440 and including but not limited to the following:

A. **Defendants Joel Burger** (23) and **Jesse Bull** (25) agreed and conspired to fake a $100,000 earnest money payment by means of wire fraud. Burger uncoupled the $5 TrustFunds convenience fee, and agreed and conspired with TrustFunds to tender Bull's $5 convenience fee check in real life to circumvent the TrustFunds online notification and payment system.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

B. **Defendant TrustFunds** (9) accepted an isolated $5 check sale, an overt act, that directly supported the conspiracy by circumventing TrustFunds' usual online-only payment process. By accepting the check payment, TrustFunds knowingly enabled the other defendants, and TrustFunds itself, to create false and fraudulent transaction records, which were later used to deceive Plaintiffs and their counsels of the earnest money's submission. TrustFunds' deviation from standard procedure eliminated all tracking and notification that would accompany a genuine earnest money payment and it was foreseeable to TrustFunds that a request for in-person, and/or isolated $5 convenience fee payment from the buyer may be criminally designed to bypass online safeguards.

C. **Defendant Joel Burger** (23), acting alone or with TrustFunds' trainer/employee's assistance, took a screenshot and/or "clipped" a copy of a TrustFunds screen depicting an outdated TrustFunds transaction table purporting to show Burger initiated a transaction through TrustFunds on May 9, 2022, at 12:20 p.m. for the Park Place earnest money payment, to conceal the missing TrustFunds notifications. Burger emailed the outdated TrustFunds transaction table to show Byrd that he "initiated" TrustFunds even though he had not done so.

D. **Defendant Jesse Bull** (25) and/or **Lee Bull** (26), operating one day after Burger's false payment submission, earmarked $5 and $100,000 in Bulls' UBS Financial RMA account, to create the false appearance of a bank debit on May 10, 2022 but where the unpaid $100,000 earnest money was later transferred by Bull, in two $50,000 increments, to increase the capital accounts of J.Bull and L. Bull per F & G, LLC's signed resolution prepared by Sachin Darji (32).



E.   **Defendant Sachin Darji** (32) drafted corporate resolutions for F & G, LLC which falsely and fraudulently indicated Defendants Bull had deposited $100,000 in earnest money "with the sellers of Park Place." Darji included provisions to increase the capital accounts of J. Bull and L. Bull by $50,000 each, enabling them to legitimize and launder the unpaid $100,000 earnest money derived from the fraudulent earnest money scheme set in motion by Burger and J. Bull. Darji's drafting served to conceal the unlawful origins of the $100,000 funds and provided an appearance of legitimacy to the Defendants' control over Plaintiffs' property. Darji knew, or should have known, that F & G, LLC, is a shell company used by J. Bull and L. Bull to launder $100,000 U.S. currency and/or wrongfully claim business expenses to avoid and/or lessen taxes. Darji drafted multiple additional F & G, LLC corporate resolutions related to Bulls' subsequent purchases at 5 Webster Place and 16175 Crosby Cove; in each instance resolving that F & G, LLC will increase the capital accounts of J. and L. Bull in equal amounts that sum up to the earnest money in the respective transactions. Darji had knowledge of and intent to further the scheme, advising J. Bull via email to lock down the Park Place property in various ways after the closing did not occur.

F.   **Defendant Joel Burger** (23), on May 9, 2022, forged a $100,000 TrustFunds submission payment notification for Bulls' $100,000 never-made earnest money payment and emailed it to Chelsey Byrd.

G.   **Defendant Chelsey Byrd** (20), as transaction coordinator, knew or should have known that Burger's TrustFunds payment notification email was false and fraudulent. Byrd agreed and conspired with Burger to utilize the forged TrustFunds notice to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

conceal Bulls' lack of earnest money deposit. Byrd knowingly concealed Burger's forgery, or "clean[ed] it up," and forwarded the TrustFunds notification body to Plaintiffs by email, falsely representing that Bulls' $100,000 earnest money had been submitted when she knew or should have known that no deposit was made. Byrd facilitated the earnest money fraud to advance the objectives of the Bull Enterprise. With knowledge of its fraudulent nature, Byrd and/or Coldwell deleted Burger's email containing the forged TrustFunds submission notification indicating falsely that Bull submitted $100,000 via TrustFunds.

H. **Defendant Isaiah Byrd** (21), in coordination with his wife Defendant Chelsey Byrd, Isaiah Byrd furthered the conspiracy by actively concealing the absence of the earnest money deposit and Defendants Bull's contingency default, which Isaiah Byrd knew or should have known existed. Isaiah Byrd, a member of Grieger's team, knowingly supported the use of false assurances to Plaintiffs, using his position as Grieger's open-house attendant and trusted team member to bolster the appearance of a legitimate transaction. By participation in the concealment and misrepresentation of critical facts, and supporting his wife's decision to do the same, Isaiah Byrd directly contributed to the scheme's unlawful objective. I. Byrd later failed to disclose to Plaintiffs the ongoing earnest money fraud to conceal his wife's and Grieger's continued pattern of racketeering activity.

I. **Defendant Mark Grieger** (19), per his unlawful routine practice, knowingly held the Park Place deal by failing to upload the executed purchase agreement to Coldwell's Transaction Manager, which prevented any earnest money verification and allowed Defendants Bull and Burger to proceed without depositing the required $100,000.



When Plaintiffs expressed repeated, and evidently founded concerns about the earnest money, Grieger downplayed these issues by instructing Plaintiff to "chill," creating a false sense of security and actively concealing the lack of earnest money deposit, as well as Grieger and Byrd's participation in the Bull Enterprise. Grieger's actions intentionally delayed Plaintiffs from exercising their contractual rights, furthering the conspiracy to defraud Plaintiffs of equitable title and control over their own property and causing long-term damages to Plaintiffs.

J. **Defendant Joel Burger** (23), on May 16, 2022, manually populated an outdated TrustFunds "Earnest Money Payment History" report with the invoice number from the uncoupled $5 in-person convenience fee payment, representing the payment history report as evidence of a $100,000 earnest money deposit that had never occurred and emailed it to L. Bull and J. Bull. This falsified TrustFunds document was then provided to Matt Wolf, Plaintiffs' counsel, as evidence of Bulls' non-existent $100,000 payment. Defendant Burger produced several false TrustFunds email notifications and at least two "Earnest Money Payment History" reports that he tendered to Coldwell by wire transmissions, which Coldwell tendered to Plaintiffs directly, by wire transmissions. Burger's actions were intended to deceive Plaintiffs and their counsel, into believing that earnest money was properly deposited by Bulls on May 9, 2022, thereby concealing the ongoing fraud and enabling Defendants to retain control of Plaintiffs' property under false pretenses.

K. **Defendant Lee Bull** (26), assumed a 'Bonnie role' in the scheme, acting not only as a passive participant but as an active, knowing partner alongside Jesse Bull. L. Bull silently acquiesced to the earnest money fraud by allowing her name to be used on



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

false and forged transaction documents which she knew, or should have known, were false and fraudulent. These false TrustFunds documents were emailed to L. Bull by Burger on May 16, 2022. L Bull then aligned herself with the conspiracy's misrepresentations through alleged ignorance despite her ongoing continued access to publicly accessible court filings. L. Bull actively furthered the scheme by obstructing Plaintiffs' discovery whereby L. Bull answered 'I don't know' 362 times in her deposition to key questions about the well-contingency and the earnest money deposit even though she previously affirmed detailed knowledge, identical to J.Bulls' in her own Interrogatory answers. In stark contrast to her professed ignorance, L. Bull and Ward facilitated signatures on F & G, LLC's resolution, L. Bull reproduced and emailed signed copies of F & G's, LLC resolution to Burger, L. Bull communicated with TitleNexus via email about titling property in F & G's name, and L. Bull knowingly accepted the increase of $50,000 to her capital accounts from the company. L. Bull's selective involvement, both actively supporting and passively concealing the conspiracy, underscores her 'Bonnie role' as a knowing accomplice in Defendants' unlawful control over Plaintiffs' property for over two years, from which L. Bull financially profited.

L.  **Defendants Anthony Maurer** (17), **Thomas Rehman** (18), and **Joel Burger** (23) held a secret meeting, on May 18, 2022, to discuss the concealment of Defendants Bull's failure to deposit the earnest money and the concurrent failure of Defendants Grieger and Byrd to upload the deal resulting in Coldwell's inability to retain earnest money. During this meeting Maurer, Rehman, and Burger agreed and conspired to suppress disclosure of the missing earnest money funds as well Defendants Bull's



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

default of the well-contingency to avoid liability. Practically, Coldwell could not enforce the well contingency against Bulls without Bulls' earnest money on deposit with Coldwell. But, to conceal Bulls and Coldwell's mutual malfeasance from Plaintiffs, Coldwell and Bulls entered an agreement wherein Coldwell agreed to conceal Bulls' well-contingency default and remit Coldwell's $100,000 for Jesse Bull as "earnest money" in exchange for Bulls' waiver of all claims against Coldwell and Bulls' silence. Coldwell agreed to continue to conceal Bulls' contingency default and earnest money default from Plaintiffs to permit Bulls to wield equitable title of Plaintiffs' residence indefinitely for their anticipated mutual profit.

M. **Defendants Matthew Baker** (16), **Anthony Maurer** (17), and **Thomas Rehman** (18), to reinvigorate the Park Place agreement, fabricated a Ghost Deal by crafting a false purchase agreement under the property address "20 507 Park Place" using Plaintiffs' signatures from the original, but legally dead, contract. This fictitious contract and Coldwell's $100,000 deposit on behalf of J.Bull, was designed to give the appearance of a legitimate earnest money payment on a live deal and further conceal the lack of funds in the original deal, allowing Defendants to maintain control of Plaintiffs' property without fulfilling their contractual obligations.

N. **Defendants Mark Grieger** (19) and **Chelsey Byrd** (20) actively concealed critical information about Defendants Bull's planned and actual breach of the well contingency throughout the transaction. Both Grieger and Byrd demonstrated a malicious satisfaction with their own and Bulls' unlawful acts, showing not only their complicity but an active intent to further the conspiracy and hide their fraud. By deliberately failing to upload the transaction to prevent the earnest money deposit,



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

284

and concealing Bulls' known contingency default, Grieger and Byrd allowed

Defendants to unlawfully convert equitable title of Plaintiffs' residence for

Defendants' profit. All the while, Grieger and Byrd viewed Plaintiffs' predicament as

a source of entertainment, relishing in the distress occasioned by their fraud and

purposefully depriving Plaintiffs of the opportunity to protect their interests and title

to "see what happens next."

O. **Defendants Burnet Title** (4) and **Sandy Glieden** (5) knew about the lack of a

genuine earnest money deposit to Coldwell via TrustFunds but deliberately failed to

inform Plaintiffs of the Bulls' earnest money default. Burnet Title failed to advise

Plaintiffs of the time and location of the scheduled closing, thereby reducing the

likelihood that Plaintiffs would attend.  Burnet Title intentionally concealed the

missing earnest money deposit and TrustFunds notifications, and remained silent so

that Bulls could "set up the sellers" at the sham closing to further the conspiracy. By

concealing this critical information, Burnet Title minimized the chance that Plaintiffs

would discover Defendants' intent not to close, thereby advancing the conspiracy's

goal of maintaining control over Plaintiffs' property without financial commitment as

a means to extort Plaintiffs. Specifically, Sandy Glieden, failed and refused to obtain

Plaintiffs legally operative signed cancellation of Park Place in May 2022,  failed to

obtain Bulls' professed signed cancellation on or around November 10, 2022, failed

to provide an accounting to Plaintiffs in 2023, failed and refused to disclose material

evidence to Plaintiffs related to the November 2022 cancellation, and proffered false

and materially misleading wire transmissions in the form of emails indicating falsely

and fraudulently that Bulls' earnest money is in "Coldwell's trust."



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

P.   **Defendants Title Nexus** (6), **Brian Hoelscher** (7), **Deena Cole** (8), **Whitney Ward** (13) and **Joel Burger** (23) coordinated to execute a sham closing in which $3,300,000, inclusive of Bulls' unpaid earnest money, was wired from Jesse Bull's UBS Financial line of credit account to an account maintained by TitleNexus for Jesse Bull at Crown Bank to create the false appearance of performance on the contract. The sham transaction was intended to deceive Plaintiffs into believing Defendants Bull had the financial means and commitment to close on the property, thereby advancing the conspiracy to retain control of Plaintiffs' residence without payment.  Hoelscher failed to intervene or supervise Cole, and later, disclaimed any knowledge or receipt of J. Bull's loan application and closing disclosure clearly showing Bulls had no earnest money credit of $100,000 on Park Place prior to June 2, 2022.

Q.   **Defendant UBS Financial** (11), through its agents and resources, facilitated the sham closing by wiring $3,300,000 of UBS Financial's funds to Jesse Bull at a Crown Bank account maintained by TitleNexus, fully aware that these funds would be immediately returned to UBS, for the purpose of creating the false appearance of a legitimate transaction. By enabling this circular transfer, UBS Financial knowingly provided Defendants Bull with a mechanism to misrepresent their financial position to Plaintiffs, misleading Plaintiffs into believing Defendants had the means and intent to fulfill the purchase agreement when they did not. This deceptive transaction furthered the conspiracy by reinforcing Defendants' fraudulent control over Plaintiffs' property without a bona fide earnest money commitment.



R. **Defendants TitleNexus** (6), **Brian Hoelscher** (7), and **Deena Cole** (8), acting individually on behalf of TitleNexus, and associates of Burger and Bulls, knowingly furthered the RICO conspiracy through their deliberate misrepresentations and concealments. Hoelscher, even while suspecting criminal activity may be afoot, still failed to investigate and intervene in the orchestrated sham closing. On June 3, 2022, Cole created a fictitious single-balance ledger at the request of Burger and/or Bulls as "evidence" purporting to show that $3,300,000 - including the $100,000 earnest money deposit, which Cole knew or should have known had not been paid to Coldwell - was held by TitleNexus for the property's purchase. This falsified ledger was intended to mislead Plaintiffs and their counsel about the pathway of funds, creating the false appearance that $3,300,000 was wired to TitleNexus and retained by TitleNexus, even after the closing did not occur. This ledger concealed the absence of a legitimate earnest money deposit and fraudulently bolstered the illusion of Bulls' financial commitment and ability to perform at closing. By fabricating this document, materially misrepresenting the one-way flow of $3,300,000 U.S. currency to TitleNexus, Cole knowingly advanced the fraudulent scheme, enabling Bulls to retain unlawful control of equitable title to Plaintiffs' property to "go after the sellers" with fraudulently obtained equitable title as their leverage. Defendant Brian Hoelscher, despite suspecting fraudulent conduct, actively concealed TitleNexus' possession of Defendant Bulls' Park Place loan application. The loan application, sent from UBS Bank to TitleNexus via a secure portal on June 2, 2022, clearly showed no earnest money credit for the Park Place property. Rather than disclose this material information, Hoelscher adopted an aggressive, unprofessional, and defensive



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

287

demeanor, repeatedly denying knowledge of a loan application for Bulls. By suppressing this critical evidence, Hoelscher facilitated the ongoing fraud by concealing Cole's actual knowledge that Bulls had no earnest money credit for Park Place when she agreed to create a false and fraudulent TitleNexus ledger showing that the full purchase price of $3,300,000, inclusive of the previously unpaid earnest money, remained at TitleNexus when the closing did not occur. Hoelscher also directly contributed to the fraudulent appearance of Bulls' readiness and ability to close on the property, thereby advancing the Bull Enterprise's goals of concealing Bulls' defaults to avoid their liability.

S.  **Defendant L.J. Rotman** (31), acting as counsel for Defendants Bull in May of 2022 and later, actively concealed the Bulls' earnest money default even after Burger advised Rotman by email that the $3,300,000 funds, including the $100,000 "earnest money," was returned to Bulls UBS Financial line of credit the same-day. Rotman further concealed Bulls' well-contingency default from Plaintiffs to conceal that 20570 was canceled by Plaintiffs as of midnight on May 16, 2022. Rotman demanded $330,000 from Plaintiffs in exchange for a signed cancellation, knowing that no earnest money had been deposited and that Rotman's "good friend" had unlawfully converted equitable title to Plaintiffs' residence with no money down. Rotman's demand, far outside the rendering of routine legal services, was a calculated attempt to leverage Defendants' fraudulent control of the property for financial gain, furthering the conspiracy for Rotman and Bulls' profit, and using fear to do so.

T.  **Defendant Ryan Trucke** (27), as lead attorney for Defendants Bull, knowingly furthered the conspiracy by falsely asserting in communications, demand letters, and



legal pleadings that Defendants Bull had fulfilled all contractual contingencies, including the earnest money deposit. Trucke threatened Plaintiffs with a forced judicial sale of their property unless Plaintiffs met Bulls' ransom demands, knowing that Defendants Bull's claims were based on Burger's fraudulent transaction records and that Bulls' had unlawfully converted equitable title to Plaintiffs' residence. By using legal threats based on fraudulent equitable conversion, Trucke directly advanced the conspiracy's goal of retaining control over Plaintiffs' property for profit and did so by inciting fear of serious economic and legal consequences. Trucke's actions as Bulls' legal counsel went far beyond rendering routine legal services, and constituted actual fraud.

U. **Defendant UMB** (14) failed to disclose Bulls' UMB transactional records and documents that would have revealed the lack of a $100,000 earnest money deposit to Coldwell on May 9, 2022, showing only an isolated $5 convenience fee payment from Bulls' UMB -4774 account that day. UMB, financially motivated to retain Defendant Bull's book of business, and protect Defendant Bull from a claim of financial fraud to maintain its banking relationship with Bulls' approximately 300 high-net-worth clients, withheld accurate transaction details that would have exposed Bulls' earnest money scheme to defraud. By prioritizing its highly profitable relationship with J. Bull and J. Bull's clients, UMB directly, and knowingly, enabled the Bull Enterprise, helping Defendants perpetuate and conceal their fraud, and unlawfully control Plaintiffs' title and subject Plaintiffs to Bulls' sham litigation for over two years.



V. **Defendant UBS Financial** (11), also driven by its profitable relationship with Bull and Bull's managerial role at UBS Financial's Bull-Wiebler Group, failed to disclose key transactional records associated with Bulls' related commercial bank account at UMB ending in -4774, which would have revealed the scheme to defraud and that no genuine earnest money payment had been made on May 9, 2022, as suggested by Burger's forged "Earnest Money Payment History" report. The state court action would have ended swiftly.  Instead, UBS Financial knowingly withheld this critical transactional information that would have revealed Bulls' long-term fraud and fraudulent use of Bulls' UBS Financial RMA account. UBS Financial enabled Defendants to maintain the false appearance of a $100,000 earnest money deposit by withholding Bulls' commercial checking account records from Bulls' UMB -4774 account, directly supporting the Bull Enterprise's objective to retain control of Plaintiffs' property under fraudulent pretenses and for a prolonged period, for financial gain and to conceal the earnest money scheme to defraud. UBS Financial actively perpetrated the fraud by falsely asserting to Plaintiffs counsel that Bulls' RMA brokerage account and Bulls' UMB checking account were the same.

W. **Defendants Anywhere RE** (1), **Coldwell** (3), **Matthew Baker** (16), **Anthony Maurer** (17), and **Thomas Rehman** (18)  knowingly enabled, and rewarded, the fraudulent conversion of equitable title of Plaintiffs' residence by approving the transfer of $100,000 of Coldwell's funds to Trident for Jesse Bull to conceal Coldwell's own unlawful conduct in preventing the earnest money deposit and participating in Burger's TrustFunds fraud. By depositing Coldwell's funds, Anywhere RE and/or Coldwell via Maurer, Rehman, and Baker, actively financed the



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

290

Bulls' earnest money scheme to defraud Plaintiffs. Not only did Maurer and Rehman repeatedly and continuously misrepresent the status of Bulls' earnest money to Plaintiffs via multiple acts of wire fraud, they directly financed and legitimized the fraudulent transaction insuring Defendants Bull's long-term control of Plaintiffs' property and, eventually, litigation. Even when Maurer, Rehman, and Baker's plan to remit Coldwell's $100,000 to conceal Coldwell's liabilities went criminal, Maurer, Rehman, and Baker still failed and refused to disclose Bulls' well-contingency default and earnest money default to Plaintiffs. Anywhere RE, Coldwell, Rehman, and Maurer's extortionate and fraudulent acts allowed Bulls to convert equitable title for the long-term so that Coldwell, its agents, and its counsel, could continue to operate the Bull Enterprise without detection to protect their unlawful, but highly profitable, business operations. Coldwell knowingly, intentionally, and maliciously masked Plaintiffs' rightful legal options and to date has still failed and refused to disclose Coldwell's accord and satisfaction with Bulls that, commonsensically, resulted in Coldwells' remission of $100,000 of U.S. currency to Bulls.

X.  **Defendants Anywhere RE** (1), **Anywhere Integrated** (2), **Coldwell** (3), **Matthew Baker** (16), **Anthony Maurer** (17), and **Thomas Rehman** (18) ratified the illegal actions of Byrd and Grieger by failing, at a minimum, to honestly and fully disclose Grieger and Byrd's unlawful hold of Plaintiffs' executed purchase agreement to prevent earnest money deposit with Coldwell. Anywhere RE, Anywhere Integrated, and Coldwell, as well as Maurer, Rehman, and Baker, knew or should have known of Burger's TrustFunds notification forgeries and Grieger and Byrd's participation in the fraudulent scheme, yet they continued to conceal the fraud to shield themselves from



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

significant liability, liability Coldwell via Maurer continued to incur by forwarding Burger's false and fraudulent TrustFunds "Earnest Money Payment History" reports to Plaintiffs to conceal Coldwell's continued wrongdoing. Maurer, Rehman, and Baker failed to discipline and terminate Grieger and Byrd's employment despite clear evidence of Byrd's TrustFunds earnest money email forgery and Grieger's knowledge and concealment of it, in an effort to obtain their commissions. While Grieger admitted he was not capable of checking his emails for TrustFunds notifications - a necessary and basic skill for fulfilling his role - Anywhere RE and Coldwell failed to terminate Grieger's contract. Instead, Coldwell, Maurer, Rehman and Baker deep into their own fraudulent activities and having ratified Grieger's and Byrd's fraud, knowingly permitted Byrd and Grieger to continue to operate together, unsupervised. For the sake of profits, Coldwell failed to end Grieger and Byrd's routine practice of 'holding deals' - a tactic that delays earnest money deposits into Coldwell's trust - so that agents may sidestep the necessary transactional work for which they are contractually and legally obligated to perform. By choosing inaction and failing to disclose Byrd and Grieger's criminal acts to Plaintiffs, Coldwell, Baker, and Maurer not only condoned, but actively facilitated, managed, and/or operated the criminal scheme enabling the scheme to persist to Defendants' financial benefit.

Y. **Defendants Coldwell** (3), **Matthew Baker** (16), **Anthony Maurer** (17), and **Thomas Rehman** (18) actively advanced the conspiracy by presenting Plaintiffs with multiple iterations of Burger's forged "Earnest Money Payment History" reports, dated May 27, 2022, and February 8, 2023, knowing that the reports were forged and fraudulent because no earnest money settlement for the authentic 20570 Park Place



was factually possible on May 16, 2022 while Grieger and Byrd were still holding the deal. Coldwell, Maurer, Rehman, and Baker were expressly advised by Plaintiffs in February of 2023 of Defendants Bull's extortionate conduct towards Plaintiffs, yet, defendants still chose to remain silent and complicit in the scheme to conceal Coldwell's, Maurer's, Rehman's and Baker's own fraudulent conduct and illegal acts at Plaintiffs' sole expense causing Plaintiffs to incur significant damages. Coldwell, Maurer, Rehman, and Baker's material misrepresentations about the earnest money coupled with their position of authority, concealed Plaintiffs' legal options, and prevented Plaintiffs from taking timely action to protect their interests and reclaim title to their property that Coldwell fraudulently "brokered" to Bulls with no money down.

Z.  **Defendants Anywhere RE** (1) and **Anywhere Integrated** (2), as parent companies of Coldwell Banker Realty and Burnet Title, respectively, knew, or should have known, of Coldwell, Burnet, Grieger, Byrd, Maurer, Baker, and Rehman's participation in the Bull Enterprise's earnest money scheme to defraud. Despite this knowledge, they knowingly failed to discipline or address the unlawful conduct of their agents. Instead, like Coldwell's leadership before them, Anywhere RE and Anywhere Integrated ratified Coldwell's unlawful decisions and then actively, an through their attorneys at **Lind Jensen PA**, participated in the scheme in an effort to manipulate evidence to conceal it. Beginning at least as early as February 2023, Anywhere RE, Anywhere Integrated, and their counsel **Sloneker**, engaged in wire fraud by transmitting false and fraudulent records to Plaintiffs that appeared to be Coldwell's transactional data to 'prove' the unmade earnest money deposit to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

293

Coldwell on May 16, 2022. But, Anywhere RE and Anywhere Integrated had no chain of custody of Bulls' unmade $100,000 earnest money deposit so it created a "Deposit Report" from 1900- 2022 showing a single line item for Bulls' $100,000 "deposit" and re-disclosed Burger's forged "Earnest Money Payment History" reports to Plaintiffs suggesting their authenticity all to conceal the unlawful operations of the Bull Enterprise and Coldwell's active participation in the earnest money scheme. By perpetuating Defendants' fraudulent scheme through continued acts of wire fraud and retaining the same bad actors at Coldwell and Burnet Title, Anywhere RE and Anywhere Integrated conveyed a clear message: they are willing to engage in criminal conduct to conceal liability and protect their lucrative business operations. Anywhere RE and Anywhere Integrated, with the assistance of Sloneker and Lind Jensen PA, knowingly concealed Defendants Bulls' failure to remit earnest money to Coldwell. In their relentless pursuit of profits above all else, they abdicated their fiduciary duties, accountability, basic decency, and respect for the law.

1484.   Defendants knowingly and intentionally agreed to engage in the pattern of racketeering activity described above at A-Z, and alleged in Chapter 5 above, Predicate Acts of Racketeering, incorporated herein by reference.

1485.   Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c), in violation of 18 U.S.C. § 1962(d).

1486.   As a direct and proximate consequence of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, causing Plaintiffs to suffer monetary damages as discussed at Chapter 6 herein, and incorporated by reference to this claim.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1487.   Because of Defendants' violations of 18 U.S.C. § 1962 (d), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees, as well as any additional relief deemed appropriate by the Court.

1488.   Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violation of 18 U.S.C. § 1962(c), through injunctive relief, as necessary, to prevent ongoing and future violations of federal law. Plaintiffs further request any other equitable relief within this Court's power to ensure Defendants do not benefit and profit from their unlawful conduct and business practices.

## **COUNT 2**

*RICO - Violation of 18 U.S.C. § 1962(c)*
*(Conduct of an Enterprise Through a Pattern of Racketeering Activity)*

**Anywhere RE** (1), **Anywhere Integrated** (2), **Coldwell Banker Realty** (3), **Burnet** (4), **TitleNexus LLC** (6), **Deena Cole** (8), **TrustFunds LLC** (9), **Lynn Leegard** (10), **UBS Financial** (11), **UBS Bank** (12), **Whitney Ward** (13), **UMB Bank N.A.** (14),  **Anthony J. Maurer** (17), **Thomas Rehman** (18), **Mark D. Grieger** (19), **Chelsey R. Hagen-Byrd** (20), **Wexford Realty** (22),  **Joel A. Burger** (23), **Fairways and Greens, LLC** (24),  **Jesse J. Bull** (25), **Lee A. Bull** (26), **Ryan J. Trucke** (27), **Brutlag, Trucke & Doherty, PA** (28), **Matthew Sloneker** (29), **Lewis J. Rotman** (31), **Sachin J. Darji** (32)

1489.   Plaintiff realleges and restates all preceding paragraphs as if fully set forth herein and further states:

1490.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity [...]" 18 U.S.C. § 1962(c).

1491.   Plaintiffs allege that all named Defendants (with the exception of NorthstarMLS) collectively formed an association-in-fact enterprise (hereinafter, the "Bull Enterprise") as



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

defined under 18 U.S.C. § 1961(4), which constitutes a group of persons associated together for the common unlawful purpose of engaging in an earnest money scheme to defraud Plaintiffs. At all times relevant to this Complaint, the Bull Enterprise operated in the District of Minnesota, and elsewhere.

1492.    The Bull Enterprise shares the common purpose to execute, facilitate, and conceal an earnest money fraud scheme whereby Defendants Bull secretly and fraudulently retained contractual earnest money while wielding equitable title to Plaintiffs' residence for their financial gain over a period of more than two years, continuing to the present.

1493.    The Bull Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Bull Enterprise has operated since May 2022, and continues to operate and wield equitable title of Plaintiffs' residence without financial commitment while, at the same time, profiting from Coldwell's submission of its own $100,000 into court escrow, and payment of $100,000 to Bulls, to conceal the operation of the Bull Enterprise and its unlawful acts and agreements.

1494.    Each Defendant also named in Count 2, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) & 1962(c) who individually conducted, participated in, engaged in, and operated and managed the affairs of the Bull Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of extortion, wire fraud, and money laundering detailed with specificity at Chapter 5 and incorporated herein by reference.

1495.    Each Defendant named in Count 2 is an "Operator or Manager" of the Bull Enterprise whose actions constitute a pattern of racketeering activity.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1496.   All named Defendants in Count 1 agreed and conspired that an operator or manager of the Bull Enterprise would commit at least two predicate acts of racketeering as part of the enterprise's activities.

1497.   The touchstone acts of wire fraud took place on May 9, 2022, when Joel Burger, in furtherance of the purpose and scheme of the Bull Enterprise, falsely and fraudulently utilized interstate wires to make an isolated $5 TrustFunds convenience fee payment affecting interstate commerce to circumvent the TrustFunds payment and notification system. Alone or in conjunction with TrustFunds' personnel, Burger utilized the interstate wires to create false and fraudulent TrustFunds notifications and payment reports for a $100,000 non-existent payment populating the same $5 convenience fee receipt information on the $100,000 payment notifications, fraudulently creating the appearance that a $100,000 payment was made to Coldwell by Bulls.

1498.   Other subsequent acts of wire fraud soon followed on May 9, 2022, when Chelsey Byrd and Mark Grieger utilized interstate wires to send Plaintiffs a "cleaned up" version of Burger's forged TrustFunds payment notification and falsely, and repeatedly, assured Plaintiffs, using interstate wires, that a $100,000 earnest money payment was made by Bulls on May 9, 2022.

1499.   Coldwell, unable to enforce Bulls' well-contingency default due to Grieger and Byrd's tortious interference with the purchase agreement by holding the deal and actively facilitating Burger's earnest money fraud scheme, used interstate wires to conceal the fraud. Coldwell uploaded a new deal, the ghost agreement, by removing the well-contingency addendum and Plaintiffs legally operative signed cancellation related thereto, from the authentic Park Place purchase agreement.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1500.   Coldwell, on May 18, 2022, fraudulently, and through interstate wires, remitted $100,000 of Coldwell's funds to create the false appearance that Coldwell retained Bulls' earnest money, when Coldwell through wire fraud sought to cover-up the unlawful routine practices and fraudulent conspiratorial acts of its agents that permitted Bulls to convert equitable title to Plaintiffs $3,300,000 with no earnest money down.

1501.   Bulls, through Rotman, and then Trucke, participated in a series of extortionate conduct and wire fraud to continue to control equitable title to Plaintiffs real property for financial gain while Bulls laundered the ill-gotten gains through F & G, LLC, to conceal the unlawful source of the funds.

1502.   All of the acts of racketeering described with specificity at Chapter 5 herein, and incorporated by reference, were related and collectively established a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c). These acts were not isolated incidents but were instead continuous, related, and coordinated, actions carried out with knowledge and intent to defraud Plaintiffs, maintain control over Plaintiffs' property, obtain unlawful financial gain, and conceal the scheme and all of its culpable actors.

1503.   Defendants used the wires for the transmission, delivery, or shipment of the following by the Defendants or third parties, all of which are related to the earnest money scheme to defraud and they were foreseeably caused to be sent as a result of Defendants' illegal earnest money scheme:

A.  Wires to the Hennepin County District Court to fraudulent file papers in 27-CV-23-6625 including, but, not limited to, Defendants sham counter-claims against Plaintiffs, fraudulent pleadings, fraudulent exhibits, and sham affidavits and attachments;



B. Wires between Defendants;

C. Wires to Plaintiffs containing false and fraudulent documents, records, and accounts;

D. Email and telephone communications between Defendants;

E. Payment by Coldwell of $100,000 on behalf of Jesse Bull into Coldwell's business account as Bulls' unpaid earnest money; and

F. Payment of $100,000, by Coldwell/Sloneker/Lind Jensen PA to Hennepin County Court Administrator, constituting Coldwell's funds to conceal the scheme and Coldwell's fraudulent acts.

1504.   Defendants use the internet and other electronic facilities to carry out the earnest money scheme to defraud and to conceal their ongoing fraudulent activities.

1505.    At all times discussed herein, Defendants have been involved in a plan or scheme to defraud; have had the intent to defraud and have willfully participated in the scheme to defraud with actual knowledge of its fraudulent nature and with specific intent to defraud; and could have reasonably foreseen that interstate wires would be used; and actually used interstate wires to further Defendants' scheme.

1506.   The Bull Enterprise engaged in and affected interstate commerce by way of said wire fraud.

1507.   The extortion, wire transmissions, and money laundering described herein were made in furtherance of Defendants' scheme and common course of conduct.

1508.   All of the acts of racketeering described in Chapter 5 herein, and incorporated by reference, were continuous so as to form a pattern of racketeering activity that is ongoing since 2022 to the present. Insofar as real estate agents' routine practice of holding deals as well as TrustFunds delivery of earnest money after buyers have already converted equitable title with no



money down, said practice threatens to continue indefinitely where these acts of racketeering are the common way in which Anywhere RE, Anywhere Integrated, Coldwell, Burnet, and TrustFunds conduct business in the residential real estate industry.

1509.   Corporate Defendants, including Anywhere RE, Anywhere Integrated, Coldwell, Burnet Title, TitleNexus, TrustFunds, UBS Financial, UBS Bank, UMB, Wexford Realty, F & G, LLC, Brutlag PA, Lind Jensen PA, knowingly ratified and benefited from the wrongful actions of the companies - such as Coldwell and Burnet Title - that they own, as well as the employees and/or independent contractors they oversee, including Maurer, Rehman, Baker, Grieger, Byrd, I. Byrd, Burger, Cole, Leegard, Ward, J. Bull, L. Bull, Trucke, and Sloneker, thereby condoning and participating in the racketeering scheme described herein. By authorizing, approving, or directing these agents to further the objectives of the Bull Enterprise, the Corporate Defendants actively operated and managed the enterprise's affairs in furtherance of the racketeering scheme, making them liable under 18 U.S.C. § 1964(c) for Plaintiffs' damages.

1510.   To achieve their common goals, individual Defendants named in Count 2, knowingly and willfully concealed from the public, the Hennepin County District Court, and Plaintiffs the unlawfulness of Anywhere RE, Anywhere Integrated, Burnet, and Coldwell's conduct, which was committed at the instruction of, and through the directions of Grieger, Byrd, Maurer, Rehman, Baker, and Sloneker.

1511.   To achieve their common goals, individual Defendants named in Count 2, knowingly and willfully concealed from the public, the Hennepin County District Court, and Plaintiffs the unlawfulness of TitleNexus, TrustFunds, UBS Financial, UMB,  F & G, LLC, Wexford Realty, which was committed at the instruction of, and through the directions of Burger, J. Bull, L. Bull, Cole, Hoelscher, Leegard, Rotman, Trucke, Ward, and Darji.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1512.   As a direct and proximate result of, and by reason of, the activities of all named Defendants in Count 2, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, within the meaning of 18 U.S.C. § 1962(c) causing Plaintiffs to suffer monetary damages as discussed at Chapter 6 herein, and incorporated by reference to this claim.

1513.   Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1514.   Pursuant to 18 U.S.C. § 1964(a), Defendants should be restrained from further violating 18 U.S.C. § 1962(c) through injunctive relief, as necessary, to prevent ongoing and future violations of federal law. Plaintiffs further request any other equitable relief within this Court's power to ensure Defendants do not benefit from their unlawful conduct or continue to harm Plaintiffs and other homeowners through their racketeering activities.

## COUNT 3

*Violation of 18 U.S.C. § 1962(a)*
*(Investment of Racketeering Proceeds in the Enterprise)*

**Joel A. Burger** (23), **F & G, LLC** (24), **Jesse J. Bull** (25), **Lee A. Bull** (26)

1515.   Plaintiffs reallege and restate all preceding paragraphs as if fully set forth herein and further state:

1516.   18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity [...] to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of



any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

1517.   Each Defendant at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3). Beginning on or around May 6, 2022, and continuing to the present, Defendants received income derived from a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

1518.   Plaintiffs incorporate by reference the detailed allegations set forth in Chapter 5 of this Complaint, specifically the acts of money laundering committed by Defendants, including J. Bull, L. Bull, Joel A. Burger, and F & G, LLC. As detailed in Chapter 5, Defendants knowingly engaged in - and created the false appearance of engaging in - financial transactions involving criminally derived property with the intent to promote, further, or conceal the unlawful activity.

1519.   Specifically, Bulls' monetary transactions were designed to conceal the origins and ownership of proceeds derived from their fraudulent scheme, in violation of 18 U.S.C. § 1956 and § 1957. These transactions included, but were not limited to, the remittance of cash from unknown sources, the earmarking of $100,000 funds in a brokerage account to create the appearance of an actual debit, the structuring of transactions to conceal unpaid earnest money, and the preparation of corporate amendments to falsely represent capital accounts. Together, each of these predicate acts constitutes a pattern of racketeering activity as defined under 18 U.S.C. § 1961(5).

1520.   By engaging in this pattern of racketeering activity, Defendants derived substantial income, which they reinvested in the acquisition, establishment, and operation of the Bull Enterprise and other related activities that affect interstate commerce, in violation of 18 U.S.C. § 1962(a).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1521.   Defendants organized Fairways and Greens, LLC, (a member of the Bull Enterprise), to hold title to property and to act as a vehicle to receive income derived from a pattern of racketeering activity as a means to launder it. Furthermore, on or around May 6, 2022, Defendants (with the exception of NorthstarMLS) formed and operated the Bull Enterprise to carry out a pattern of racketeering activity.

1522.   Defendants J. Bull, L. Bull, and J. Burger agreed to and did use income received directly from a pattern of racketeering activity, specifically, the $100,000 in unpaid earnest money retained by fraudulent means and an additional $100,000 remitted to Bulls by Coldwell, to control, establish, and operate the Bull Enterprise, which was engaged in and affected interstate commerce through acts including money laundering, as defined by 18 U.S.C. § 1956 and 18 U.S.C. § 1957, and wire fraud, as defined by 18 U.S.C. § 1343, all for the unlawful purpose of intentionally defrauding Plaintiffs.

1523.   As a direct and proximate result of, and by reason of, the activities of  named Defendants, and their conduct in violation of 18 U.S.C. § 1962(a), Plaintiffs have been  injured in their business and property, within the meaning of 18 U.S.C. § 1962(c) causing Plaintiffs to suffer monetary damages as discussed at Chapter 6 herein, and incorporated by reference to this claim.

1524.   Because of Defendants' violations of 18 U.S.C. § 1962(a), Defendants are liable to Plaintiffs for treble damages, plus the costs of this suit, including reasonable attorney's fees, as provided by 18 U.S.C. § 1964(c).



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 4

*Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)*

**Anywhere RE** (1), **Coldwell** (3), **Anthony Maurer** (17), **Mark Grieger** (19)

1525.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1526.   **False and Misleading Advertising by Defendants:** Defendants Coldwell, Maurer, and Grieger engaged in false and misleading advertisement and promotional conduct in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by publicizing false "news" to Finance and Commerce online news outlets that Plaintiffs' Park Place farmhouse sold for $4.1 million dollars on April 22, 2022, with Grieger as the listing agent. This false publicity created the false impression that Plaintiffs had sold their property for $4.1 million, significantly above the contract price of $3.3 million under the purchase agreement with Defendants Bull.

1527.   **Material Misrepresentations and Omissions:** Defendants Coldwell, Maurer, and Grieger:

A.   Released false information advertising that the Plaintiffs' property sold in April of 2022 at $4.1 million with Grieger as the listing agent and Coldwell as the broker;

B.   Created the false appearance that Plaintiffs had already sold the property for $800,000 more than the price under the agreement with Defendants Bull; and

C.   Failed to disclose the inaccurate nature of this advertisement, allowing it to mislead the public, including Defendant Burger, into believing that Plaintiffs had realized a significant financial gain all to Grieger, Maurer, and Coldwell's credit.

1528.   **Impact of False Advertising**: The false advertising in Finance and Commerce online news platform was disseminated through interstate commerce, where it was accessible to



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Burger, Bulls, and the general public. It misled and deceived viewers, including Defendant

Burger, into believing that Plaintiffs had profited significantly from the falsely reported April

2022 sale of the property. Coldwell, Grieger, and Maurer's misrepresentation directly motivated

Defendants Bull to demand a higher payout or extort Plaintiffs for additional funds, aggravating

the fraudulent earnest money scheme.

1529.   **Knowledge and Intent:** Defendants Coldwell and Grieger knew that Coldwell's

$4.1 million press release was false and misleading. Coldwell intentionally and falsely publicized

the property as "sold" for $4.1 million to create the illusion of a lucrative sale, knowing that this

information would incentivize Defendants Bulls to retain long-term fraudulent control of

Plaintiffs' equitable title for profit. Even after Burger brought the false news release to

Coldwell's attention via email, Coldwell and Maurer failed and refused to remove the false news

release from Finance and Commerce's website for nine months. Plaintiffs contacted Finance and

Commerce nine-months later which then confirmed that the reported sale was false and

reluctantly removed the false information.

1530.   **Damages pursuant to 15 U.S.C. § 1117(a)**: Plaintiffs seek treble damages for

Defendants' willful violations of the Lanham Act, including an award of Defendants' profits,

Plaintiffs' actual damages, and the costs of this action.

1531.   **Damages to Plaintiffs**:  As a direct and proximate result of, and by reason of, the

activities of all named Defendants in Count 4, including their conspiratorial conduct and false

advertising, Plaintiffs have suffered damages, including financial loss, reputational harm,

emotional distress, and significant legal expenses, as discussed in Chapter 6 herein and

incorporated herein by reference to this claim.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 5

*Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)*

**Anywhere RE** (1), **Coldwell** (3)**, Anthony Maurer** (17)

1532.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1533.  **False and Misleading Advertising by Defendants:** Defendants Coldwell and Anywhere RE engaged in false and misleading advertisement, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by publicly listing Plaintiffs' property online "for sale" abd brokered by the Coldwell of Wayzata at $3.75 million on at least one of Coldwell's agents' websites until October 15, 2024. By doing so, Defendants Coldwell and Anywhere RE created the false impression that Coldwell's Wayzata branch was brokering the Plaintiffs' property, the property was currently available for sale, and Plaintiffs sought to sell the property. In reality, the property was no longer for sale and Defendants had no authorization from Plaintiffs to advertise the property or its listing photos, to the financial benefit of Coldwell and its agents.

1534.  **Material Misrepresentations and Omissions:** Defendants Coldwell and Anywhere RE:

A.  Advertised Plaintiffs' property as "for sale" without authorization from Plaintiffs or any legitimate basis for the listing since 2022;

B.  Misrepresented the property's availability and price, misleading viewers into believing the property was actively on the market for $3.75 million as listed by Coldwell in Wayzata; and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

306

C.  Willfully continued to falsely and fraudulently market the property even after repeated requests from Plaintiffs dating back to 2022 to remove the Park Place listing, and its photos, from the MLS and all of Coldwell's websites.

1535.  **Impact of False Advertising:** This false and misleading advertising was disseminated through interstate commerce, including online real estate platforms and Defendants' own websites, where it was accessible to Defendants Bull, potential buyers, and the general public. This false advertising created the false appearance that Plaintiffs' sought to sell the property, the property was for sale, and that the property was brokered by Coldwell. This false advertising created the false appearance that Plaintiffs intended to sell the property up until October 15, 2024, giving Defendants Bull increased financial motivation to delay signing the cancellation of the purchase agreement or continue to falsely deny signing the cancellation of the purchase agreement. By perpetuating this false narrative, Coldwell's advertising incentivized Defendants Bull to wait and strengthen their position to bring a damages claim against Plaintiffs in the event of a subsequent sale in excess of $3.3 million, thereby prolonging the fraudulent earnest money scheme and exacerbating the harm to Plaintiffs.

1536.  **Knowledge and Intent:** Defendants Coldwell and Anywhere RE knew or should have known that continuing to advertise Plaintiffs' property as "for sale" was false and misleading. Despite this knowledge, Defendants allowed the unauthorized and inaccurate listing to persist until October 2024, intending to benefit Coldwell's own financial interests by garnishing new leads for itself while motivating Defendants Bull to use the false narrative to further delay or deny signing the cancellation. Defendants' conduct constituted a willful violation of the Lanham Act.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

307

1537.   **Damages pursuant to 15 U.S.C. § 1117 (a)**: Plaintiffs seek treble damages for Defendants' willful violations of the Lanham Act, including Defendants' profits, Plaintiffs' actual damages, and the costs of this action.

1538.   **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, Defendants' false advertising, Plaintiffs have suffered damages, including financial loss, reputational harm, emotional distress, and significant legal expenses, as discussed in Chapter 6 herein and incorporated herein by reference to this claim.

### COUNT 6

*Violation of the Lanham Act - False Advertising 15 U.S.C. § 1125(a)*

**TrustFunds LLC** (9)

1539.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1540.   **False and Misleading Advertising by Defendants:** Defendant TrustFunds, Inc. (TrustFunds) engaged in false and misleading advertising, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by falsely representing on its website and marketing materials that it provides users with notification of the earnest money payment "every.step.of.the.way." TrustFunds' advertisements create the false impression that the company accurately tracks the status of earnest money deposits, including their settlement time into the designated trust account holder's trust account.

1541.   In reality, TrustFunds lacks the technical capability to confirm or track when payments actually settle into the designated trust account and TrustFunds does not provide the advertised notifications of settlement time as it claims. Instead, TrustFunds provides "notification" of a settlement time of 6:00 A.M. on the date of settlement for every TrustFunds



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

transaction even though the earnest money for every TrustFunds transaction does not actually settle at 6:00 a.m. into each individual trust account.

1542. **Material Misrepresentations and Omissions:** Defendant TrustFunds:

A. Advertised that it provides notification of the earnest money payment every step of the way, despite lacking any mechanism to accurately track, confirm, and report the settlement time of funds into designated trust accounts.

B. Advertised that it provides "layers of digital security" to assure customers that its delivery service is secure and reliable, when in fact TrustFunds outsources the processing of earnest money payments to ReliaFund and the delivery of email notifications to SendGrid. TrustFunds lacks the technological capability to secure the transaction or verify its timing, and its notifications can be easily replicated, making it impossible to confirm their authenticity.

C. Misrepresented its role and capabilities in monitoring earnest money transactions, creating the false impression that users and trust account holders receive reliable and complete updates regarding earnest money settlement but where TrustFunds fails to provide direct notification to sellers and its "help-desk" refers any questions back to TrustFunds' broker customers.

D. Omitted critical facts about its inability to ensure the settlement of payments into trust accounts, leaving Plaintiffs and other users to rely on incomplete or inaccurate information.

1543. **Impact of False Advertising:** This false and misleading advertising was disseminated through interstate commerce, including TrustFunds' website, marketing materials, and platform communications, accessible to users, trust account holders, and the general public.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

309

TrustFunds' false advertising led Plaintiffs to believe that TrustFunds could ensure proper notification and tracking of Bulls' $100,000 earnest money payment. Plaintiffs relied on TrustFunds' misrepresentations, only to discover during the course of this litigation that no such payment had settled into Coldwell's trust account, contrary to the false assurances provided by TrustFunds.

1544.   By misrepresenting its capabilities, TrustFunds contributed to the perpetuation of the fraudulent earnest money scheme. This false advertising allowed Defendants, including Bulls and Coldwell, to leverage the false appearance of a valid earnest money deposit, compounding the harm to Plaintiffs.

1545.   **Knowledge and Intent:** TrustFunds knew or should have known that its statements regarding "notifications every step of the way" were false and misleading. Despite this knowledge, TrustFunds advertised its services with the intent to attract users and gain a competitive advantage in the market. TrustFunds' conduct constituted a willful violation of the Lanham Act, designed to enhance its reputation while concealing its inability to collect earnest money payments prior to the equitable conversion of seller's real property or confirm settlement of earnest money deposits.

1546.   **Damages pursuant to 15 U.S.C. § 1117 (a)**: Plaintiffs seek treble damages for TrustFunds' willful violations of the Lanham Act, including TrustFunds' profits, Plaintiffs' actual damages, and the costs of this action.

1547.   **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, Defendants' false advertising, Plaintiffs have suffered damages, including financial loss, reputational harm, emotional distress, and significant legal expenses, as discussed in Chapter 6 herein and incorporated herein by reference to this claim.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 7

*Civil Conspiracy*

**All Named Defendants** (1-34), except NorthstarMLS (33)

1548.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1549.    **Agreement to Conspire**: All named Defendants, with the exception of NorthstarMLS, knowingly and willfully agreed and conspired to execute an earnest money scheme to defraud Plaintiffs. This agreement is evidenced by each Defendant's concerted actions, communications, and manipulations designed to give the false impression that the $100,000 earnest money had been deposited with Coldwell, as required, despite knowing that this was untrue and factually impossible. Each Defendant played a role in advancing the scheme by concealing the failure of Defendants Bull to deposit earnest money, fabricating transaction confirmations and records, and actively misleading Plaintiffs about the transaction's status. Through their coordinated efforts spanning more than two years, and continuing to the present, each Defendant knowingly contributed to and advanced the fraudulent scheme. They understood that their actions would collectively enable Bulls to unlawfully retain $100,000, assert an illegitimate claim to equitable title to Plaintiffs' property, and position themselves to sue Plaintiffs for damages while leveraging the fraudulent conversion of Plaintiffs' equitable title.

1550.    **Unlawful Purpose and Means:** Defendants undertook overt acts in furtherance of the conspiracy, as detailed in Chapter 5 and incorporated herein by reference. These overt acts include but are not limited to:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

A. Falsifying earnest money payment confirmations, falsifying "Earnest Money Payment History" reports, manipulating electronic TrustFunds records, altering emails to create the appearance of authentic TrustFunds notifications, and sending internal emails to create the appearance that Coldwell retained Bulls' $100,000 deposit that Defendants knew was never made; and

B. Concealing the actual status of the earnest money and contingency requirements to delay and manipulate Plaintiffs' ability to cancel the purchase agreement in a timely manner, despite Defendants' own breaches of the agreement and sham closing that concealed Bulls' failure to perform at closing.

1551.   **Intent and Participation:** Each Defendant, fully aware of the fraudulent nature of the earnest money scheme and its impact on Plaintiffs' rights to the property, and by specific overt acts as outlined, participated knowingly and with intent to deceive Plaintiffs.

1552.   **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the activities of all named Defendants in Count 4, and their conspiratorial conduct constituting repeated acts of fraud, Plaintiffs have suffered damages, including financial loss, emotional distress, and significant legal expenses as discussed at Chapter 6 herein, and incorporated herein by reference to this claim.

## COUNT 8

*Fraud (Primary Individual Actors): Fake Earnest Money Payment*

**Mark Grieger** (19), **Chelsey Byrd** (20),  **Joel Burger** (23), **Jesse Bull** (25), **Lee Bull** (26)

1553.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1554.   **Material Misrepresentations and Concealment**: Defendants Joel Burger, Jesse Bull, Lee Bull, Chelsey Byrd, and Mark Grieger (collectively, "Primary Individual Defendants") knowingly made material misrepresentations and actively concealed facts with the intent to deceive Plaintiffs regarding the earnest money deposit and transaction status for the property located at 20570 Park Place, Deephaven, Minnesota.

1555.   Material False Statements and Omissions:

A.   **Defendant Joel Burger** (23), acting as the broker for Jesse and Lee Bull, falsely represented that he had initiated the TrustFunds transaction to request that Bulls remit $100,000 earnest money to Coldwell. Burger fabricated a TrustFunds email notification falsely purporting that J. Bull submitted $100,000 using TrustFunds when he did not. Burger later generated a fraudulent "Earnest Money Payment History" report to falsely document the earnest money transaction, to conceal that no actual payment had been made. Burger generated an additional fraudulent "Earnest Money Payment History" report, dated May 27, 2022, for Coldwell's file.

B.   **Defendants Jesse Bull** (25) and **Lee Bull** (26) committed fraud by earmarking funds in their UBS Resource Management Account to create the illusion of an earnest money deposit without actually remitting the funds to Coldwell as required. Bulls continued to conceal their failure to deposit the earnest money from Plaintiffs and colluded with Burger to produce fabricated evidence of the transaction.

C.   **Defendant Chelsey Byrd** (20) knowingly furthered the fraud by altering and forwarding Burger's fake TrustFunds notification to Plaintiffs, when she knew or should have known that it was false and fraudulent. Byrd purposefully deleted Burger's email pathway and identifying information to make his forged TrustFunds



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

313

notification appear legitimate. Byrd failed to disclose that the notice did not originate

from TrustFunds and actively misled Plaintiffs into believing the earnest money had

been paid by Bulls when she knew, or should have known, no payment was made.

D. **Defendant Mark Grieger** (19), as Plaintiffs' agent, purposefully held the deal to

prevent earnest money settlement. Grieger further failed to ensure that the earnest

money was properly submitted and agreed and conspired with Byrd to conceal the

missing payment. Grieger supported Byrd's and Burger's fraud by withholding

information regarding the Bulls missing earnest money and repeatedly, and falsely,

assured Plaintiffs that the payment had been made and would settle in Coldwell's

trust. Grieger failed to advise Plaintiffs no earnest money could settle while Grieger

held the deal.

1556.    **Defendants' Knowledge of Falsity**: Each of the Primary Individual Defendants

knew or should have known that their representations regarding the earnest money deposit were

false and that these misrepresentations were likely to, and did, deceive Plaintiffs.

1557.    **Intent to Deceive and Induce Reliance**: Primary Individual Defendants intended

for Plaintiffs to rely on these misrepresentations, inducing Plaintiffs to continue with the sale

process under the false belief that the earnest money deposit had been made.  Defendants knew

that their false representations would prevent Plaintiffs from exercising their right to cancel the

agreement based on the failed deposit.

1558.    **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the

misrepresentations made by Defendants, particularly the assurances from Grieger, Byrd, and

Burger that the earnest money was deposited in accord with the contract terms. Based on this



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

reliance, Plaintiffs incurred significant financial and emotional costs, including ongoing outside legal counsel's fees and litigation costs.

1559.    **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the fraud committed by the Primary Individual Defendants, Plaintiffs have suffered substantial damages, including financial loss, emotional distress, and significant legal expenses, as detailed at Chapter 6, which is incorporated herein by reference to this claim.

## COUNT 9

*Fraud (Well-Contingency Conspirators): Concealment of Well-Contingency Default*

**Anywhere RE** (1), **Coldwell** (3), **Grieger** (19) **Byrd** (20), **I. Byrd** (21)

1560.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1561.    **Material Misrepresentations and Concealment**: Defendants Anywhere RE, Coldwell, Grieger, Byrd, and I. Byrd, ("Well Contingency Conspirators") knowingly concealed Bulls' well-contingency default from Plaintiffs. Despite their legal obligation to disclose material facts about Bulls' compliance with the agreement, Coldwell failed to inform Plaintiffs that Bulls had not waived the well-contingency in writing prior the expiration of the contingency period, as required by the agreement. This omission misled Plaintiffs into believing the contract was valid and enforceable, concealing Bulls' defaults and permitting Bulls to wield equitable title to Plaintiffs property to further the fraudulent scheme.

1562.    **Defendants' Knowledge of Falsity**: The Well-Contingency Conspirators knew or should have known that Bulls had failed to comply with the well-contingency provision of the



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

agreement. Their failure to disclose this material fact, despite their active involvement in the transaction and knowledge of its details, underscores their intent to mislead Plaintiffs.

1563.   **Intent to Deceive and Induce Reliance**: The Well-Contingency Conspirators concealment of the well-contingency default was intentional and calculated to deceive Plaintiffs. This concealment allowed Bulls to leverage the false appearance of compliance, inducing Plaintiffs to proceed with the transaction under fraudulent premises.

1564.   **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the Well-Contingency Conspirators omissions, assuming the contract was valid and enforceable based on Coldwell's role in the transaction. As a result, Plaintiffs delayed pursuing their legal remedies, incurred significant legal fees, and suffered financial losses.

1565.   **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the Well-Contingency Conspirators' fraudulent concealment, Plaintiffs suffered substantial damages, including financial losses, emotional distress, and significant legal expenses, as detailed at Chapter 6, which is incorporated herein by reference to this claim.

## **COUNT 10**

*Fraud (Coldwell Defendants): Regarding the Earnest Money*

**Coldwell** (3), **Matthew Baker** (16) **Anthony Maurer** (17), **Thomas Rehman** (18)

1566.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1567.   **Material Misrepresentations and Concealment**: Defendants Coldwell Banker Realty, Anthony Maurer, Thomas Rehman, and Matthew Baker (collectively, Coldwell Defendants) knowingly made, facilitated, or concealed material misrepresentations with the



intent to deceive Plaintiffs regarding the status of the earnest money deposit, Grieger and Byrd's

fraudulent conduct, and Coldwell Banker Realty's management of the sale of Plaintiffs' property.

1568.   Material False Statements and Omissions:

A.  **Defendant Coldwell Banker Realty** (3), through its agents and management,

misrepresented the status of the earnest money deposit to Plaintiffs, despite knowing

that the payment had not been submitted as required and that Burger's TrustFunds

notifications were not authentic. Coldwell Banker Realty also failed to disclose that

Grieger and Byrd failed to upload the signed purchase agreement, which prevented

the earnest money from being deposited and retained in escrow while the deal was

held, even if the earnest money payment had been remitted. Coldwell's failure to

disclose these material facts, while still holding itself out as Plaintiffs' fiduciary to

obtain its commission, constituted fraud for profit.

B.  **Defendant Anthony Maurer** (17), as branch Vice President at Coldwell knowingly

participated in and facilitated the fraudulent scheme to conceal the misconduct of

Grieger, Byrd, and Burger.  Specifically: a) Maurer knowing provided Plaintiffs with

two distinct, false copies of Burger's forged "Earnest Money Payment History"

reports, falsely asserting that Coldwell properly retained the $100,000 earnest money

deposit on May 16, 2022 at 6:00 a.m. in Coldwell's trust, b) Maurer falsely

represented that Grieger had properly uploaded the deal as required and that Burnet

Title failed to receive the funds because the transaction was not closing, c) Maurer

knowingly conveyed false information about the status of the transaction, creating the

false appearance of a legitimate $100,000 earnest money deposit, d) Maurer

affirmatively and falsely claimed that Ms. Duca of Burnet Title was not credible when



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

she honestly advised Plaintiffs that the buyers have had their earnest money the whole time.

C.  **Defendant Thomas Rehman** (18), as Vice President of Sales Administration, Rehman had oversight of Coldwell's trust accounts but failed to take corrective action upon learning of the lack of earnest money for 20570 Park Place, in 2022. Rehman knowingly concealed the absence of a valid earnest money deposit by Bull in Coldwell's trust accounts, and materially misrepresented to Plaintiffs that an earnest money payment was made by Bulls to Coldwell. To buttress Rehman's statements, Rehman attached false NRT records Rehman falsely claimed were bank records purporting to show Bull's "deposit" on May 16, 2022 to Coldwell's trust. Rehman concealed that Coldwell remitted $100,000 as earnest money "for Jesse Bull." Rehman concealed Bulls' accord and satisfaction with Coldwell that entailed the payment of $100,000 to Bulls for their yet undisclosed signed cancellation.

D.  **Defendant Matthew Baker** (16), as then-President of Coldwell Banker Realty, Baker was privy to, and condoned, Coldwell's concealment of the ongoing fraudulent scheme wherein Coldwell permitted Bulls' to unlawfully convert equitable title to Plaintiffs property with no money down. Baker remained silent to conceal from Plaintiffs that Coldwell purposefully prevented earnest money deposit through Coldwell's routine practice of holding deals and Bulls faked the earnest money payment with the complicity of Grieger and Byrd. Baker remained silent even when Plaintiffs pleaded for truthful information regarding the status of the transaction to end Bulls' extortionate conduct.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

318

1569.  **Defendants' Knowledge of Falsity**: Each of the Coldwell Defendants made knowing and deliberate misrepresentations with full awareness of their falsity. Specifically, Coldwell Defendants knew that Bulls had not remitted the $100,000 earnest money deposit to Coldwell, despite representing otherwise. Defendants were aware no funds had settled in Coldwell's trust account and deliberately concealed this fact from Plaintiffs. Coldwell Defendants knowingly provided or facilitated the provision of false "Earnest Money Payment History" reports and related documents to Plaintiffs to create the false appearance of compliance with contractual obligations. Defendants knowingly perpetuated the fraudulent scheme to obscure Bulls' defaults, shield Coldwell from liability, and leverage the false appearance of compliance to Plaintiffs legal and financial detriment.

1570.  **Intent to Deceive and Induce Reliance**: The Coldwell Defendants knowingly misrepresented the status of the earnest money deposit to conceal their own fraudulent conduct and avoid liability. They intended for Plaintiffs to rely on these misrepresentations, inducing Plaintiffs to proceed with the sale, or remit a payout to Bulls, under the false belief that the $100,000 earnest money deposit had been made by Bulls. Defendants were fully aware that these misrepresentations would cause Plaintiffs to forgo their right to cancel the agreement and suspend Coldwell's commissions based on the failure to secure the deposit. By perpetuating these material misrepresentations, Coldwell Defendants actively concealed the absence of the earnest money deposit to protect themselves from scrutiny and potential legal action.

1571.  **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the material misrepresentations made by the Coldwell Defendants, including explicit assurances from Coldwell Banker Realty that the earnest money had been deposited. In reliance on these assurances, Plaintiffs elected to pursue a limited action under Minn. Stat. § 559.217 in state



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

319

court, restricting their available remedies, instead of seeking broader damages. As a result, Plaintiffs have incurred significant and ongoing financial costs which are directly attributable to Coldwell's continued fraudulent conduct.

1572.  **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the fraud committed by the Coldwell Defendants, Plaintiffs have suffered substantial damages, including financial loss, emotional distress, and significant legal expenses, as detailed at Chapter 6, which is incorporated herein by reference to this claim.

## COUNT 11

*Fraud (Coldwell Defendants): Regarding the "Ghost Agreement"*

**Anywhere RE** (1)**, Coldwell** (3), **Matthew Baker** (16), **Anthony Maurer** (17), **Thomas Rehman** (18)

1573.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1574.  **Material Misrepresentations and Concealment**: Coldwell Defendants knowingly made, facilitated, or concealed material misrepresentations with the intent to deceive Plaintiffs and Hennepin County District Court regarding Bulls' $100,000 earnest money deposit. Specifically, Defendants forged a fraudulent Ghost Agreement to operate as a placeholder for the authentic canceled Park Place purchase agreement. This Ghost Agreement was used by Coldwell to falsely represent to Plaintiffs and the Court that Coldwell retained Bulls' earnest money for the Park Place agreement, when in fact Coldwell was referring to its Ghost Agreement for which it remitted $100,000 of its own funds to obscure Bulls' failure to remit, and Coldwell's inability to retain, the earnest money on the authentic deal.

1575.  **Material False Statements and Omissions:**



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

A. **Defendant Anthony Maurer** (17) knowingly facilitated the creation of a Ghost Agreement to operate as a placeholder for the canceled Park Place deal. Maurer removed the well-contingency addendum and Plaintiffs May 14, 2022 signed cancellation but retained Campolis' signature pages to create a fraudulent look-alike. Maurer misrepresented that Coldwell held Bulls' $100,000 earnest money deposit when Coldwell had substituted its own funds. Maurer concealed the fabrication of the Ghost Agreement and created the false impression that Coldwell had complied with its fiduciary obligations.

B. **Defendant Thomas Rehman** (18) oversaw trust accounts and Rehman knowingly concealed the absence of Bulls' earnest money deposit in Coldwell's trust.  Rehman submitted the fraudulent Ghost Agreement and a supporting affidavit to Hennepin County District Court, falsely portraying the Ghost Agreement as the genuine agreement for Plaintiffs' Park Place property.  Rehman presented this Ghost Agreement and his affidavit with the intent to mislead the Court and Plaintiffs into believing that Coldwell had secured the earnest money as required under the original purchase agreement, when in fact, no such funds were deposited by Bulls. Rehman's submission of the fabricated document to the Court not only misrepresented the status of the transaction but also served to obstruct Plaintiffs' ability to end the court action, thereby causing ongoing financial and legal harm to Plaintiffs. Rehman intentionally misrepresented the transaction's status to obstruct Plaintiffs' legal efforts, delay rightful cancellation, and perpetuate the fraudulent scheme.

C. **Defendant Matthew Baker** (16), acting in a senior capacity at Coldwell, contributed to and concealed the fraudulent Ghost Agreement and Coldwell's $100,000 payment



"for Jesse Bull." Baker failed to disclose to Plaintiffs that the Ghost Agreement was created solely to mislead Plaintiffs and later, the Court, to prevent Plaintiffs from acting on their right to cancel the transaction due to lack of earnest money and sue Coldwell for their long-term earnest money fraud, brokering of a non-existent property, and facilitating the unlawful conversion of equitable title to Plaintiffs property while Coldwell was to act as Plaintiffs' fiduciary.

1576.  **Defendants' Knowledge of Falsity**: The Coldwell Defendants knew that the Ghost Agreement was a fabricated document designed to deceive Plaintiffs and the Court. Specifically:

A.  Defendants were aware that Bulls had not deposited the $100,000 earnest money and that Coldwell had substituted its own funds to cover this omission;

B.  Defendants knew the Ghost Agreement misrepresented the status of the transaction and the validity of Bulls' earnest money deposit; and

C.  These actions were undertaken to conceal their own misconduct, as well as the fraud committed by Grieger, Byrd, Burger, and Bulls.

1577.  **Intent to Deceive and Induce Reliance**: The Coldwell Defendants intended for Plaintiffs to rely on their misrepresentations regarding the validity of the purchase agreement and Bulls' earnest money deposit. Their deliberate actions sought to:

A.  Conceal Coldwell's substitution of funds and failure to enforce the agreement's requirements;

B.  Shield Coldwell and its agents from liability for their complicity in the broader fraudulent scheme; and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

322

C.  Obstruct Plaintiffs' ability to pursue timely legal remedies, delay cancellation, and
protect their rights and title.

1578.  **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the
misrepresentations made by the Coldwell Defendants' misrepresentations, including the Ghost
Agreement attached to Rehman's affidavit, believing it to be valid and an accurate representation
of the transaction. As a result, Plaintiffs delayed taking legal action to cancel the sale and later,
against Coldwell. Plaintiffs incurred substantial financial and legal expenses and suffered
emotional distress due to the concealment and misrepresentation of material facts.

1579.  **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the
fraud committed by the Coldwell Defendants, Plaintiffs have suffered substantial damages,
including financial loss, emotional distress, and significant legal expenses, as detailed at Chapter
6, which is incorporated herein by reference to this claim.

## COUNTS 12 - 20

*Fraud (Financial Defendants): Banking and Wire Fraud*

**UBS Financial** (11), **UBS Bank** (12), **UMB Bank** (14), **T.J. Mundy** (15)

1580.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding
paragraphs of this complaint as though fully set forth herein.

1581.  **Material Misrepresentations and Concealment**: Defendants UBS Financial
Services, UBS Bank USA, UMB Bank N.A., and T.J. Mundy (collectively, the "Financial
Defendants") knowingly made, facilitated, or concealed material misrepresentations and
omissions with the intent to deceive Plaintiffs regarding the legitimacy of Bulls' earnest money
deposit and related transactions.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1582.   The following table enumerates the material misrepresentations and omissions, identifying the responsible Defendant, the false representation, and its impact on Plaintiffs:

| Count | Defendant | Material Misrepresentation | Explanation |
|---|---|---|---|
| 12 | UBS Financial | Withheld production of transactional and ACH records from Bulls' UMB checking account ending in -4774. | Concealed that no $100,000 earnest money deposit was made via TrustFunds on May 9, 2022, and obscured Bulls' fraud scheme involving an uncoupled $5 payment to TrustFunds. |
| 13 | UBS Financial | Misrepresented that Bulls' UMB -4774 account and RMA account ending in DXXXX28 were the same. | Created the false appearance of a $100,000 debit on May 10, 2022, to Coldwell, legitimizing Bulls' fraudulent scheme. |
| 14 | UBS Bank USA | Issued a premature loan commitment letter to Bulls despite deficiencies in his loan application. | Misled Plaintiffs into believing Bulls could perform by falsely suggesting he was "locked in" to close a loan on June 3, 2022. |
| 15 | TJ Mundy | Overlooked deficiencies in Bulls' loan application and emailed a final loan commitment letter. | Created the false appearance that UBS Bank would fund Bulls' $2,000,000 loan on June 3, 2022, despite knowledge that Bulls' loan application was deficient and UBS Bank was not funding the loan on June 3, 2022. |
| 16 | UMB Bank NA | Misrepresented that Bulls' UMB checking account ending in -4774 did not exist. | Withheld account records to conceal the absence of a $100,000 earnest money payment on May 9, 2022. |
| 17 | UMB Bank NA | Claimed that Bulls' UMB account records were held by TrustFunds LLC. | Further concealed the fraudulent scheme by deflecting responsibility for producing records. |
| 18 | UMB Bank NA | Misrepresented in response to a subpoena that no records existed for Bulls' UMB | Obstructed Plaintiffs' ability to verify the absence of a $100,000 payment and expose Bulls' |



| | | account ending in -4774. | fraud. |
|---|---|---|---|
| **19** | UMB Bank NA | Refused to issue an affidavit of no records for Bulls' UMB checking account ending in -4774. | Actively concealed the absence of the $100,000 earnest money deposit to perpetuate the fraudulent scheme. |
| **20** | UBS Financial | Refused to issue an affidavit of no records for Bulls' UMB checking account ending in -4774. | Actively concealed the absence of the $100,000 earnest money deposit to perpetuate the fraudulent scheme. |

1583.  **Defendants' Knowledge of Falsity**: The Financial Defendants knew that their representations and omissions regarding Bulls' UMB checking account ending in -4774 were false. Despite clear evidence, including the undisputed definition of a bank routing number, UBS Financial and UMB Bank N.A. intentionally withheld Bulls' account records to obscure the fraudulent earnest money scheme. These records showed no $100,000 earnest money deposit on May 9, 2022, via TrustFunds.

1584.  Defendants also falsely claimed they did not possess relevant records while leveraging their positions to protect their business relationships with Bulls and his high-net-worth network. T.J. Mundy knowingly issued a fraudulent loan commitment letter despite UBS Bank underwriting showing Bulls had no earnest money credit and, with several outstanding loan application deficiencies, Bulls had not secured a $2,000,000 loan for Park Place on June 3, 2022.

1585.  **Intent to Deceive and Induce Reliance**: The Financial Defendants acted with intent to deceive Plaintiffs and induce reliance. By withholding critical bank records and issuing false assurances, Defendants concealed the fraudulent scheme to protect their profitable business relationships with J. Bull and his network. Mundy and UBS Bank senior wealth strategist



Johnson, prioritized preserving UBS Bank's referral relationship over disclosing Bulls' earnest money fraud and inability to perform. Mundy knowingly provided false evidence to create the appearance of Bulls' financial readiness to close the sale.

1586. **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the Financial Defendants' misrepresentations and omissions. In reliance on Defendants' false claims of no records, Plaintiffs were unable to produce authentic bank records showing the absence of a $100,000 deposit in their state court action to end the fraudulent scheme and reclaim rightful possession of the fraudulently converted equitable title to their home. Defendants' long-term concealment allowed Bulls to fraudulently wield equitable title to Plaintiffs' residence without scrutiny or consequence to the Financial Defendants' profitable business operations.

1587. **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the fraud committed by the Financial Defendants, Plaintiffs have suffered substantial damages, including financial loss, emotional distress, and significant legal expenses, as detailed at Chapter 6, which is incorporated herein by reference to this claim.

## **COUNT 21**

*Fraud (Wire Fraud Defendants): Regarding the Sham Closing*

**TitleNexus** (6), **Deena Cole** (8), **UBS Financial** (11), **Joel Burger** (23), **Jesse Bull** (25), **Lee Bull** (26), **L.J. Rotman** (31)

1588. **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1589. **Material Misrepresentations and Concealment**: Defendants Joel Burger, L.J. Rotman, Whitney Ward, UBS Financial, TitleNexus, Deena Cole, and Jesse and Lee Bull (collectively, the "Wire Fraud Defendants") knowingly engaged in a fraudulent scheme to create



the false appearance that Defendants Bulls could perform at closing to "go after the sellers." The sham closing involved the use of interstate wire communications to execute a circular transfer of U.S. currency originating from Jesse Bull's UBS line of credit in the amount of $3,300,000.

1590.   Defendant Rotman advised Bull to wire the full contract price of $3,300,000, inclusive of the $100,000 unpaid earnest money that Rotman knew Bulls had failed to remit to Coldwell. Rotman intentionally created the false appearance that Bulls could perform on the $3,300,000 all cash deal, knowing they were unwilling or unable to do so.  The circular wire was initiated by Whitney Ward acting on behalf of UBS Financial designating Jesse Bull as both the sender and beneficiary of the $3,300,000 at an account maintained by TitleNexus. UBS Financial approved the fraudulent wire setup, knowing it lacked legitimate purpose.

1591.   Defendant Deena Cole, acting on behalf of TitleNexus, fabricated a materially misleading Single Balance Ledger as false evidence of a legitimate $3,300,000 deposit of purchase funds with TitleNexus. This ledger was provided to Defendants Burger and Bull to create the false appearance of compliance with the purchase agreement, even though TitleNexus did not have actual or legal possession of Bulls' funds.

1592.   Despite knowing the "closing" was a sham, Bulls failed and refused to sign the buyer documents necessary to purchase Park Place.  As a result, TitleNexus had no authority to disburse Bulls' $3,300,000 line of credit funds to Plaintiffs. Instead, Cole printed a second Single Balance Ledger minutes later, documenting the immediate return of the $3,300,000 to UBS Financial, and TitleNexus facilitated the return wire per Burger's directives.

1593.   Burger confirmed to Rotman via email that the $3,300,000 was wired and immediately returned to UBS. Defendants concealed the second ledger in state court proceedings, costing Plaintiffs over $11,000 in discovery fees to TitleNexus to obtain the ledgers



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

and Burger's conspiratorial email showing all Defendants knew the "closing" was a sham designed to set up the sellers.

1594.   Defendants Bul, aided by Trucke, also failed to disclose the final disbursement of funds in their interrogatory answers, falsely asserting in pleadings that TitleNexus retained their earnest money.  These false claims were based on the fabricated Single Balance Ledger and perpetuated the scheme to defraud Plaintiffs.

1595.   **Knowledge and Intent:** The Wire Fraud Defendants knew that their representations and fabricated evidence were false and misleading. Each Defendant actively participated in the sham closing with the intent to deceive Plaintiffs, create the illusion of compliance with the purchase agreement, and further Defendants Bulls' ability to extort Plaintiffs for additional compensation while retaining control of equitable title to Plaintiffs property.

1596.   **Plaintiffs' Reliance and Damages:** Plaintiffs reasonably relied on Defendants' material misrepresentations and fabricated evidence, believing the sham closing reflected Defendants' Bull's genuine ability to perform.

1597.   **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the activities of the Wire Fraud Defendants in Count 18, and their conspiratorial conduct and fraudulent actions, Plaintiffs have suffered damages, including financial loss, reputational harm, emotional distress, and significant legal expenses, as discussed in Chapter 6 herein and incorporated herein by reference to this claim.

## COUNT 22

*Fraud: Extortionate Demands*

**L.J. Rotman** (31)

1598.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1599.  **Material Misrepresentation, Concealment, and Inducement**: Defendant L.J. Rotman, leveraging his professional stature and reputation, knowingly engaged in material misrepresentations, concealed Defendants Bulls' well-contingency and earnest money defaults, and induced Plaintiffs to act to their legal and financial detriment.

1600.  Rotman knowingly concealed that Bulls' failed and refused to waive the well-contingency in writing, as required by the agreement.  Rotman also knowingly concealed that Bulls' failed and refused to remit $100,000 to Coldwell. By hiding Bulls' defaults, Rotman misrepresented the enforceability of the agreement to extort Plaintiffs for financial gain.

1601.  Rotman falsely represented to Plaintiffs that both Jesse Bull and Lee Bull attended the closing and performed their contractual obligations, including remitting purchase funds to the title company to buy Park Place.  In reality, Rotman was fully aware that Bulls and Burger, acting at Rotman's direction, orchestrated a circular transfer of $3,300,000 - inclusive of the unpaid $100,000 earnest money deposit - to mislead Plaintiffs into believing Bulls had performed at closing and that the purchase agreement was enforceable.

1602.  **Defendant's Knowledge of Falsity**: Rotman knew his representations were false at the time they were made.  As a close associate of Bulls with direct involvement in the transaction, Rotman knew that:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

329

A. Bulls had defaulted on the well-contingency and failed to waive it in writing prior to May 16, 2022;

B. Bulls had not deposited the required $100,000 earnest money with Coldwell within two business days of May 6, 2022 necessitating a transfer of $3,300,000 at closing to fein performance;

C. Bulls had not performed at closing but instead participated in a fraudulent circular transfer of funds, including their unpaid earnest money that was returned to a UBS line of credit.

1603. Rotman's active participation in, and facilitation of, the circular transfer including $100,000 earnest money, underscores his knowledge of the falsity of his statements.

1604. **Intent to Deceive and Induce Reliance:** Rotman made these misrepresentations and concealed material facts with the intent to deceive Plaintiffs and induce reliance. His false statements regarding Bulls' performance were intended to:

A. Mislead Plaintiffs into believing the closing was legitimate and that Bulls had performed all their contractual obligations, rendering the contract enforceable despite Bulls' multiple defaults;

B. Induce Plaintiffs to remit a $330,000 financial payout to Bulls to clear title to Plaintiffs' property; and

C. Conceal material facts about Bulls' financial incapacity and fraudulent actions, intentionally preventing Plaintiffs from discovering the scheme and protecting their legal interests and property title.

1605. **Plaintiffs' Reasonable Reliance:** Plaintiffs reasonably relied on Defendant L.J. Rotman's material misrepresentations and concealment due to his professional stature,



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

330

reputation, and role in the transaction.  Specifically, Plaintiffs relied on Rotman's false assurances that Bulls had fully complied with all of their contractual obligations, including: remitting $100,000 earnest money to Coldwell, fulfilling the contingencies of the agreement, and fully performing at closing.

1606.   Rotman's material misrepresentations created the false appearance that the agreement was enforceable and that Plaintiffs owed Defendants Bull $330,000 to clear title.

1607.   **Damages to Plaintiffs:** Plaintiffs have suffered substantial damages as a direct and proximate result of Defendant L.J. Rotman's fraudulent misrepresentations, concealment, and inducement. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint as though fully set forth herein, including financial losses, legal expenses, emotional distress, and other harms directly resulting from Rotman's conduct.

## COUNTS 23 - 30

*Fraud: Pre-Litigation and Litigation Fraud*

### Ryan Trucke (27)

1608.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1609.   **Material Misrepresentations**: Defendant Ryan Trucke, acting as counsel for the Bulls since 2022, knowingly engaged in fraudulent misrepresentations and acts of concealment not protected by litigation privilege. These actions were deliberately designed to mislead Plaintiffs, obstruct their discovery efforts, and conceal the Bull Enterprise, its constituents, and the ongoing earnest money scheme to defraud. Each material misrepresentation and act of concealment committed by Defendant Trucke is detailed in the table below:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

| Count | Misrepresentation | Explanation | Impact on Plaintiffs |
|---|---|---|---|
| 23 | Wrote a demand letter for $225,000, Trucke deliberately misrepresented that all contingencies of the agreement were fulfilled and that $225k was required to clear title or face a forced judicial sale. | Created the false appearance that Bulls had remitted $100,000 earnest money to Coldwell, complied with the contingencies, and rendered the contract enforceable. | Plaintiffs were coerced by the demand letter's material misrepresentations and threats and misled into believing the transaction was legitimate, causing significant and undue stress, anxiety, and legal costs. |
| 24 | Commenced a frivolous action against Coldwell, and naming Campolis, alleging that Bulls remitted $100,000 to Coldwell. | Intended to create the false appearance that the $100,000 earnest money deposit existed and was in Coldwell's possession. | Plaintiffs were misled into believing Defendants Bull made the deposit to Coldwell. This deception delayed Plaintiffs' discovery of the fraudulent scheme, and forced Plaintiffs to expend significant time and resources on discovery costs and litigation, and exacerbated stress and financial burden. |
| 25 | Commenced a sham suit against Plaintiffs in state court as part of the scheme to defraud. | Filed baseless counterclaims against Plaintiffs in 27-CV-23-6625 to create false leverage and obscure the fraudulent scheme, and mislead the Court. | Plaintiffs incurred substantial and unnecessary legal expenses, delayed uncovering the fraud, and endured heightened stress and anxiety due to the baseless lawsuit. Plaintiffs could not sell the property without risk of Defendants asserting a damages claim for any delta between the contract price and the sale price. |
| 26 | Named Coldwell as "Another Defendant" in Defendants' sham action, alleging Bulls deposited $100,000 with Coldwell | Fabricated allegations and requested an Order against Coldwell to further the false narrative that the $100,000 earnest | Plaintiffs were misled into believing the deposit was valid, causing delays in uncovering the fraud and additional legal costs. |



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

|   | without serving Coldwell. | money deposit existed and Bulls were entitled to its "return." |   |
|---|---|---|---|
| 27 | Falsely pleaded that the title company retained and continued to retain Defendants' $100,000 earnest money in Defendants' sham action. | Misrepresented the status of the earnest money to create the false appearance that Bulls had complied with contractual obligations. | Plaintiffs were misled into believing the earnest money funds existed at TitleNexus, delaying Plaintiffs ability to uncover the fraud and resulting in additional discovery litigation, legal costs and fees. |
| 28 | Brought a frivolous counterclaim for damages that is contrary to black letter law, claiming unspecified damages premised upon a canceled contract. | Intended to conceal the fraudulent scheme by creating a false narrative of harm and diverting attention from Bulls' defaults and misconduct. | Plaintiffs incurred significant additional legal expenses, discovery fees, and delays in addressing the fraud due to the baseless counterclaim. |
| 29 | Represented in pleadings, affidavits, and exhibits known to be false and fraudulent, that Bulls had remitted $100,000 to Coldwell as required by the agreement. | Misrepresented compliance with contractual terms to obscure Bulls' defaults. | Plaintiffs incurred significant discovery costs to uncover the fraudulent scheme that delayed Plaintiffs ability to pursue proper remedies. |
| 30 | Represented that the contract was enforceable despite Bulls' failure to waive contingencies or remit earnest money. | Concealed Bulls' defaults and the unenforceability of the agreement, creating false legal leverage. | Plaintiffs acted under the mistaken belief the contract was valid, permitting Bulls to leverage equitable title to the property and requiring Plaintiffs to incur significant legal fees and costs. |

1610. **Defendants' Knowledge of Falsity**: Defendant Ryan Trucke knew that the representations, omissions, and filings described in Counts 22-29 were false at the time they were made. As legal counsel for Bulls and a direct participant in the transaction and litigation, Trucke had access to the facts and circumstances that directly contradicted his assertions.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

333

A. Earnest Money Deposit: Trucke knew that Bulls had not remitted the $100,000 earnest money deposit to Coldwell or any other entity, despite repeatedly representing otherwise in pleadings, affidavits, exhibits, and correspondence. Trucke served a sham Notice of Declaratory Cancellation naming TitleNexus as the earnest money holder, knowing that Bulls themselves retained and continued to retain the earnest money.

B. Contingencies and Contractual Compliance: Trucke knew that Bulls had failed to waive contingencies in writing, as required by the agreement, and that these defaults rendered the contract unenforceable. Nevertheless, Trucke falsely represented that all contingencies were fulfilled and that the agreement was valid and enforceable.

C. Frivolous Lawsuits and Counterclaims: Trucke knowingly commenced a baseless lawsuit against Coldwell and included fabricated allegations to create the false appearance of a legitimate dispute over the earnest money deposit when Coldwell remitted Coldwell's funds on behalf of Bull. Trucke further advanced this false narrative by filing a frivolous counterclaim against Plaintiffs for damages without any factual or legal basis, to perpetuate, conceal, and further monetize the fraudulent scheme.

D. Misrepresentation of Performance at Closing: Trucke was aware that Bulls and other Defendants orchestrated a sham closing, wherein a circular wire transfer of funds created the illusion of performance at closing. Despite this, Trucke represented that Bulls had performed their obligations, including remitting the full purchase amount including the earnest money funds to the title company, to mislead Plaintiffs and conceal the fraudulent scheme.



E.   Intentional Concealment: Trucke deliberately withheld material facts about Bulls'

financial incapacity, the absence of earnest money deposit, and Bulls' contractual

defaults. Trucke's omissions were calculated to obscure the fraudulent scheme and

permit Defendants Bull to continue to exert unlawful control over Plaintiffs equitable

title for Defendant Bulls' and Trucke's profit.

1611.   **Intent to Deceive and Induce Reliance**: Trucke's repeated material

misrepresentations, coupled with his direct involvement in the litigation and knowledge of the

underlying facts, demonstrate his intentional efforts to deceive Plaintiffs, conceal Bulls fraud,

and perpetuate the earnest money scheme to defraud Plaintiffs for profit.

1612.  **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on the material

misrepresentations and omissions made by Defendant Trucke, as outlined in Counts 22-29.

Trucke's misrepresentations, including statements made in pleadings, affidavits, exhibits, and

correspondence, were presented in the context of his role as legal counsel for Bulls, lending them

credibility and authority. Specifically, Plaintiffs relied on Trucke's representations that: (a) Bulls

remitted the $100,000 earnest money to Coldwell, (b) Bulls had fulfilled all contingencies in

agreement, rendering the contract enforceable, and (c) Bulls had performed at closing, including

depositing funds, including the earnest money with the title company.

1613.   Plaintiffs' reliance was reasonable given Trucke's role as Bulls' attorney since

2022 and the professional trust Plaintiffs placed in the representations of a legal professional.

Relying on Trucke's assurances, Plaintiffs delayed pursuing their legal remedies for Bulls'

undisclosed breaches, opted for a limited action, postponed uncovering the fraudulent scheme,

and incurred substantial legal fees defending against Bulls' frivolous lawsuit, as well as

discovery costs and other financial losses resulting from Trucke's material misrepresentations.



1614.  **Damages to Plaintiffs**: As a direct and proximate result of, and by reason of, the fraud committed by Defendant Ryan Trucke, Plaintiffs have suffered substantial damages. These damages include financial losses such as costs incurred in addressing frivolous litigation and discovery expenses necessitated by Trucke's fraudulent misrepresentations. Plaintiffs have also endured emotional distress caused by the protracted concealment and facilitation of Defendants' fraud by Defendant Trucke. Plaintiffs have incurred significant legal expenses to uncover and address the scheme, all as detailed in Chapter 6, which is incorporated herein by reference to this claim.

**COUNT 31**

*Fraud: Litigation Fraud by Third-Party Coldwell*

**Coldwell** (3), **Sloneker** (29)

1615.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1616.  **Material Misrepresentations**: Defendant Coldwell, and Sloneker, acting as legal counsel for Coldwell, knowingly made false statements during litigation proceedings, despite the fact that neither Sloneker nor Coldwell were parties to the case. These material misrepresentations were intended to deceive Plaintiffs and obscure the earnest money scheme to defraud, creating the false appearance that Bulls made the $100,000 deposit to Coldwell and Coldwell retained the funds.

1617.  Specifically, Sloneker, while not a party or representing a party in the case, appeared in court unannounced and without standing.  Sloneker falsely represented that Coldwell had possession of $100,000 earnest money and Coldwell and/or its parent company wanted to "be rid of it." Sloneker's  statement created the false appearance that Bulls had remitted the



earnest money as required by the agreement in May of 2022, concealing Bulls' earnest money default and misleading Plaintiffs and the Court.

1618.   Later in the litigation, while moving to quash Coldwell's deposition subpoena, Sloneker falsely asserted that the earnest money deposit went through TrustFunds, further perpetuating the false narrative that Bulls had fulfilled their contractual earnest money obligations using TrustFunds.

1619.   **Defendant's Knowledge of Falsity:** Defendant Matthew Sloneker knew that his statements were false. As Coldwell's legal counsel, Sloneker had direct access to the relevant financial records, which confirmed that Bulls had not remitted the $100,000 earnest money deposit to Coldwell via TrustFunds. Instead, Coldwell itself remitted $100,000 on behalf of Jesse Bull and subsequently created false internal business records to suggest that Bull had deposited the funds with Coldwell on May 16, 2022.

1620.   Sloneker was fully aware that no earnest money settlement could occur on May 16, 2022, because Grieger and Byrd were still holding the deal, deliberately preventing the settlement of earnest money.

1621.   Sloneker's knowledge of the falsity of Bulls' "deposit" is further evidenced by his failure to submit, along with Coldwell's Rule 67 Petition, any bank records, transaction reports, TrustFunds notifications, TrustFunds receipts, or any other documentation to substantiate that Coldwell had retained Bulls' earnest money since May 9, 2022.

1622.   Sloneker's total omission of evidence in the state court litigation underscores his awareness that Burger's proffered TrustFunds "records" are false and fraudulent, further demonstrating his knowledge of the falsity of the representations.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

337

1623.   Moreover, when directly questioned by the Court about when and how Coldwell came into possession of Bulls' funds, Sloneker falsely replied, "TrustFunds." At the time of this statement, Sloneker knew that Bulls had not made a TrustFunds payment to Coldwell on May 9, 2022, or ever. Sloneker, then managing and operating the Bull Enterprise, fully intended to perpetuate the fraudulent narrative that Bulls had complied with the agreement by remitting the $100,000 earnest money deposit to Coldwell.

1624.   Sloneker's misrepresentations are not protected by litigation privilege because they were made solely to advance and conceal the Bull Enterprise's fraudulent scheme by lending credence to Burger's forged TrustFunds notifications indicating that Bull's $100,000 settled at Coldwell - on the factually impossible date of May 16, 2022.

1625.   **Intent to Deceive and Induce Reliance:** Sloneker made these misrepresentations with the intent to deceive Plaintiffs and the Court. Sloneker's statements were designed to create the false appearance that the Bulls deposited earnest money in accord with the purchase agreement and that Coldwell retained the Bulls' earnest money in accord with the purchase agreement.

1626.   **Plaintiffs' Reasonable Reliance**: Plaintiffs relied on Sloneker's statements, as they were made by legal counsel in a courtroom setting and during litigation. Plaintiffs acted under the mistaken belief that the earnest money deposit existed, causing Plaintiffs to undergo significant and expensive discovery to uncover the long-term and complex fraudulent scheme.

1627.   **Damages to Plaintiffs:** As a direct and proximate result of, and by reason of, the fraud committed by Defendant Matthew Sloneker, Plaintiffs have suffered substantial damages. These include financial losses such as discovery expenses and legal fees incurred in addressing Sloneker's fraudulent misrepresentations. Plaintiffs also endured emotional distress caused by



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

the prolonged concealment of the fraud, as detailed in Chapter 6, which is incorporated herein by reference to this claim.

## COUNT 32

*Fraud: Material Misrepresentation by Burnet Title*

**Anywhere Integrated** (2)**, Burnet Title** (4)

1628.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1629.  **Material Misrepresentations**: Defendant Burnet Title, through its agent Sandy Glieden, sent an email to TitleNexus on or around April 21, 2023, purporting to confirm that Coldwell had Bull's earnest money in "Coldwell's Trust Account" for the Park Place transaction. This statement was false, and Burnet either knew it was false or made the statement with reckless disregard for its truth. Burnet Title made this representation with the intent to induce Plaintiffs to rely on it.

1630.  **Defendant's Knowledge of Falsity:** Burnet Title knew that Coldwell did not have possession of Bull's $100,000 earnest money deposit because Bull did not make a $100,000 earnest money deposit to Coldwell. As the title company actively involved in the transaction, Burnet had access to all relevant financial records and was responsible for ensuring the earnest money deposit was made and the accuracy of its statements with respect to the earnest money deposit. Burnet Title's knowledge of the falsity of its representation is evidenced by its failure to provide any documentation supporting its claim that Coldwell held Bulls' funds since May 9, 2022, for Park Place.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1631.  **Intent to Deceive and Induce Reliance:** Burnet Title's false statement was made with the intent to mislead Plaintiffs and induce their reliance. By creating the false impression that Bulls had complied with the earnest money deposit requirement, Burnet Title sought to obscure Bulls' default and facilitate the fraudulent scheme to conceal Burnet's liability in the fraudulent scheme.

1632.  **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on Burnet Title's representation that Coldwell held the $100,000 earnest money deposit in April 2023. As a trusted party to the transaction, Burnet's statements, via the closer for the transaction Sandy Glieden, carried significant weight. Plaintiffs proceeded with the litigation process on a limited basis and refrained from pursuing other more suitable legal remedies against Burnet and Coldwell based on Burnet's assurances.

1633.  **Damages to Plaintiffs:** As a direct and proximate result of Burnet Title's fraudulent misrepresentation, Plaintiffs suffered substantial damages. These include financial losses, such as legal fees and discovery costs incurred to uncover the truth about the earnest money deposit, as well as emotional distress caused by the extended concealment of the fraudulent scheme. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

## COUNT 33

*Fraud: Fraud by TrustFunds LLC*

**TrustFunds** (9)

1634.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1635.  **Material Misrepresentations**: Defendant TrustFunds LLC knowingly made material misrepresentations and omissions in connection with the fraudulent earnest money deposit with the intent to deceive Plaintiffs. Specifically:

A.  TrustFunds falsely represented that Bulls had deposited the $100,000 earnest money through its platform on May 9, 2022.

B.  TrustFunds produced false transaction records, notification "email PDFs," and an Earnest Money Payment Request History Report containing a 2018 listing photo of Park Place, that falsely reflected a valid $100,000 deposit on May 9, 2022, despite knowing the earnest money deposit was fabricated and never executed.

C.  TrustFunds materially misrepresented to Plaintiffs that the $100,000 earnest money transaction successfully occurred, "In the history report, you can see that the money settled into Coldwell Banker's Trust Account on May 16, 2022, at 6:00 a.m. and there is no information that this transaction was either returned or reversed for some reason."

D.  TrustFunds falsely represented that Coldwell received an ACH transfer from TrustFunds' ACH processor ReliaFund on May 16, 2022, that contained Bulls' $100,000 deposit made via TrustFunds on May 9, 2022.

E.  TrustFunds falsely represented that the parties to the non-existent TrustFunds transaction received TrustFunds email notifications and a "Settled" notification: "I have included a screenshot of the parties that received this, "settled email notice for the transaction in question."

1636.  **Defendant's Knowledge of Falsity:** TrustFunds had actual knowledge that Bulls did not make a $100,000 earnest money payment using TrustFunds on May 9, 2022, and that its



statements to the contrary were false. As the platform responsible for facilitating the transaction, TrustFunds had direct access to records confirming that no $100,000 earnest money deposit had been made contemporaneously with Bulls' $5 convenience fee payment. By actively participating in the creation and endorsement of false TrustFunds records, TrustFunds demonstrated actual knowledge of the fraudulent nature of the transaction and willfully furthered the earnest money scheme to defraud Plaintiffs.

1637.    **Intent to Deceive and Induce Reliance:** TrustFunds acted with the intent to deceive Plaintiffs and induce reliance on its misrepresentations. By fabricating the appearance of a valid $100,000 earnest money deposit, and generating falsified "email PDFs" alleging TrustFunds notifications dispatched for the non-existent transaction, TrustFunds sought to conceal its own fraudulent conduct. Through its acceptance of Bulls' $5 uncoupled convenience fee payment, TrustFunds furthered the fraudulent scheme and obscured Bulls' and Burger's roles in the broader fraud orchestrated by the Bull Enterprise. TrustFunds' actions were specifically designed to shield the fraudulent scheme from legal scrutiny, and safeguard TrustFunds lucrative monopoly position on NorthstarMLS.

1638.    **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on TrustFunds' representations, given its role as a financial intermediary in the transaction. Plaintiffs believed the representations to be accurate and acted accordingly, proceeding with a limited action under the mistaken belief that Bulls had satisfied the earnest money deposit requirement using TrustFunds.

1639.    **Damages to Plaintiffs:** As a direct and proximate result of TrustFunds' fraudulent misrepresentations, Plaintiffs have suffered substantial damages. These include financial losses, legal expenses incurred to uncover the fraud, and emotional distress caused by



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

the protracted concealment of the scheme, all as detailed in Chapter 6, which is incorporated herein by reference to this claim.

## COUNT 34

*Fraud: Material Misrepresentation by Anywhere RE and Anywhere Integrated*

**Anywhere RE** (1), **Anywhere Integrated** (2)

1640.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1641.  **Material Misrepresentations**: Defendants Anywhere RE and Anywhere Integrated, as parent companies overseeing the transaction through their subsidiary Coldwell, and Burnet Title, respectively, knowingly made material misrepresentations to Plaintiffs. Specifically:

   A.  Through their counsel, Defendants falsely represented that Coldwell held the $100,000 earnest money deposit as required by the agreement.

   B.  These misrepresentations were made to induce Plaintiffs to proceed with a limited action under false premises, concealing the absence of earnest money deposit and the broader fraudulent scheme of which Coldwell, and its agents, played an integral role.

1642.  **Defendant's Knowledge of Falsity:** Anywhere RE and Anywhere Integrated knew that their representations were false. As parent companies overseeing Coldwell's and Burnet Title's operations and actively involved in this transaction, Defendants had access to financial records and other information confirming that the $100,000 earnest money deposit had not been remitted. Their use of counsel to perpetuate this falsehood underscores their intentional participation in the fraudulent scheme.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1643.  **Intent to Deceive and Induce Reliance:** Defendants acted with the intent to deceive Plaintiffs and induce reliance on their misrepresentations. By creating the false appearance that Coldwell held the earnest money deposit, Anywhere RE and Anywhere Integrated sought to shield Coldwell and their other subsidiaries from liability, while preventing Plaintiffs from uncovering the absence of the deposit and taking timely legal action against Coldwell, Burnet Title, and/or their parent companies.

1644.  **Plaintiffs' Reasonable Reliance**: Plaintiffs reasonably relied on Defendants' 2023 misrepresentations due to their role as parent companies and the professional authority of their counsel. Plaintiffs proceeded with their limited action, under the mistaken belief that the earnest money deposit had been remitted, causing delays in uncovering the fraud and incurring additional financial harm.

1645.  **Damages to Plaintiffs:** As a direct and proximate result of Anywhere RE and Anywhere Integrated's fraudulent misrepresentations, Plaintiffs have suffered substantial damages. These include financial losses, legal fees, and discovery costs incurred to uncover the truth about the earnest money deposit, as well as emotional distress caused by the extended concealment of the fraudulent scheme. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

## COUNT 35

*Tortious Interference with Contract*

**Grieger** (19), **Byrd** (20)

1646.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1647.   **Existence of a Valid Contract**: At all relevant times, a fully executed purchase agreement for the sale of Plaintiffs real property located at 20570 Park Place existed between Plaintiffs and Defendants Bull. This contract imposed specific duties and obligations that were known to Defendants Grieger and Byrd.

1648.   **Defendants Knowledge of the Contract**: Defendants Grieger and Byrd had actual knowledge of the existence of this contract and its terms.  As Plaintiffs licensed real estate agents affiliated with Coldwell, they were aware of the obligations owed under the agreement, including but not limited to Defendants Bulls' obligation to deposit $100,000 earnest money within two business days of final acceptance date to Coldwell Banker Realty.

1649.   **Intentional Interference:** Defendants Grieger and Byrd intentionally interfered with the contract by failing to upload, or otherwise submit, the fully executed Park Place purchase agreement to Coldwell within 48 hours of the final acceptance date of May 6, 2022. Instead, Grieger and Byrd held the deal deliberately preventing the settlement of earnest money in Coldwell's trust account. These actions were willful and malicious, designed to disrupt Plaintiffs' contractual rights and benefits. Grieger and Byrd's failure to submit the fully executed purchase agreement intentionally disrupted the contract's performance and concealed Bulls' earnest money default, depriving Plaintiffs of the opportunity to act on the default and protect their interests.

1650.   Minnesota law recognizes a claim for tortious interference with contract, where a defendant intentionally disrupts a contractual relationship without justification, causing harm to the plaintiff. *See, Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998).

1651.   **Causation:** As a direct and proximate result of Defendants Grieger and Byrd's interference, the contract was disrupted, and the settlement of earnest money was intentionally


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

delayed. This interference caused Plaintiffs to suffer harm, including the inability to enforce their

rights under the agreement to compel Bulls' signature on a cancellation after Bulls subsequent

contingency default. Grieger's and Byrd's interference further facilitated the unlawful equitable

conversion of equitable title to Plaintiffs' property.

1652.   **Damages to Plaintiffs:** As a result of Defendants' tortious interference, and

Coldwell's inability to retain Bulls' earnest money, Plaintiffs have suffered substantial damages,

including financial losses, emotional distress, and significant legal expenses, as detailed in

Chapter 6, which is incorporated herein by reference.

### COUNT 36

*Breach of Contract*

**Jesse Bull** (25), **Lee Bull** (26)

1653.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding

paragraphs of this complaint as though fully set forth herein.

1654.   **Existence of a Valid Contract**: A valid contract for deed existed between

Plaintiffs and Defendants Jesse and Lee Bull regarding the purchase of 20570 Park Place,

Deephaven, Minnesota 55331. The purchase agreement required Bulls to remit a $100,000

earnest money deposit to Coldwell within two business days of May 6, 2022, the final

acceptance date of the purchase agreement as a material term of the agreement.

1655.   **Defendant's Default and Breach:** Defendant Bulls defaulted on the contract by

failing to remit the required $100,000 earnest money deposit to Coldwell within two business

days of final acceptance date.  This default, left undisclosed and uncured, escalated to a material

breach, depriving Plaintiffs of the assurance and performance expected under the contract. Bulls'



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

346

failure to cure the default fundamentally undermined the contract's purpose and rendered the agreement unenforceable. Bulls' failure to cure the default allowed Bulls to unlawfully leverage and convert equitable title to the property for over two years, further compounding the harm to Plaintiffs.

1656.    **Causation:** As a direct and proximate result of Bulls' default and breach, Plaintiffs suffered harm, including:

A. Delayed discovery of Bulls' non-performance and default.

B. The inability to enforce the contract's terms or cancel the agreement promptly.

C. The unlawful leveraging of equitable title by Bulls to assert rights over the property to Plaintiffs' detriment.

D. Financial losses and legal expenses incurred over two years to address the default, breach, and resulting harm.

1657.    **Damages to Plaintiffs:** As a result of Bulls' default and breach, Plaintiffs have suffered substantial damages, including financial losses, legal fees, and other related expenses, as detailed in Chapter 6, which is incorporated herein by reference.

<u>**COUNT 37**</u>

*Fraudulent Misrepresentation*

**Joel Burger** (23), **Jesse Bull** (25), **Lee Bull** (26)

1658.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

347

1659.   **False Representation of a Material Fact**: Defendants Burger and Bulls made false representations to Plaintiffs regarding material facts related to the transaction for Park Place. Specifically:

    A.  **Defendant Joel Burger** (23) falsely represented that Bulls had remitted the $100,000 earnest money deposit to Coldwell as required by the agreement in an email to Plaintiffs counsel on May 18, 2022, including what Burger claimed was proof that Bulls remitted the earnest money.

    B.  **Defendant Jesse Bull** (25) falsely represented to Plaintiffs' counsel Matt Wolf and to Plaintiffs that Burger's forged TrustFunds documents constitute proof that Bull remitted the $100,000 earnest money deposit to Coldwell via TrustFunds.

    C.  **Defendants Joel Burger** (23), **Jesse Bull** (25), and **Lee Bull** (26) falsely represented that Bulls had complied with all contractual obligations, including the contingencies.

These false statements were material to the transaction, as they directly impacted Plaintiffs' ability to enforce the contract and protect their interests.

1660.   **Knowledge of Falsity**: Defendants knew that their representations were false at the time they were made.

1661.   Defendants Burger and Bulls knew that no earnest money deposit had been made to Coldwell or any other party because Burger and J. Bull utilized a TrustFunds work-around to avoid remitting the earnest money payment for Park Place.

1662.   Defendants knew that Bulls had not fulfilled the contingency requirement by submitting a signed waiver of the well-contingency.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1663.   Burger and Bulls' participation in the fraudulent scheme, including fabricating documents and utilizing those false documents in affidavits attached to legal pleadings (Jesse Bull), demonstrates their knowledge of the falsity of their statements.

1664.   **Intent to Induce Reliance**: Defendants made these false representations with the intent to deceive Plaintiffs and the Court and induce reliance. Defendants sought to:

A.  Conceal Bulls' defaults under the agreement;

B.  Induce Plaintiffs to refrain from canceling the transaction or pursuing remedies for non-performance to include damages; and

C.  Leverage false legal and financial positions against Plaintiffs for Defendants' benefit.

1665.   **Reasonable Reliance by Plaintiffs**: Plaintiffs reasonably relied on Defendants' false representations, believing them to be true based on the information provided and Defendants' roles in the transaction. As a result of this reliance, Plaintiffs were unaware of Defendants defaults and delayed pursuing legal action to protect their property rights. As a result of this reliance Plaintiffs also incurred substantial financial and legal costs to uncover Defendants' defaults and fraud for over two years.

1666.   **Damages to Plaintiffs**: As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered substantial damages, including financial losses, emotional distress, and significant legal expenses, as detailed in Chapter 6, which is incorporated herein by reference.

<u>**COUNT 38**</u>

*Unjust Enrichment (Unpaid Earnest Money)*

**Jesse Bull** (25), **Lee Bull** (26)



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1667.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1668.   **Unjust Retention of Benefits**: Defendants Bull have been unjustly enriched by Coldwell's remission of $100,000 into Hennepin County Court escrow in place of Bulls' earnest money deposit.

1669.   Defendants Bull failed to deposit $100,000 of Bulls' earnest money to Coldwell within two business days of final acceptance.

1670.   Coldwell's remittance of Coldwell's own funds was unlawfully used to fulfill Bulls' financial obligation, concealing the Bull Enterprise, and benefitting Defendants Bull at Plaintiffs' expense.

1671.   **Unjust Nature of Retention**: Defendants Bulls' retention of this $100,000 is unjust because Defendants obtained this benefit through fraud, leveraging Coldwell's fraud, fraudulent misrepresentations, and non-performance of their contractual obligations.

1672.   Plaintiffs were deprived of the protections and assurances Bulls' $100,000 earnest money was intended to provide under the contract.

1673.   **No Adequate Legal Remedy**: Plaintiffs have no adequate remedy at law to recover the $100,000 unjustly retained by Defendants and seek equitable relief to prevent Defendants from retaining this benefit.  Plaintiffs request that the Court disgorge the $100,000 wrongfully obtained from Coldwell in lieu of Bulls' earnest money for Plaintiffs' property.

1674.   **Damages to Plaintiffs**: As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered substantial damages, including financial losses and legal expenses, as detailed in Chapter 6, which is incorporated herein by reference.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 39

*Unjust Enrichment (Coldwell's Accord and Satisfaction)*

**Jesse Bull** (25), **Lee Bull** (26)

1675.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1676.    **Unjust Retention of Benefits**: Defendants Bull have been unjustly enriched by Coldwell's remission of $100,000 directly to them.

1677.    Defendants wrongfully received funds remitted by Coldwell to Bulls, despite their failure to remit the earnest money deposit or fulfill their contractual obligations.

1678.    This remittance to Bulls enriched Defendants by providing financial benefits they were not entitled to under the terms of the contract.

1679.    **Unjust Nature of Retention**: Defendants Bulls' retention of Coldwell's $100,000 is unjust because Defendants obtained this benefit through fraud, fraudulent misrepresentations, leveraging Coldwell's fraud, and non-performance of their contractual obligations.

1680.    Plaintiffs were deprived of the financial and legal protections associated with the earnest money deposit, and Coldwell's improper remittance of $100,000 to Bulls further perpetuated Defendants' unjust enrichment.

1681.    **No Adequate Legal Remedy**: Plaintiffs have no adequate remedy at law to recover the $100,000 unjustly retained by Defendants and seek equitable relief to prevent Defendants from retaining this benefit.

1682.    **Damages to Plaintiffs**: As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered substantial damages, including financial losses and legal expenses, as detailed in Chapter 6, which is incorporated herein by reference.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 40

*Unjust Enrichment (Equitable Title)*

**Jesse Bull** (25), **Lee Bull** (26)

1683.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1684.   **Unjust Retention of Benefits**: Defendants Bull have been unjustly enriched by the unlawful conversion of equitable title to Plaintiffs' residence despite failing to remit the agreed-upon earnest money deposit to satisfy their financial obligations under the contract.

1685.   Defendants unlawfully converted equitable title to Plaintiffs' residence, allowing them to gain leverage and legal standing without providing the deposit required by the agreement.

1686.   Plaintiffs' property and financial resources were unlawfully retained and used to benefit Defendants, including but not limited to the use of Plaintiffs' equitable title for Defendants' personal or financial advantage.

1687.   Defendants J. Bull and L. Bull accepted and retained control over Plaintiffs' property under the guise of a legitimate transaction, even after Defendants J. Bull and L. Bull failed and refused to remit their $100,000 earnest money deposit to Coldwell.

1688.   Defendants J. Bull and L. Bull accepted and retained control over Plaintiffs property by concealing their default of the well-contingency.

1689.   This enrichment deprived Plaintiffs of their rightful control and security over their property, forcing them to expend resources to defend their interests.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1690.   **Unjust Nature of Retention**: Defendants Bulls' failure to perform their contractual obligations renders their assertion of equitable title wrongful and without justification.

1691.   Plaintiffs were harmed by Defendants' use of equitable title as leverage, which caused mental, emotional, and financial damages.

1692.   **No Adequate Legal Remedy**: Plaintiffs have no adequate remedy at law to address the unjust enrichment resulting from Defendants' wrongful conversion of equitable title to Plaintiff's residence and seeks equitable relief to prevent further harm.

1693.   **Damages to Plaintiffs**: As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered substantial damages, including financial losses and legal expenses, as detailed in Chapter 6, which is incorporated herein by reference.

## COUNT 41

*Slander of Title*

**Jesse Bull** (25), **Lee Bull** (26)

1694.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1695.   **False Statement About Title**: Defendants falsely and maliciously asserted ownership of equitable title to Plaintiffs' property despite failing to fulfill their financial obligations under the contract, including the remittance of the $100,000 earnest money deposit. These false statements about title were made by Defendants Bull intentionally, and with knowledge of their falsity. These statements include, but are not limited to:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

A. Asserting Equitable Title after Contingency Default: Claiming that Bulls held equitable title despite failing to perform or waive the well-contingency in writing rendering the purchase agreement unenforceable;

B. Asserting Equitable Title without Deposit: Claiming that Bulls held equitable title despite failing to deposit the $100,000 earnest money; while demanding $330,000 and various amounts for Plaintiffs to clear title; and

C. Representing in communications to TitleNexus, Burnet Title, and in court filings in 27-CV-23-6625 that Defendants had rights to, and an interest in, the property and were entitled to the "return" of their non-existent earnest money and damages.

1696.   **Publication**: Defendants communicated these false claims to third parties, including TitleNexus, Burnet Title, and in court filings, thereby clouding Plaintiffs' title.

1697.   **Plaintiffs' Special Damages:** As a direct and proximate result of Defendants' slander of title, Plaintiffs have suffered substantial damages, including:

A. Legal expenses incurred and ongoing to clear the cloud on title since May 2022;

B. Financial losses resulting from delays in resolving the open purchase agreement dispute; and

C. Harm to the property's marketability or value.

1698.   Plaintiffs respectfully request that the Court award compensatory damages in an amount to be proven at trial, award punitive damages for Defendants' malicious conduct, and grant any further relief the Court deems just and proper.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 42

*Breach of Fiduciary Duty of Accounting: Failure to Retain Earnest Money*

**Coldwell** (3), **Maurer** (17), **Rehman** (18), **Mark Grieger** (19), **Chelsey Byrd** (20)

1699.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1700.   **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, Subd. 3, real estate brokers and salespersons owe their clients duties of loyalty, disclosure, confidentiality, obedience, accounting, and reasonable care.

1701.   Defendants Coldwell Banker Realty, Maurer, Rehman, Grieger, and Byrd owed fiduciary duties of accounting to Plaintiffs in their roles facilitating the transaction for the sale of Plaintiffs' property:

   A.   **Defendant Coldwell Banker Realty** (3), as Plaintiffs' broker under the exclusive right to sell agreement, was responsible for ensuring proper collection, handling, and retention of the $100,000 earnest money deposit.

   B.   **Defendants Anthony Maurer** (17) and **Thomas Rehman** (18), as managerial agents of Coldwell, were responsible for supervising compliance with fiduciary obligations, including ensuring the earnest money was properly handled and retained.

   C.   **Defendant Mark Grieger** (19), as Plaintiffs' licensed real estate agent under Coldwell's exclusive right-to-sell agreement, owed fiduciary duties to Plaintiffs in the sale of their Property. These duties included the proper collection, retention, and safeguarding of the $100,000 earnest money deposit as well as accurately accounting for the earnest money deposit to Plaintiffs.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

355

D. **Defendant Chelsey Byrd** (20), as Grieger's transaction coordinator under Coldwell's supervision, was similarly obligated to ensure proper handling and retention of the earnest money deposit, a fundamental part of the transaction.

1702.    **Breach of Duty of Accounting**: Defendants breached their fiduciary duty of accounting by failing to properly collect, handle, retain, and account for Bulls' $100,000 earnest money deposit, a critical aspect of the transaction constituting a downpayment on Plaintiffs' property. Specific breaches include:

A. *Failure to Collect Earnest Money:* Defendants Grieger and Byrd failed to ensure the collection of Bulls' $100,000 earnest money deposit by wire, check, or TrustFunds as required under the purchase agreement.

B. *Failure to Retain Earnest Money:* Defendants Grieger and Byrd failed to comply with Coldwell's transactional timeline that requires upload or submission of a fully executed purchase agreement to Coldwell within 48 hours so that Coldwell can receive and retain earnest money into Coldwell's trust account electronically via TrustFunds.  Per their routine practice, Defendants Grieger and Byrd purposefully held the deal to prevent earnest money settlement.

C. *Failure to Authenticate TrustFunds Notifications:* Defendants Grieger and/or Byrd knowingly relied on falsified TrustFunds payment notifications, created and emailed to Grieger and/or Byrd by Defendant Joel Burger, despite the fact that Grieger and Byrd were not receiving TrustFunds notifications as usual from TrustFunds. Grieger and Byrd, Grieger's transaction coordinator, knew or should have known that authentic TrustFunds notices come from TrustFunds, not individual agents or brokers, like Burger.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

D. *Failure to Verify Deposit:* Defendants Grieger and/or Byrd failed to take any steps to verify with TrustFunds and/or Coldwell and/or Maurer and Rehman that Burger initiated a TrustFunds earnest money payment request for Park Place. Defendants Grieger and/or Byrd failed to take any steps to verify that Bull actually remitted an earnest money payment for Park Place even after Byrd recognized that Grieger and Byrd were not receiving any TrustFunds notifications for Park Place.

E. *Coldwell's Systemic Earnest Money Failure*: Coldwell failed to ensure the proper collection and retention of Bulls' $100,000 earnest money deposit in its trust account, in direct violation of its fiduciary obligations. Coldwell permitted its agents to mishandle the transaction through their routine practice of holding deals that prevented the deposit of earnest money from TrustFunds while the deal was held. Coldwell further condoned Grieger and Byrd's acceptance of Burger's false and fraudulent TrustFunds notifications as evidence of a non-existent $100,000 earnest money payment from Jesse Bull.

F. *Maurer and Rehman's Active Concealment of Earnest Money Default:* Rather than addressing and disciplining Grieger's and Byrd's breach of fiduciary duties, Coldwell condoned and concealed them. To conceal Grieger and Byrd's breach of fiduciary duties, Coldwell also had to conceal Grieger's and Byrd's fraudulent conduct, which created the false appearance that Bulls had remitted a $100,000 earnest money payment to Coldwell, when in fact no payment was made. Coldwell, in an effort to shield itself from significant liability, endorsed Burger's fraudulent "Earnest Money Payment History" reports and emailed them to Plaintiffs to create the false appearance that Grieger and Byrd properly collected, and Coldwell properly retained, Bulls'



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

357

earnest money. Maurer and Rehman's failure to accurately account for the $100,000 unpaid earnest money permitted Bulls' to unlawfully convert equitable title to Plaintiffs' property for over two years.

G. *Holding the Fully Executed Agreement:* Defendants Coldwell, Grieger, and Byrd withheld the fully executed purchase agreement from Coldwell's Transaction Manager system, knowingly and purposely preventing the earnest money deposit from being retained by Coldwell via TrustFunds for the Park Place transaction. As a result, no money could settle in Coldwell's trust account for Park Place because neither Coldwell nor Grieger and/or Byrd ever uploaded the authentic Park Place purchase agreement to Coldwell's system.

1703.    **Causation and Damages:** As a direct and proximate result of Coldwell, Maurer, Rehman, Grieger, and Byrd's breaches of their fiduciary duties of accounting, Plaintiffs suffered substantial harm, including but not limited to:

A. The absence of the $100,000 earnest money deposit, depriving Plaintiffs of critical contractual financial protections and ability to assess Defendants' financial commitment to the purchase;

B. The lack of $100,000 on deposit with Coldwell, which could have financially motivated Bulls to sign a cancellation of the purchase agreement following Bulls' undisclosed well-contingency default;

C. Delays and additional costs incurred to uncover and address Bulls' earnest money fraud and contractual default;

D. Plaintiffs inability to obtain a signed cancellation of the purchase agreement for over two years; and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

E.  Emotional distress caused by the breach and its impact on Plaintiffs' property rights.

Plaintiffs' damages include significant financial losses, legal fees, and discovery costs incurred to discover the earnest money fraud and clear title to Plaintiffs' residence. These damages arose directly from Coldwell, Maurer, Rehman, Grieger, and Byrd's failure to collect Bulls' earnest money deposit and their extended concealment of the fraudulent earnest money scheme. Their actions, including their operation and management of the Bull Enterprise, further facilitated the fraud and amplified Plaintiffs' harm. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1704.  **Punitive Damages:** Plaintiffs seek punitive damages for Defendants' willful and malicious conduct. Defendants' deliberate disregard for Plaintiffs' rights, including their active participation in concealing the fraudulent scheme and prioritizing their own self-interests over their fiduciary obligations, constitutes egregious conduct warranting punitive damages. Punitive damages are necessary to punish Defendants for their misconduct and deter similar actions in the future.

## <u>COUNT 43</u>

*Breach of Fiduciary Duty of Loyalty: Failure to Enforce Well-Contingency Default*

**Coldwell** (3), **Maurer** (17), **Mark Grieger** (19), **Chelsey Byrd** (20)

1705.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1706.  **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, Subd. 3, real estate brokers and salespersons owe their clients duties of loyalty, disclosure, confidentiality, obedience, accounting, and reasonable care.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1707.   Defendants Mark Grieger and Chelsey Byrd, acting as Plaintiffs' licensed real estate agent and transaction coordinator under the supervision of Coldwell and Maurer, owed Plaintiffs the fiduciary duty of loyalty.

1708.   The duty of loyalty required Coldwell, Maurer and its agents, Grieger and Byrd to act in Plaintiffs' best interests at all times, particularly when protecting Plaintiffs' contractual rights and financial security.

1709.   **Breach of Duty of Loyalty**: Defendants Coldwell, Maurer, Grieger and Byrd breached their duty of loyalty by prioritizing their own financial interests over Plaintiffs'. Coldwell, Maurer, Grieger, and Byrd failed to act in Plaintiffs' best interests. Specifically, they:

A.   *Concealed Bulls' Planned Default*: Grieger and/or Byrd were aware of Bulls' planned default of the well-contingency days before, on or around May 13, 2022, and failed to inform Plaintiffs of this material fact. Grieger and/or Byrd were aware that Bulls were unable to test the well on time and planned to unilaterally expand the scope of inspection past May 16, 2022.  Grieger and/or Byrd, pursuing their commission, concealed the planned default so that Plaintiffs would not act upon the default and exercise their option to cancel the agreement pursuant to its terms.

B.   *Failed to Provide Critical Advice about Material Facts:* Grieger, knowing of Bulls' planned contingency default and said contingency giving Plaintiffs the option to cancel, failed to advise Plaintiffs to wait until May 16, 2022 to execute the cancellation pursuant to the contingency benefitting Plaintiffs, causing Plaintiffs to prematurely act on May 14, 2022. Grieger's silence concealed Bulls' actual default on May 16, 2022 and prevented Plaintiffs from taking timely action to protect their interests and title to their Property.



C. *Failed to Enforce Well-Contingency Default*: Coldwell, Maurer, Grieger and Byrd failed to enforce Bulls' well-contingency default by obtaining a counter-signed cancellation on May 16, 2022 upon Bulls' actual default. Coldwell, Maurer, Grieger and Byrd remained silent despite knowing Bulls had not satisfied or waived the contingency in writing, signed by Bulls, by May 16, 2022.

D. *Concealed Email Address so Plaintiffs could not Enforce Well-Contingency Default*: On May 14, 2022, Grieger and/or Byrd deleted Burger's email address header from Burger's email indicating that Bulls "decline to sign the cancellation." By forwarding Burger's response without Burger's return email information, Grieger and/or Byrd intentionally obstructed Plaintiffs' ability to communicate directly with Burger in the event that Plaintiffs later discovered, and then tried to enforce, the Bulls' well-contingency default.

E. *Permitted Fraudulent Equitable Conversion*: By failing to act in Plaintiffs best interests and obtain the signed cancellation pursuant to Bulls' well-contingency default, Coldwell, Maurer, Grieger and Byrd, permitted the fraudulent conversion of equitable title to Bulls - with no money down.

1710. **Causation and Damages:** As a direct and proximate result of Coldwell's, Maurer's, Grieger's and Byrd's breaches of their fiduciary duties of loyalty, Plaintiffs suffered substantial harm, including but not limited to:

A. The inability to effectively cancel the purchase agreement due to Defendants' concealment of Bulls' default, depriving Plaintiffs of their option to cancel and immediately enforce the contingency against Bulls pursuant to the contract.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

361

B. Financial losses stemming from Bulls' fraudulent leveraging of equitable title to Plaintiffs property.

C. Additional legal expenses and discovery costs incurred to uncover Bulls' default and enforce Plaintiffs' rights.

D. Prolonged delays in resolving the transaction, further compounding Plaintiffs' financial and emotional distress.

E. Emotional harm caused by the loss of control over Plaintiffs' property and Defendants Coldwell's, Maurer's, Grieger's and Byrd's failure to act in Plaintiffs best interests.

Plaintiffs damages include significant financial losses, legal fees, and discovery costs incurred in their efforts to clear title to Plaintiffs'property.  These damages arose directly from Coldwell's, Maurer's, Grieger's and Byrd's failure to enforce the Bulls' well-contingency default coupled with their extended participation in, and concealment of, the fraudulent earnest money scheme. Coldwell, Maurer, Grieger and Byrd's actions, including their operation and management of the Bull Enterprise, further facilitated the fraud and amplified Plaintiffs' harm. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1711.  **Punitive Damages:** Plaintiffs seek punitive damages for Defendants' willful and malicious conduct pursuant to Minn. Stat. § 549.20. Defendants deliberate failure to disclose critical facts regarding Bulls' well-contingency default was instrumental in enabling the long-term fraudulent equitable conversion of Plaintiffs' property, which depended on concealing Bulls' defaults and misrepresenting compliance with the purchase agreement. Coldwell, Maurer, Grieger and Byrd prioritized their own self-interests over their fiduciary obligations, and punitive damages to punish and deter similar misconduct is warranted.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

<u>**COUNT 44**</u>

*Breach of Fiduciary Duty: Failure to Disclose*

**Anywhere RE** (1), **Anywhere Integrated** (2), **Coldwell** (3), **Maurer** (17), **Grieger** (19), **Byrd** (20), **I. Byrd** (21)

1712.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1713.    **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, subd. 3, real estate brokers and salespersons owe their clients duties of loyalty, disclosure, confidentiality, obedience, accounting, and reasonable care.

1714.    Defendants, including Anywhere RE and Anywhere Integrated as the parent entities overseeing Coldwell and Burnet Title, and Coldwell's broker Maurer, and agents Mark Grieger, Chelsey Byrd, and Isaiah Byrd, owed fiduciary duties to Plaintiffs by virtue of the exclusive right-to-sell agreement and their roles in managing the transaction for the sale of Plaintiffs' property.

1715.    **Breach of Fiduciary Duty of Disclosure**: Defendants breached their fiduciary duty of disclosure by remaining silent and withholding critical information that was material to Plaintiffs' ability to protect their interests and enforce their contractual rights.  Specifically, Defendants failed to disclose the following material facts:

A.    *Failure to Disclose Bulls' Earnest Money Default*: Defendants knew that Bulls had failed to remit the $100,000 earnest money deposit required under the purchase agreement but deliberately withheld this fact from Plaintiffs.



B. *Failure to Disclose Bulls' Well-Contingency Default*: Defendants concealed that Bulls had defaulted on the well-contingency by failing to waive the contingency in writing and signed by Defendants Bull by the May 16, 2022 deadline, depriving Plaintiffs of the opportunity to exercise their option to cancel the agreement and pursue legal remedies.

C. *Failure to Disclose Bulls' Lack of Financial Performance*: Defendants knowingly concealed that Bulls had no money down and were leveraging fraudulent equitable title to Plaintiffs' property, causing prolonged harm to Plaintiffs and despite knowledge of Bulls' extortionate conduct, and Defendants duty to disclose, still chose to remain silent for over two years.

D. *Failure to Disclose Signed Cancellation Documents:* Defendants failed to inform Plaintiffs that Bulls submitted a signed cancellation to Coldwell and/or TitleNexus and/or Burnet Title. Defendants failed to disclose Defendants' Bulls' signed cancellation. This omission facilitated Bulls' ability to fraudulently benefit from the transaction, deprived Plaintiffs of knowledge critical to protecting their property interests, and allowed Defendants to continue to wield equitable title to Plaintiffs' residence in pursuit of unspecified damages and Coldwell's court-escrow of Coldwell's $100,000.

E. *Failure to Disclose the Earnest Money Scheme to Defraud:* Defendants failed to disclose their knowledge of the broader fraudulent earnest money scheme, including the active roles and fraudulent acts of TrustFunds, Burger, and Bulls, thereby allowing the scheme, and the unlawful equitable conversion of Plaintiffs' property to continue for over two years.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

F. *Failure to Disclose Canceled Status of the Purchase Agreement:* Despite knowing that the Purchase Agreement had been legally canceled in the absence of a signed written waiver of the well-contingency on May 16, 2022, Defendants failed to disclose this fact to Plaintiffs. Instead, Defendants portrayed that Defendant Bulls had satisfied all the contingencies and remitted $100,000 earnest money to Coldwell. Coldwell actively perpetuated the existence of the Ghost Agreement, which Anywhere RE and/or Coldwell misrepresented to Plaintiffs and later, to Hennepin County District Court, as the valid and enforceable agreement between the parties. This fabricated agreement served to conceal Coldwell's fraudulent conduct and breach of fiduciary duties as well as Bulls' known defaults and unjust enrichment of the Bulls by at least $100,000, at Plaintiffs' expense.

G. *Failure to Disclose Accord and Satisfaction and/or Waiver:* On or about May 12, 2023, Coldwell, through its affirmative allegations in response to Bulls' unfiled and frivolous suit against Coldwell, disclosed the existence of an "accord and satisfaction and/or waiver" between Bulls and Coldwell. Upon information and belief, and as discovery is expected to confirm, Bulls and Coldwell reached an agreement under which Bulls signed a cancellation of the purchase agreement and received $100,000 in earnest money, which Coldwell remitted on or around May 18, 2022 "for Jesse Bull." Despite repeated requests for disclosure of all documents related to this accord and satisfaction and/or waiver, Coldwell and its parent companies failed and refused to provide the terms and conditions of their agreement or the signed cancellation. Coldwell also failed to disclose how and when Bulls purportedly canceled or attempted to cancel the Park Place purchase agreement.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1716.  **Causation and Damages:** As a direct and proximate result of Defendants' failure to disclose, Plaintiffs suffered substantial harm, including but not limited to:

A.  Plaintiffs incurred significant financial losses due to Bulls' fraudulent leveraging of Plaintiffs' equitable title without providing the required $100,000 financial commitment.

B.  Plaintiffs faced delays and additional costs to uncover Bulls' defaults and expose the broader earnest money scheme to defraud, which could have been avoided with timely and complete disclosure by Defendants who had a fiduciary duty to Plaintiffs to disclose these material facts.

C.  Defendants' concealment prevented Plaintiffs from protecting their legal interests, such as timely canceling the agreement or pursuing proper remedies, such as enforcing the earnest money and well-contingency defaults or seeking damages.

D.  Plaintiffs endured emotional distress resulting from Defendants' deliberate concealment of Bulls' lack of financial commitment and the subsequent adverse impact on Plaintiffs' property rights.

1717.   Plaintiffs damages include significant financial losses, legal fees, and discovery costs incurred in their long-term efforts to clear title to Plaintiffs' property.  These damages arose directly from Anywhere RE's, Anywhere Integrated's, Coldwell's, Maurer's Grieger's, Byrd's and I. Byrd's, failure to disclose the Bulls' earnest money and well-contingency defaults coupled with their extended participation in, and concealment of, the fraudulent earnest money scheme.

1718.   Furthermore, Anywhere RE and Anywhere Integrated, as the parent companies overseeing Coldwell's operations, failed to disclose the earnest money scheme premised upon the contractual earnest money and well contingency defaults.  Anywhere RE and Anywhere



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

Integrated condoned the behavior by concealing the ongoing fraud of its subsidiaries. Anywhere RE and Anywhere Integrated failed to take corrective action to prevent or mitigate the fraud, including disclosing the fraud to Plaintiffs, despite their authority and responsibility to supervise Coldwell, and Coldwell's agents, to ensure compliance with the law and their fiduciary obligations. Their inaction allowed the fraudulent scheme to continue unabated, directly contributing to the harm Plaintiffs suffered and continue to suffer. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1719.   **Punitive Damages:** Plaintiffs seek punitive damages for Defendants' willful and malicious conduct pursuant to Minn. Stat. § 549.20. Defendants' deliberate failure to disclose critical facts regarding Bulls' contractual defaults was essential to enabling the prolonged fraudulent equitable conversion of Plaintiffs' property. The fraudulent scheme relied on concealing Bulls' defaults and misrepresenting compliance with the purchase agreement, allowing Bulls to unlawfully profit.

1720.   Defendants' actions demonstrated a willful disregard for Plaintiffs' rights, exemplified by their ongoing and active concealment of Bulls' well-contingency breach to sustain the fraudulent scheme for over two years, continuing to date. Coldwell, Grieger, Byrd, and I. Byrd, along with their parent companies, prioritized their self-interest over their fiduciary duties to Plaintiffs.

1721.   Punitive damages are necessary to punish Defendants' egregious misconduct and deter similar behavior in the future, safeguarding the integrity of fiduciary relationships and property rights.

1722.   Bulls' defaults and misrepresenting compliance with the purchase agreement for which Bulls have unlawfully profited.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## COUNT 45

*Breach of Fiduciary Duty: Failure to Supervise and Correct Subsidiary Misconduct*

**Anywhere RE** (1), **Anywhere Integrated** (2)

1723.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1724.  **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, subd. 3, real estate brokers and salespersons owe their clients duties of loyalty, disclosure, confidentiality, obedience, accounting, and reasonable care.

1725.  Defendants Anywhere RE and Anywhere Integrated, as parent companies of Coldwell Banker Realty and Burnet Title, actively supervised and oversaw Coldwell's and Burnet Title's operations, including its compliance with fiduciary obligations in the real estate transaction at issue. Through their operational control and management of Coldwell, Anywhere RE and Anywhere Integrated assumed fiduciary responsibilities to Plaintiffs, including duties of disclosure, loyalty, and accounting.

1726.  **Breach of Duties of Loyalty, Disclosure and Accounting**: Anywhere RE and Anywhere Integrated breached their fiduciary duties to Plaintiffs by failing to supervise and correct Coldwell's, and its agents', misconduct, despite having actual or constructive knowledge of ongoing fiduciary breaches and fraudulent activity in the transaction. Specifically, Anywhere RE and Anywhere Integrated:

    A.  *Failed to Disclose Bulls' Earnest Money Default:* Despite knowledge that Bulls had not remitted Bulls' $100,000 earnest money deposit to Coldwell required under the authentic Park Place purchase agreement, Anywhere RE and Anywhere Integrated



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

368

remained silent, actively concealing this material fact from Plaintiffs. Anywhere RE and Anywhere Integrated, like Coldwell, perpetuated the fraudulent scheme, disclosing false documents to Plaintiffs purporting that Bull's earnest money was deposited on May 16, 2022 even though Anywhere RE and Anywhere Integrated knew that no $100,000 deposit had been made by Bulls to Coldwell.

B. *Failed to Address Subsidiary Misconduct:* Anywhere RE and Anywhere Integrated had actual knowledge of Coldwell's systemic mishandling of earnest money transactions due to agents' routine practice of holding deals for their own convenience. Anywhere RE and Anywhere Integrated failed to intervene or take any corrective action against Coldwell, Maurer, Rehman, Grieger, Byrd, I. Byrd, or Burnet Title, to curb these practices constituting a flagrant violation of their fiduciary duties. Moreover, Anywhere RE and Anywhere Integrated failed to address and disclose Coldwell's fraudulent acceptance of falsified TrustFunds payment notifications for Park Place, relying on Anywhere RE's counsel to continue to conceal the fraudulent scheme and Coldwell's role in it, all with the hope of avoiding detection and accountablity.

C. *Perpetuated Fraudulent Ghost Agreement*: Defendants knowing allowed, and likely instructed, Coldwell and Matthew Sloneker to misrepresent the Ghost Agreement as the valid and enforceable version of the formerly canceled authentic Park Place purchase agreement. Anywhere RE and Anywhere Integrated condoned the e-filing of the fraudulent Ghost Agreement as a means to deliver $100,000 of parent-company funds into Hennepin County Court escrow and to avoid Coldwell's corporate



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

369

deposition to conceal that Coldwell did not retain, or continue to retain Bulls' $100,000 earnest money since May 9, 2022.

D. *Participated in Concealing Fraudulent Title Conversion:* Anywhere RE and Anywhere Integrated, through their oversight of Coldwell, facilitated the concealment of Bulls' fraudulent equitable conversion of Plaintiffs' property. Defendants enabled Coldwell and its agents to continue to misrepresent compliance with contractual obligations, purposefully obstructing Plaintiffs' efforts to enforce their rights and clear title to their Property.

E. *Misrepresented the Status of Earnest Money:* As highlighted by Sloneker's unannounced courtroom statements, Anywhere RE and/or Anywhere Integrated claimed to be holding the $100,000 earnest money, creating the false appearance that the funds existed and were properly handled and retained by Coldwell. Defendants failed to explain when, how, or why the parent company(ies) came into possession of the earnest money to conceal that the parent companies simply remitted their own funds to conceal the fraudulent earnest money scheme of which they all partook.

F. *Failure to Disclose:* In the state court action, Anywhere RE and Anywhere Integrated assumed the responsibility of responding to Plaintiffs' subpoena duces tecum on behalf of Coldwell and Burnet Title. To conceal the origin of Grieger's and Byrd's emails and texts, Anywhere RE and/or Anywhere Integrated intermingled Grieger's and Byrd's email and text communications so that it was not entirely possible to determine the origin of Coldwell's 1700 page production. Anywhere RE and Anywhere Integrated combined their productions to further conceal the lack of receipt of any authentic TrustFunds email notifications from TrustFunds to Grieger, Byrd, or



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

I. Byrd related to MLS #6160342. Moreover, Anywhere RE withheld over 600 documents until September 14, 2024, in a deliberate effort to continue concealing Coldwell's failure to upload the authentic Park Place deal, as well as Grieger's and Byrd's fraudulent actions involving TrustFunds and their intentional misconduct, which they carried out with malicious intent and apparent satisfaction.

1727. **Causation and Damages:** As a direct and proximate result of Anywhere RE's and Anywhere Integrated's breaches of their fiduciary duties, Plaintiffs suffered substantial harm, including but not limited to:

A. Plaintiffs incurred significant financial losses due to Bulls' fraudulent leveraging of Plaintiffs' equitable title without providing the required $100,000 financial commitment.

B. Plaintiffs faced delays and additional costs to uncover Bulls' defaults and expose the broader earnest money scheme to defraud, which could have been avoided with timely and complete disclosure by Defendants who had a fiduciary duty to Plaintiffs to disclose these material facts.

C. Defendants' concealment prevented Plaintiffs from protecting their legal interests, such as timely canceling the agreement or pursuing proper remedies, such as enforcing the earnest money and well-contingency defaults or seeking damages.

D. Plaintiffs endured emotional distress resulting from Defendants' deliberate concealment of Bulls' lack of financial commitment and the subsequent adverse impact on Plaintiffs' property rights. Financial losses resulting from the fraudulent equitable conversion of Plaintiffs' property.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

371

1728.   Plaintiffs damages include significant financial losses, legal fees, and discovery costs incurred to uncover and rectify the fraudulent scheme.  These damages were directly caused by Anywhere RE's and Anywhere Integrated's failure to act in Plaintiffs' best interests and supervise Coldwell's compliance with its fiduciary obligations. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1729.   **Punitive Damages:** Plaintiffs seek punitive damages for Defendants' willful and malicious conduct pursuant to Minn. Stat. § 549.20. Defendants demonstrated a deliberate disregard for Plaintiffs' rights by actively participating in the concealment of a fraudulent scheme and prioritizing their self-interests over their fiduciary obligations. Their actions were not only intentional to conceal Coldwell's long-term earnest money fraud, but also designed to perpetuate harm to Plaintiffs for Defendants' unlawful gain, constituting clear and convincing evidence of conduct warranting punitive damages.

1730.   Punitive damages are necessary to punish Defendants for their egregious misconduct, uphold the principles of justice, and deter similar actions in the future.

## COUNT 46

*Breach of Fiduciary Duty: Failure to Act Honestly*

**Joel Burger (23)**

1731.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1732.   **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, subd. 3, real estate brokers and salespersons owe their clients


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

duties of loyalty, disclosure, confidentiality, obedience, accounting, reasonable care, and honesty in all transactions. These duties encompass an obligation to act truthfully and transparently in all representations made during a transaction.

1733. **Breach of Duty to Act Honestly**: Defendant Joel Burger breached his fiduciary duty of honesty to Plaintiffs by engaging in deceptive practices and knowingly making false representations to Plaintiffs during the course of the real estate transaction. Specific breaches include, but are not limited to:

A. *Fabricating TrustFunds Notifications:* Burger created and sent falsified TrustFunds email payment notifications to Grieger and/or Byrd and/or Coldwell to create the false appearance that Bulls had remitted the $100,000 earnest money deposit on May 9, 2022. Burger knew these notifications were fraudulent and intended to deceive Plaintiffs, Plaintiffs counsel, and other parties involved in the transaction.

B. *Misrepresenting Earnest Money Compliance:* Burger knowingly misrepresented that Bulls had complied with the earnest money deposit requirements under the purchase agreement, despite knowing that no such deposit had been made.

C. *Perpetuating the Ghost Agreement:* By misrepresenting Bulls' compliance with contractual obligations, Burger contributed to the continued existence of the Ghost Agreement enabling Bulls to fraudulently leverage equitable title to Plaintiffs' property with no money down.

D. *Concealing Bulls' Default*: Burger failed to advise Bulls to sign Plaintiffs cancellation even after Bulls failed to perform the well test or waive the well-contingency test, in writing, and signed by Bulls before May 16, 2022. Despite knowing Bulls' defaults, including the failure to remit the $100,000 earnest money, Burger dishonestly



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

373

concealed these facts, perpetuating the false appearance that the agreement was in full force and effect. Burger continued to materially misrepresent that Burger initiated the TrustFunds transaction and Bulls remitted the $100,000 earnest money to Coldwell, even when Burger and Bulls had orchestrated the earnest money scheme to defraud by circumventing the TrustFunds payment system.

E. *Participating in the Scheme to Defraud:* Burger's actions were part of a broader fraudulent scheme designed to obscure Bulls' defaults, deceive Plaintiffs, and manipulate the transaction, and the fraudulently obtained equitable title, to Defendants' advantage at Plaintiffs' expense.

1734.   **Causation and Damages:** As a direct and proximate result of Burger's breach of fiduciary duty of honesty, Plaintiffs suffered substantial harm, including but not limited to:

A. Plaintiffs incurred significant financial losses resulting from the fraudulent equitable conversion of Plaintiffs' property.

B. Plaintiffs were forced to bear extensive outside legal expenses and discovery costs to uncover the fraudulent earnest money scheme and discover Burger's forgeries and material misrepresentations.

C. Plaintiffs endured emotional distress during and after a critical life event caused by Burger's deceptive practices, which undermined Plaintiffs' property rights and financial security.

D. Burger's misconduct caused prolonged delays in clearing title to Plaintiffs' property, compounding Plaintiffs' financial and emotional harm.

1735.   Plaintiffs' damages include substantial financial losses, legal fees, and discovery costs incurred in their long-term efforts to clear title to Plaintiffs' property and defend against



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

374

Bulls' sham lawsuit. These damages were directly caused by Burger's dishonesty and orchestration of the fraudulent earnest money scheme capitalizing on the vulnerabilities of TrustFunds merchant-based system and the complicity of its agents. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1736.   **Punitive Damages**: Plaintiffs seek punitive damages for Burger's willful and malicious conduct pursuant to Minn. Stat. § 549.20. Burger's deliberate disregard for Plaintiffs' rights—exemplified by his repeated forgeries to effectuate the Bull Enterprise and his continued concealment of the fraudulent earnest money scheme — constitutes clear and convincing evidence of conduct warranting punitive damages.

1737.   Punitive damages are necessary to punish Burger for his long-term and egregious dishonesty, deter similar misconduct in the future, and uphold the principles of justice in fiduciary relationships.

## COUNT 47

*Breach of Fiduciary Duty of Loyalty: Failure to Communicate*

### Mark Grieger (23)

1738.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1739.   **Fiduciary Relationship**: Under Minnesota law, fiduciary duties arise in the context of agency relationships, including those between real estate brokers and their clients. Pursuant to Minn. Stat. § 82.67, subd. 3, real estate brokers and salespersons owe their clients duties of loyalty, disclosure, confidentiality, obedience, accounting, reasonable care, and honesty in all transactions.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1740.   These fiduciary duties include an obligation to act in the best interest of the client and to keep the client informed of all material facts and options that could affect their interests. This obligation is particularly critical in real estate transactions where decisions have significant financial and legal consequences.

1741.   **Breach of Duty to Act in Plaintiffs Best Interest**: Defendant Grieger breached his duty of loyalty to Plaintiffs by failing to communicate with Plaintiffs promptly and thoroughly regarding critical aspects of their transaction, especially when material facts or viable alternatives could significantly impact their decision making.

    A.  *Failure to Timely Communicate:* On May 14, 2022 Grieger failed to fulfill his duty of loyalty through timely communication.  Plaintiffs had proposed alternatives to signing a cancellation of the purchase agreement, including moving the closing date up or renting back the property from the buyer, as a means of preserving the deal and ensuring financial security. Despite receiving Plaintiffs' communication outlining these options, Grieger, acting in his own self-interest, failed to respond to Plaintiffs that morning or provide the necessary guidance and advice for Plaintiffs to make a well-reasoned decision in accord with their contractual options.

    B.  *Purposeful Withholding of Material Information*: Grieger also failed to communicate critical information, including that Defendants had not made the $100,000 earnest money deposit to Coldwell and were unable or unwilling to meet the well-contingency deadline. Grieger's failure to communicate regarding the Bulls' planned well-contingency default, forced Plaintiffs to make a decision



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

376

without full knowledge of the facts, resulting in Plaintiffs prematurely signing the cancellation.

C. *Failure to Communicate Status of the Transaction*: Grieger ignored Plaintiffs until the afternoon of May 14, 2022, after Plaintiffs had already signed the cancellation in the absence of any response from Grieger.  Even then Grieger failed to disclose that Bulls had no money down and no intention of closing the transaction.

D. *Materially Misled Plaintiffs*: Instead, Grieger affirmatively and materially misrepresented that Coldwell was still awaiting the settlement of Bulls' TrustFunds earnest money deposit. Grieger materially misrepresented that TrustFunds settlement takes 5-7 business days. At the time, Grieger was well-aware that Grieger and Byrd were holding the deal to prevent earnest money deposit so that no earnest money could possibly settle at Coldwell on May 14, 2022 or thereafter while the deal was withheld.

E. *Failure to Act in Plaintiffs' Best Interest*: Even after May 14, 2022 when Bulls failed and refused to sign Plaintiffs' cancellation, Grieger failed to communicate with Plaintiffs upon Bulls' planned contingency default on May 16, 2022. Grieger, who refused to agree to terminate the exclusive right to sell listing agreement upon Plaintiffs request on May 14, 2022, remained obligated as Plaintiffs' fiduciary to act in Plaintiffs best interest. Grieger knew that Bulls' defaulted on the well-contingency as of May 16, 2022 when they failed to waive the contingency in writing signed by Buyers before the contingency deadline. Yet, after refusing listing termination, Grieger failed and refused to communicate the buyers' purposeful failure to waive the contingency in writing. Grieger, kept this



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

377

crucial fact to himself, to conceal the buyer's default and Plaintiffs' legally operative cancellation. Grieger acted with intention and malice stating to Maurer, "I could tell her that [about the cancellation], but, I'm not going to."

F. *Failure to Communicate Status of the Transaction*: After March 16, 2022, Grieger still failed and refused to communicate with Plaintiffs regarding the failure of Grieger, Byrd, and Coldwell to retain and continue to retain Bulls' earnest money even during his 2024 deposition. Grieger knew that the purchase agreement was effectively canceled by Plaintiffs even though it was tendered early. As such, Grieger did not upload the deal because it was canceled by Plaintiffs. But, to conceal the earnest money scheme to defraud as well as Grieger and Byrd's participation in it, Grieger continued to act as though the deal was valid and enforceable in an effort to secure his commission and later, to conceal his breach of fiduciary duties and his fraudulent conduct.

1742. **Causation and Damages:** As a direct and proximate result of Grieger's breach of fiduciary duty of loyalty, Plaintiffs suffered substantial harm, including but not limited to:

A. Plaintiffs incurred significant financial losses resulting from the long-term fraudulent equitable conversion of Plaintiffs' property.

B. Plaintiffs were forced to bear extensive outside legal expenses and discovery costs to uncover the fraudulent earnest money scheme and the well-contingency default.

C. Plaintiffs endured emotional distress during and after a critical life event caused by Grieger's self-interested practices, which undermined Plaintiffs' property rights and financial security.


COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

D. By failing to timely respond, communicate, or disclose critical information, Grieger deprived Plaintiffs of the opportunity to pursue viable alternatives and protect their financial and contractual interests.

1743.    Plaintiffs' damages include substantial financial losses, legal fees, and discovery costs incurred in their long-term efforts to clear title to Plaintiffs' property and defend against Bulls' sham lawsuit. These damages were directly caused by Grieger's early disloyalty and breach of his fiduciary duties as well as participation in Burger's fraudulent earnest money scheme. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1744.    **Punitive Damages**: Plaintiffs seek punitive damages for Grieger's willful and malicious conduct pursuant to Minn. Stat. § 549.20. Grieger's deliberate disregard for Plaintiffs' rights—exemplified by his failure to communicate critical information, prioritize Plaintiffs' interests, and disclose material facts about Bulls' defaults—constitutes clear and convincing evidence of conduct warranting punitive damages.

1745.    Punitive damages are necessary to punish Grieger for his long-term and egregious breaches of loyalty, deter similar misconduct in the future, and uphold the principles of justice and accountability in fiduciary relationships.

### COUNT 48

*Breach of Fiduciary Duties by Burnet Title and TitleNexus*

**Anywhere RE** (1), **Anywhere Integrated** (2), **Burnet Title** (4), **TitleNexus** (6)

1746.    **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1747.    **Fiduciary Relationship**: Under Minnesota common law, and principles of agency, fiduciary duties arise when a party assumes a position of trust in managing funds or



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

critical aspects of a transaction. In *Dahl v. Charles Schwab & Co., Inc.*, 545 N.W.2d 918 (Minn. 1996), the court acknowledged that escrow agents owe fiduciary duties to their principals. By extension, title companies, acting as escrow agents or with escrow agent responsibilities, owe fiduciary duties to the parties in a transaction.

1748.   Burnet Title, as Coldwell's affiliated title company, assumed Coldwell's fiduciary responsibilities and acted under Coldwell's direction. TitleNexus, as the buyer's title company, similarly assumed fiduciary responsibilities to the parties involved in the transaction.

1749.   **Fiduciary Duty Owed:** Burnet Title, as well as its parent companies Anywhere RE and Anywhere Integrated who are liable pursuant to the principles of respondeat superior and vicarious liability, as well as TitleNexus, owed fiduciary duties to the parties to the transaction.

A. **Burnet Title** (4), as Coldwell's affiliated title company for the seller Plaintiffs, Burnet Title owed fiduciary duties to Plaintiffs, including:

   I. Acting with honesty and loyalty to Plaintiffs' interests;

   II. Safeguarding Plaintiffs' financial and contractual interests during the transaction;

   III. Disclosing material facts affecting the transaction, including the status of the earnest money deposit;

   IV. Obtaining Buyer's signed cancellation upon receiving verbal confirmation from Coldwell, and/or Grieger and/or TitleNexus that Buyers had signed.

B. **TitleNexus** (6), owed fiduciary duties to all parties in the transaction, including:

   I. Acting honestly and impartially.

   II. Avoid material misrepresentation of the transaction's status.

   III. Refrain from creating false or misleading records.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

IV.    Disclose known issues affecting the earnest money deposit or the validity of
the agreement.

1750.    **Breach of Fiduciary Duties as to Burnet Title**

A.    *Failure to Obtain Seller's Cancellation:* Burnet Title failed to obtain Plaintiffs' signed
cancellation of the purchase agreement, even after being advised by Plaintiffs that
Plaintiffs signed a cancellation and were awaiting a counter-signature. Burnet Title
purposefully obstructed Plaintiffs' ability to clear title.

B.    *Failure to Obtain Buyer's Cancellation:* Burnet Title failed to secure Bulls' signed
cancellation of the purchase agreement, despite verbal confirmation from Coldwell,
Grieger, or TitleNexus that the signed document existed.

C.    *Failure to Disclose Defendants' Cancellation:* Burnet Title failed to disclose that
Bulls signed a cancellation or claimed to have done so, and instead closed their file,
noting only "Buyer/Lender Cancel." This information was withheld from Plaintiffs
and their counsel by Burnet Title.

D.    *Failure to Disclose Earnest Money Noncompliance:* Burnet Title failed to inform
Plaintiffs that Bulls had not remitted the $100,000 earnest money deposit, despite
being responsible for accounting for the funds.

E.    *Failure to Disclose:* Burnet Title failed to advise Plaintiffs that Bulls had not remitted
the $100,000 earnest money deposit to Coldwell via TrustFunds, despite Burnet's
designated role to account for the earnest money on behalf of Plaintiff sellers in the
lead up to closing.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

381

F. *Material Misrepresentation:* Burnet Title falsely represented in April 2023 that the earnest money had been deposited and was held in Coldwell's trust account, knowing or recklessly disregarding the falsity of this claim.

G. *Concealment of Key Facts:* Burnet Title concealed (1) the absence of earnest money and its implications for the transaction's validity, and (2) Bulls' signed cancellation which was critical to resolving the transaction.

1751. **Breach of Fiduciary Duties as to TitleNexus:**

A. *Failed to act honestly:* TitleNexus facilitated a sham closing to create the appearance that Bulls performed, despite knowing that Bulls had failed to remit purchase funds and had not signed required buyer documents for TitleNexus to disburse funds to Plaintiffs.

B. *Created false title records:* TitleNexus fabricated false "evidence" of a deposit of purchase funds, including the earnest money, to TitleNexus on June 3, 2022.

C. *Provided false title records to Burger and Bulls:* TitleNexus knowingly provided false balance ledgers to Bulls and Burger to "set up the sellers" for litigation, despite knowing Bulls had not performed under the purchase agreement.

D. *Concealment of Key Facts:* TitleNexus concealed and continued to conceal, (1) the absence of Bulls' earnest money deposit to Coldwell pursuant to the purchase agreement, (2) the broader fraudulent scheme, including the ongoing misrepresentations in the state court case, and Bulls subsequent failure to remit earnest money pursuant to the Crosby Cove purchase agreement, (3) failed to disclose Bulls' open Park Place purchase agreement liability to unrepresented sellers and represented sellers in subsequent transactions with Bulls.



1752.   **Causation and Damages:** As a direct and proximate result of Anywhere RE, Anywhere Integrated, Burnet Title and TitleNexus' breach of fiduciary duty of honesty, loyalty, disclosure and impartiality, Plaintiffs suffered substantial harm, including but not limited to:

A.  Financial losses resulting from the fraudulent equitable conversion of Plaintiffs' property.

B.  Legal expenses and discovery costs incurred to uncover the fraudulent earnest money scheme.

C.  Emotional distress caused by Defendants' deceptive practices and their impact on Plaintiffs' property rights.

D.  Prolonged delays in clearing title to Plaintiffs' property, compounding Plaintiffs' financial and emotional harm.

E.  Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

1753.   **Punitive Damages**: Plaintiffs seek punitive damages pursuant to Minn. Stat. § 549.20 for Defendant title companies' deliberate and malicious conduct, including fabricating evidence and concealing material facts for over two years. This conduct constitutes clear and convincing evidence of a willful disregard for Plaintiffs' rights and warrants punitive damages to punish Defendants and deter similar misconduct.

## COUNT 49

*Negligence*

**All Named Defendants** (1-34), except NorthstarMLS (33)

1754.  **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1755.  **Duty of Care:** Defendants owed Plaintiffs a duty to act lawfully, honestly, and in compliance with professional, fiduciary, and/or contractual obligations of good faith and fair dealing. This included a duty to refrain from engaging in fraudulent, deceptive, or otherwise unlawful conduct in connection with the transaction involving Plaintiffs' property.

1756.  **Breach of Duty:** Defendants breached their duty to act lawfully, honestly, and in compliance with professional, fiduciary, and/or contractual obligations of good faith and fair dealing by engaging in fraud, forgery, fraudulent misrepresentations, concealment of material facts, and negligently failing to disclose critical information about the transaction. The predicate acts of fraud as listed in Chapter 5 are incorporated herein by reference.

1757.  **Causation:** As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered substantial harm in the form of financial losses from delays, legal fees, and unresolved disputes, damage to the marketability and value of the property, emotional distress and reputational harm caused by Defendants' actions and exploitation of the fraudulent equitable conversion of Plaintiffs title.

1758.  **Damages:** Plaintiffs' damages include significant financial losses, legal fees, and discovery costs incurred in their continued efforts to clear title to Plaintiffs' property. These damages were directly caused by Defendants' failure to act lawfully, honestly, and in compliance



with professional, fiduciary, and/or contractual obligations of good faith and fair dealing.

Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

## COUNT 50

*Negligence*

**NorthstarMLS** (33)

1759.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.

1760.   **Duty of Care:** Under Minnesota law, entities providing services to the public owe a duty to exercise reasonable care in the selection, implementation, and oversight of systems and programs that directly affect consumers. This includes ensuring that integrated third-party services meet industry standards and do not impose undue harm or limitations on users. *Schmanski v. Church of St. Casimir*, 243 Minn. 289, 67 N.W.2d 644 (1954).

1761.   As the Multiple Listing Service central to real estate transactions across the midwest, NorthstarMLS assumed a gatekeeper role, inserting itself into the earnest money transaction process through its integration of TrustFunds escrow service across every property listing on the NorthstarMLS.

1762.   By permitting TrustFunds, the only escrow delivery service integrated on NorthstarMLS, to replace brokers' responsibilities to collect and retain earnest money, NorthstarMLS undertook a duty of reasonable care to Plaintiffs to ensure the security, reliability, and legal validity of TrustFunds in the context of transacting earnest money for real property.

1763.   NorthstarMLS owed Plaintiffs a duty of care to:



A. Exercise reasonable care in vetting and overseeing third-party services integrated into NorthstarMLS;

B. Ensure that services like TrustFunds, operating on an online merchant-based program, meet professional and industry standards in compliance with the demands of the law and contractual agreements;

C. Safeguarding Plaintiffs' interests by preventing the misuse of TrustFunds and MLS platform for fraudulent or deceptive practices;

D. Avoid creating monopolistic or anti-competitive conditions that would unduly burden consumers or limit their choices in critical escrow and payment services;

E. Monitor and evaluate the reliability and security of programs integrated into its platform; and

F. Monitor and evaluate the level of customer service and/or lack thereof to ascertain whether TrustFunds provides reliable reporting to consumers about the status of deposits made on their property.

1764. **Breach of Duty:** NorthstarMLS breached its duty of care by:

A. Failing to properly vet TrustFunds escrow delivery service before endorsing its exclusive use across all property listings on NorthstarMLS' platform;

B. Failing to assess the legal implications of TrustFunds' standard system operation, which requires equitable conversion of sellers' title to occur before the buyer has remitted any earnest money, thereby exposing sellers to undue legal and financial risks;

C. Failing to assess the inevitable consequence of TrustFunds' operational structure, wherein a buyer can fail to remit a payment through TrustFunds while the seller,



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

having fully executed a purchase agreement, is left without recourse and entirely at the mercy of the buyer, exposing sellers to undisclosed and significant legal and financial vulnerability;

D.  Failing to require that TrustFunds directly notify seller-beneficiaries of the status of the earnest money deposit for their property listing on MLS;

E.  Failing to require that Sellers make a knowing, and intelligent decision to accept or reject the use of TrustFunds for the delivery of earnest money on their Property before MLS automatically offers it as an escrow delivery option on the listing;

F.  Failing to require TrustFunds "help desk" to confirm and provide critical transaction data to the seller-beneficiaries of the earnest money transaction;

G.  Failing to require TrustFunds to enable security features on TrustFunds email notifications to allow agents and sellers to determine the authenticity of the easy-to-replicate TrustFunds notifications;

H.  Failing to require TrustFunds to comport their earnest money delivery timeline with the standard residential real estate purchase agreement;

I.  Failing to require TrustFunds to deliver earnest money contemporaneous with a fully executed purchase agreement so that the buyer cannot convert equitable title to the Property unless an earnest money payment has been submitted;

J.  Failing to require TrustFunds to uniformly require that all TrustFunds paid members utilize the return / refund feature of TrustFunds so that brokerages cannot obscure the earnest money pathway from the seller-beneficiaries to the transaction; and

K.  Failing to require that TrustFunds provide an accounting to seller beneficiaries to the TrustFunds transaction without a subpoena or legal action.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1765.   **Causation:** As a direct and proximate result of NorthstarMLS' negligence, Plaintiffs suffered substantial harm, including:

A.  Financial losses stemming from the fraudulent scheme enabled by TrustFunds' integration on the MLS platform.

B.  Legal costs incurred to address misrepresentations and omissions perpetuated through the escrow system NorthstarMLS allowed.

C.  Harm to the marketability and value of Plaintiffs' property caused by the unresolved disputes  and opaque TrustFunds transaction process.

1766.   The harm suffered by Plaintiffs was a direct and foreseeable result of Defendant NorthstarMLS' failure to exercise reasonable care in the selection, integration, and oversight of TrustFunds as the sole online escrow delivery service integrated into the MLS platform and every MLS Listing on NorthstarMLS.

1767.   **Damages:** Plaintiffs' damages include significant financial losses, legal fees, and discovery costs incurred in their continued efforts to clear title to Plaintiffs' property. These damages were directly caused by NorthstarMLS' negligence in integrating TrustFunds into its platform. Plaintiffs incorporate by reference the damages detailed in Chapter 6 of this Complaint.

### COUNTS 51 - 55

*Negligent Retention*

**Anywhere RE** (1), **Anywhere Integrated** (2), **Coldwell Banker Realty** (3), **Burnet Title** (4), **TitleNexus** (6), **NorthstarMLS** (33)

1768.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding paragraphs of this complaint as though fully set forth herein.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1769.   **Duty of Care: Anywhere RE** and **Anywhere Integrated** owed Plaintiffs a duty of care, as the parent companies of Coldwell and Burnet Title, to exercise reasonable care in retaining agents, brokers, and affiliated entities in a manner that prevents foreseeable harm to others. Anywhere RE and Anywhere Integrated also had a duty to ensure that retained individuals and entities adhered to professional and legal standards, operated honestly, and safeguarded Plaintiffs' interests consistent with their roles as fiduciaries.

1770.   **Duty of Care: Coldwell Banker Realty** and **Burnet Title**, **TitleNexus**, and **NorthstarMLS** also owed Plaintiffs a duty of care to exercise reasonable care in retaining individuals or entities who do not pose a known, or reasonably discoverable, unfitness that poses a foreseeable risk of harm.

1771.   Breaches of Duty:

A.   **Count 51 - Anywhere RE** (1) and **Anywhere Integrated** (2)

  I.   **Knowledge of Unfitness:** Anywhere RE and Anywhere Integrated knew or should have known that Coldwell's and Burnet's leadership, including Maurer, Rehman, Baker, and Glieden, as well as Coldwell's agents Grieger and Byrd, were unfit for duty. Anywhere RE and Anywhere Integrated, advised of earnest money fraud and Coldwell's Park Place Ghost Agreement at least as early as February 2023, failed to take any action upon becoming aware of Coldwell, Burnet Title, Maurer, Rehman, Baker, Glieden, Grieger, and Byrd's participation in, and facilitation of, the earnest money scheme to defraud Plaintiffs.

  II.   **Failure to Act:** Anywhere RE and Anywhere Integrated failed to take appropriate action upon becoming aware of Coldwell and Burnet employees'



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

unfitness that posed a foreseeable risk of harm and indeed caused Plaintiffs

ongoing harm. Anywhere RE and Anywhere Integrated failed to discharge

Maurer, Rehman, Baker, Glieden, Grieger and Byrd, despite their on-going

fraud, to prevent harm to others.

III.     **Foreseeable:** Maurer, Rehman, and Baker's unfitness, in the form of their

unlawful fraud and wrongdoing, posed foreseeable harm to Plaintiffs. Maurer,

Rehman, Baker, and Glieden's unfitness was apparent and foreseeable to

Anywhere RE and Anywhere Integrated because Maurer, Rehman, Glieden,

and Baker's acts of concealing and participating in the earnest money fraud,

were continuous, related, and on-going for over two years. Despite the

companies being aware that Maurer, Rehman, and Baker's acts permitted

unlawful equitable conversion of Plaintiffs' property at Plaintiffs' expense and

that Plaintiffs were being exploited by Bulls and incurring significant legal

expenses, Anywhere RE and Anywhere Integrated still failed to act within

their duty or take action against the ongoing concerted corporate cover-up, in

order to conceal their own liabilities, as well as those of Coldwell and Burnet

Title. In so doing, Anywhere RE and Anywhere Integrated failed to act to end

the fraudulent scheme by discharging all the involved parties whose continued

silence damaged Plaintiffs. The harm caused by Grieger's and Byrd's routine

practice of holding deals, evidencing their unfitness for their jobs, posed a

foreseeable risk of harm. The resulting harm was the inability to retain buyer's

earnest money to protect the seller's equitable title, financial interest, and/or

enforce any contingency benefitting sellers. Moreover, Grieger admitted he

"didn't realize" the Bulls' had defaulted on the well-contingency and Grieger was "not capable of that [checking emails]" for TrustFunds' email notifications. The harm caused by Grieger's apparent unfitness and inabilities - falling well-below the standard of care for agents whose routine job responsibilities include enforcing standard purchase agreement contingencies and checking emails for earnest money payment notifications - posed a foreseeable risk of harm. The harm caused by Byrd's dishonesty and continued concealment of the lack of earnest money payment in her role of transaction coordinator, was also foreseeable.  Despite recognizing, at least as early as February, 2023 that Byrd participated in Burger and Bulls' TrustFunds fraud and materially misrepresented the status of the earnest money transaction to Plaintiffs. Anywhere RE and Anywhere Integrated failed to discharge Grieger and Byrd. To this day Grieger, Byrd, and I. Byrd are contracted with Coldwell to operate as fiduciaries, roles which they do not comprehend, and were unwilling and incapable of performing, in 2022. Grieger and Byrd's apparent unfitness for their jobs, or in the alternative, unfitness that should have been discovered through Anywhere's reasonable investigation, coupled with their unlawful and fraudulent conduct caused significant and ongoing foreseeable harm to Plaintiffs.

B.  **Count 52 - Coldwell Banker Realty** (3)

I.    For the same reasons as stated above, **Coldwell Banker Realty** knew or, through reasonable investigation, should have known that Maurer, Rehman, Baker, Byrd, and Grieger were unfit for duty and posed a foreseeable harm to



Plaintiffs and other consumers. Coldwell, at least as early as May 18, 2022, had actual knowledge that Grieger and Byrd failed to retain earnest money and that their routine practice of holding deals prevented earnest money deposit. Coldwell had actual knowledge that Grieger and Byrd failed to effectuate Plaintiffs cancellation pursuant to Bulls' contingency default. Coldwell failed to take appropriate action upon becoming aware of their employees' unfitness that created a foreseeable risk of harm to Plaintiffs. Maurer, Rehman, Baker, Byrd and Grieger's unfitness was evident in their ongoing concealment of Bulls' contingency default and earnest money default as well as Coldwell's creation of a false deal and the deposit of $100,000 for Jesse Bull that would inevitably lead to foreseeable and ongoing harm to Plaintiffs.

## C. **Count 53 - Burnet Title** (4)

I.  **Knowledge of Unfitness:** Burnet Title knew that Sandy Glieden was unfit for duty when she accepted a "verbal" cancellation over the phone in place of obtaining the signed cancellation of purchase agreement on behalf of Plaintiffs. Burnet Title knew, as of November 10, 2022, that Glieden was unable or unwilling to faithfully execute her role in the transaction, and instead concealed material information, including the status of the earnest money as well as the Defendants' signed cancellation, from Plaintiffs. Sandy Glieden knowingly and materially misrepresented that Bulls' earnest money was in "Coldwell's Trust" in April 2023.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

II.   **Failure to Act:** Despite having actual knowledge that Sandy Glieden materially misrepresented the earnest money status and failed to obtain Defendants' signed cancellation, Burnet Title failed to discharge Glieden.

III.  **Foreseeability:** Burnet Title knew or should have known that Glieden's willingness to perpetrate a fraudulent earnest money scheme indicated her unfitness for the job of title and escrow agent and posed a risk of continued harm to Plaintiffs and other consumers. Burnet Title retained Glieden despite Burnet Title's actual and constructive knowledge of the risk she posed to others.

D.  **Count 54 - TitleNexus** (6)

I.   **Knowledge of Unfitness:** TitleNexus knew or, through reasonable investigation, should have known that Deena Cole was unfit for duty. Cole, participating in numerous transactions involving Burger, Bull, and/or Bulls' UBS Financial clients, indicated a willingness to bend the rules for financial gain. Cole previously agreed to accept payments unrelated to the purchase or sale of real estate into TitleNexus' escrow accounts and then cut checks as directed by Burger, for a fee. The practice, which may or may not have had tax benefits, paved the way for Cole to comply with Burger and Bull's other demands.

II.  **Failure to Act:** TitleNexus, via its owner Hoelscher, was aware of Cole, Burger, and the Bulls' plan to stage a closing to "go after the sellers." Yet, Hoelscher took no action against Cole to intervene, or discharge Cole, even

COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

393

after Cole produced false and materially misleading title records to Burger and Bulls.

III.   **Foreseeability:** TitleNexus knew or should have known that Cole posed a risk of harm to others due to her inability to act with honesty and impartiality with respect to the transaction. TitleNexus was on notice of the sham closing coordinated by Cole and still failed to act. Afterwards, instead of discharging Cole, TitleNexus concealed Cole's knowing participation in the fraudulent earnest money scheme by alleging that Cole did not have possession of Bulls' loan application clearing showing no earnest money credit for Park Place. Cole's actions showed a propensity for harm.

E.   **Count 55 - NorthstarMLS** (33)

I.   **Knowledge of Unfitness:** NorthstarMLS either knew or, through reasonable investigation, should have known that TrustFunds' merchant-based system lacked adequate safeguards to ensure contemporaneous earnest money submissions, leaving sellers without financial protection that is fundamental to the purchase agreement. The system's design, which delays earnest money payment until after full execution of the purchase agreement, directly undermines the seller's leverage in the transaction and exposes sellers who list their properties on NorthstarMLS to undue financial risk resulting in the unlawful equitable conversion of the property to the buyer with no money down.

II.   NorthstarMLS knew or should have known that TrustFunds permits easy forgery and manipulation of email notifications, transactional records, and



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

payment confirmations, which undermines trust and increases vulnerability to fraud.

III.    NorthstarMLS knew or should have known TrustFunds fails to notify sellers directly about the status of earned money payments, forcing them to rely entirely on brokers or agents, who are financially incentivized to overlook a TrustFunds problem, and may be negligent or complicit in fraud.

IV.    NorthstarMLS knew or should have known that TrustFunds relies on third-party processors, delegating the key financial processing and notification tasks to third-party entities like ReliaFund and SendGrid, increasing the opacity and reducing accountability for failed or fraudulent transactions.

V.    **Failure to Act:** NorthstarMLS' retention of TrustFunds enabled and facilitated the fraudulent conduct of Defendants by creating the false appearance of legitimacy for TrustFunds' operations. The inadequacies in TrustFunds' system directly contributed to the Plaintiffs' harm, as the fraudulent transaction was executed under the guise of TrustFunds' integration with NorthstarMLS' platform. NorthstarMLS continues to endorse TrustFunds despite its failure to protect NorthstarMLS' sellers' contractual and financial interests in any respects.

1772.  **Causation:** The negligent retention of unfit individuals, entities, and systems by Anywhere RE, Anywhere Integrated, Coldwell Banker Realty, Burnet Title, TitleNexus, and NorthstarMLS directly caused Plaintiffs' harm. Defendants' collective failure to discharge or address the known or reasonably discoverable unfitness of their employees, agents, or service providers enabled the fraudulent scheme to flourish unchecked. Specifically:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

A. **Facilitation of Fraudulent Conduct:** Defendants' retention of unfit personnel, including Maurer, Rehman, Baker, Glieden, Grieger, Byrd, and Cole, as well as TrustFunds' flawed merchant-based system, facilitated the earnest money fraud scheme. These failures allowed fraudulent transactions to proceed under the guise of legitimacy and enabled Defendants Bull and Burger to unlawfully leverage equitable title to Plaintiffs' property without providing any financial consideration.

B. **Hindrance of Contractual Protections:** The actions and omissions of Defendants, including holding deals, misrepresenting the status of earnest money, and failing to enforce standard purchase agreement contingencies, deprived Plaintiffs of the financial protections inherent in their agreement. As a result, Plaintiffs were left vulnerable to the unlawful conversion of their property with no money down.

C. **Prolongation of Fraud and Harm:** Defendants' refusal to act on actual or constructive knowledge of unfitness prolonged Plaintiffs' exposure to fraudulent and deceitful practices that Defendants intentionally concealed from Plaintiffs. This resulted in significant legal expenses, emotional distress, and financial harm as Plaintiffs were forced to defend against sham litigation and endure protracted attempts to clear title to their property.

D. **Creation of a False Appearance of Legitimacy:** NorthstarMLS' retention of TrustFunds, despite its known deficiencies, created the false impression that TrustFunds' system was reliable and secure. This false appearance emboldened the fraudulent actors and obscured Plaintiffs' ability to identify and address the deficiencies in the earnest money process.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

E. **Failure to Act on Foreseeable Risks:** The unfitness of the individuals and systems retained by Defendants created foreseeable risks of harm to Plaintiffs. These risks were actualized through acts of concealment, material misrepresentation, and direct participation in the fraudulent scheme, all of which caused Plaintiffs to suffer financial losses, significant legal costs, and emotional distress.

F. **Unified Causal Chain:** Each Defendant's negligence in retaining unfit individuals and systems, whether through direct acts or omissions, contributed to the overarching harm Plaintiffs suffered. The interconnected failures across the Defendants ensured that the fraudulent scheme could operate seamlessly, compounding Plaintiffs' damages and prolonging their inability to protect their title.

1773. **Damages:** As a direct and proximate result of Defendants' collective failures to act with reasonable care in retaining unfit individuals, entities, and systems, Plaintiffs have suffered extensive and ongoing damages, including but not limited to:

A. **Financial Losses:**

   I. Plaintiffs incurred significant legal fees and costs exceeding $75,000 in their efforts to address and combat the fraudulent schemes enabled by Defendants' negligence.

   II. Plaintiffs were deprived of the financial security that should have been provided by a $100,000 earnest money deposit, leaving them unable to leverage the buyer's default and enforce key contractual protections.

B. **Harm to Property Interests:**

   I. Plaintiffs' property was subjected to the unlawful conversion of equitable title, depriving them of their rights and control over the property while



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

simultaneously enabling fraudulent actors to exploit their interests for financial gain.

    II.    Plaintiffs were forced to expend additional resources to defend against sham litigation intended to further Defendants' fraudulent scheme and cloud the title to their property.

**C.  Emotional Distress:**

    I.    Plaintiffs endured prolonged stress, anxiety, and emotional hardship as a result of Defendants' ongoing fraudulent conduct, failures to disclose critical information, and refusal to take corrective action.

    II.    The uncertainty surrounding their property rights and the extended litigation compounded Plaintiffs' emotional harm, exacerbated by the fact that these issues arose during a period of significant personal vulnerability.

**D.  Reputational Harm:**

    I.    The fraudulent and negligent conduct of Defendants has caused reputational harm to Plaintiffs, who have been falsely implicated in Defendants' sham litigation and schemes.

**E.  Loss of Time:**

    I.    Plaintiffs were forced to dedicate countless hours of their personal time to investigating, uncovering, and addressing the fraudulent scheme perpetuated by Defendants, detracting from their professional and personal lives.

1774.  **Punitive Damages:** Defendants' prolonged and egregious conduct, including their reckless disregard for Plaintiffs' rights and interests, warrants the imposition of exemplary and punitive damages. Defendants knew or should have known that their agents or employees



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

posed a risk of harm to Plaintiffs but deliberately disregarded this knowledge, allowing ongoing

harm. Plaintiffs seek an award of $75,000,000 or an amount otherwise determined by the jury to

punish Defendants for their misconduct and deter similar conduct in the future.

## COUNT 56

*Negligent Supervision*

**Coldwell Banker Realty** (3), **Matthew Baker** (16), **Anthony Maurer** (17), **Thomas Rehman** (18), **Mark Grieger** (19)

1775.   **Incorporation by Reference:** Plaintiffs incorporate by reference all preceding

paragraphs of this complaint as though fully set forth herein.

1776.   Under Minnesota law, negligent supervision arises when an entity or individual

responsible for overseeing others fails to take reasonable steps to prevent foreseeable harm

caused by their actions or omissions, as recognized in *M.L. v. Magnuson*, 531 N.W.2d 849

(Minn. Ct. App. 1995).

1777.   **Duty:** Defendants Coldwell, Maurer, Rehman, Baker, and Grieger, who held

supervisory responsibilities over the transaction, including collecting the earnest money and

making sure the well and radon contingencies were satisfied or waived, owed Plaintiffs a duty to

ensure that: (A) earnest money deposits were made and properly handled in compliance with the

purchase agreement and Minn. Stat. § 82.68; (B) all contingencies were fulfilled, or enforced,

according to the terms of the agreement; and (C) appropriate care and diligence were exercised

throughout the transaction process.

1778.   **Breach of Duty:** Defendants breached their supervisory duties by:

A.  Failing to oversee the timely deposit and proper handling of the earnest money.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

B.  Concealing Well-Contingency Default and inability of Coldwell to enforce the well-contingency default on behalf of sellers.

C.  Neglecting to ensure compliance with Minn. Stat. § 82.67, which requires reasonable care, disclosure, and diligence in real estate transactions.

1779.  **Causation:** As a direct and proximate result of Defendants' negligent supervision, Plaintiffs suffered harm, including but not limited to:

A.  Lost opportunities to sell the property to other qualified buyers.

B.  Financial losses associated with the failed sale, extended carrying costs, and legal expenses.

C.  Emotional distress and disruption caused by Defendants' failures to properly oversee the transaction.

1780.  **Damages:** Damages as asserted in Paragraph 1773 and 1774 above and incorporated herein by reference.

## <u>COUNT 57</u>

*Abuse of Process*

**Coldwell** (3), **Jesse Bull** (25), **Lee Bull** (26), **Ryan Trucke** (27)

1781.  Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

1782.  Under Minnesota law, the tort of abuse of process occurs when a party uses legal proceedings primarily to accomplish a purpose for which the process was not designed, as established in *Dunham v. Roer*, 708 N.W.2d 552, 571 (Minn. Ct. App. 2006).

1783.  Defendants Jesse Bull, Lee Bull, and their attorney, Trucke, leveraged the legal process for improper and unlawful purposes. Specifically, the Defendants misused the legal process:



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1784.  **To Conceal the Earnest Money Scheme to Defraud:** Defendants Jesse Bull, Lee Bull, and their attorney Trucke, commenced a sham lawsuit against Coldwell asserting therein falsely that Defendants Bull remitted an earnest money deposit to Coldwell. Coldwell provided a copy of Defendants Bulls' unfiled sham suit, naming Plaintiffs, to Plaintiffs' counsel to substantiate its legitimacy. Coldwell, in an effort to conceal the Bull Enterprise, its culpable actors, and the earnest money scheme, then utilized Bulls' unfiled sham suit against Coldwell as consideration in Coldwell's proposed "Stipulation" to allow Coldwell to remit $100,000 into Court escrow. Bulls sham suit and Coldwell's cryptic answer to it, created the false appearance that Bulls had remitted $100,000 to Coldwell and had a legitimate claim against Coldwell and Plaintiffs. But, Coldwell, Bulls and Trucke were only litigating to conceal the fraudulent earnest money scheme because Coldwell never received an earnest money payment from Bull and Coldwell remitted $100,000 to Bull in its undisclosed accord and satisfaction with Bull for Bull to sign a cancellation, which he did. Thus, Bulls went on to perpetuate an additional sham suit against Plaintiffs to conceal the scheme as well as their own failure to remit the earnest money in 2022.

1785.  **To Conceal the Lack of Earnest Money Payment:** To conceal the lack of Bulls' earnest money payment in Plaintiffs state court case, Defendants Bulls counter-claimed Plaintiffs for the "earnest money" and unspecified damages. Defendants conducted no timely discovery, attended no depositions except for their own, and engaged in no substantive prosecution of their claims, underscoring the frivolous and improper nature of their suit and their motivations. In the absence of actual discovery, Defendants Bull and Trucke, along with Burger, continued to fabricate their own evidence in the form of sham affidavits they submitted to the Court in their continued effort to use the judicial process to conceal their lack of earnest money deposit.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1786.   **To Delay and Obstruct:** The Defendants' sham action was intended to delay Plaintiffs' efforts to clear title and recover their property interests, forcing Plaintiffs to expend significant resources defending against baseless claims. Moreover, the delay served to hinder Plaintiffs' potential sale efforts since Defendants sought to perfect their damages claim at trial, impacting Plaintiffs' ability to sell the property during the pending action that Defendants delayed.

1787.   **To Cloud title:** Defendants utilized legal mechanisms to unlawfully cloud title to Plaintiffs' property, hindering Plaintiffs' ability to freely exercise ownership rights or sell the property, and coercing Plaintiffs into negotiations, even during depositional discovery.

1788.   **To Obtain Unjust Enrichment:** Defendants continued to participate in their state court sham suit in an effort to fraudulently obtain Coldwell's $100,000 currently in court escrow; additional illicit gains of Defendants' earnest money scheme. By failing to comply with Plaintiffs discovery, concealing Defendants' UMB -4774 bank records, and leveraging Coldwell's fraud, Defendants continue to litigate their sham case for profit while still wielding the equitable title to Plaintiffs' property and avoiding the inconvenience of discovery and its costs and fees.

1789.   **To Conceal the Earnest Money Failure** - For **Coldwell**, Sloneker's court appearance while lacking in standing was its first litigious step towards using the legal process to conceal Coldwell's earnest money fraud. Coldwell later abused judicial process by filing a Rule 67 motion in the state court action knowingly utilizing Rehman's false affidavit and the Ghost Deal, to create the appearance that Coldwell was a disinterested third-party in possession of Bulls' earnest money. To avoid judicial inquiry, Bulls did not appear at the hearing in which Coldwell argued to remit $100,000 earnest money Coldwell was endeavoring to pass off as Bulls' funds.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

1790.   **Causation:** Defendants' improper actions directly caused harm to Plaintiffs by forcing Plaintiffs to incur substantial legal fees and costs defending against frivolous claims - exclusive of Plaintiffs own attorney time on the matter - and in excess of $75,000. Defendants prevented Plaintiffs from exercising their rights to sell the property due to clouded title and the pending damages claim. Defendants intentionally inflicted distress on Plaintiffs through prolonged and unnecessary litigation, litigation whose result is immaterial to Defendants Bull who have been unjustly enriched by Coldwell's remission of $100,000 to Bulls, Coldwell's remission of $100,000 into Court escrow, and the value of wielding equitable title to Plaintiffs property for over two years.

1791.   **Damages:** As a result of Defendants' abuse of process, Plaintiffs suffered financial losses, reputational harm, emotional distress, delays in clearing title, and impediments to recovering their property interests. Plaintiffs reassert and incorporate the damages set forth in Chapter 6.

1792.   **Punitive Damages:** Plaintiffs seek punitive damages because Defendants' conduct was willful, malicious, and in deliberate disregard of Plaintiffs' rights. In 2022, Defendants devised an earnest money scheme intending to convert equitable title to Plaintiffs' property with no money down. Defendants acted fraudulently, knowing they lacked both the intention and financial capacity to remit $3,300,000 cash for the property. They purposefully defaulted on the well-contingency as a safeguard for their non-existent earnest money payment. Leveraging Coldwell's liabilities and Byrd's fraud, Bulls secured a favorable accord and satisfaction, producing $100,000 earnest money and a fabricated "Ghost Agreement" mimicking the canceled contract. Defendants' actions displayed actual malice, including a pattern of abusive

legal tactics over an extended period, marked by an utter lack of remorse, accountability, or efforts to mitigate harm to Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

### A. RICO Specific Relief

1793.   Entering a finding that all defendants, with the exception of NorthstarMLS, are jointly and severally liable for all damages caused to Plaintiffs pursuant to 18 U.S.C. § 1964(c);

1794.   Awarding Plaintiff monetary damages in an amount not less than $100,000, to be proven at trial consistent with Chapter 6 herein, and enhanced (treble damages) pursuant to 18 U.S.C. § 1964(c).

1795.   Awarding Plaintiffs their litigation expenses, including reasonable outside counsel attorneys' fees, costs, and disbursements pursuant to 18 U.S.C. § 1964(c);

1796.   Enjoin Defendants from further violations of RICO, including:

    A.   Ordering the dissolution or reorganization of entities found to have participated in the racketeering enterprise.

    B.   Requiring Defendants to divest themselves of any interest, direct or indirect, in enterprises involved in the racketeering activity, as authorized by 18 U.S.C. § 1964(a).

1797.   Issue a permanent injunction restraining Defendants from:

    A.   Asserting further fraudulent claims against Plaintiffs' property or clouding title to Plaintiffs' property;



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

B.  Filing any liens, claims, or encumbrances fraudulently asserted against

Plaintiffs' property.

1798.  Order Defendants to disgorge all ill-gotten profits obtained through their

violations of 18 U.S.C. § 1962(c) pursuant to 18 U.S.C. § 1964(a), including:

A.  Disgorgement of $100,000 in U.S. currency obtained by Defendants Bull

from Coldwell, and requiring Defendants Bull to remit $100,000 into

Hennepin County Court escrow in the declaratory action.

1799.  Enter judgment for Plaintiffs for all interest allowed by law; including pre- and

post-judgment interest.

## B.  General Relief

### I.  Compensatory Damages

1800.  Award Plaintiffs compensatory damages in an amount in excess of $75,000, to be

proven at trial, including:

A.  Financial losses caused by Defendants' fraudulent conduct, breaches of

fiduciary duties, negligence, and abuse of process;

B.  Loss of property rights and diminished property value resulting from

Defendants' wrongful acts;

C.  Legal fees and costs incurred to uncover the fraudulent scheme; and

D.  Emotional distress suffered due to Defendants' willful and malicious

conduct.

### II.  Exemplary and Punitive Damages

1801.  Award Plaintiffs punitive damages of $75,000,000, or an amount determined by a

jury sufficient to penalize and deter Defendant Anywhere RE, a $6.9 billion-dollar company, its



subsidiaries Anywhere Integrated and Coldwell, and its agents and brokers as well as other corporate and individual Defendants including Burger, Wexford Real Estate, and Jesse and Lee Bull for their intentional, egregious, and long-term fraud and other misconduct.

### III.    Declaratory Relief

1802.   Declare that Defendants' conduct was fraudulent, unlawful, and in violation of Plaintiffs' rights.

1803.   Declare that any equitable title asserted by Defendants Jesse Bull and Lee Bull was fraudulently obtained and is null and void.

### IV.    Disgorgement and Restitution

1804.   Order Defendants to disgorge all profits, funds, or benefits obtained through their fraudulent and unlawful conduct and award such funds to Plaintiffs as restitution.

### V.    Interest, Costs and Fees

1805.   Award Plaintiffs pre- and post- judgment interest on all monetary damages, as allowed by law.

1806.   Award Plaintiffs reasonable costs and fees, including attorneys' fees, incurred to bring the state court action and to bring this action, to the extent permitted by law.

### VI.    Injunctive Relief

1807.   Issue an injunction prohibiting Defendants and their agents from further fraudulent, unlawful, or deceptive conduct.

1808.   Grant such other and further relief as this Honorable Court deems just, equitable, and proper.



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

Respectfully submitted,

**The Law Office of Lauren Campoli, PLLC**

Dated: <u>December 13, 2024</u>    <u>*/s/ Lauren J. Campoli, Esq.*</u>

Lauren J. Campoli
MN# 392012
7300 France Ave, Suite 405
Edina, MN 55435
Telephone: (612) 810-0060
e-mail: Lauren@campolidefense.com

**ATTORNEY FOR PLAINTIFFS**



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS

407

## <u>CERTIFICATION</u>

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

**The Law Office of Lauren Campoli, PLLC**

Dated: <u>December 13, 2024</u>     */s/ Lauren J. Campoli, Esq.*
Lauren J. Campoli
MN# 392012
7300 France Ave, Suite 405
Edina, MN 55435
Telephone: (612) 810-0060
e-mail: Lauren@campolidefense.com

**ATTORNEY FOR PLAINTIFFS**



COMPLAINT FOR FRAUD & RACKETEERING
BREACH OF FIDUCIARY DUTIES
& RELATED CLAIMS